

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## COVINGTON

UNITED STATES OF AMERICA

v.  INDICTMENT NO. 2:21-CR-2-DLB-CJS

WILLIAM LAWRENCE SIEFERT, M.D.,
and TIMOTHY EHN, D.C.

\* \* \* \* \*

**THE GRAND JURY CHARGES:**

At all times material to this Indictment:

1. **WILLIAM LAWRENCE SIEFERT, M.D. ("SIEFERT")**, was a licensed physician practicing in or around Newport and Florence, Kentucky. He was licensed to practice medicine in Kentucky during all times relevant to this Indictment and was permitted by the United States Drug Enforcement Administration ("DEA") to write or prescribe controlled substances.

2. **TIMOTHY EHN, D.C. ("EHN")**, was a licensed chiropractor practicing in or around Newport and Florence, Kentucky.

3. Northern Kentucky Center for Pain Relief ("NKYCPR") was a Kentucky Limited Liability Company located in Florence, Kentucky. NKYCPR had been previously located in Newport, Kentucky.

4. **EHN** owned and operated NKYCPR.

5. **SIEFERT** was employed by NKYCPR and served as NKYCPR's medical director.

## BACKGROUND ON CONTROLLED SUBSTANCES

6. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States.

7. Under the CSA, the DEA regulated certain pharmaceutical drugs designated as "controlled substances" because of their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision. *See* 21 U.S.C. § 802(6).

8. The DEA issued registration numbers to qualifying practitioners, including physicians, which permitted them to dispense Schedule II, III, IV, and V controlled substances consistent with the terms of that registration. 21 U.S.C. § 822.

9. "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner. . . ." 21 C.F.R. § 1306.04(a).

## BACKGROUND ON MEDICAID

10. The Kentucky Medicaid Program ("Medicaid") was a "health care benefit program," as defined by 18 U.S.C. § 24(b), that provided benefits to Kentucky residents who met certain eligibility requirements, including income requirements. Medicaid was jointly funded by federal and state sources and administered by the Centers for Medicare & Medicaid Services ("CMS") and by the Kentucky Cabinet for Health and Family

Services, Department for Medicaid Services ("DMS"), located in Franklin County, Kentucky.

11. Individuals who qualified for Medicaid benefits were commonly referred to as "members," and as members, they were eligible to receive a variety of goods and services.

12. Among a variety of items and services, Medicaid provided coverage to members for outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, including urine drug testing ("UDT").

13. Medical service providers, including clinics and physicians ("service providers"), meeting certain criteria, could enroll in and obtain Medicaid provider numbers. Upon Medicaid enrollment, service providers were permitted to provide medical services and items to members, and subsequently submit claims, either electronically or in hardcopy, to Medicaid, through fiscal intermediaries, seeking reimbursement for the cost of services and items provided.

14. When seeking reimbursement from Medicaid, service providers certified that: (1) the contents of the claim forms were true, correct, and complete; (2) the claim forms were prepared in compliance with the laws and regulations governing Medicaid; and (3) the services purportedly provided, as set forth in the claim forms, were medically necessary.

15. Medicaid reimbursed claims submitted by service providers if the services and items provided were medically necessary for the diagnoses and treatment of members. Conversely, Medicaid did not cover and would not reimburse claims for services and items

that were not medically necessary.

16. Medicaid, through DMS, and through its fiscal intermediaries, ultimately reimbursed claims submitted by service providers, including NKYCPR for laboratory services and UDT, in Campbell and Boone Counties, in the Eastern District of Kentucky.

## RELEVANT UDT BILLING CODES

17. When seeking reimbursement from Medicaid, service providers submitted the cost of the service or item provided together with the appropriate "procedure code," as defined by the American Medical Association, and set forth and maintained in the Current Procedural Terminology ("CPT") Manual or by the Healthcare Common Procedure Coding System ("HCPCS"). Although service providers submitted the cost of the service provided, together with other information, Medicaid reimbursed providers designated amounts according to the CPT or HCPCS code utilized.

18. UDT was divided into two categories: presumptive (qualitative) testing and definitive (quantitative or confirmation) testing. Presumptive testing identified which substances, if any, were present in the provided specimen. Definitive testing identified how much of a particular substance was present in the provided specimen.

19. Presumptive testing was performed in a variety of ways, including utilizing devices that were capable of being read by direct optical observation, such as "cups" that reacted to the specimen and identified which drugs, if any, were present ("optical devices"), as well as by more complex testing performed by instrument chemistry analyzers.

20. Definitive testing was performed by higher complexity instrument chemistry analyzers.

21.     Medicaid considered presumptive testing to be medically necessary, and appropriately reimbursable, in the treatment of chronic pain patients, provided the presumptive testing was used in the diagnosis and treatment of members and the need for the testing was substantiated by documentation in the patient's medical record. Conversely, Medicaid specifically excluded from coverage, and did not consider medically necessary, "blanket orders" or routine presumptive testing of substances.

22.     Medicaid considered definitive testing to be medically necessary, and appropriately reimbursable, in the treatment of chronic pain patients in certain limited circumstances, including when members had a specific and documented need for definitive testing. Conversely, Medicaid specifically excluded from coverage, and did not consider medically necessary, "blanket orders" or routine definitive testing of substances.

23.     As of January 1, 2017, presumptive drug testing was with CPT codes 80305, 80306, and 80307. These codes differed based on the level of complexity of the testing methodology and were reimbursed at different rates. For instance, CPT code 80307 indicated that a higher complexity analyzer was used to perform the presumptive testing.

24.     As of January 1, 2016, definitive drug testing was reported with HCPCS codes G0480, G0481, G0482, and G0483. These codes differed based on the number of drug classes, including metabolites, tested, and were reimbursed at different rates—the more drugs tested, the greater the reimbursement.

# ILLEGAL CONTROLLED SUBSTANCE DISTRIBUTION AND FRAUDULENT UDT SCHEME

## Overview and Purpose of the Scheme

25. **SIEFERT** and **EHN** engaged in a scheme to prescribe opioids and other controlled substances to NKYCPR patients who should not have received such substances. **SIEFERT** and **EHN** agreed that **SIEFERT** would write such illegitimate prescriptions, in part, because each patient they kept at NKYCPR represented another opportunity to bill for medically unnecessary but lucratively reimbursed UDT. The more procedures **SIEFERT** and **EHN** were able to bill, the more money NKYCPR would receive in reimbursements from Medicaid and other health care benefit programs, and the more money **SIEFERT** and **EHN** would ultimately receive in compensation.

26. **SIEFERT** and **EHN** continued with this scheme even as other staff at NKYCPR warned them of how dangerous NKYCPR's prescribing had become and even as **SIEFERT** and **EHN** became aware that NKYCPR patients were overdosing on opioids and dying. In fact, **SIEFERT** and **EHN's** scheme became so dangerous and the prescribing so illegitimate that **SIEFERT's** prescribing was a contributing factor in the deaths of at least six former NKYCPR patients.

## Manner and Means

27. **EHN** and **SIEFERT**, through NKYCPR, provided physician services to members and other patients, including purported pain management services by, among other methods, prescribing controlled substances.

28. NKYCPR had purported policies regarding the prescribing of controlled

substances to members and patients who engaged in certain conduct, including not prescribing to members and patients who had UDT indicating: (1) the absence of a controlled substance previously prescribed, which is indicative of drug diversion, or (2) the presence of a controlled substance, such as cocaine, that was not previously prescribed (collectively "aberrant behavior").

29. Despite these purported policies, **SIEFERT**, with **EHN's** agreement and consent, prescribed controlled substances to NKYCPR members and patients who engaged in aberrant behavior. **SIEFERT**, again with **EHN's** agreement and consent, also prescribed controlled substances to patients who presented in other ways that would have alerted a medical professional that it was dangerous to prescribe the types, combinations, and dosages of controlled substances that the members and patients were prescribed at NKYCPR.

30. **SIEFERT** and **EHN** ignored and overruled NKYCPR staff who told them about members and patients engaged in aberrant behavior or who otherwise told them that NKYCPR patients should not have received the types, combinations, and dosages of controlled substances being prescribed at NKYCPR.

31. **EHN**, who was not a medical doctor, at least once overruled **SIEFERT's** decision not to prescribe controlled substances to a patient who had engaged in aberrant behavior. **EHN** further persuaded **SIEFERT** to prescribe controlled substances to this individual.

32. **SIEFERT** and **EHN** were also aware that members and patients of NKYCPR had overdosed and died shortly after receiving prescriptions from **SIEFERT**

because other NKYCPR staff told them about the overdose deaths and because **SIEFERT** and **EHN** talked about the deaths with NKYCPR staff.

33. In fact, at least six patients—including Patients JS, GB, MT, MC, TI, and BW—died of opioid overdoses shortly after receiving prescriptions written by **SIEFERT** under circumstances in which **SIEFERT's** prescribing contributed to the patients' overdose deaths and in some cases after the patients had engaged in aberrant behavior.

34. Despite their awareness of NKYCPR patient overdose deaths, **SIEFERT** and **EHN** did not change NKYCPR's prescribing practices or how they addressed either the aberrant behavior presented by members and patients or the concerns raised by others about NKYCPR's prescribing.

35. Instead, **SIEFERT** and **EHN** continued with their agreement of having **SIEFERT** prescribe controlled substances to patients who should not have received such prescriptions and of ignoring recommendations from other NKYCPR staff about the problems with NKYCPR's prescribing practices.

36. The dangerous prescribing of controlled substances, including opioids, was in part driven by **EHN** and **SIEFERT's** desire and intent to perform and bill for UDT on members and patients, the tests for which were lucratively reimbursed by Medicaid and other health care benefit programs.

37. To that end, **EHN** and **SIEFERT** directed NKYCPR employees to obtain urine specimens from members and patients ("provided specimens") during office visits;

38. **EHN** and **SIEFERT** directed employees of NKYCPR to perform both presumptive and definitive testing on the provided specimens, irrespective of any identified

individualized need, and concealed the existence of this blanket order from Medicaid.

39. At **EHN** and **SIEFERT**'s order and direction, NKYCPR employees submitted false and fraudulent claims to Medicaid for presumptive and definitive testing, representing that these tests were medically necessary for the diagnosis and treatment of members and patients, when, in reality, there was no medical necessity for these tests and these tests were performed for the purpose of maximizing subsequent reimbursements from Medicaid and other health care benefit programs.

## COUNT 1
### Conspiracy to Distribute a Controlled Substance
### (21 U.S.C. § 846)

40. Paragraphs 1 through 39 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

41. From in or around August 2014, and continuing through in or around February 2019, in Boone and Campbell Counties, in the Eastern District of Kentucky, and elsewhere,

**WILLIAM LAWRENCE SIEFERT, M.D.,**
and
**TIMOTHY EHN, D.C.,**

did knowingly and intentionally combine, conspire, confederate, and agree with each other, and with other persons known and unknown to the Grand Jury, to distribute and dispense, outside the scope of professional practice and not for a legitimate medical purpose, quantities of Schedule II controlled substances, including hydrocodone and oxycodone, and Schedule IV controlled substances, including clonazepam, in violation of 21 U.S.C. § 841(a)(1).

## COUNTS 2-12
### Distribution of a Controlled Substance
### (21 U.S.C. § 841(a)(1))

42. Paragraphs 1 through 39 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

43. On or about the dates listed below, in Boone and Campbell Counties, in the Eastern District of Kentucky, and elsewhere,

**WILLIAM LAWRENCE SIEFERT, M.D.,**

aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense, outside the scope of professional practice and not for a legitimate medical purpose, controlled substances, as set forth below:

| Count | Date Filled | Patient | Drug Name | Quantity | Schedule of Controlled Substance |
|---|---|---|---|---|---|
| 2 | February 25, 2016 | GB | Clonazepam | 90 | IV |
| 3 | February 25, 2016 | GB | Oxycodone Hydrochloride | 120 | II |
| 4 | February 25, 2016 | GB | Oxycodone Hydrochloride | 30 | II |
| 5 | January 12, 2017 | MT | Oxycodone Hydrochloride | 150 | II |
| 6 | February 9, 2017 | MT | Oxycodone Hydrochloride | 150 | II |
| 7 | February 15, 2017 | TI | Oxycodone Hydrochloride | 120 | II |
| 8 | March 20, 2017 | TI | Oxycodone Hydrochloride | 120 | II |
| 9 | January 19, 2017 | MC | Oxycodone Hydrochloride | 120 | II |
| 10 | February 16, 2017 | MC | Oxycodone Hydrochloride | 120 | II |

| Count | Date Filled | Patient | Drug Name | Quantity | Schedule of Controlled Substance |
|---|---|---|---|---|---|
| 11 | March 27, 2017 | BW | Hydrocodone/Acetaminophen | 120 | II |
| 12 | May 2, 2017 | BW | Hydrocodone/Acetaminophen | 120 | II |

Each of the above in violation 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

## COUNT 13
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

44.     Paragraphs 1 through 24 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

45.     Beginning at least in or around January 2017, and continuing through at least in or around February 2019, in Boone and Campbell Counties, in the Eastern District of Kentucky, and elsewhere,

**WILLIAM LAWRENCE SIEFERT, M.D.,**
and
**TIMOTHY EHN, D.C.,**

did knowingly and willfully, combine, conspire, confederate, and agree to commit an offense against the United States, that is: to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18 United Sates Code, Section 24(b), that is Medicaid and other health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicaid and other health care benefit programs, in connection with the delivery of and payment for health care

benefits, items, and services, in violation of Title 18 United States Code, Section 1347.

### Purpose of the Conspiracy

46. It was a purpose of the conspiracy for **SIEFERT** and **EHN** to unlawfully enrich themselves and NKYCPR, as described in paragraphs 25 and 26 of this Indictment, which are realleged and incorporated by reference as though fully set forth herein.

### Manner and Means

47. In furtherance of the conspiracy and to accomplish its objects and purpose, the methods, manner, and means that were used are described in paragraphs 36 through 39 of this Indictment, which are realleged and incorporated by reference as though fully set forth herein.

All in violation of 18 U.S.C. § 1349.

### COUNTS 14-21
### Health Care Fraud
### (18 U.S.C. § 1347)

48. Paragraphs 1 through 24 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

49. Beginning at least in or around January 2017, and continuing through at least in or around July 2020, in Boone and Campbell Counties, in the Eastern District of Kentucky, and elsewhere,

**WILLIAM LAWRENCE SIEFERT, M.D.,**
and
**TIMOTHY EHN, D.C.,**

did knowingly and willfully execute, and attempt to execute, a scheme or artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is,

Medicaid, and obtain, by means of materially false and fraudulent pretenses, representations, and promises, and omission and concealment of material facts, money and property owned by, and under the custody and control of, this health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

50. The scheme to defraud is more fully described in paragraphs 36 through 39 of this Indictment, which are realleged and incorporated by reference as though fully set forth herein.

51. On or about the dates specified below, in the Eastern District of Kentucky, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **SIEFERT** and **EHN** caused the submission of false claims to Medicare for UDT for Member MR, in an attempt to execute, and in execution of the scheme, as described in paragraphs 36 through 39 of this Indictment, with each execution set forth below forming a separate count:

| Count | Defendant | Item/Service Billed | Claim Number | Approx. Claim Date |
|---|---|---|---|---|
| 14 | **EHN** and **SIEFERT** | G0483 | 7617360008933 | 1/16/17 |
| 15 | **EHN** and **SIEFERT** | G0483 | 7518038040812 | 1/9/18 |
| 16 | **EHN** and **SIEFERT** | G0483 | 7518156096590 | 5/20/18 |
| 17 | **EHN** | G0482 | 7519247088087 | 8/23/19 |
| 18 | **EHN** | G0483 | 7620105006379 | 9/10/19 |
| 19 | **EHN** | G0483 | 7520162011561 | 5/26/20 |
| 20 | **EHN** | G0483 | 7520196056334 | 6/29/20 |
| 21 | **EHN** | G0483 | 7520225020552 | 7/28/20 |

Each of the above in violation of 18 U.S.C. §§ 1347 and 2.

## FORFEITURE ALLEGATIONS

1. The allegations contained in Counts 1 through 21 of this Indictment are incorporated here for the purpose of alleging forfeiture pursuant to the provisions of Title 21 United States Code, Section 853 and Title 18, United States Code, Section 982.

2. Upon conviction of a violation of Title 21, United States Code, Section 841, as alleged in Counts 2 through 12 in this Indictment, defendant **WILLIAM LAWRENCE SIEFERT** shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses.

3. Upon conviction of the offenses in violation of a federal health care offense, including a violation of Title 18, United States Code, Sections 1347 and 2 as set forth in Counts 13-21 of this Indictment, defendant **TIMOTHY EHN** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

4. Upon conviction of the offenses in violation of a federal health care offense, including a violation of Title 18, United States Code, Sections 1347 and 2 as set forth in Counts 13-16 of this Indictment, defendant **WILLIAM LAWRENCE SIEFERT** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

5.	Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of a conspiracy to violate Title 18, United States Code, Section 1347 as set forth in Count 13 and/or Title 21, United States Code, Section 841 as set forth in Count 1, defendants **TIMOTHY EHN** and **WILLIAM LAWRENCE SIEFERT** shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s).

6.	The property to be forfeited includes, but is not limited to, the following:

    a.	any property, real or personal, that constitutes or is derived, directly or indirectly, as the result of such violation;

    b.	any DEA license(s) for **WILLIAM LAWRENCE SIEFERT**; and

    c.	any of the defendants' property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

7.	If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.	cannot be located upon the exercise of due diligence;

    b.	has been transferred or sold to, or deposited with, a third party;

    c.	has been placed beyond the jurisdiction of the Court;

    d.	has been substantially diminished in value; or

    e.	has been commingled with other property that cannot be subdivided without difficulty;

the defendants shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section

853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to Title 21, United States Code, Section 853(a), Title 18, United States Code, Section 982(a)(7), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

███████████████

FOREPERSON

_____
CARLTON S. SHIER, IV
ACTING UNITED STATES ATTORNEY

_____
DANIEL KAHN
ACTING CHIEF, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

## PENALTIES

**COUNTS 1-12:**  Not more than 20 years imprisonment, a fine of not more than $1,000,000, and supervised release of at least 3 years.

**COUNTS 13-21:**  Not more than 10 years imprisonment, a fine of not more than $250,000 or twice the gross gain or loss, whichever is greater, and supervised release of at least 3 years.

**PLUS:**  Mandatory special assessment of $100 per count.

**PLUS:**  Restitution, if applicable.

**PLUS:**  Forfeiture as listed.