1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
2            NORTHERN DIVISION at COVINGTON
                      - - -
3
   UNITED STATES OF AMERICA,   : Docket No. 21-cr-2
4                          :
              Plaintiff,  : Covington, Kentucky
5                          : Friday, March 17, 2023
                          : 8:45 a.m.
6   versus                     :
                          :
7   WILLIAM LAWRENCE SIEFERT, M.D.:  **Jury Trial Day 9**
   TIMOTHY EHN, D.C.          :
8                          :
            Defendants.  :
9

10                      - - -
            TRANSCRIPT OF JURY TRIAL
11          BEFORE DAVID L. BUNNING
        UNITED STATES DISTRICT COURT JUDGE
12                      - - -

13   APPEARANCES:
   For the United States:    DERMOT WILLIAM LYNCH, ESQ.
14                      U.S. Department of Justice - 1400
                      Public Integrity Section
15                      Criminal Division
                      1400 New York Avenue NW
16                      Washington, DC 20005

17                      LAUREN BRENNA KOOTMAN, ESQ.
                      LINDSEY CARSON, ESQ.
18                      U.S. Department of Justice
                      Criminal Division, Fraud Section
19                      1400 New York Avenue NW
                      Washington, DC 20005
20
   For Defendant Siefert:    LINDSAY K. GERDES, ESQ.
21                      MADELINE PINTO, ESQ.
                      Dinsmore & Shohl, LLP - Cincinnati
22                      255 E. Fifth Street
                      1900 First Financial Center
23                      Cincinnati, OH 45202

24

25   Appearances continued on page 2

1    APPEARANCES: (continued)

2

3    For Defendant Siefert:        MICHAEL J. FERRERA, ESQ.
                                   Dinsmore & Shohl, LLP - Columbus
                                   191 W. Nationwide Blvd., Ste. 300
4                                  Columbus, OH 43215

5    For Defendant Ehn:           BENJAMIN C. GLASSMAN, ESQ.
                                   GLENN LUKUS BURTON, ESQ.
6                                  Squire Patton Boggs LLP
                                   201 East Fourth Street
7                                  Suite 1900
                                   Cincinnati, OH 45202

8

9    Court Reporter:              LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
10                                 35 W. Fifth Street
                                   Covington, KY 41011
                                   (859) 291-4410
11

12

13

14

15

16

17

18

19

20

21

22

23

24

          Proceedings recorded by mechanical stenography,
25   transcript produced by computer.

1    (Proceedings commenced at 8:48 a.m.)

2         THE COURT:  I understand that we're still one juror

3    short.  I did want to briefly take up something about the

4    disclosures that were sent to chambers last night, 8:00-ish.

5    I know you all previously received those, counsel for

6    Defendant Siefert and Defendant Ehn.  Some of it was

7    encrypted.  I wasn't able to look at it.

8         What I was able to glean from it, in the absence of there

9    being some sort of motion of some sort by the defendants, I

10   wasn't necessarily sure if it needed to be filed because it's

11   not -- I mean, I'm not making any final determination, but my

12   initial read-through of what I was able to look at on my

13   laptop was mostly exculpatory as relates to primarily Dr. Ehn.

14   It's not things that I would -- it just doesn't seem like

15   there's anything that the lack of any prior disclosure would

16   have enabled the defendants to use something during this trial

17   that would be beneficial to them.

18        The short answer is I don't think there's anything that's

19   prejudicial from the late disclosure, my first glance at it.

20   I don't know if it needs to be filed.

21        I always try to, as you heard multiple times already in

22   this trial, preserve the record.  In the absence of something

23   challenging the proceedings because of the late disclosure, I

24   don't know that it's necessary to file.

25        MR. GLASSMAN:  On behalf of Dr. Ehn, I agree with the

1    Court.  It's on us as the defense if we want to make that

2    record.  I took a look at it last night as well, and I have

3    the same issue with a lot of it looks like gobbledy-gook.

4              THE COURT:  Using my word.  One of my favorite words.

5              MR. GLASSMAN:  I do think there's some stuff in there

6    that does seem a little exculpatory, inasmuch as, for example,

7    having a confidential human source inside the clinic and them

8    asking the source, like, about this and that, and he's like,

9    yeah, there's none of that, none of that, none of that.

10             THE COURT:  It was so generic, it wouldn't have been

11   anything that --

12             MR. GLASSMAN:  Yeah.  So I don't want to waive

13   anything, but I don't feel like -- I feel like if we need to

14   bring it to your attention by motion, that's on us to do.

15             THE COURT:  That's fair.

16             MS. GERDES:  I agree with Mr. Glassman.

17             MR. LYNCH:  I think the Court said earlier that you

18   had reviewed the information, you thought it might be

19   exculpatory.  I thought you meant inculpatory.

20             THE COURT:  No.  It's not exculpatory.

21             MR. LYNCH:  I do think if anything is going to be

22   filed, I do think there's some somewhat sensitive stuff that I

23   don't think we need to talk about here.  It's not really

24   relevant.

25             THE COURT:  Some of it involves alleged conduct by

1    another doctor that has nothing to do with this case.

2             MR. LYNCH:  Yes.

3             MS. GERDES:  The only thing I would ask is to make

4    sure that the government makes an inquiry that that --

5    whatever is encrypted, whatever is at the bottom, there's not

6    somehow narrative that we're missing if it's in some other

7    form, that that is --

8             THE COURT:  That's a fair request.

9             MS. GERDES:  I just want to get some type of

10   confirmation that --

11            THE COURT:  You can read part of it, but a couple of

12   the pages were of that nature.

13            MR. LYNCH:  Yes, Your Honor.  I think what is going

14   on, and I want to confirm this, but I think the FBI switched,

15   like, systems, and that might have -- I think a similar thing

16   happened with some of the stuff we disclosed from earlier

17   investigations, like from, you know, 2013.

18            THE COURT:  Okay.  Just check on that.

19            MR. LYNCH:  I will.

20            THE COURT:  Do we have all 15?

21            COURT SECURITY OFFICER:  We do.

22            MS. GERDES:  It's my understanding the government has

23   one more witness this morning, that the government will then

24   rest.

25            THE COURT:  Correct.

1          MS. GERDES:  I would ask when the government rests if

2     we could take a five-minute break.  Our witness is on the

3     fourth floor so I can go down and get the witness and maybe

4     tell the jury that the defense case is going to be starting

5     after a break.

6          THE COURT:  That's fine.  You'll make your oral

7     motions.

8          MS. GERDES:  Exactly.  His phone was taken away.

9     Otherwise, I would text and say come up, but he doesn't have a

10    phone.

11         THE COURT:  That's fine.  I did authorize, at your

12    request, let him have his laptop.

13         MS. GERDES:  We appreciate that.  Thank you, Your

14    Honor.

15         THE COURT:  We'll do that.

16         MS. GERDES:  Thank you.

17       (The jury entered the courtroom at 8:54 a.m.)

18         THE COURT:  Ladies and gentlemen, I made a mental

19    note that I thought I'd see about half of you in green.  I was

20    a little bit off.

21       At any rate, welcome.  As I mentioned earlier, today

22    we're hoping to stop around 4:30.  From a batting order

23    standpoint, the government, through counsel, has one

24    additional witness.  And then we'll have to take a break

25    because the defendants will start their case, and there's a

1   couple of logistical things they need to take care of before

2   that.  There may be a 10-minute break, maybe 15.  But we'll

3   let you know when that occurs.

4        Final witness, Ms. Kootman.

5             MS. KOOTMAN:  The United States calls Tiffany

6   Killion.

7             TIFFANY KILLION, GOVERNMENT'S WITNESS, SWORN

8             THE COURT:  Good morning, ma'am.

9             THE WITNESS:  Good morning.

10            THE COURT:  Try to keep your voice up.

11                          DIRECT EXAMINATION

12  BY MS. KOOTMAN:

13  Q.   Good morning, Ms. Killion.  Can you please tell the jury

14  your name and spell it for the record.

15  A.   My name's Tiffany Killion.  T-i-f-f-a-n-y K-i-l-l-i-o-n.

16  Q.   Where do you live, Ms. Killion?

17  A.   Currently in Crittenden, Kentucky.

18  Q.   How long have you lived there?

19  A.   For about five years.

20  Q.   And how long have you lived in the Kentucky area?

21  A.   All my life.

22  Q.   And what do you do for a living?

23  A.   Right now, I'm a server at Longhorn in Florence.

24  Q.   Did you know someone by the name of Gary Bitter?

25  A.   Yes, ma'am.

1  Q.   How did you know him?

2  A.   He was my dad.

3  Q.   Did you live with your father growing up?

4  A.   At parts, yes, when I was a little older.

5  Q.   Can you explain, when did you live with your dad?

6  A.   I was going into the seventh grade, so I was almost 13,

7  until my senior year of high school.

8  Q.   Okay.  And what was your relationship like when you moved

9  out?

10  A.   It was strained for about 12 years.  We didn't really

11  talk or see each other.

12  Q.   Why not?

13  A.   We just got into an argument because him and my mom

14  didn't get along very well.  So for my senior night, I wanted

15  my mom and my dad to walk me down the aisle.  He wanted my

16  stepmom.  It turned crazy, and we kind of parted ways.  I was

17  almost 18 so I thought I was going to be good on my own.

18  Q.   And just to orient us, what year was that that you moved

19  out?

20  A.   It would have been 2002.

21  Q.   Okay.  And after that -- so you moved out in 2002.  After

22  that, how long did you go -- how long did this period when you

23  had a strained relationship with your father last?

24  A.   About 12 years.

25  Q.   And so about -- you did reconnect with him?

1    A.   Yes.  Eventually.

2    Q.   And about when was that?

3    A.   He was actually on life support at the hospital so I was

4    actually just going to say my good-byes and make sure, you

5    know, I paid my respects to my dad, and he actually woke up,

6    and we kind of rekindled the relationship from there.

7    Q.   And why was he on life support?

8    A.   Overdose.

9    Q.   So after this incident and you rekindled your

10   relationship, did you stay in contact with him after that?

11   A.   Yes, ma'am.

12   Q.   Ms. Killion, is your father still alive?

13   A.   He is not.

14        THE COURT:  Do you know approximately what date --

15   don't give me an exact date, but year -- when he had this

16   situation with the overdose and the hospital?  Approximately

17   when was that?

18        THE WITNESS:  Pretty sure it was 2014.

19        THE COURT:  Thank you.

20        THE WITNESS:  You're welcome.

21   BY MS. KOOTMAN:

22   Q.   Going back to the period of time when you lived with your

23   father when you were in high school, to your knowledge, did he

24   use drugs during that period of time?

25        MS. GERDES:  Objection, Your Honor.

1       THE COURT:  Sustained.

2  BY MS. KOOTMAN:

3  Q.   After you reconnected with your father in 2014, following

4  the overdose, did he continue to use drugs, to your knowledge?

5  A.   Yes.

6  Q.   Okay.  How do you know this?

7  A.   I am currently a recovering addict.  I was an addict at

8  the time as well.

9  Q.   Did you -- so you -- you said you -- you are a recovering

10  addict?

11  A.   Yes.

12  Q.   And are you sober now?

13  A.   I am, since June 17 of last year.

14  Q.   And you said -- as an addict, are you familiar with the

15  signs of addiction?

16  A.   I am, yes.

17  Q.   Did you observe some of those signs of addiction in your

18  father?

19  A.   Yes.  We went through a lot of it at the same time, you

20  know.  Irritable, manic, sometimes not really responsive, you

21  know, kind of in and out, you know, in a daze kind of would be

22  the easiest way to describe it.

23  Q.   And in that period of time, 2014, was your father, based

24  on your observations, was he the same person he was when -- as

25  he -- when you lived with him when you were younger?

1    A.   No, not at all.

2    Q.   Can you explain?

3    A.   My dad was a very big basketball player, very active,

4    lifted weights, very outgoing, in the public a lot.  And when

5    you become an addict, you become very secluded and, you know,

6    kind of stay in your own little bubble away from people so,

7    you know, your mannerisms change a lot so you don't go out in

8    public much.

9    Q.   And after you reconnected in 2014, during that period of

10   time, what was your relationship like with your dad?

11   A.   I mean, honestly, it was more drug related than anything.

12   Just making sure -- I would go check on him, make sure he was,

13   you know, still breathing.  He would call me sometimes manic

14   because he hid his medicine, couldn't find it, thought someone

15   stole it.  So, basically, I was more the babysitter, just

16   making sure, you know, he was okay on a day-to-day basis.

17   Q.   And was he, to your knowledge, taking prescription pills

18   during that time?

19   A.   Yes, ma'am.

20   Q.   Do you know which ones?

21   A.   The one that I know the most is the Percocet.

22   Q.   How do you know this?

23   A.   I actually bought them from him.

24   Q.   And were these drugs prescribed to him by a doctor?

25   A.   Yes, ma'am.

1  Q.   How do you know that?

2  A.   I would take him to get his scripts filled at the

3  pharmacy and, like I said, I would buy them from him.  So I

4  would get them from him.

5  Q.   So he sold pills to you?

6  A.   Yes, ma'am.

7  Q.   Did he sell them to anybody else?

8  A.   Yes.

9  Q.   And what did he use the money for?

10 A.   He didn't have a job so he still had, you know, a house,

11 regular expenses of a house, utilities, and things like that.

12 And he also had a car that he had to pay for and insurance.

13 So that's how he made his living.

14 Q.   Do you have any personal knowledge of how much it costs

15 to buy pills on the street?

16         MS. GERDES:  Objection, Your Honor.

17         THE COURT:  Sustained.

18         MS. KOOTMAN:  May we approach?

19         THE COURT:  Very well.

20     (Sidebar conference.)

21         THE COURT:  Basis for this?

22         MS. KOOTMAN:  So she -- Gary Bitter was diverting

23 pills prior to his death.

24         THE COURT:  She testified to that.

25         MS. KOOTMAN:  This gives a basis for understanding

1   why -- how -- what -- why he was doing it and how he was

2   supporting himself.

3           THE COURT:  You've established that, though.  How

4   much it costs per pill has nothing to do with --

5           MS. KOOTMAN:  It explains why -- how he was actually

6   able to pay for his bills and support -- pay for his -- she

7   was saying he was -- he had no job.  He was supporting his

8   entire lifestyle.

9           MS. GERDES:  You already got that out.

10          THE COURT:  Go ahead.  If you'd like to make a

11  record.

12          MS. GERDES:  I'm sorry.

13          THE COURT:  That's fine.

14          MS. GERDES:  I let a little -- I'm trying to be

15  responsible in the objections and not be obnoxious about it.

16          THE COURT:  Understood.

17          MS. GERDES:  But there's something in the record.

18  When it's more, it's like going beyond the scope of what's

19  appropriate --

20      (Indiscernible crosstalk.)

21          THE COURT:  -- under 403, objection will be

22  sustained.

23          MS. GERDES:  Apologize, Your Honor.

24          THE COURT:  No worries.

25      (Sidebar concluded.)

1          THE COURT:  You may proceed.

2          MS. KOOTMAN:  Thank you, Your Honor.

3    BY MS. KOOTMAN:

4    Q.   Ms. Killion, did you ever see your father trading

5    prescriptions with any other individuals?

6    A.   Yes.  It would be, like, a buddy system.  Like so a

7    couple of them -- it was two other people, like, where they

8    wouldn't run out before they got their next prescription.

9    Q.   And during this period of time, did he ever get arrested?

10   A.   Yes.

11   Q.   And did he go to jail?

12   A.   Yes.

13   Q.   When was the last time he was in jail?

14   A.   It was right before he passed.  He was in for about two

15   months.

16   Q.   And about how long before he died was he released from

17   jail?

18   A.   It was only within a couple weeks.

19   Q.   When was the last time you saw him?

20   A.   Four days before his death date.

21   Q.   Do you remember what happened that day?

22   A.   Just the normal.  Went over.  He didn't have a phone

23   because he just had gotten out of jail so I stopped by.  He

24   had already picked up his prescriptions for that time.  He was

25   already kind of in a dozing state, I guess you would say.

1    So I made sure he was okay, put him to bed, made sure his

2    prescriptions were next to him on the nightstand so when he

3    woke up, he wouldn't, you know, think or go crazy that he

4    couldn't find them.  So I put them there, and then I left.

5    Q.   Did you see him take any -- any pills before you ...

6    A.   Yes.  I did some with him.

7    Q.   How many did he take?

8    A.   He snorted three Perc 30s.

9    Q.   And how long after that did you learn that he had died?

10   A.   Four days.

11        MS. KOOTMAN:  Thank you, Ms. Killion.

12        THE COURT:  Who is going to start?  Ms. Pinto?

13        MS. PINTO:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15   BY MS. PINTO:

16   Q.   Good morning, Ms. Killion.

17   A.   Good morning.

18   Q.   My name is Madeline Pinto.  I'm one of the attorneys who

19   is representing Dr. Siefert.  I just have a few questions for

20   you.

21   A.   Okay.

22   Q.   So your dad was involved in a car accident in 2013; is

23   that correct?

24   A.   I don't know the year, but he was in a car accident, yes.

25   Q.   And he did sustain an injury to his ankle; is that right?

1    A.   Yes.

2    Q.   And ultimately, your dad required surgery on his ankle,

3    right?

4    A.   Correct.

5    Q.   So they put pins and needles in his ankle?

6    A.   Yes.

7    Q.   And after the accident, his ankle would give him pain,

8    correct?

9    A.   I wasn't around really at that time so I can't -- I know

10   he had surgery, but I don't -- I can't explain his pain or

11   anything like that.

12   Q.   Sure.  And your dad struggled with anxiety; is that

13   right?

14   A.   Not that I was aware of.

15   Q.   Did you go through -- you went through the terrible

16   tragedy of losing another family member in 2005; is that

17   right?

18   A.   Yes.

19   Q.   It was your sister?

20   A.   Yes.

21   Q.   And that caused your dad some mental health issues?

22   A.   Both of us, yes.

23   Q.   And pain medication wasn't the only treatment that your

24   dad was receiving at the clinic; is that right?

25   A.   I'm not sure, to be honest.

1   Q.   Do you recall that he received some injections in his

2   back?

3   A.   Oh, yes.  Yes.

4   Q.   And, you know, you testified you saw that your dad was

5   abusing his medication, right?

6   A.   Yes.

7   Q.   And you drove him to the pharmacy and to some of his

8   doctors' appointments; is that right?

9   A.   I technically never went to a doctor appointment, no.

10  Q.   Okay.  And is it fair to say that you never spoke with

11  any of his providers about your concerns about taking his

12  medication?

13  A.   No.

14          MS. PINTO:  Just a moment, Your Honor.

15          THE COURT:  Very well.

16          MS. PINTO:  No further questions.  Thank you,

17  Ms. Killion.

18          THE WITNESS:  Thank you.

19          MR. GLASSMAN:  We have no questions of this witness.

20          THE COURT:  Any redirect?

21          MS. KOOTMAN:  No, Your Honor.

22          THE COURT:  Thank you, ma'am.

23       Mr. Lynch?

24          MR. LYNCH:  The government has no further witnesses,

25  Your Honor.  The government rests.

1          THE COURT:  Ladies and gentlemen, one additional

2     thing.  I will take judicial notice of the fact that both

3     Campbell and Boone County are in the eastern judicial district

4     of Kentucky.  You'll see behind me it says Covington.  There

5     was no proof regarding that.  But it's something that I can

6     take judicial notice of so I wanted to make sure I did that.

7          Okay.  We're going to take a break.  The United States

8     has announced it's rested its case.  The trial is not over.

9     The defendants have an opportunity to present witnesses, which

10    I understand they're ready to do in a few minutes.

11         During the recess, continue to heed all the prior

12    admonitions of the Court.  As I told you during *voir dire*, you

13    need to keep an open mind until all the evidence is in, and

14    that includes any evidence offered by the defendants, which is

15    about to start here momentarily.

16         So we will see you back here -- I'll say 9:25.  We'll do

17    9:25.

18         (The jury exited the courtroom at 9:10 a.m.)

19         THE COURT:  Jury has left.  Counsel, go ahead and

20    make your motions.

21         MR. FERRERA:  Once more, as Ms. Gerdes indicated

22    yesterday, reserving the right to brief the Rule 29 issues

23    after the trial, at this time, Dr. Siefert makes a motion for

24    a Rule 29 direction of a verdict of acquittal.

25         Even viewing the evidence in the light most favorable to

1   the government, no reasonable jury could find all of the

2   elements of each of the counts in the indictment.  For that

3   reason, Your Honor, we make our Rule 29 motion.

4          THE COURT:  You just want to stand on that?

5          MR. GLASSMAN:  Likewise, for Dr. Ehn, make a general

6   Rule 29 motion for the same reason, that a judgment of

7   acquittal should be entered because viewing the evidence in

8   the light most favorable to the government, no reasonable

9   factfinder could find proof beyond a reasonable doubt of all

10  the elements of the crimes charged.

11         THE COURT:  All right.  Well, Mr. Lynch?  In the

12  absence of more specificity, I don't know that you need to be

13  more specific in your response.

14      I have lots of red and blue in my notes.  I won't have to

15  go through them specifically for the motion because they're

16  more generic than specific.

17         MR. LYNCH:  Your Honor, we think that on all the

18  counts charged in the indictment, we've presented sufficient

19  evidence, we've presented sufficient -- for example, for all

20  of the 841 counts, we presented testimony by Dr. Thomas.  That

21  alone is enough on the 841.

22         THE COURT:  Not necessarily.  Subjective intent of

23  the physician is something you'll have to establish under the

24  *Ruan*.  We've been looking at that and pulled up the *Kahn*

25  Eleventh Circuit case.  As you know, *Ruan* just kind of

1    interpreted the statute and then remanded *Kahn* and *Ruan* to the

2    Circuits to determine whether or not the jury instructions

3    were sufficient.

4         In the absence of the Sixth Circuit -- we don't have a

5    Sixth Circuit case post-*Ruan* yet, at least a circuit case.  I

6    know we've got the case with Judge Wier and myself in

7    Suetholz, but the circuit decisions indicate just indicating

8    that it's outside the scope of legitimate medical practice

9    for -- what's the buzz phrase?

10        MR. LYNCH:  Outside the usual course of professional

11   practice for legitimate medical purpose.

12        THE COURT:  Not for a legitimate medical purpose.

13   That, in and of itself, won't be sufficient post-*Ruan*.  You

14   acknowledge that?

15        MR. LYNCH:  Sure, Your Honor.  As to knowledge, one

16   piece of the evidence on knowledge is they had all of these

17   forms, narcotic agreements and the like, that shows what they

18   knew they were supposed to be doing.  And we established with

19   all of the witnesses that those forms were not being complied

20   with.  So we have knowledge of what you're supposed to do and

21   what's actually happening.

22        And then, obviously, one additional piece of the

23   knowledge issue is when confronted by the medical board, we

24   have the evidence of deception, which is --

25        THE COURT:  There's also plenty of evidence -- thank

1  you.  Of course, we've got seasoned lawyers all around here.

2  You recognize the applicable standard, *Jackson v. Virginia*,

3  longstanding standard at this stage.

4      I used to comment specifically on what the evidence was.

5  In the absence of there being a specific challenge at this

6  stage, I'm going to just, in essence, I'm going to orally deny

7  the motion, given the facts presented, testimony of the

8  witnesses, voluminous records.

9      I think on the fraud counts, the business plan, the

10  hiring of Siefert, the fact that they're co-partners, I think

11  it's 55/45.  It's been so long ago since I heard that

12  testimony, maybe beginning of last week.  They presumed, even

13  before they did the very first definitive test, that they were

14  going to charge for the G0483 -- maybe not for every patient,

15  but 93, 94, 95 percent of the patients got both tests.  So

16  that's indicia of knowledge and intent regarding the fraud

17  count.

18      So for all these reasons, I think there's sufficient

19  evidence from which a reasonable jury could conclude beyond a

20  reasonable doubt the counts that remain for the jury to

21  consider.

22      Madam Clerk, you can indicate the oral motion at this

23  stage was denied for reasons stated on the record.

24      We'll take our break.  The first witness is going to be

25  Baker; is that right?

1           MS. GERDES:  Yes, Your Honor.

2           THE COURT:  We'll come back, and then we'll proceed

3    with Baker, and then we'll just go from there.

4           MS. GERDES:  Thank you.

5           THE COURT:  We'll be in recess until 9:25.

6         (Recess from 9:16 a.m. until 9:28 a.m.)

7           THE COURT:  Jury's not in.  Anything we need to take

8    up before we bring the jury in?

9           MS. GERDES:  No, Your Honor.  Nothing from

10   Dr. Siefert.

11          MR. LYNCH:  No, Your Honor.

12          MR. GLASSMAN:  No, Your Honor.

13          THE COURT:  Go ahead and bring them in, please.

14   (The jury entered the courtroom at 9:30 a.m.)

15          THE COURT:  Ms. Gerdes, you may proceed.

16          MS. GERDES:  Thank you, Your Honor.  We will call

17   Dr. Andrew Baker.

18          THE COURT:  All right.

19           ANDREW BAKER, M.D., DEFENSE WITNESS, SWORN

20          THE COURT:  Good morning, sir.

21          THE WITNESS:  Good morning, Your Honor.

22          THE COURT:  If you'd try to keep your voice up while

23   you're testifying.

24          THE WITNESS:  I will.

25          THE COURT:  You may proceed.

1          MS. GERDES:  Thank you.

2                         DIRECT EXAMINATION

3     BY MS. GERDES:

4     Q.   Can you please state your name for the record.

5     A.   My full name is Andrew Michael Baker.  A-n-d-r-e-w

6     M-i-c-h-a-e-l B-a-k-e-r.

7     Q.   Dr. Baker, whom are you employed by?

8     A.   My day job is I am a chief medical examiner for Hennepin,

9     Dakota, and Scott Counties in the state of Minnesota.  If

10    you're not familiar with Minnesota geography, Hennepin County

11    is Minneapolis and most of the surrounding suburbs, and Dakota

12    and Scott are two adjacent counties.

13    Q.   How long have you held the title of chief medical

14    examiner there?

15    A.   I have been the medical examiner for Hennepin County

16    since 2004, and Dakota and Scott joined my operation in 2013.

17    Q.   How long have you been a medical examiner in Minnesota?

18    A.   Since 2002.

19    Q.   What are your duties and responsibilities as a medical

20    examiner in Minnesota?

21    A.   So like all the medical examiners in my office, I

22    supervise death investigations.  I perform autopsies.  I

23    interpret postmortem laboratory results.  I sign death

24    certificates.  I communicate findings to families.  And in

25    cases that go to court, I often end up testifying.

1    Q.   Do you have additional responsibilities as the chief

2    medical examiner now?

3    A.   I do.

4    Q.   What are those?

5    A.   Because I supervise a staff of approximately 50 people, I

6    have a number of financial and administrative and HR duties

7    that take up about half my time, and I would say that the

8    autopsies and death certificates take up the other half of my

9    time.

10        (Clarification requested by the court reporter.)

11   A.   Death certificates and those sorts of things.

12   Q.   When you say you supervise a number of staff, did you say

13   50 as in five-zero?

14   A.   Correct.

15   Q.   Can you tell us about your training and education that

16   led you to that position?

17   A.   Yes.  I received my bachelor's degree from the University

18   of Iowa in 1988.  I received my medical degree from the

19   University of Iowa College of Medicine in 1992.  From 1992

20   through 1997, I was a resident at the University of Iowa

21   hospitals and clinics, where I completed my training in what's

22   known as anatomic and clinical pathology.  And then in 1997, I

23   moved to Minneapolis to do a one-year fellowship in forensic

24   pathology at the Hennepin County Medical Examiner's Office.

25   Q.   What did you do after 1997?

1    A.   So the fellowship ended in 1998.  And in 1998, I went on

2    active duty as a major in the Medical Corps of the United

3    States Air Force.  I was assigned to the Armed Forces Medical

4    Examiner's Office in Washington, D.C., and I served in that

5    position for four years, until 2002.

6    Q.   And if you can, for the benefit of everyone for hearing,

7    for Dr. Siefert, can you scoot up to the microphone a little

8    bit more?

9         Thank you.

10        Did you go on any missions on behalf of the Air Force for

11   the government?

12   A.   I did go on some missions, and some missions came to us.

13   That will make more sense when I think I answer your follow-up

14   questions.

15   Q.   If you could tell us about those.

16   A.   So, for example, in 1999, I deployed to Kosovo with the

17   FBI to do work for the international criminal tribunals for

18   former Yugoslavia.  We investigated mass graves and crimes

19   against humanity.

20        In the year 2000, I was part of the Corps team of

21   forensic scientists that handled all the remains of the

22   terrorist attack on the USS Cole in the Port of Yemen for

23   those of you who may recall that.

24        Probably the most significant thing I was involved in is

25   following the hijacking of American Airlines Flight 77 on

1    9/11, I was part of the Corps team that handled all the

2    remains from the crash into the Pentagon.

3    Q.    And what was the time period that that leads us to?  You

4    go to Minnesota shortly thereafter?

5    A.    Correct.  I was honorably discharged from the Air Force

6    in 2002, and I was recruited back to Minnesota to join the

7    Hennepin County Medical Examiner's Office and have been there

8    since.

9    Q.    Are you part of any medical associations?

10   A.    Yes.

11   Q.    Can you tell us?

12   A.    I'm a fellow of the National Association of Medical

13   Examiners, also known as NAME.

14   Q.    Are there other -- I'm going to come back to NAME in a

15   minute.  Are there other professional organizations that

16   you're a member of?

17   A.    Yes.

18   Q.    Which others?

19   A.    I am a fellow of the American Academy of Forensic

20   Sciences, I am a fellow of the College of American

21   Pathologists, and I am a member of the Minnesota Coroners and

22   Medical Examiners Association.

23   Q.    Let's spend a few minutes talking about the National

24   Association of Medical Examiners.  Is there an acronym that

25   that's known by?

1    A.   Yes.  We typically refer to ourselves as NAME.

2    Q.   Have you held any board level or executive level

3    positions within NAME?

4    A.   I have.

5    Q.   Please tell us exactly what NAME is, what it stands for,

6    and the positions you've held within the organization.

7    A.   So NAME is the national professional organization that

8    represents forensic pathologists, which is what I do for a

9    living, and the interests of forensic pathologists and medical

10   examiners.

11        Like most professional medical societies, we have an

12   annual scientific meeting.  Like most professional medical

13   societies, we have an official journal that we publish our

14   work in, and we also put out position statements, which are

15   the official positions of the organization, and we also put

16   out forensic autopsy performance standards.

17   Q.   And how many members or fellows are there in NAME?

18   A.   Members, there's probably, ballpark, about a thousand.

19   Fellows, which is a higher level of membership and requires

20   you to be a Board certified in forensic pathologist, probably

21   half that many; maybe 600 or so.

22   Q.   What is the highest position you've held in NAME?

23   A.   I've served as both the president and the chair of the

24   Board of Directors of NAME.

25   Q.   And was it in approximately 2012 that you were the

1    president?

2    A.   I'm just going to refer to my CV so I get the answer to

3    that right.

4         Yes, I was the president for calendar year 2012.

5    Q.   And when were you the chair of the Board of Directors?

6    A.   That would have been the following year, so 2013.

7    Q.   Were you ever the chair of any committees within NAME?

8    A.   Yes.

9    Q.   Which one?

10   A.   I was the chair of NAME's standard committee -- standards

11   committee, I should say, from 2013 to 2017.

12   Q.   What is the standards committee in NAME?

13   A.   So NAME annually puts out a set of forensic autopsy

14   performance standards.  Those are the minimum standards that

15   every medical examiner is expected to perform to.  Those

16   standards are voted on by the membership at our annual

17   meeting.  So they're driven by and approved by the members.

18        The primary function of the standards committee was to

19   vet any proposed new standards that came in from the

20   membership, work with the person making the submission to make

21   sure the wording was correct and would fit in with preexisting

22   standards.  And then as the chair of the committee, I would

23   actually be the person at the annual scientific meeting who

24   moderated the discussion about that standard, the pro and the

25   con, before a vote would finally be taken as to whether the

1    standards would be changed or not.

2    Q.   And these standards that you're speaking of that NAME

3    promulgates, these are standards, then, that are set forth by

4    the practitioners in the field?

5            MR. LYNCH:  Objection.  Leading.

6            MS. GERDES:  Well, we can be here all day.

7            THE COURT:  I'm going to allow a little bit of

8    leading with respect to the qualifications and background of

9    the witnesses, just like I did with your witness.

10        You may proceed.

11   BY MS. GERDES:

12   Q.   Is it the legislators who set the standards of NAME, sir,

13   or is it the members, like yourself, who set the standards of

14   NAME?

15   A.   So the members of the organization actually vote on the

16   standards.  It's a product of the members as a group.

17   Q.   And the different positions that you held, who chose you?

18   Again, is it the membership that chooses you or somebody else

19   that chooses you to hold those positions?

20   A.   So like most professional organizations, there's a

21   nominating committee within NAME that vets certain candidates

22   whose names have been put forward.  Ultimately, the membership

23   votes on the slate of nominees.

24   Q.   You said you were also a fellow of the American Academy

25   of Forensic Sciences.  What is that professional association?

1  A.   The American Academy of Forensic Sciences, or I'll just

2  call it "the Academy" as we discuss it, is an umbrella

3  organization that covers about 10 or 12 different disciplines

4  ranging from anthropology to toxicology to criminalistics to

5  DNA.

6       There is a very large pathology section in the Academy as

7  well, and most of the members of the pathology section are

8  medical examiners like myself.  The Academy has thousands and

9  thousands of members.  Its annual scientific meeting is huge.

10 And it also puts out an official journal.

11 Q.   And have you held any committee positions or leadership

12 positions within the Academy of Forensic Sciences?

13 A.   Yes, I have.

14 Q.   And what were those?

15 A.   Again, I'm going to refer to my CV just so I get these

16 right.  I was on the Executive Committee and the Board of

17 Directors for the Academy as a whole from 2016 to 2019.  I

18 chaired the Forensic Science Foundation, which was the

19 nonprofit arm of the Academy, from 2016 to 2020.  I chaired

20 the annual meeting program in 2015 to 2016.  And I was the

21 chair of the Continuing Education Committee from 2009 to 2018.

22 At a slightly lower level, I was also the chair of my own

23 section, the pathology section, from 2007 to 2008.

24 Q.   You also said that you're a member of The College of

25 American Pathologists or a fellow of that organization?

1   A.   Yes.

2   Q.   And have you been on any committees within that

3   organization?

4   A.   Yes.

5   Q.   Which one?

6   A.   From 2014 to 2019, I was a member of the Forensic

7   Pathology Committee of The College of American Pathologists.

8   Just so folks know what I mean when I talk about the College

9   of American Pathologists, or what we call The CAP, that's the

10  organization that represents all pathologists in the United

11  States; so the 99 percent of pathologists that work in

12  hospitals and labs and the small subset of pathologists like

13  me who work in medical examiners' offices.  It's a very large

14  organization, certainly north of 10,000 members.

15  Q.   Are you Board certified in any areas?

16  A.   Yes.

17  Q.   Which ones?

18  A.   I am certified by the American Board of Pathology in

19  anatomic and clinical pathology, and I have a subspecialty

20  certification in forensic pathology.

21  Q.   Have you taught in your area of expertise?

22  A.   Yes.

23  Q.   And can you just give us some of the highlights of the

24  teachings that you've done?

25  A.   Sure.  I'll start with my teaching at the local level.

1    So my office has a relationship with the University of

2    Minnesota.  So we take third- and fourth-year medical students

3    from Minnesota who can come and do a short rotation with my

4    office, shadow the positions, shadow the investigators.  If we

5    have trials, they can go to court with us.

6         We also train pathology residents from the University of

7    Minnesota Department of Pathology.  So they come and spend a

8    month with us to learn how to do quality forensic autopsies.

9         My office also runs an accredited fellowship program.  So

10   we take a pathologist who spends an entire year with us, and

11   we train that person to become a forensic pathologist, just

12   like I did in 1997.  Now I'm running the program at my very

13   own office here some 25 years later.

14        That's the formal teaching I do through my office's

15   relationship with the University of Minnesota.  I also give

16   presentations routinely at the local level, the regional

17   level, the national level, and occasionally at the

18   international level.

19   Q.   And have you given or taught any courses for any kind of

20   government organizations?

21   A.   Yes.

22   Q.   Does that include the FBI?

23   A.   Yes.

24   Q.   Have you also lectured at schools outside of Minnesota?

25   A.   Yes.

1   Q.   Does that include Harvard University?

2   A.   Yes.  I did give a guest lecture at Harvard Law School

3   some years ago.

4   Q.   Have you lectured on the topic of drug related deaths?

5   A.   Yes.

6   Q.   And is there any kind of common theme that is a part of

7   your lectures on drug related deaths?

8   A.   Yes.

9   Q.   And what is that?

10  A.   So when I give presentations on drug related fatalities

11  from the medical examiner's perspective, and I've done this

12  formally probably a dozen or so times, it almost invariably

13  focuses on how you do these death investigations, the

14  importance of the autopsy.  And then sort of a bigger picture

15  view, how the number of fatalities is affecting our workforce

16  issues in the United States because we're dealing with so many

17  more drug fatalities than we were dealing with 20 years ago

18  with essentially the same workforce.

19  Q.   And when you say the workforce issues, is it fair to say

20  there are a lot more deaths and not enough people to always

21  investigate those deaths?

22  A.   Correct.

23  Q.   And how has NAME kind of grappled with that?  Does a lack

24  of resources excuse ignoring the standards?

25  A.   No.  NAME has not changed the forensic autopsy

1    performance standards or lowered them because of that.

2    Q.   We'll come back, talk more about the forensic autopsy

3    standards shortly.  I want to talk a little bit more about

4    your background.

5         Have you also lectured for the United States Army Judge

6    Advocate General school?

7    A.   Yes.

8    Q.   And at the Naval Justice school?

9    A.   Yes.

10   Q.   And at the Defense Institute of International Legal

11   Studies?

12   A.   Yes.

13   Q.   Have you received any honors and awards?

14   A.   I have.

15   Q.   And can you just give us some highlights?

16   A.   Yes.

17   Q.   You don't have to read all of them.  Just some of the

18   more notable ones.

19   A.   I'm going to refer to my CV again.  So in 2018, I

20   received the Milton Helpern Award from the pathology section

21   of the American Academy of Forensic Sciences.  That's

22   basically a lifetime achievement award for service to the

23   Academy and service to the field of forensic pathology.

24   Milton Helpern was a giant several generations removed from

25   me, one of the founding fathers of the practice of forensic

1    pathology.

2         I received some awards from the National Association of

3    Medical Examiners, including the STAR Award for Service, Time,

4    Attitude, and Respect.  I received the Outstanding Service

5    Award from the National Association of Medical Examiners.  I

6    received a Teacher of the Year Award from the Anatomic

7    Pathology Division of the University of Minnesota in 2010.  So

8    I assume that was voted on by the residents that would have

9    rotated through my office.

10        My military awards include a Defense Meritorious Service

11   Medal, a Joint Service Commendation Medal, a Joint Meritorious

12   Unit Award, and I was a Distinguished Graduate of commissioned

13   officer training when I did my officer training in 1998.

14   Q.   And those military awards came from the Department of

15   Defense?

16   A.   Correct.

17   Q.   Have you given presentations in Kentucky in your area of

18   expertise?

19   A.   Yes.

20   Q.   And given presentations that Dr. Ralston has attended?

21   A.   I believe Dr. Ralston was in attendance, yes.

22   Q.   Okay.  And what was the subject matter that you spoke on

23   there?

24   A.   So that was in 2001.  I was an invited guest speaker at

25   the state coroner's conference, and I believe the topics I

1   spoke on was investigating infant deaths and the 9/11 attack

2   on Washington D.C.

3   Q.   Do you personally know Dr. Ralston?

4   A.   I do.

5   Q.   And are you aware -- well, fair to say that there were

6   letters prepared in this case by the government that

7   documented his conclusions in this case?

8   A.   Yes.

9   Q.   And are those letters, two letters, letters that were

10  provided to you and that you reviewed?

11  A.   Yes.

12  Q.   And when Dr. Ralston prepared his first letter, had you

13  been retained by the defense?

14  A.   No.  I believe his first letter predates your contacting

15  me by several months, if I have my dates right.

16  Q.   And if you're aware, how is it that I, as Dr. Siefert's

17  attorney, found you?

18  A.   I believe a couple of my colleagues gave you my name.

19  One of those would be Dr. Greg Davis, who is a professor of

20  pathology at the University of Kentucky and also a very

21  nationally regarded forensic pathologist.  And then I believe

22  Dr. Amy Hawes, who practices in Tennessee, also gave you my

23  name.  And I know Amy because we have served on a committee

24  together and worked together for years.

25  Q.   What role, if any, did Dr. Amy Hawes have --

1           MR. LYNCH:  Objection, Your Honor.  Relevance.

2           THE COURT:  Sustained.

3     BY MS. GERDES:

4     Q.   Was Dr. Amy Hawes a consultant of the government's on

5     this case?

6     A.   I believe so, yes.

7     Q.   Is it fair to say that you have a 27-page CV?

8     A.   Yes.

9     Q.   And it documents many -- basically, the highlights of

10    your professional career and some of the things that you've

11    done over the course of that time?

12    A.   Yes.

13    Q.   Does it also include publications that you have authored

14    or participated in authoring?

15    A.   Yes.

16    Q.   And have you written on the subjects that you're going to

17    be discussing today, forensic pathology and anything related

18    to death investigations?

19    A.   Yeah.  I mean, I don't know that they directly relate to

20    what we're touching on today, but I've certainly written about

21    drug related fatalities in my publications.

22    Q.   Fair enough.  And have your publications, have any of

23    them been peer reviewed?

24    A.   Yes.

25    Q.   Approximately how many times have you been published,

1    Dr. Baker?

2    A.   I'm just referring to my CV.  So it looks like about 30

3    or 31 publications, either in peer reviewed journals or

4    through the College of American Pathologists, and then two

5    book chapters and five reviews, editorials, or commentaries.

6    Q.   And these peer reviewed journals and the books, fair to

7    say that they're publicly available, or to the members, or

8    people across the nation can read these things?

9    A.   You could.  I mean, some of them would be behind a

10   paywall.  If you didn't have a subscription to the journal,

11   you may have to buy the paper.  But yeah, they're out there on

12   PubMed.  Or in the case of American Pathologists, you'd have

13   to get those publications from them.

14   Q.   And have you also trained a number of medical examiners

15   and fellows?

16   A.   Yes.

17   Q.   Now, you said your day job is as a medical examiner in

18   Minnesota.  Is it fair to say that you're testifying here

19   outside of the scope of your day job?

20   A.   Correct.  I'm testifying here in my private capacity as a

21   forensic pathologist.  I am not here as a representative of

22   any county in Minnesota.

23   Q.   And what is your billing rate per hour, sir?

24   A.   I charge a flat rate of $600 per hour for my time,

25   whether it's conference calls with attorneys, research,

1    writing reports, reviewing records, et cetera.

2    Q.   And do you have a flat rate for when you come to court,

3    days that you're traveling for testimony?

4    A.   Yes.

5    Q.   And when you're traveling for testimony, what, if any,

6    impact does that have on the work you do back in Minnesota?

7    A.   I'm not sure I understand the question.

8    Q.   I'll rephrase it.  Do you have to take a day off?

9    A.   Yes.  I'm here on my personal time.  I'm not here on my

10   day job time.

11   Q.   And to date, what have you billed for your work on this

12   case?

13   A.   Counting today, my total work for this case is likely to

14   come in at around 36 or 37 thousand dollars.

15   Q.   Now, in the scope of being the medical examiner in

16   Hennepin County, would it be fair to say that you testify

17   regularly for the prosecution?

18   A.   So to clarify, I testify regularly.  But in the state of

19   Minnesota, by statute and by Supreme Court decree, medical

20   examiners are independent.  So the overwhelming majority of

21   the subpoenas I get are, in fact, issued by the prosecution,

22   but we would not view ourselves as testifying, quote/unquote,

23   for the prosecution, if that makes sense.

24   Q.   It makes sense.  So essentially, you're an independent

25   witness.  But typically, you find yourself, more often than

1    not, being called by the prosecutor in the case, versus the

2    defense attorney in the case?

3    A.    Correct.

4    Q.    Have you testified for defense attorneys in criminal

5    cases?

6    A.    Not in the state of Minnesota.  But yes, I have.

7    Q.    In your expert capacity?  Or tell us about when you've

8    testified for defense attorneys.

9    A.    So in my private capacity, I do occasionally take

10   criminal cases from other states.  I would never do that in

11   the state of Minnesota.  There's too much potential for

12   conflict.  But, yes, I have, on occasion, worked with defense

13   attorneys in other states in criminal matters.

14   Q.    I want to talk to you about the standards for death

15   investigations that are set forth by NAME.  If you need to

16   look at the paper articulating the standards, just let us

17   know.

18       Does NAME set forth standards for death investigations in

19   the context of drug related deaths?

20   A.    It does.

21   Q.    And what is the standard that NAME sets forward?

22   A.    If I can refer to the actual document, I will just read

23   it.

24   Q.    Please do.

25   A.    So with regard to potential drug related fatalities, the

1    NAME standard reads, "The forensic pathologist shall perform a

2    forensic autopsy when the death is by apparent intoxication by

3    alcohol, drugs, or poison unless a significant interval has

4    passed and the medical findings and absence of trauma are well

5    documented."

6    Q.   So there's one exception to when the standard is autopsy,

7    correct?

8    A.   Correct.

9    Q.   What is that one exception?

10   A.   So that one exception is generally when somebody appears

11   to have overdosed, but they're resuscitated by EMS.  They make

12   it to the hospital.  They may not recover their neurological

13   function because their CPR went on for so long, but they're

14   hospitalized for several days, maybe longer.  And during that

15   hospitalization, they get all kinds of CT scans.  They get a

16   coronary artery catheterization.  They get head-to-toe

17   clinical examinations.  Basically, the clinicians have ruled

18   out everything that an autopsy would rule out had that person

19   died at home.

20        So when they're pronounced dead five or six days later in

21   the hospital, there's no reason to bring them to the ME's

22   office for a forensic autopsy because already you know all

23   this other stuff has been ruled out.  Ideally, the hospital

24   still has the person's admission blood specimen so you can run

25   the toxicology testing and find out what it is that

1    precipitated their arrest.

2          Now, those are a minority of the fatalities we see in the

3    U.S.  Most of the cases that we medical examiners deal with

4    are people who are either found dead outside of the hospital

5    or pronounced dead in the back of an ambulance or in the

6    emergency room.  The exception cases really make up a very

7    small percentage of our drug fatalities.

8    Q.   With respect to the cases that you reviewed for the

9    purposes of your testimony today, did any of those cases fall

10   within that exception that you just described?

11   A.   No.  None of the individuals we'll be discussing today

12   had protracted hospitalizations or extensive pre-autopsy

13   clinical workups before they were pronounced dead.

14   Q.   So the standard set forth by NAME for these deaths would

15   be to conduct an autopsy for a death investigation?

16   A.   Yes.

17   Q.   And explain to us, what is the underpinning of that

18   standard in the context of drug related deaths?

19   A.   So the bottom line is diagnosing a death as being due to

20   drug intoxication or contributed to by drug intoxication is a

21   diagnosis of exclusion.

22          So what that means is you do an autopsy, and you confirm

23   the person doesn't have a thrombosed coronary artery or a

24   ruptured heart attack or a massive pulmonary embolism or a

25   massive bleed into their brain from an aneurysm or an aortic

1    dissection.  Any one of a number of catastrophic medical

2    conditions that would make all the toxicology findings a moot

3    issue, right?  Because if a person dies from a thrombosed

4    coronary artery, it has nothing to do with the oxycodone they

5    may have taken.

6            THE COURT:  Similarly, like someone's jumping out of

7    a plane, the parachute doesn't go out, and they die and test

8    positive for COVID.  I'm using a generic example.  I mean,

9    they obviously died because of the jumping out of the plane.

10   The fact that they tested positive for COVID, the fact that

11   they may have had drugs in their system, but if they had one

12   of those other things, that was the cause of death, the fact

13   that they have an embolism or whatever you described?

14           THE WITNESS:  That's correct, Your Honor.  There's

15   any number of autopsy findings that make the toxicology

16   results --

17           THE COURT:  Kind of a moot point?

18           THE WITNESS:  Exactly.

19           THE COURT:  Fair enough.

20   A.   That's the entire reason you do autopsies in these cases.

21   Because until you've done that, you can't know what, if any,

22   significance to put on the postmortem drug concentrations or

23   even the presence of the drugs.  You have to do the autopsy to

24   rule out the competing causes of death.  That's what we mean

25   by it's a diagnosis of exclusion.

1    The illusion that you can just stick a needle into a

2    decedent's body, send some blood off to a lab and whatever

3    number comes back from the lab is your cause of death is just

4    that.  It's an illusion.  It only has meaning when you put it

5    in the context of what did I find during this person's

6    autopsy.

7    Q.    Have there been situations where a body has come to you

8    in your lab and the belief was that it was an overdose drug

9    related death, and the autopsy proved that to be wrong?

10   A.    Oh, yes.  That happens quite frequently.  We bring people

11   into the office all the time who have a history of drug use.

12   Maybe it's through medical channels, maybe it's illicit drug

13   use.  But that history alone is enough to trigger an autopsy

14   in that case.

15        It's not uncommon for that person's toxicology to, in

16   fact, come back negative, and it turns out they just had a

17   really enlarged heart or really bad coronary arteries or a

18   cancer they were ignoring or didn't know they had.  Whatever

19   the case might be.

20   Q.    Are there studies that speak to the error rate in cause

21   of death or contributing cause of death determinations, absent

22   an autopsy?

23   A.    Yes.

24   Q.    And tell us about that.

25   A.    So, for example, if you were to look at the current NAME

1    position paper on recommendations for investigating apparent

2    opioid and drug related fatalities, they cite multiple studies

3    over the course of multiple years that would say the error

4    rate is about 20 to 30 percent.  If you're not doing

5    autopsies, if you're just doing external exams and toxicology,

6    that's kind of the batting average you'll have is 20 to 30

7    percent.

8         There was a study that was -- well, not published.  It

9    was presented as an abstract in 2016 at the American Academy

10   of Forensic Sciences meeting, and I'm just going to pull that

11   abstract up and reference it as I continue my answer.

12   Q.   Please do.

13   A.   So in this particular study, they didn't just do external

14   examinations of decedents.  They actually did external exams

15   plus a postmortem CT scan.  So they literally gave the person

16   a CT scan from head to toe.  I'm going to assume everybody in

17   the room knows what a CT scan is.  Super fancy x-rays with

18   really high levels of resolution that show you everything from

19   the head to the toes.

20        What they did is they took a cohort of people believed to

21   have died of potential drug related causes and did the

22   external exam --

23             MR. LYNCH:  Your Honor, can we have the citation that

24   the doctor is referring to?  I don't think he's referenced the

25   article.  And I just want to confirm --

1        THE COURT:  Something published at the American

2   Academy of Forensic Science meeting in 2016.

3        You can show it on the ELMO.  That's fine.

4        MS. GERDES:  I'll move to admit it.

5        THE COURT:  Ladies and gentlemen, we're not going to

6   be admitting articles and documents.  You can certainly refer

7   to them.  You can ask him about them.

8        There you go, Mr. Lynch.

9        MR. LYNCH:  Thank you.

10        THE COURT:  Thank you.

11        THE WITNESS:  Shall I continue my answer?

12   BY MS. GERDES:

13   Q.  Yes, please.

14   A.  So this was a prospective study, meaning that they took

15   people in advance over a course of time, and each of these

16   deceased individuals got an external examination and a

17   postmortem CT, and then they got an autopsy.

18        The people who did the autopsies were blinded to what the

19   radiologist saw on the CT.  The radiologists who read the CTs

20   were blinded to what the autopsy showed until the end of the

21   study.  Then they unblinded all the results and compared them.

22        What they were going for is, is CT scanning plus external

23   good enough to replace autopsies in this particular group of

24   patients.

25        And the answer is, for decedents over the age of 40, they

1    were only right 75 percent of the time with the external exam

2    plus the CT.  So this is one step beyond just looking at a

3    decedent's body and drawing blood.  This is looking at their

4    body, doing a CT scan, and drawing blood.  Even then, you're

5    only right about three-quarters of the time.

6    Q.   And did you review Dr. Ralston's testimony in this case?

7    A.   I did.

8    Q.   And do you recall Dr. Ralston being directed to these

9    studies, and he suggested that maybe that error rate is

10   attributed to potentially coroners getting it wrong versus

11   medical examiners?

12   A.   I do recall him saying something to that effect, yes.

13   Q.   So in the study that you're talking about, if somebody is

14   performing an autopsy, who is that person?

15   A.   In the study that I just referenced, those would all be

16   qualified forensic pathologists and the fellows that they're

17   training.

18   Q.   And so in those cases, they were still wrong 25 percent

19   of the time, forensic pathologists?

20   A.   So the combination of the CT scan plus the external

21   examination didn't get the right diagnosis a quarter of the

22   time.  You had to have the autopsy to get it right.

23   Q.   Correct.  Did you also review testimony where Dr. Ralston

24   was talking about the therapeutic range of oxycodone in a

25   person's system?

1    A.   Yes.

2    Q.   And he put that therapeutic range, the top of the range

3    to be 200?

4    A.   200 nanograms per milliliter, yes.

5    Q.   Beyond that, somebody would start to experience toxic

6    effects.  Do you recall that?

7    A.   I took that to be the gist of his testimony, yes.

8    Q.   Now, have there been studies done in the context of

9    people who are on chronic opioid therapy that suggests their

10   therapeutic range is higher than that?

11   A.   One study that I'm aware of, yes.

12   Q.   And tell us about that study.

13   A.   In this particular study, a pain management physician

14   collected data from his own patients and patients from other

15   pain management physicians, and they actually looked at blood

16   oxycodone concentrations in chronic pain patients who had been

17   on long-term therapy.  And what they found was they can run at

18   much higher levels than the, quote/unquote, therapeutic range

19   that you would see, for instance, on the toxicology reports

20   that Dr. Ralston was relying on.

21   Q.   And what is the therapeutic range that people who are on

22   chronic opioid therapy can run on?

23   A.   Again, I mean, the numbers are small, but the average,

24   the mean for the cohort of patients in this particular

25   study -- for example, for oxycodone -- their average was 360

1    nanograms per ML.  And the majority of these individuals were

2    able to drive cars, go to work, participate in activities of

3    daily living.  I mean, they were not invalids because of the

4    amount of medication in their systems.  They were functioning.

5    Q.   And did the study offer kind of what the top of that

6    range was?  You said 360 is the average.

7    A.   I'd have to pull the study up, counselor, to see what the

8    range was.

9    Q.   Please do.

10   A.   So for the oxycodone, immediate release group, the mean,

11   or the average, was 360 plus or minus 776 nanograms per ML.

12   So on a bell-shaped curve, you have a group ranging from, you

13   know, up to 1,000 nanograms per ML in that group.  The total

14   range for that group was 5 nanograms per ML to over 3,000.

15   Q.   So there were some people who were registering in the

16   3,000 range who were still functioning?

17   A.   I would suspect it was probably only one, given the small

18   numbers.

19   Q.   Fair enough.

20   A.   But the point of all this is --

21   Q.   Tell us.

22   A.   The, quote/unquote, therapeutic range that you get back

23   on a report from a toxicology lab is probably based on people

24   who were using opioids short-term for things like pain after a

25   dental procedure or pain after an orthopedic procedure.  You

1   have to be really careful applying that to chronic pain

2   patients on long-term opioids.  That was the point of this

3   study.  It did, in fact, show that people on long-term opioids

4   can routinely run at much higher concentrations than you would

5   expect.

6   Q.   And did this study include any other drugs besides

7   oxycodone?

8   A.   It did.

9   Q.   And for the purposes of your testimony today, what are

10  the other drugs that are relevant for us to discuss?

11  A.   The only other one would be hydrocodone because I don't

12  believe -- I don't believe medical fentanyl is an issue in any

13  of the cases we're discussing today, nor is Methadone,

14  morphine, or propoxyphene.  Those are all addressed in the

15  study, but I don't believe any of those are relevant for

16  today's purposes.

17  Q.   Tell us about the hydrocodone levels.

18  A.   So in this particular study, there were 11 patients on

19  long-term hydrocodone.  Their mean, their average

20  concentration was 94.7 nanograms per ML with a range of 18 to

21  396.  Again, these are people who 100 percent of them were

22  fully functional.  100 percent were able to drive.

23  Three-quarters of them were able to work or do volunteer work

24  with those blood concentrations.

25  Q.   And what was the purpose of this study and the goal of

1    this study?

2    A.   So the author had previously published some of these

3    data, and I'm just going to quote one of the "major problems"

4    that he identified which led him to perform the study.   And

5    that major problem was, "Some physicians have been accused of

6    malpractice based solely on opioid blood level concentrations

7    in patients who have died."

8    Q.   And was another major problem that he identified as one

9    object of the study was to show that chronic pain patients may

10   function well if they are tolerant to high doses of opioids

11   and maintain a significant blood level?

12   A.   Yes.

13   Q.   And was another goal of this study --

14          MR. LYNCH:   Objection, Your Honor.   This is leading.

15          THE COURT:   It is.   I'm going to sustain that.

16   BY MS. GERDES:

17   Q.   What was the first goal of the study listed in the

18   article published with the picture on the top?

19   A.   So the first goal, according to the author, is "To

20   prevent the arbitrary application of published therapeutic

21   opioid blood levels in non-tolerant patients with acute or

22   short-term conditions (postoperative or dental) to chronic

23   pain patients who were tolerant and treated with high opioid

24   dosages."

25   Q.   And what was the first result that the author of the

1   study listed?

2   A.   The first result that he listed in the reference that

3   you're using now, counselor, is, "Many opioid blood

4   concentrations in fully functional patients were above the

5   therapeutic and toxic ranges published for non-tolerant

6   persons."

7   Q.   Getting back to the standards in NAME's position paper on

8   death investigations, I want to ask you a couple of things

9   about that and see if you agree with certain things in here.

10       Tell me if you agree with this statement, Dr. Baker.

11  "The simple presence of a drug concentration within the

12  reported lethal range does not necessarily make the drug the

13  cause of death."

14  A.   Yes, I agree with that.

15  Q.   "Tolerance accounts for some of the overlap between

16  therapeutic, supra-therapeutic, and lethal concentrations of

17  opioid analgesics" --

18       MR. LYNCH:  Your Honor, objection.  This is again

19  leading the witness.  She's reading a statement.

20       THE COURT:  She can ask him to read it.  Why don't

21  you just read it.  You asked Thomas to read quite a few

22  things, or you've asked witnesses to read quite a few things

23  during the trial.

24       MS. GERDES:  To avoid reading the whole paper in the

25  record, if I can address the witness's attention to certain

1    portions and ask if he agrees with the statements to be

2    efficient.

3              THE COURT:  Well, in the absence of -- that's fine.

4    You can do that.

5              MS. GERDES:  Thank you, Your Honor.

6    BY MS. GERDES:

7    Q.   "Tolerance accounts for some of the overlap between

8    therapeutic, supra-therapeutic, and lethal concentrations of

9    opioid analgesics observed in decedents, complicating the

10   interpretation of postmortem concentrations of opioids and

11   other drugs."

12             Do you agree with that?

13   A.   I do.

14   Q.   "Evidence of a history of prescription opioid use may

15   allow a pathologist to infer some degree of opioid tolerance,

16   as opposed to a decedent's being opioid naive, remembering

17   that such an inference makes assumptions about appropriate use

18   of the prescription medications that may or may not be true."

19             Do you agree with that?

20   A.   I do.

21   Q.   How long has this been the position of NAME, that an

22   autopsy is -- shall be done in the context of a drug related

23   death?

24   A.   So in terms of the forensic autopsy performance standards

25   that we referenced earlier, I don't know exactly when the

1    standard that you shall perform an autopsy in those cases went

2    into effect, but I do know it was in effect in 2015, prior to

3    the earliest date of death of any of the cases we'll be

4    discussing today.

5    Q.    You said you read Dr. Ralston's testimony.  There was a

6    suggestion that a lesser standard applies when somebody is

7    coming and offering an opinion on whether something was a

8    contributing cause of death.

9          Do you recall that testimony?

10   A.    I do.

11   Q.    Is that consistent with the position of NAME?

12   A.    No, it is not.

13   Q.    And tell us where in the position paper that NAME stands

14   on that as articulated.

15   A.    So what you have highlighted on the screen right here,

16   counselor, is basically an executive summary in the abstract

17   of NAME's position paper.  You'll notice that the very first

18   point in that executive summary is "Autopsy provides the best

19   information about a decedent's medical condition for optimal

20   interpretation of toxicology results, circumstances

21   surrounding death, medical history, and scene findings.  The

22   panel considers autopsy an essential component of

23   investigating apparent overdose deaths."

24         Now, if you skip down to point number 5, you'll notice

25   that the paper specifically has both cause and contributing

1    factor in the parenthetical, but at no point in this position

2    paper am I aware of any statement by NAME that says there's a

3    lesser standard if you're just going for this drug contributed

4    to the person's death, as opposed to caused it.  Point

5    number 5 is clearly in the context of the overarching

6    statement that the panel considers autopsy an essential

7    component.

8    Q.   And what does point number 5 say?

9    A.   Point number 5, in its entirety, says, "When death is

10   attributed to a drug or a combination of drugs as cause or a

11   contributing factor, the certifier should list the drugs by

12   generic name in the autopsy report and death certificate."

13   Q.   And so this is saying what the certifier needs to do for

14   the autopsy report and the death certificate.  Is that a

15   beyond a reasonable doubt standard when you're certifying a

16   death certificate or an autopsy report?

17   A.   No.  I'm not aware of any medical examiner that uses the

18   beyond a reasonable doubt mindset to certify a death.  That

19   would be an almost impossible bar for us to clear.

20   Q.   Fair enough.  And do you have situations when you're the

21   medical examiner where, say, a decedent's family does not want

22   an autopsy performed in the case of a drug related death?

23   A.   Yes.

24   Q.   And is there a conversation that you have with them in

25   those situations?

1    A.   There is.

2    Q.   Tell us about that.

3    A.   So as of 2015 in the state of Minnesota, our state

4    statutes were amended so that under certain circumstances,

5    based on religious or cultural reasons, families can object to

6    a medical examiner-ordered autopsy.  And in certain

7    situations, I am legally bound to honor that objection.  One

8    of those situations is if the death appears to be from a drug

9    overdose.

10        If I'm not concerned about murder, if I'm not concerned

11   that this death is a threat to public health, if my only

12   concern is did this person die of natural disease versus

13   drugs, if the family objects to that autopsy, I am legally

14   bound to honor that objection.

15        Now, my investigators will normally explain to the family

16   the repercussions of not having an autopsy that could range

17   all the way up to, perhaps, a life insurance policy doesn't

18   pay out, or perhaps it pays out differently.  There may be

19   repercussions down the road.  Please think about this.

20        If the family still objects to the autopsy, then we

21   certify those deaths as undetermined in cause and manner

22   because we couldn't do an autopsy to figure out why that

23   person died or resolve the issue of drugs versus natural

24   disease.

25   Q.   So you told us you do not agree with the statement that a

1    lesser standard applies when somebody is certifying a drug

2    related death absent an autopsy report.  What about when

3    somebody is coming into court and offering opinion testimony

4    in a criminal trial on contributing cause of death.  Do you

5    believe a lesser standard applies based on the standards that

6    we're talking about?

7    A.   So I think I understand the question, counselor.  So

8    there's nothing in the NAME position papers that say a lesser

9    standard applies to your performing an autopsy if you're just

10   going for a contributing cause versus the main cause of death.

11        As I agreed to earlier, the standard for your level of

12   competence and your opinion on a death certificate is not

13   beyond a reasonable doubt.  If you haven't even met the

14   minimum standards to properly fill out the death certificate

15   based on the data you have, to me, by definition, you haven't

16   met the standard to bring an opinion into court and testify as

17   to how you think that person died or --

18             MR. LYNCH:  Objection.  This is speculation.  He

19   can't --

20             THE COURT:  I'm going to sustain the objection.  This

21   is more inference that can be raised in a closing argument.

22             MR. LYNCH:  Move to strike the testimony, Your Honor.

23             MS. GERDES:  Your Honor, I'm going to ask that this

24   remain.  This was fully discussed on Dr. Ralston's testimony.

25   Fully.

1          MR. LYNCH:  Dr. Ralston's --

2      (Indiscernible crosstalk.)

3          THE COURT:  Hold on.  I'm not going to strike the

4   testimony, but move on.

5          MS. GERDES:  I will.

6          THE COURT:  The objection is sustained.

7          MS. GERDES:  Thank you.

8   BY MS. GERDES:

9   Q.   Now, in the state of Kentucky, are you familiar with who

10  is responsible for conducting death investigations?

11  A.   I'm not going to be able to quote Kentucky statute

12  chapter and verse.  I think I have a working familiarity with

13  how things work here.  Obviously, I operate under different

14  statutes.

15  Q.   Did you review the Kentucky statutes?

16  A.   Briefly, yes.

17  Q.   Tell me if this is an accurate statement.  "The coroner

18  of each county shall investigate the cause and manner of

19  all deaths that are defined by KRS 72.450 as a coroner's

20  case."

21      Did I read that accurately?

22  A.   Yes.  I recognize that.

23  Q.   72.450 defines a coroner's case as "a case in which the

24  coroner has reasonable cause for believing that the death of a

25  human being within his or her county is caused by any of the

1    conditions set forth in KRS 72.025."

2        Did I read that correctly?

3    A.   You did.

4    Q.   And 72.025 lays out the circumstances requiring

5    postmortem examination to be performed by a coroner.  One of

6    those circumstances where coroners shall require a postmortem

7    examination to be performed is "when the death of a human

8    being appears to be the result of the presence of drugs or

9    poisons in the body."

10       Did I read that accurately?

11   A.   You did.

12   Q.   And under Kentucky law, do coroners have subpoena power

13   under 72.420?

14   A.   So I'm not a lawyer, but it does say the --

15       MR. LYNCH:  Objection, Your Honor.  This is

16   speculative.

17       THE COURT:  Overruled.  This is a statute.  She's

18   just asking if they have subpoena power.

19   A.   I mean, counselor, to answer your question, it clearly

20   says the coroner may issue subpoenas.

21   Q.   Thank you.  Let's transition to some of the findings in

22   this case.  First, we're going to talk about Mr. Stima.

23       THE COURT:  Are you going to get into specifics now?

24       MS. GERDES:  Yes, Your Honor.

25       THE COURT:  Very well.

1  BY MS. GERDES:

2  Q.  Dr. Ralston, is it fair to say you reviewed a number of

3  records related to --

4          THE COURT:  Dr. Baker.

5          MS. GERDES:  Thank you, I appreciate it.

6  BY MS. GERDES:

7  Q.  Dr. Baker, is it fair to say you reviewed a number of

8  records provided to you with respect to the death of James

9  Stima?

10 A.  Yes.

11 Q.  And those records included a death certificate; is that

12 fair to say?

13 A.  Yes.

14 Q.  And in the case of Mr. Stima, he also had an autopsy and

15 a toxicology report done, correct?

16 A.  That is correct.

17 Q.  Now, when the records for Mr. Stima were first presented

18 to you, the records the defense received from the government,

19 did you notice anything was missing?

20 A.  I did.

21 Q.  And what was missing?

22 A.  My recollection is what was provided to me is the autopsy

23 report was just the cover page of the autopsy.  It did not

24 include the body of the autopsy report, nor did it include the

25 actual toxicology report.  It just included transcribed

1    toxicology results on the single page that I did have.

2    Q.   So, basically, the full autopsy report was missing?

3    A.   Correct.

4    Q.   And the actual toxicology report was missing, correct?

5    A.   Correct.

6    Q.   Who did you alert about that?

7    A.   That would have been you.

8    Q.   After you alerted me, did there come a time when

9    additional information was provided by the government to me

10   and given to you?

11   A.   Yes.

12   Q.   And what did that additional information include?

13   A.   It included the autopsy report and the toxicology report.

14   It also included the death scene photographs, but I don't

15   believe I ever got the autopsy photographs.

16   Q.   And so then when Dr. Ralston formed his initial opinion,

17   that was an opinion he formed without the full autopsy report

18   and without the toxicology report?

19   A.   It's my understanding, yes.

20   Q.   What were the results of Mr. Stima's toxicology report?

21        THE WITNESS:  With the Court's permission, I'm going

22   to refer to my report, and I'll probably be doing that

23   frequently this morning.

24        THE COURT:  That's fine.  The other experts have

25   referred to their reports throughout their testimony.  No

1    objection.

2            THE WITNESS:  Thank you, Your Honor.

3    A.   So with regard to Mr. Stima's toxicology results, his

4    postmortem blood was positive for benzoylecgonine at a

5    concentration of 570 nanograms per ML, fentanyl at 2.1

6    nanograms per ML, oxycodone at 14.1 nanograms per ML, and

7    gabapentin at 87 micrograms per ML.

8            MS. GERDES:  If we can pull up, please, Mr. Stima's

9    death certificate.  While we're doing that, we'll continue on.

10   Q.   Now, that level of fentanyl in Mr. Stima, have you ever

11   certified a death certificate on that level of fentanyl,

12   meaning have you ever said that that level of fentanyl,

13   standing alone, was a lethal level of fentanyl?

14   A.   I have.

15   Q.   And that level of oxycodone -- that level, standing

16   alone -- have you ever certified that level as a drug death?

17   A.   By "stand alone," I assume you mean that was the only

18   thing found in the decedent's blood of any significance?

19   Q.   Exactly.

20   A.   No.  I've never seen an oxycodone fatality in an adult

21   that low.  I wouldn't consider that to be a life-threatening

22   level if that were the only thing present.

23   Q.   Now, do you agree -- well, when Dr. Ralston authored

24   his -- well, when Dr. Ralston conveyed his opinion through the

25   DOJ's letter in this case, did Dr. Ralston even mention

1    fentanyl as one of the substances that caused the death?

2    A.   He did not specifically mention fentanyl, no.

3    Q.   What was the, quote, illicit drug that he mentioned?

4    A.   I'm going to quote his statement as represented by DOJ

5    directly.

6    Q.   Please.

7    A.   "Consumption of illegal drugs, like cocaine, was the

8    principal contributing factor to the patient's death."  That

9    was his opinion on July 7, 2022.

10        On December 19, 2022, he again stated, "Consumption of

11   illegal drugs, like cocaine, was the principal contributing

12   factor into the patient's death."

13   Q.   And benzoylecgonine, what is that?

14   A.   So benzoylecgonine is a metabolite, a breakdown product,

15   if you will, of cocaine.  So with many drugs or medications

16   that we humans ingest, one of the things the body does is it

17   changes the chemical structure of that drug or medication to

18   something else, usually on the pathway to that drug eventually

19   getting excreted from the body, most often in the urine, but

20   in the bile or the stool.  There's other ways.

21        So benzoylecgonine is what the body changes cocaine into

22   as part of metabolizing cocaine.  The most important thing to

23   understand about benzoylecgonine is it's not pharmacologically

24   active, meaning it doesn't do to your body what cocaine does.

25   Cocaine will do things like drive up your blood pressure,

1    drive up your heart rate, stimulate you.  That's what makes

2    cocaine dangerous.  Benzoylecgonine, by itself, is generally

3    held to be pharmacologically inactive.

4    Q.   So what role, if any, did cocaine -- given that you see

5    benzoylecgonine, what role, if any, did cocaine play in his

6    death?

7    A.   So cocaine did not play a direct role in Mr. Stima's

8    death because he didn't have cocaine in his blood at the time

9    he passed away.  The most you can say about his cocaine use is

10   he used cocaine at some point in the recent past because

11   that's why he's still got the breakdown product in his blood.

12   But he's not actively under the influence of cocaine at the

13   time he passes away so I would not have put it on his death

14   certificate.

15   Q.   So you wouldn't have even listed it, period, on the death

16   certificate?

17   A.   I might list recent cocaine use on a different part of

18   the death certificate just so I captured it, but I wouldn't

19   write the death certificate to imply that cocaine actually

20   contributed as the cause of his death.

21   Q.   And the way that Dr. Ralston's opinion was conveyed to

22   you was he was conveying that cocaine played a role in the

23   death, caused the death?

24   A.   I mean, his terminology is "like cocaine, was the

25   principal contributing factor to the patient's death."  I'm

1   not sure --

2          MR. LYNCH:  Your Honor, that mischaracterizes the

3   letter.  It says, "consumption of illegal drugs," plural,

4   "like cocaine ..."

5   BY MS. GERDES:

6   Q.   Did consumption of cocaine, in your opinion, play a role

7   in Mr. Stima's death with the benzoylecgonine in his system?

8   A.   It did not play a direct role in Mr. Stima's death.

9   Q.   Okay.  And what do you -- in your opinion, what was the

10  lion's share cause of Mr. Stima's death?

11  A.   The lion's share of his death would be attributable to

12  the fentanyl that he has in his system.

13  Q.   And did Dr. Ralston even mention the fentanyl at all by

14  name?

15  A.   In the opinions conveyed by the U.S. DOJ, no.  Fentanyl

16  was not specifically called out.

17  Q.   Dr. Baker, can you offer an opinion on whether, in any of

18  these cases, on whether the prescriptions or the prescribing

19  decisions of a physician contributed to the cause of death?

20  A.   I would not offer an opinion on prescribing habits of a

21  clinician.  To me, that's just too far outside the swim lane

22  of a forensic pathologist.  We don't treat living patients.

23  We don't write prescriptions, certainly not for controlled

24  substances.  That would be the bailiwick of clinicians, not

25  people who do autopsies for a living.

1    Q.   And do you believe that a pain management physician is

2    qualified to offer an opinion on contributing cause of death,

3    absent autopsy reports?

4              MR. LYNCH:  Objection, Your Honor.  Relevance and

5    speculation.

6              THE COURT:  Overruled.

7    A.   Well, by definition, as people who certify deaths for a

8    living, we shouldn't be opining cause of death if there hasn't

9    been an autopsy.  And clearly, people who don't certify deaths

10   for a living shouldn't be opining on cause of death when

11   there's no autopsy.

12   Q.   Do you recall if Mr. Stima had any comorbidities?

13   A.   I don't recall in his medical history that he had

14   comorbidities.  Now, it turns out the autopsy report did

15   disclose that he had a 650 gram heart, which is a pretty

16   enlarged heart.  I'd also point out that was in the body of

17   the autopsy report, not the cover page of the autopsy report,

18   so neither Dr. Ralston nor I knew about that part until after

19   we requested the full autopsy report.

20   Q.   And what -- go ahead.

21   A.   I was going to say a heart of that weight is usually

22   indicative of hypertension, although there are other causes

23   for a heart to be that large.

24   Q.   So if the statement was made that you and Dr. Ralston

25   agree on the circumstances of Mr. Stima's death, do you just

1    agree with that statement in its totality?

2    A.   I think that seriously oversimplifies things to say that

3    he and I agree on Mr. Stima's cause of death.

4    Q.   Why do you say that?

5    A.   If I were sitting down with an attorney who was about to

6    write a letter representing my opinions in a death, I wouldn't

7    have used the phrase "consumption of illegal drugs like

8    cocaine was the principal contributing factor to the patient's

9    death."  I would have said, "consumption of fentanyl was the

10   principal contributing factor to the patient's death."

11        Do Dr. Ralston and I agree that the best way to certify

12   Mr. Stima's death would have been mixed fentanyl and oxycodone

13   toxicity?  Yes, at a very superficial level, I do agree with

14   that.

15        But in further clarification to an attorney, I would say,

16   You need to understand the fentanyl is the lion's share of

17   what explains this individual's death because that fentanyl

18   level alone, in other circumstances, might explain someone's

19   death.  That oxycodone level alone, in other circumstances,

20   would not be a life-threatening level.

21   Q.   Transitioning to Ms. Taylor, Michelle Taylor.  Just tell

22   us about Ms. Taylor, her age, and any comorbidities that she

23   may have suffered from.

24   A.   Ms. Taylor -- and again, I'm referring to my report.

25   Ms. Taylor was a 35-year-old woman who had a history of leg

1    radiculopathy, transverse myelopathy, and back pain and

2    migraines and diverticulitis.

3         From my point of view, as a medical examiner, the

4    comorbidities that would be of most interest would be her

5    hyperlipidemia.  That's generally taken to be things like

6    elevated cholesterol, hypertension, which is high blood

7    pressure, and she had a port-a-cath placed in her body.

8    Q.   Tell the jurors what a port-a-cath is.

9    A.   A port-a-cath is a medical infusion port that's implanted

10   under the skin.  Usually it's put in on the upper chest.  And

11   there's a tube that goes from that port into a vein, call it

12   the subclavian vein, and eventually into the inferior vena

13   cava.  The end of that tube is right above the heart in the

14   inferior vena cava.

15        The reason patients get -- there's a variety of reasons

16   patients get those put in, but it might be for chemotherapy.

17   It might be for chronic infusion of antibiotics for an

18   intractable infection.  It might be for somebody who has

19   really bad IV access and is regularly in the hospital and

20   needs IV access for some reason.  For whatever reason, they

21   have a chronic indwelling catheter where you can just put a

22   substance into that port, and it goes straight into their

23   venous system.

24             THE COURT:  That's different than a PICC line for an

25   infection?

1          THE WITNESS:  Your Honor, it actually functions

2     exactly like a PICC line.  It's just put in a different place;

3     but the end of the catheter is pretty much the same location,

4     right above the right atrium of the heart.

5          THE COURT:  Thank you.

6     BY MS. GERDES:

7     Q.   And was there any evidence that that port-a-cath was

8     still in Ms. Taylor at the time of her death?

9     A.   There was.

10    Q.   And what was that evidence?

11    A.   Referring to my report, Ms. Taylor saw a clinician by

12    name of Dr. Chad Coe prior to the date of death.  There's a

13    note from Dr. Coe that includes, "Will not approve port-a-cath

14    care as we are not using it.  Patient needs it removed."

15         Then at the time of her death, the autopsy pathologist

16    noted, "A palpable subcutaneous object over the right upper

17    chest."  Now, I have to assume that's the port-a-cath Dr. Coe

18    was referencing the day before.

19    Q.   Why would you make that assumption, based on how that

20    object was described in the autopsy report?

21    A.   Because it's pretty much exactly where you would expect a

22    port-a-cath to be, on the upper chest, and you can feel it at

23    autopsy, I mean, because it's right under the skin.

24    Q.   If somebody at autopsy under these circumstances has a

25    port-a-cath that you observed, what would you do?

1    A.    So in addition to the routine autopsy, what I would do or

2    direct any of my physicians or the people that I'm training to

3    do is make sure you get a biopsy or two of the lungs and put

4    them under the microscope to look at as part of the autopsy.

5    Q.    Why would you do that?

6    A.    Because there is a phenomenon in chronic pain patients

7    who have indwelling catheters where a subset of them have been

8    known to grind up their oral medications and inject them into

9    their own port-a-cath or PICC line or other indwelling

10   catheter.

11        Every forensic pathologist who has been doing this long

12   enough has seen cases of that.  The really fancy term is

13   pulmonary granulomatosis.  What that means is when you take an

14   oral medication, about 99 percent of that pill isn't the drug.

15   It's the coloring of the pill, it's the taste of the pill,

16   what makes the pill dissolve slowly.  All of those things are

17   called excipients.  Those things are not soluble in liquid or

18   blood.

19        So when you grind up that pill and shoot it straight into

20   your lungs through the port-a-cath, all of those excipients

21   get caught up in the lung vasculature.  It's like having

22   hundreds of little clots hit your lung at the same time.  It's

23   a very dangerous thing to do.  If it's done frequently enough

24   or long enough, it can actually be fatal.  It's a different

25   mechanism of death than the actual toxicity of the drug

1    itself.

2        I've seen many cases of this in my career.  I've written

3    about this phenomenon.  I'm surprised how few clinicians are

4    aware that this does sometimes happen, but virtually every

5    forensic pathologist has seen cases of this.  So that's why

6    any time I see somebody who has an indwelling catheter, if

7    there's any question about chronic pain, chronic use of pain

8    medication, access to narcotics, it's trivially easy to take a

9    lung biopsy at autopsy and look at it under a microscope.

10   Q.   And that would answer the question as to whether or not

11   the patient was crushing up pills and putting them in the

12   port-a-cath?

13   A.   Yes.  It would resolve the issue because the findings

14   under the microscope are not at all subtle.

15   Q.   And was that done in this case?

16   A.   Unfortunately, it was not.

17   Q.   Can liquid pain medication also be injected in a

18   port-a-cath?

19   A.   Sure.  If the liquid pain medication is designed for

20   intravenous use, then yes, it would be perfectly safe to put

21   it in a port-a-cath, just like any IV.

22   Q.   And can morphine come in the form of a liquid pain

23   medication?

24   A.   It's been a while since I've been in a hospital, but

25   liquid morphine existed when I was a medical student.  I

1    assume it still does.

2    Q.   What would you say about the levels of the substances in

3    Ms. Taylor at the time of her death?

4    A.   Would you like me to read off the levels first?

5    Q.   Sure.

6         THE COURT:   Is this from the toxicology report?

7    Q.   Did you put the toxicology results in your report?  If

8    you want us to pull up the toxicology report, we can do that

9    too.

10   A.   So I did type them into my own report.

11   Q.   Okay.   What were her levels?

12   A.   She was positive for oxycodone at a concentration of

13   274 nanograms per ML.  She was positive for oxymorphone, which

14   is a metabolite of oxycodone, at 40.7 nanograms per ML.  She

15   was positive for gabapentin at 17.6 micrograms per ML,

16   Topiramate at 9 micrograms per ML, nortriptyline at 202

17   nanograms per ML, diphenhydramine at 543 nanograms per ML.

18   Somehow I didn't type it in the report, but I also know there

19   was also cyclobenzaprine, and that was 354 nanograms per ML.

20   Q.   So what significance, if any, was that oxycodone level to

21   you, keeping in mind what you told us about the study that

22   suggested for chronic opioid users their therapeutic levels of

23   oxycodone can be higher?

24   A.   Right.  Her oxycodone concentration may be perfectly

25   normal for someone at her level of functionality, given that

1   she's a chronic pain patient, as compared to the,

2   quote/unquote, therapeutic range of 200 that was repeatedly

3   quoted in Dr. Ralston's testimony.

4   Q.   The other substances found in her system, can any of

5   those have a synergistic effect on the oxycodone or anything

6   else in her system?  And when I say "synergistic," do you

7   prefer to use the word additive effect?

8   A.   As a pathologist, I usually use the term "additive" for

9   drugs that have the same general effect but don't do it

10  through the same mechanism.

11       So to answer your question, cyclobenzaprine can be

12  sedating.  In some patients, it would have a central nervous

13  system depressant effect.  Diphenhydramine, which is marketed

14  under the trade name Benadryl, I think almost everybody knows

15  that has a depressant effect because so many people use it as

16  a sleep aid.  So I would say the diphenhydramine and the

17  cyclobenzaprine could have additive central nervous depressant

18  effects, in addition to the oxycodone.

19  Q.   And so for Ms. Taylor, would you agree with the wording

20  of her death on the death certificate?

21  A.   The original death certificate, I would disagree with

22  because it was signed by the Boone County deputy coroner, who

23  just listed "multiple drug intoxication."  That's

24  inappropriate because it doesn't give the reader of the death

25  certificate any useful information.

1    The guidance from NAME and the guidance from the CDC

2  would be, list out every drug you think played a role because

3  when your state health department gets that death certificate,

4  they really don't know how to categorize that death because

5  you didn't tell them what drugs you're talking about.

6    Now, in this case, the Kentucky state medical examiner's

7  office apparently recommends the wording to their coroners.  I

8  would agree with the wording they propose, although I would

9  not have included oxymorphone simply because, in all

10  likelihood, the oxymorphone here is a metabolite of the

11  oxycodone.  You can get pharmaceutical grade oxymorphone, but

12  I don't believe that was prescribed for this particular

13  decedent.  I think, in all likelihood, her oxymorphone is just

14  a metabolite of the oxycodone she was taking.

15  Q.   So, again, are you offering an opinion on the prescribing

16  decisions of an individual physician in this case?

17  A.   No.  As I testified earlier, that's not in the swim lane

18  of people who do autopsies for a living.

19  Q.   Did Dr. Ralston say anything about the port-a-cath in her

20  system or in her body that you're aware of?

21  A.   Certainly not in his representations to the DOJ.  I don't

22  recall if it came up in his testimony.  I just honestly don't

23  recall.

24  Q.   But when you say "in his representations," in the letters

25  that were given to you that conveyed his opinions?

1    A.    Correct.  I don't think he mentioned the port-a-cath or

2    any concerns that could be referable to that.

3    Q.    If we can please look at Ms. Stewart.  Dr. Ralston,

4    before we speak specifics about --

5            MR. GLASSMAN:  Dr. Baker.

6    Q.    I keep doing that.  I have Dr. Ralston's name in my head.

7    I'm sorry.

8    A.    Quite all right.

9    Q.    Dr. Baker, before we speak specifics about Ms. Stewart,

10   let me ask if you agree with the statement.  "One of the

11   greatest mistakes that a forensic pathologist can make with

12   toxicology is opining the cause of death based solely on a

13   drug concentration without consideration of the entire case."

14   A.    I agree with that.

15   Q.    "If the cause of death could be determined just from the

16   toxicology results, forensic toxicologists, not forensic

17   pathologists, would determine the cause of death.  There is a

18   need for a physician with medical and forensic training to

19   interpret the toxicology results in the context of the entire

20   case.  This also highlights the myth of fatal concentration."

21         Do you agree with that?

22   A.    I do.

23   Q.    And tell me if you agree with this.  "The proper

24   determination of the cause of death due to an intoxication

25   requires three factors:

1      "First, the autopsy fails to disclose a disease or

2  physical injury whose extent or severity is inconsistent with

3  continued life;

4      "Second, the toxicology results are in the range

5  typically encountered in such deaths;

6      "Third, the history and circumstances are consistent with

7  a fatal intoxication."

8      Do you agree with that?

9  A.   I do.

10 Q.   Now, turning to Ms. Stewart, was she autopsied?

11 A.   She did not have an autopsy.

12 Q.   And did Dr. Ralston offer an opinion as to her cause of

13 death or contributing cause of death?

14 A.   He did.

15 Q.   And what was that?

16 A.   I'm going to reference his representations to the U.S.

17 DOJ in the two letters they produced.

18      In July, he opined, "the concentration of oxycodone

19 documented in this patient's" --

20          THE COURT:  When you're reading -- it's not just you.

21 I've told everybody who is reading something, we tend to read

22 faster.  The court reporter's got to take it down so try to

23 slow down a little bit.

24          THE WITNESS:  Fair enough, Your Honor.

25          THE COURT:  Thank you.

1    A.   I'll start that over.  The opinion was, "The

2    concentration of oxycodone documented in this patient's

3    toxicology report, combined with many of the patient's

4    comorbidities, such as hypertension and cardiac disease,

5    contributed to this patient's overdose death."

6    Q.   Do you agree with that statement?

7    A.   I do not.  In the absence of an autopsy, that statement

8    is not defensible.

9    Q.   You said the statement is not defensible?

10   A.   Correct.  Because you didn't meet the standard of

11   performing an autopsy, you can't defend the claim that the

12   oxycodone played a role in this person's death.

13   Q.   Did Ms. Stewart have any comorbidities?  Tell us about

14   her.

15   A.   She did.  According to what I gleaned from the provided

16   records, she had lumbar spondylosis -- I should add she was 63

17   years old.  She had lumbar spondylosis, radiculitis,

18   degenerative joint disease, hypertension, which is high blood

19   pressure, atrial fibrillation, which is a form of cardiac

20   arrhythmia, and she had a pacemaker placement.

21   Q.   And for somebody who is 63 with those underlying

22   comorbidities, what significance does that have?

23   A.   Just by virtue of her age alone and the fact that she's

24   got multiple underlying heart conditions, she could very well

25   have a natural disease discernible at autopsy that would make

1   all the toxicology results a moot issue.

2   Q.   Kind of similar to that example that Judge Bunning gave

3   you at the beginning of your testimony?

4   A.   About somebody falling out of an airplane with a

5   nonfunctioning parachute?

6           THE COURT:   That's about as obvious as you can get.

7   That's why I used it.

8   A.   Correct.   The medical analogy would be there are plenty

9   of catastrophic natural diseases that can kill a person that

10  have nothing to do with their toxicological status.

11  Q.   Tell us about kind of the relative numbers -- first,

12  before I get to that question, what is the number one cause of

13  death for adults her age in this country?

14  A.   In most years, the leading cause of death for adults in

15  the developed world is cardiovascular disease, generally

16  things like blocked coronary arteries, hardening of the

17  coronary arteries, heart attacks, things in that general

18  category.

19  Q.   Do you have a sense of approximately how many people die

20  each year of heart related disease?

21  A.   I haven't been to the CDC website in a while, but it's

22  generally measured in the many hundreds of thousands so 5-,

23  600,000 Americans die every year of heart disease.   In

24  contrast about 100,000 Americans every year, according to the

25  CDC last year, died of drug related fatalities.

1          MS. GERDES:  If we could pull up Exhibit 111a.

2          THE COURT:  Government Exhibit 111a?

3          MS. GERDES:  Yes.

4    BY MS. GERDES:

5    Q.  If we could display it to the jurors.  It's quite small.

6    Kind of in the middle of the page, where it says multidrug

7    intoxication.

8    A.  Counselor, for what it's worth, this is Gary Bitter's

9    death certificate.

10   Q.  Oh, I apologize.

11         MS. GERDES:  If we can pull up Ms. Stewart's death

12   certificate.

13         THE COURT:  Good catch.

14      What exhibit number?

15         MS. GERDES:  This is 121a, Your Honor.

16         THE COURT:  Thank you.

17   BY MS. GERDES:

18   Q.  If you can tell us about the levels of drugs in her

19   system at the time of her death, as per her blood results.

20   A.  So I'll be quoting from my report.  Her postmortem blood

21   was positive for 7-aminoclonazepam at a concentration of 43.4

22   nanograms per ML, oxycodone at 154 nanograms per ML, and

23   gabapentin at 43.5 micrograms per ML.

24   Q.  The jury's heard about clonazepam, but what is amino

25   clonazepam?

1   A.   7-amino clonazepam is an active metabolite of clonazepam.

2   And I don't know how active it is, but at some level, it has

3   the same or similar effects to the parent drug, even though

4   it's a metabolite.

5   Q.   Okay.  And what is the significance, if any, that we see

6   the metabolite versus the actual substance in the blood?

7   A.   So it's a soft finding, but the fact that you have no

8   parent drug and just a metabolite is often taken as evidence

9   that that drug didn't have much of a role, if any, in that

10  person's death.  If you're overdosing on a drug, why would

11  your body wait until you metabolized it for the overdose to

12  manifest?

13       Again, in the absence of an autopsy, none of these

14  numbers are particularly helpful, but that's oftentimes how

15  metabolites are interpreted.

16  Q.   And when you say in the absence of an autopsy, none of

17  these numbers are particularly helpful, why is that?  Why are

18  the numbers not helpful?

19  A.   Again, because a drug fatality is a diagnosis of

20  exclusion.  If you didn't do the autopsy, you haven't ruled

21  out the myriad natural diseases that may have rendered these

22  results completely moot.  You can only interpret these results

23  in the context of the complete autopsy and death

24  investigation.

25  Q.   And, again, because we see a level of oxycodone at 155,

1    is that within the therapeutic range even as defined by the

2    lab?

3    A.   For this particular lab, yes, that's even within their

4    therapeutic range.

5    Q.   And it's well under the therapeutic range that the study

6    suggested exists for chronic opioid patients?

7    A.   Yes.

8    Q.   Now, do you consider how long the patient has been on a

9    dose or a combination of drugs when you're making conclusions

10   in these cases?

11   A.   Yes.  As a general rule, as a medical examiner, you would

12   like part of your investigation to be how much of the

13   medication is the person taking and how long have they been

14   taking it.

15        The reason I say that, counselor, is we can't assess

16   tolerance at autopsy.  There's no organ I can look at, there's

17   no tissue I can put under the microscope that's going to tell

18   me how tolerant a person is to a particular drug.  So we do

19   our best to get a patient's history from their family, from

20   their roommate, from their medical records.  In many states,

21   mine included, medical examiners can access the state

22   prescription monitoring program.  So we have a number of

23   proxies to try to figure out how tolerant this person might be

24   to more and more medications.

25   Q.   And for people who die of drug toxicity, is it fair to

1    say that there's a range in the amount of time, depending on

2    what the drug is, that it may take them to die?

3    A.    Yes.

4    Q.    And can you give us kind of what a low end of the range

5    is and what a high end of a range is, depending on the

6    different drugs?

7    A.    So my answer will be based on all of the anecdotal cases

8    I've investigated over the years.

9          So I've certified deaths as being due to opiate toxicity

10   where a well-meaning family member, roommate, somebody else in

11   the residence heard the decedent snoring very, very loudly, in

12   some cases for hours, before they finally found them

13   unresponsive on the couch and called 911.

14         Presumably, that really loud, abnormal snoring was them

15   getting more and more respiratory depression until they lapsed

16   into a coma and stopped breathing completely.  That's when the

17   person there realized this was a medical emergency.

18         On the other end of the spectrum, I'm certainly aware,

19   particularly in the modern era, where most of what we see now

20   is illicit fentanyl.  People are overdosing almost immediately

21   after getting that hit of fentanyl, and whoever is around them

22   either administers Narcan or calls 911 or both.  So there's

23   really a spectrum.  I assume it has a lot to do with the drug,

24   the route of administration, and the person's tolerance.

25   Q.    Fair enough.  The spectrum we're talking about is

1    potentially minutes versus potentially hours --

2    A.   Correct.

3    Q.   -- generally fair to say?

4         So if Ms. Stewart had been autopsied and you found a

5    blocked artery or her heart had ruptured, what significance,

6    if any, would those concentration levels of drugs in her

7    system be to you?

8    A.   So the drugs in her system would be a completely moot

9    issue because these drugs have nothing to do with the fact

10   that you formed a clot in your coronary artery or the fact you

11   had a heart attack that went unrecognized that ruptured and

12   took your life.

13   Q.   So in your reports, I think you kind of used this idea of

14   a person -- the question is whether a person dies with a drug

15   in their system or because of a drug in their system.

16        Can you kind of explain that to the jurors?

17   A.   Right.  That's the million dollar question.  Did the

18   person die because of this drug, or did they just happen to

19   have this drug in their system and they died of something

20   else?

21        As I hope has become clear from my testimony, the only

22   way to answer that question is with an autopsy.  If you

23   haven't done an autopsy, you cannot resolve the question, did

24   they die with the drug or because of the drug?

25   Q.   Do you believe any responsible medical examiner can offer

1    an opinion that the oxycodone in Ms. Stewart's blood at the

2    time of her death contributed to her death?

3    A.    Absent an autopsy?

4    Q.    Correct.

5    A.    No.

6    Q.    And we did not have an autopsy in her case, correct?

7    A.    Correct.

8    Q.    If we could turn now to Mr. Bitter.

9          THE COURT:  We've been going about 90 minutes.  We'll

10   take a break before we go to Bitter.

11         Ladies and gentlemen, we'll take a recess.  We'll

12   probably break for lunch around 12:30.  We'll be in recess

13   until 11:05.  During the recess, continue to heed all the

14   prior admonitions of the Court.

15         (The jury exited the courtroom at 10:56 a.m.)

16         THE COURT:  Anything we need to take up before our

17   break?

18              MR. LYNCH:  Nothing from the government, Your Honor.

19              MS. GERDES:  No, Your Honor.

20              MR. GLASSMAN:  No, Your Honor.

21         THE COURT:  Very well.  We'll be in recess for ten

22   minutes.

23         (Recess from 10:56 a.m. until 11:07 a.m.)

24         THE COURT:  You may bring the jury in.

25         Anything we need to take up before we bring them in?

1          MS. GERDES:  No, thank you, Your Honor.

2          MR. LYNCH:  No, Your Honor.

3          MR. GLASSMAN:  No, Your Honor.

4          THE COURT:  Very well.

5    BY MS. GERDES:

6    Q.   Dr. Baker, before we get back to Mr. Bitter, for purposes

7    of the record, the therapeutic level you had given for the

8    oxycodone in the study of patients in chronic opioid therapy,

9    you talked about that being for immediate-release oxycodone.

10   A.   Correct.  I do believe I said that.

11   Q.   What is the therapeutic level for the slow release

12   oxycodone that the study showed?

13   A.   I'm going to have to refer to the study, counselor.

14   Q.   Please do.

15          THE COURT:  Is that referred to as OxyContin, slow

16   release?  I remember one being referred to as oxycodone, one

17   OxyContin.

18          THE WITNESS:  Yes, Your Honor.  OxyContin is the

19   trade name for the slow release.  The underlying medication is

20   the same.  It's just the mechanism of how quickly it gets

21   released.

22   A.   Counselor, to answer your question, for the 33 cases

23   cited in the Tennant study where it was oxycodone slow release

24   or could be sustained release, I'm not sure what the "S"

25   stands for, the serum concentrations in those patients ranged

1    from 10 to 650 with an average of 200, plus or minus 148.5.

2    Q.   Let's talk about Mr. Bitter.

3         MS. GERDES:   If we could please put up Government

4    Exhibit 111a on the screen, which would be his death

5    certificate.   If we could zoom into what was in his blood at

6    the time of his death.

7    Q.   First of all, what does it say on his death certificate

8    that he died of?

9    A.   His cause of death is listed as "multidrug intoxication,

10   (Xanax, Methadone, oxycodone)."

11   Q.   And what was found in Mr. Bitter's blood at the time of

12   his death?

13   A.   His postmortem blood was positive for 7-aminoclonazepam

14   at 26.1 nanograms per ML, oxycodone at 60.6 nanograms per ML,

15   and gabapentin at 10 micrograms per ML.   I can't remember if

16   you asked about the urine, counselor, but he had his urine

17   tested too.

18   Q.   Before we get to the urine -- go ahead and say the urine

19   results now.   Then I'll ask questions.

20   A.   His urine was positive for Methadone at 1,197 nanograms

21   per ML, oxycodone at 3,497 nanograms per ML, and oxymorphone

22   at 4,165 nanograms per ML.

23   Q.   So the Methadone was only found in his urine?

24   A.   Correct.   It was not found in his blood.

25   Q.   And what significance, if any, do substances found in the

1   urine versus the blood have on contributing cause of death

2   considerations?

3   A.   For the purposes of death certification, for cause or

4   contributing causes, it only makes sense to include those

5   things that were found in the blood because that's -- blood is

6   how we know the person was under the influence, to some

7   degree, of that medication.  Simply having it found in your

8   urine but not in your blood means you used the medication or

9   the drug at some point in the recent past, but you're not

10  actively under the influence at the time the blood is being

11  drawn.

12  Q.   So was it correct to list Xanax and Methadone on the

13  death certificate as the drugs that caused or contributed to

14  his death?

15  A.   No.

16  Q.   And, again, why is it incorrect to list those two drugs

17  there?

18  A.   Well, the Methadone is incorrect, in my opinion, because

19  it wasn't found in his blood at all.  It was just the urine.

20  I'm not sure how the Xanax ended up on the death certificate

21  because Xanax is the trade name for alprazolam, which is not

22  what was found in his blood.  It was actually

23  7-aminoclonazepam.  Xanax has a different metabolite.  I don't

24  believe Xanax is metabolized as 7-aminoclonazepam.

25       So I don't know why the coroner put Xanax there.  I'm

1  just going to assume it was an honest mistake, mixing up two

2  benzodiazepines.

3  Q.  So in your opinion, this death certificate is wrong?

4  A.  Yes.  I would not have certified his death this way.

5  Q.  And was Mr. Bitter autopsied?

6  A.  He was not.

7  Q.  So absent an autopsy, what do these levels of drugs --

8  what's the significance of them, if any, that you can say?

9  A.  Well, again, as I testified previously, the drug levels

10  really have very little utility in the absence of an autopsy.

11  That being said, these are relatively low levels.  I mean, the

12  oxycodone level is not impressive.  The 7-aminoclonazepam

13  level is in the range you'd expect to see if somebody's taking

14  their clonazepam as prescribed, and the gabapentin is not

15  elevated either.

16      So, again, absent an autopsy, it's hard to ascribe any

17  significance to these.  To the extent that you can, they're

18  fairly unimpressive concentrations.

19  Q.  And did you review police reports related to Mr. Bitter's

20  death that you considered as part of the facts that either --

21  that support this opinion that you have that you can't make

22  any kind of conclusions in this case?

23  A.  I certainly didn't review the police reports.  They're

24  far less informative to my opinion than the fact that there

25  was no autopsy.  I mean, having access to police data is a

1    useful part of an investigation, but it's not a supplement for

2    doing an autopsy.

3    Q.   Fair enough.  And according to the police records, who

4    was the last person who saw Mr. Bitter?

5    A.   I recorded a witness by the last name of Sholler,

6    S-h-o-l-l-e-r, states she visited the victim on February 27,

7    and he advised her he was sick and had been throwing up.

8    Q.   Is throwing up typically a side effect of opioid

9    toxicity?

10   A.   So I don't practice clinical medicine.  I don't know if

11   that's a side effect of opioids in general.  It might be.  I

12   don't know.  But I'm not familiar with throwing up being a

13   manifestation of life-threatening opioid toxicity.

14   Q.   And did Dr. Ralston find evidence of a comorbidity for

15   Mr. Bitter?

16   A.   He did.

17   Q.   And what was that?

18   A.   I am going to quote his December 19, '22, representation

19   to the U.S. DOJ in the letter that we've referenced multiple

20   times.  Keep in mind, he's speaking about two patients so some

21   of it will be in the plural.

22        It says, with regard to Gary Bitter and Barbara Works,

23   "Dr. Ralston was unable to determine what caused or

24   contributed to these patients' deaths because of the

25   relatively lower levels of controlled substances in these

1   patients' postmortem toxicology reports and because both

2   patients had comorbidities; for example, cardiac issues, that

3   could also have caused or contributed to these patients'

4   deaths.  In addition, no autopsy was performed on either

5   patient, which makes it more difficult to definitively

6   determine the cause of death or rule out certain causes.  It

7   is also difficult to disaggregate potential cardiac and drug

8   related causes or contributing factors to both patients'

9   deaths."

10      It does go on.  I will add that I believe he uses the

11   phrase cardiac issues, or something to that effect, at least

12   five times in this opinion.

13   Q.  And based on your review of the records, did you see any

14   significant cardiac issues for Mr. Bitter?

15   A.  I did not see any significant cardiac issues diagnosed

16   for Mr. Bitter during life.  I did find two instances in the

17   records that I was given where his blood pressure was taken.

18   On April 11th, 2015, it was 131 over 79.  On October 12th,

19   2015, it was 124 over 84.

20      There was -- sleep apnea was also checked on one of his

21   records under a review of systems.  I don't know if that was a

22   formal diagnosis or it was just him self-reporting sleep

23   issues.  I don't have any record that it was actually worked

24   out and formally diagnosed.

25   Q.  Are those typical or atypical blood pressure levels that

1   you just gave us?

2   A.   Well, it's going to vary from person to person.  You

3   know, 131 over 79 is more or less normal.  Most of us would

4   prefer the 131 be closer to 120.  124 over 84, again,

5   marginally elevated if your goal is 120 over 80, but not

6   exactly, you know, out of control hypertension.

7   Q.   So this is not evidence that he had hypertensive cardiac

8   disease?

9   A.   Correct.  There's no evidence he has long-term

10  repercussions on his actual heart function because of

11  long-standing blood pressure or any other cardiac disease that

12  I was able to find in his record.

13  Q.   I'm going to pose a hypothetical to you.  If someone saw

14  Mr. Bitter approximately four days prior to his death and saw

15  him snort three Percocets, would that in any way change the

16  conclusions that you reached with respect to Mr. Bitter?

17  A.   No, it wouldn't, because he didn't have an autopsy so I

18  really can't reach any conclusions other than to point out you

19  have no idea why he died, in the absence of an autopsy.

20  Q.   And, again, the police file indicates that somebody saw

21  him on February 27, 2016?

22  A.   Correct.

23  Q.   Do the police records indicate whether the pill bottle

24  was full or empty when it was found on the date of his death?

25  A.   There is a note to that effect, yes.

1    Q.   And what was the result?

2    A.   I'm going to quote the police report.  "Victim had the

3    medication prescriptions filled on 2/24 and 2/25.  An empty

4    bottle of 15 milligrams oxycodone, 120 count, which was filled

5    on 2/25, was located next to a Coke can on the nightstand next

6    to the bed where he was located."

7    Q.   So it was empty when he was found?

8    A.   According to the police, yes.

9    Q.   Fair enough.  And the date of his death is 2/29/2016?

10   A.   Yes.

11   Q.   What are leads, Dr. Baker?

12   A.   Do you mean in the context of the EMS report?

13   Q.   Yes.

14   A.   Oh.  So, frequently, when EMS responds to a scene of

15   someone unresponsive, the first thing they will do is put EKG

16   patches on them, sometimes on the shoulder, sometimes on more

17   parts of the body.  They'll quickly hook the decedent -- or

18   the patient, I should say, up to a monitor.  If there's no

19   cardiac activity whatsoever, then they'll just go ahead and

20   call it right there, as opposed to trying to intubate the

21   person and resuscitate the person because if there's zero

22   cardiac electrical activity, you're beyond the point of no

23   return.

24        So we commonly see that as medical examiners where that's

25   the first thing they do when they get to a scene.  They also

1   noted that he was cold to the touch.  So that's a pretty good

2   indicator you're not going to find any signs of life as a

3   first responder.

4   Q.    Fair enough.  And did you reach a conclusion about the

5   cause of death or contributing causes of death in Mr. Bitter's

6   case?

7   A.    In a sense, yes.

8   Q.    What was that?

9   A.    The conclusion is you don't know why he died because he

10  did not have a postmortem examination.

11  Q.    Let's turn to Ms. Works.  Tell us about Ms. Works.  How

12  old was she at the time of her death and what, if any,

13  comorbidities did you observe on her and did Dr. Ralston note?

14  A.    Ms. Works was a 45-year-old woman.  According to the

15  records I received, she had lumbar spine and right hip issues.

16  Hypertension was indicated in some of her records, and she had

17  a history of a hysterectomy.

18  Q.    Okay.  And did Dr. Ralston reach a conclusion with

19  respect to Ms. Works?  Just remind us.

20  A.    In a sense, he did.  He declined to reach a conclusion.

21  Q.    Okay.  And do you agree that this is not a case you can

22  reach a conclusion in?

23  A.    Correct.  By definition, because she did not have a

24  postmortem examination, we do not have any idea whether her

25  medications played a contributory or causal role in her death.

1    Q.   Tell us about the concentrations of drugs in her system.

2    A.   According to my report, the only thing her femoral blood

3    toxicology was positive for was hydrocodone at a concentration

4    of 89.3 nanograms per ML.

5    Q.   And I can't recall.  Did you give us the therapeutic

6    levels of hydrocodone in the study from Dr. Tennant?

7    A.   I believe you did ask me about that, counselor.

8    Q.   Okay.  And can you just remind us what the therapeutic

9    levels were that he observed in patients on long-term opioid

10   regimens?

11   A.   I can.  I've just got to pull up the paper again here.

12   So in the 11 cases of hydrocodone that he reported, the

13   patients ranged from 18 to 396 nanograms per ML.  Their

14   average was 94.7 plus or minus 1 point -- excuse me, 109.7.

15        And I'll just point out, I think I may have testified to

16   this earlier, 100 percent of those patients were fully

17   functional, 100 percent of those 11 patients were able to

18   drive, and 73 percent of them were able to work or do

19   volunteer work.

20   Q.   And so she was below that average level that you just

21   cited to?

22   A.   Yeah.  She would be pretty much right in the middle of

23   this group of 11 patients.

24   Q.   The KASPER records in her case indicate that her

25   prescriptions -- they were filled on May 2 and May 3, and she

1    did not pass away until May 24th of 2017.

2        What, if anything, would you say about that time period

3    that's passed and how that would kind of impact some of the

4    opinions and conclusions that you have?

5    A.   Again, my opinions are going to be very limited because

6    there was no autopsy in this case.  But if this were in the

7    context of a full death investigation, I would find the stem

8    of your question very useful, knowing that she was given the

9    medication on or about May 2nd or May 3rd but didn't pass away

10   until May 24th.  Because if you're taking the medication as

11   prescribed, and the allegation is you died of the toxicity of

12   that medication, why would it take three weeks for that

13   toxicity to manifest itself?  Why wouldn't it happen within

14   the first few days of therapy, once you've achieved whatever

15   your maximum serum level is likely to be?

16       Again, that's just -- that's one data point that we, as

17   medical examiners, look at in the context of the full death

18   investigation, including an autopsy.  It becomes a lot less

19   helpful when we don't have an autopsy in which to put this in

20   context.

21   Q.   Fair enough.  And as a forensic pathologist, do you feel

22   like it's out of your swim lane to talk about how long it

23   takes a person to build up tolerance and to lose tolerance?

24   A.   Yes.  I would defer to a clinician who treats pain

25   patients to have that kind of knowledge.

1  Q.   Now, as part of your analysis here, did you also look at

2  the case of Ms. Ilg?

3  A.   I did.

4  Q.   If we can look at her report now, Ms. Ilg is not the

5  subject of any of the specific counts or charges in the

6  indictment, but I just wanted to kind of talk to you about

7  Ms. Ilg and your findings with respect to her and

8  Dr. Ralston's findings with respect to her and compare that to

9  his findings with Works and Bitter.

10      So what were Dr. Ralston's findings with respect to

11 Ms. Ilg?

12 A.   So with regard to Ms. Ilg, this is Dr. Ralston's

13 representation to the U.S. DOJ in their July 27, 2022, letter.

14 "The concentration of alprazolam and oxycodone documented in

15 this patient's toxicology report were at sufficient levels

16 that both substances contributed to this patient's death."

17 Q.   And was Ms. Ilg autopsied?

18 A.   She was not.

19 Q.   Did she have any comorbidities?

20 A.   She did.

21 Q.   And what were they?

22 A.   Ms. Ilg had chronic obstructive pulmonary disease, which

23 is fancy medical lingo for the spectrum of diseases that

24 includes bronchitis and pulmonary emphysema.  She was a

25 smoker, she had lumbar spondylosis and degenerative joint

1    disease.  She also had high blood pressure and high

2    cholesterol.

3    Q.   So a few comorbidities, fair to say?

4    A.   Correct.

5    Q.   And what were her levels of concentrations at the time of

6    her death in her blood of drugs?

7    A.   So her postmortem blood was positive for alprazolam at

8    54.9 nanograms per ML, oxycodone at 153 nanograms per ML, and

9    gabapentin at 25.7 micrograms per ML.

10   Q.   And given everything you said, are those levels of the

11   alprazolam and the oxycodone significant to you?

12   A.   Given her medication history, they're not particularly

13   impressive.  And, of course, again, as I've emphasized

14   multiple times, you can't put a lot of stock in these results

15   in the absence of an autopsy.

16   Q.   When you say given her medication, what do you mean by

17   that?

18   A.   Given that she was a chronic pain patient.  It's not like

19   she was prescribed these medications three days before she

20   passed away.

21   Q.   So in her case, Dr. Ralston reached the opinion that the

22   concentration of drugs in her system contributed to her death,

23   even though she had all of these comorbidities and no autopsy,

24   correct?

25   A.   Correct.

1   Q.   But in the case of Mr. Bitter, who appears to have no

2   significant comorbidities and did not have an autopsy; and in

3   the case of Ms. Works, who did not have significant

4   comorbidities and did not have an autopsy, he was not able to

5   reach a conclusion.

6        Are you able to reconcile his opinions on these cases,

7   like how he could reach a conclusion in one case and not

8   another when one has more comorbidities than another?

9   A.   I have to admit, it doesn't make any sense.  It's not

10  obvious to me what standard he's applying here when he

11  declines to offer an opinion on two patients who have minimal

12  to no comorbidities, but he's willing to go out on a limb in a

13  patient with multiple comorbidities, even though the common

14  denominator for all three of them is they didn't have

15  autopsies.

16  Q.   Can you reach a conclusion in the case of Ms. Ilg as to

17  whether or not these substances caused or contributed to the

18  cause of her death?

19  A.   Not without an autopsy.

20  Q.   Do you believe any responsible medical examiner can reach

21  a conclusion in this case with respect to Ms. Ilg without an

22  autopsy?

23  A.   Absent an autopsy, no.

24  Q.   Let's talk about Mr. Casebolt.  How old was Mr. Casebolt,

25  and did he have any comorbidities?

1    A.   Mr. Casebolt was 63 years old.  He had a history of

2    cervical spondylosis, degenerative joint disease, high blood

3    pressure, and tobacco use disorder.  One of his intake or

4    early medical forms that was available for my review indicated

5    he'd smoked one and a half packs a day for 48 years.

6    Q.   And for the purposes of your evaluation of his case,

7    would hypertension and a 48-year history of smoking be

8    significant comorbidities that could impact him at death or

9    could cause his death?

10   A.   Yes.  Those are both risk factors for multiple serious

11   natural disease processes that may explain someone's death.

12   Q.   Did you review Dr. Ralston's testimony about

13   comorbidities with respect to Mr. Casebolt?

14   A.   I don't recall his testimony, specifically.  I just have

15   his --

16   Q.   I'll direct -- did I provide you a copy of his testimony?

17   A.   You did, but it's been some time since I read it.

18   Q.   No problem.  Do you see page 115 here?

19   A.   I do.

20   Q.   Going to orient you at the bottom.  Do you see we're

21   talking about Mr. Casebolt?

22   A.   I do, yes.

23   Q.   And Dr. Ralston said:  I was unaware of any

24   comorbidities?

25   A.   He does say that, yes.

1    Q.    And then I asked him:  So in the record you were

2    provided, you didn't see any evidence that he had any

3    comorbidities?

4         He says:  Not that I recall.

5         And then I asked:  If that was in the records, would that

6    be something significant for you to miss?

7         He says:  I don't recall whether I saw it or not.

8         And then I say:  And so comorbidities are something you

9    would be paying particular attention to, correct?

10        He says:  To a certain degree, depending on what they

11   were and what the -- how it related to the rest of these --

12   the case.

13        So Dr. Ralston did not note any comorbidities in his

14   testimony with respect to Mr. Bitter or his prior reports; is

15   that correct?

16   A.    Let me just check his prior report.  That is correct.  In

17   his prior report, "No other comorbidities noted in the

18   available record could provide an alternative cause of this

19   patient's death."

20   Q.    Putting on the screen Government Exhibit 140, this is

21   page 145, the initial evaluation report of Mr. Bitter.  Is

22   this a record that was in the Northern Kentucky file that you

23   were provided?

24   A.    Yes.

25   Q.    And we see past medical history.  Do you see the

1    comorbidities that you just discussed listed here?

2    A.   Yes.

3    Q.   And what do you see?

4    A.   So they -- well, anxiety, sleep disorder, degenerative

5    disk disease, hypertension, and tobacco use disorder.

6    Q.   And you said for the purposes of your evaluation, the

7    most significant ones are the hypertension and tobacco use

8    disorder?

9    A.   Correct.

10   Q.   On page 2 of this report, does it talk about the amount

11   that the patient smoked that you just referenced, the

12   one-and-a-half -- 1-1/2 packs per day for 48 years?

13   A.   Yes.

14   Q.   And that's at page 146?

15   A.   Yes.

16   Q.   And what was the opinion that Dr. Ralston offered with

17   respect to Mr. Casebolt in his reports -- well, in his letters

18   that the DOJ offered?

19   A.   In the initial letter, "The concentration of oxycodone

20   documented in this patient's toxicology report at the time of

21   his death was sufficient to constitute a contributing factor

22   to this patient's death.  The patient's consumption of cocaine

23   also contributed to his overdose death."

24   Q.   Was Mr. Casebolt autopsied?

25   A.   He was not.

1  Q.   And remind us, how old was Mr. Casebolt?

2  A.   He was 63 at the time he passed away.

3  Q.   So he was 63 with hypertension and had been smoking for

4  over 40 years.  Are those significant comorbidities in a

5  person of Mr. Casebolt's age?

6  A.   Yes.

7  Q.   And with respect to the levels of substances found in his

8  system, that level of oxycodone at 249 nanograms per -- is

9  it -- did you say microliters?

10  A.   Milliliters.

11  Q.   Milliliters.  Can you make any statement about the

12  significance that that had in his death?

13  A.   In the absence of an autopsy, there's very little you can

14  ascribe to that.

15  Q.   And the benzoylecgonine, I think you discussed that with

16  respect to Mr. Stima.  That's the cocaine metabolite?

17  A.   Correct.

18  Q.   And remind us, it's active or inactive?

19  A.   It's inactive.  It's not an intoxicant.

20  Q.   And given that it was inactive in his blood at the time

21  of his death, what role, if any, did that cocaine play in his

22  death?  Can you say, absent an autopsy?

23  A.   Even without an autopsy, you would not consider the

24  benzoylecgonine as playing a role in his "overdose death."  If

25  you were using cocaine long-term and you did an autopsy, you

1    might find the cardiac effects of the cocaine in that person's

2    heart even if they weren't using cocaine at the time they

3    died.  So you could consider cocaine as contributing to their

4    death, again, if you did an autopsy and actually documented

5    those complications.

6         But in the vacuum of not having an autopsy, and all you

7    have is the breakdown product of the cocaine, it's

8    inappropriate to consider cocaine as part of an "overdose

9    death."

10   Q.   What would you see at autopsy that may indicate to you as

11   a medical examiner that somebody had a history of cocaine use?

12   A.   So cocaine can go part and parcel with high blood

13   pressure because cocaine does make your blood pressure go up.

14   It also makes your heart work harder and beat faster.  Cocaine

15   causes vasospasm in arteries of your body, which makes your

16   blood pressure go up and makes your heart work harder.

17   Long-term, that can cause your heart to get bigger and

18   thicker, which is not a good thing.

19        We also know that cocaine can accelerate the development

20   of hardening of the coronary arteries, much like smoking does,

21   although smoking is probably worse than cocaine.  But there's

22   a lot of deleterious effects of cocaine on your heart that, if

23   it went on long enough, you could ferret those out at autopsy

24   with a really good cardiac exam.  Obviously, if you don't have

25   an autopsy, you have no idea if there was any long-term

1   effect.

2   Q.   And if someone offered an opinion about the cause of

3   death in Mr. Casebolt's scenario or contributing cause of

4   death in Mr. Casebolt's scenario, do you believe that that's

5   an opinion you can rely on in any way?

6   A.   If that opinion is not supported by an autopsy, I would

7   not rely on it, no.

8   Q.   Again, no autopsy for Mr. Casebolt, correct?

9   A.   Correct.

10  Q.   Did you review testimony that Dr. Ralston gave in a prior

11  case, United States versus Robert Lee Shields and Wesley Scott

12  Hamm?

13  A.   I did.

14  Q.   Was he cross-examined about the testimony he gave in that

15  case when he testified here in this trial, based on your

16  review of the transcript?

17  A.   He was.

18  Q.   And in that case, did you also review what the individual

19  was charged with?

20  A.   Yes.

21  Q.   And relative to the opioid related death, what was the

22  charge?

23  A.   I'm going to have to refer to my report.

24  Q.   Please do.

25  A.   The indictment charged the defendants with knowingly and

1    intentionally distributing carfentanil, the use of which

2    resulted in an overdose death of Lonnie Kevin Willoughby.

3    Q.   So in that instance, they were charged with causing the

4    death of that individual by giving him carfentanil,

5    essentially?

6    A.   Yes.

7    Q.   Okay.  And so carfentanil being the cause of death was

8    the key thing there, correct?

9    A.   That would appear to be the case, based on the wording of

10   the indictment.

11   Q.   Okay.  Now, do you agree with the ultimate opinion that

12   Dr. Ralston gave at that trial?

13   A.   I do not.

14   Q.   What was the ultimate opinion that he gave at that trial?

15   A.   I'm going to quote my report.

16   Q.   Please do.

17   A.   So just as background, Mr. Willoughby had both

18   carfentanil and methamphetamine in his blood, found at

19   autopsy.  The final opinion that Dr. Ralston offered

20   was actually -- he was being questioned by the Court, which I

21   assume means the judge.

22        The Court said:  Had he not ingested carfentanil, it's

23   your opinion he would not have died?

24        Dr. Ralston's concluding answer is:  He would not have

25   died at that time.

1  Q.   What was the level of carfentanil in that decedent's

2  body?

3  A.   Per Dr. Ralston's testimony, the carfentanil

4  concentration was 114 picograms per milliliter.

5  Q.   Is that a lethal dose of carfentanil, meaning have you

6  certified deaths at a carfentanil level of that?

7  A.   I don't -- so I've only seen 17 carfentanil fatalities in

8  my jurisdiction.  I don't recall what the concentrations were.

9  But there is a better answer to your question, based on

10 medical research.

11 Q.   Tell us about that.  Has medical research shown whether

12 or not that level of carfentanil is a lethal, meaning a deadly

13 dose of carfentanil?

14 A.   So this concentration of carfentanil could be fatal, but

15 it doesn't have to be fatal.  And the reason I say that is

16 there have been studies of people who have been pulled over

17 for driving erratically, appearing to be under the influence,

18 and their toxicological testing -- and these are people who

19 are obviously alive -- showed higher concentrations of

20 carfentanil than was found in Mr. Willoughby's autopsy.

21      So that's clearly evidence that there are concentrations

22 of carfentanil that could be survivable or fatal depending on

23 circumstances.  So you can't take a carfentanil concentration

24 at autopsy in a vacuum if somebody has more than one substance

25 on board and say, you know, the carfentanil alone would

1    certainly explain this person's death.  We know now that you

2    shouldn't be able to say that.

3    Q.   The level of methamphetamines in that decedent's system,

4    have you, yourself, seen levels of methamphetamines at that

5    number that were lethal, or has research suggested that that

6    level can be a lethal level, standing alone?

7    A.   Yes.  There is research to indicate that the

8    concentration in Mr. Willoughby's blood has and can kill

9    people, even if that's the only substance in their blood.

10   Q.   So based on your observations and what the medical

11   literature says, can any responsible medical examiner go into

12   court and say that level of carfentanil in that man's system

13   is what caused his death?

14   A.   In my opinion, the only responsible testimony would be to

15   acknowledge that the combination of carfentanil and

16   methamphetamine explained this man's death, and you can't say

17   that one of these and one of these alone would have always

18   explained his death.

19   Q.   And adding to what was going on in that man's body at the

20   time of his death, was he autopsied?

21   A.   He did have an autopsy, yes.

22   Q.   Were there findings at autopsy that would also be

23   significant in potentially playing a role in his death?

24   A.   I was not privy to the autopsy report, but Dr. Ralston

25   did testify as to Mr. Willoughby's heart weight as well as

1    Mr. Willoughby's height and body weight.

2    Q.   And what significance, if any, did the size of that man's

3    heart in relation to his body have for you when you're

4    considering the levels of substances in his system at the time

5    of his death?

6    A.   So Mr. Willoughby's heart weighed 580 grams.  To put that

7    in context, and the data I use comes from a study done at the

8    Mayo Clinic back in Minnesota, if we normalize

9    Mr. Willoughby's heart weight against his body weight, the

10   upper limit of normal would be 536 grams.  So on the

11   bell-shaped distribution of human heart weights, he's way off

12   on one end.

13        If we normalize his heart weight against his stature,

14   which we often do if people are heavier than they should be,

15   the upper limit of normal is 487 grams.  So either way, his

16   heart is considerably larger than the upper limit of normal

17   for a man of his size and weight.

18        The reason that's relevant is because methamphetamine is

19   very hard on your heart.  Like cocaine, it's a stimulant so it

20   drives up your heart rate, drives up your blood pressure.  If

21   you have a bad heart, methamphetamine is not something you

22   should be using.

23   Q.   We spent a lot of time talking about concentration levels

24   of substances in someone's blood, and you told us why looking

25   at blood versus urine is important.  Is there any area of the

1    body that we see these blood concentrations being taken from?

2    A.   You mean at autopsy?

3    Q.   Correct.

4    A.   Well, the ideal place to draw blood at autopsy, if you

5    can, is from the femoral vein.  It's a great big vein in your

6    groin or just below your groin.  That is the preferred place

7    to draw blood from during an autopsy.

8    Q.   And why is that the preferred place to draw blood from?

9    A.   So some drugs can undergo what's called postmortem

10   redistribution, which means after you die, the enzymes, the

11   channels in your cell walls, the other activities the organs

12   engage in to keep drugs in certain parts of your body, those

13   things don't work anymore after you pass away.

14        So some drugs can start to move along concentration

15   gradients in a decedent.  So say, for example, there's a

16   particular medication a patient is on.  And we know, in living

17   people, that drug is concentrated in their heart muscle.

18        So if that person were to pass away, and you stuck a

19   needle into that person's heart, and you measured the level of

20   that particular drug, it shouldn't surprise you that the level

21   is a lot higher than you would have seen in life because

22   you're drawing it literally from the area where that drug

23   would be concentrated.

24        So there's a variety of other examples, but the bottom

25   line is we try to draw blood as far away from the internal

1   organs as we can whenever possible to minimize the chances for

2   that postmortem redistribution for those drug levels to change

3   after death.

4   Q.   And when you say "change," are you saying it's more

5   likely that it could have actually been higher or lower at the

6   time of their death, depending on the substance?

7   A.   So depending on the drug, and depending on the specimen,

8   postmortem redistribution can go in either direction.  It may

9   make some drugs go up.  It may make some drugs go down.  It's

10  not always predictable every time for every drug.

11      We tend to be more concerned about levels being falsely

12  elevated rather than going down because we don't want to

13  over-call drug fatalities based on spurious results due to

14  postmortem changes.

15          MS. GERDES:  One moment, Your Honor.

16          THE COURT:  Very well.

17          MS. GERDES:  Thank you very much for your time,

18  Dr. Baker.

19          THE COURT:  Any questions?

20          MR. GLASSMAN:  No questions for this witness.

21          THE COURT:  All right.  Mr. Lynch.

22          MR. LYNCH:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24  BY MR. LYNCH:

25  Q.   Good morning, Dr. Baker.

1    A.   Good morning.

2    Q.   My name is Dermot Lynch.  I'm with the Department of

3    Justice.  We've never met before; is that correct?

4    A.   I don't believe we have.

5    Q.   All right.  Let me just start, Ms. Gerdes did bring this

6    up a bit on direct examination, but I want to get a couple

7    things clear in terms of the scope of your testimony.

8         First, as you said on direct examination, you are not a

9    pain management specialist; is that right?

10   A.   That's correct.

11   Q.   And you're not here to offer any opinion about whether or

12   not the prescribing of opioids by Dr. Siefert was authorized

13   under the law; is that correct?

14   A.   Correct.

15   Q.   Whether it was -- are you even familiar with the phrase

16   whether or not a prescription was in the usual course of

17   professional practice for a legitimate medical purpose?  Are

18   you familiar with that phrase?

19   A.   I'm not.

20   Q.   Okay.  And just to be clear, you would not be -- you

21   concede you're not qualified to offer an opinion about whether

22   or not a prescription was or was not within the usual course

23   of professional practice?

24   A.   That's correct.  I would not offer those opinions.

25   Q.   Okay.  And similarly, just because you do not believe

1    that there's a connection between opioid prescribing and at

2    least some of these patients' deaths, it does not follow that

3    those same patients should have received the opioids that they

4    did receive from Dr. Siefert.  That's correct?

5    A.   The clinical decision as to whether they should have

6    received opioids, not my swim lane.  You are correct.

7    Q.   That's a separate question.  You're here, regardless of

8    whether or not somebody died of an opioid overdose or opioids

9    contributed to a death, that is a separate question from

10   whether or not the patient should have received opioids in the

11   first place.  Fair?

12   A.   Yeah, I think those are completely different issues.

13   Q.   All right.  Now, we have six patients here.

14          MR. LYNCH:  I'm going to use a demonstrative.  It's

15   the same one.

16          MS. GERDES:  Sure.

17          MR. LYNCH:  Pull up on the ELMO.

18          THE COURT:  Any objection to the demonstrative?

19          MS. GERDES:  No.

20          THE COURT:  Very well.

21          MR. LYNCH:  Want to make sure we go through this.

22   This is just a demonstrative we can publish to the jury.

23   BY MR. LYNCH:

24   Q.   Dr. Baker, just to walk you through a very simple

25   demonstrative right here, six of the patients that you were

1   asked to offer an opinion on are listed on this demonstrative;

2   is that right?

3   A.   Yes.

4   Q.   All right.  So that's Taylor, Stima, Casebolt, Stewart,

5   Works, and Bitter.  Is that right?

6   A.   Yes.

7   Q.   And you would agree with me that on four of these

8   patients, Dr. Ralston offered an opinion that the opioid

9   prescribing did contribute to the patient's death?  I

10  understand you have disagreements with him, but that's your

11  understanding of his opinion, correct?

12  A.   Yes.

13  Q.   All right.  On two of these patients, you agree with

14  Dr. Ralston that opioid prescribing did contribute to the

15  patient's death; is that correct?

16  A.   I would not use the phrase "opioid prescribing

17  contributed to patient's death."  I simply opine whether or

18  not a particular combination of drugs might explain or

19  contribute to a person's death.  I can't comment on someone's

20  prescribing habits or whether the prescription was

21  appropriate.

22  Q.   So what if we cross out this word and just said did

23  opioids --

24          THE COURT:  The jury can't see that.

25  A.   You're outside the frame of the camera.

1     Q.    Sorry.  Cross out "prescribing."

2           Did opioids contribute to the patient's death?  Your

3     answer to that question for Taylor and Stima is yes?

4     A.    Yes.

5     Q.    Okay.  I'm going to go through each of these -- and then

6     the scope of the dispute with Dr. Ralston is really on

7     Casebolt and Stewart, is that right, in terms of this specific

8     question that's on the demonstrative?

9     A.    I wouldn't use the word dispute.  We have different

10    opinions.

11    Q.    Different opinions, sorry.

12    A.    That's all right.

13    Q.    You're a very agreeable guy.  I'm overly litigious.

14    Sorry about that.

15          THE COURT:  It's a lawyer trait.

16          MR. LYNCH:  My wife complains about that.

17          THE COURT:  I was too.  Probably still am.

18          Go ahead.

19    BY MR. LYNCH:

20    Q.    All right.  So just to be clear, on all six of these

21    patients, you cannot rule out whether opioid or opioid and

22    benzodiazepine prescribing contributed to the patient deaths;

23    is that correct?

24    A.    I can't rule it out?

25    Q.    Yeah, right.  Fair enough.  Okay.

1    A.   I'm sorry.   That was an inflection.   I'm repeating the

2    question to make sure I answer it correctly.

3    Q.   Oh, I'm sorry.   You cannot -- yes.   The question is, you

4    are unable to rule out -- let's limit it to four patients.

5    These four patients.

6            THE COURT:   Move it up so we can see it.

7            MR. LYNCH:   Let me zoom out.   I apologize.

8    BY MR. LYNCH:

9    Q.   Okay.   For these four patients, for Casebolt, Stewart,

10    Works, and Bitter, fair to say that you cannot rule out that

11    opioid prescribing or opioid and benz -- excuse me, opioids or

12    opioids and benzodiazepines contributed to the death?

13    A.   That's correct.   Absent an autopsy, you cannot rule it

14    out or in.

15    Q.   Okay.   So, for example, you concede that it is possible

16    that opioids could have contributed to Mr. Bitter's death?

17    A.   It's possible that they could have, yes.

18    Q.   And one of the factors that would be -- that was, in

19    fact, noted by the coroner was -- in favor of a finding of

20    overdose death is that he had a history of overdose; isn't

21    that right?

22    A.   I do recall that, yes.

23    Q.   And that would be a factor that could weigh into an

24    analysis as to whether or not somebody has died under

25    circumstances where opioids contributed to the death?

1    A.   I disagree with that assertion in the absence of an

2    autopsy.  In the totality of an investigation, knowing

3    somebody previously overdosed would be a useful data point,

4    but it's not helpful if you don't have an autopsy.

5    Q.   In fact, you actually looked at Mr. -- the entirety of

6    sort of the medical records related to Mr. Bitter, including

7    two EMS reports where paramedics were called to Mr. Bitter's

8    house after he had overdosed; is that correct?

9    A.   Yes, I do recall that.

10   Q.   You also reviewed evidence that on both occasions, he had

11   to be administered Narcan because he overdosed.

12        Do you remember that?

13   A.   I don't specifically recall the details.  I'm not going

14   to disagree with you on that.

15   Q.   All right.  Another factor -- again, I understand your

16   position about the autopsy.  Put that to the side for the

17   moment, okay?  I understand it's an important point.

18   A.   I want to be clear, it's not my position.  It's the

19   position of my professional organization.

20   Q.   The position that you need an autopsy, for purposes of

21   this question, please understand that I understand that point,

22   okay?

23   A.   Okay.

24   Q.   All right.  Another factor that you would consider as a

25   medical examiner, in addition to an autopsy, with, for

1    example, Mr. Bitter, is the fact that he was relatively opioid

2    naive at the time of his death?

3    A.   I have no way of knowing how opioid naive he was nor how

4    quickly people lose their tolerance.  I would have to refer to

5    a clinician for that level of expertise.

6    Q.   So the only person that would be able to offer that

7    opinion would be -- excuse me.  One person who would be able

8    to offer that opinion would be a pain management doctor; is

9    that right?

10   A.   I would assume that person would have that empirical

11   knowledge based on their training and experience.  I wouldn't.

12   Q.   If you were conveyed -- if it was conveyed to you by a

13   pain management doctor Mr. Bitter was relatively opioid naive,

14   that is something that you could consider as a medical

15   examiner in determining whether or not Mr. Bitter -- opioids

16   contributed to Mr. Bitter's death?

17   A.   If he had an autopsy, yeah, that would be useful.

18   Q.   We all know the autopsy issue.  But that would be a

19   factor that you could consider as a medical examiner if that

20   information was conveyed to you by somebody qualified to offer

21   that opinion?

22   A.   Again, I don't mean to beat a dead horse, but that

23   information would only be useful to me in the context of an

24   autopsy.

25   Q.   We all definitely understand the position --

1      THE COURT:  You don't need to keep saying that.  Just

2  go to the next question.

3      MR. LYNCH:  All right.

4  Q.   I just gave the example, a couple examples with

5  Mr. Bitter.  But just to be clear, with Works, Casebolt, and

6  Stewart, if they had had an autopsy, history of any sort of

7  drug abuse would be a factor, in addition to an autopsy, that

8  you could consider in determining whether or not opioids

9  contributed to their death?

10 A.   So the answer to that would depend on what the autopsy

11 found.  If the autopsy finds a natural disease process

12 unrelated to opioids that's unequivocally going to kill a

13 person, the history of the opioid use becomes moot.  So in

14 that case, it would be a red herring, the opioid use.

15 Q.   All right.  Let's move on.  Let's talk specifically about

16 something -- I want to move into some of the patients on whom

17 you offered specific opinions.  Why don't we go ahead and

18 start with Ms. Taylor.

19 A.   Okay.

20 Q.   By the way, what materials do you have up there with you,

21 Dr. Baker?

22 A.   I have the six or seven reports that I authored for

23 Ms. Gerdes.  Obviously, you would have copies of them.

24 Q.   Yes.  Are there notes on those documents?

25 A.   I did add a few notes over the last couple days, if you'd

1   like to take a look.

2   Q.  Let me think about it.  Thank you for letting me know

3   that.

4       Have you sent any emails to Ms. Gerdes that include

5   opinions that go beyond what's in the report?

6   A.  I'm sorry.  I couldn't hear the stem of your question.

7       THE COURT:  I'm sorry.  I was coughing.

8   Q.  Let me ask it again.  Did you send any emails to

9   Ms. Gerdes offering opinions that go beyond what is included

10  in your reports?

11  A.  No, not opinions.

12  Q.  Any additional glosses on what was -- any emails at all

13  to Ms. Gerdes about this case?

14  A.  Have I emailed her at all?  Yes.

15  Q.  Emailed her at all on anything other than, like,

16  logistical matters?

17  A.  Yes.

18  Q.  Okay.  Can you give me a summary of the substance of

19  those emails?

20  A.  Oh, I'd have to go back and read them all.  At one point,

21  I pointed out that Dr. Ralston testified about one of the

22  patients having anemia, and I just pointed out that that

23  patient also had atrial fibrillation.  That came up in

24  cross-examination, and I just caught those two things and

25  pointed that out to her.  That's about the only thing of

1    substance I can think of in an email.

2    Q.    All right.  I might take a look at your notes.  I don't

3    need to do that right now.  In the interest of time, let's

4    keep moving on on this.

5          So on Ms. Taylor, in your report, on page 3 of your

6    report on Ms. Taylor, you say, and I think you testified on

7    direct as well, that you "largely agree" with the proposed

8    wording of the death certificate for Ms. Taylor.

9          Do you remember writing that in your report?

10   A.    I do, yes.

11   Q.    Do you remember testifying -- I believe you were talking

12   about -- you clarified this on direct examination, that you

13   agreed with the medical -- what you interpreted to be the

14   medical examiner's proposed wording on a death certificate; is

15   that right?

16   A.    Yes, I largely agreed with that.

17   Q.    Largely.  Fair enough, fair enough.

18             MR. LYNCH:  To be sure we're on the same sheet of

19   music, we're going to pull that record up, Exhibit 131b at

20   page 13.

21             THE COURT:  Should appear on your screen there.

22             MR. LYNCH:  If we can zoom in on the middle section

23   there, section 28.

24   BY MR. LYNCH:

25   Q.    So I think, just to make sure we're all on the same page

1   here, Dr. Baker, you said you largely agree with -- largely

2   agree.  Largely agree with the proposed wording of the death

3   certificate for Ms. Taylor.  This is the death certificate

4   you're talking about?

5   A.   Yes.

6   Q.   And according to your report, your only disagreement, and

7   you said this on direct examination as well, that "I would

8   have not have included oxymorphone on the list of contributing

9   drugs since oxymorphone is almost certainly a metabolite of

10  oxycodone in this case."  That's in your report?

11  A.   Yes.

12  Q.   So the sum total of what we're talking about here, if we

13  crossed out the word oxymorphone, you, as a medical examiner,

14  would have certified this death certificate in the way it is

15  presented by the Kentucky medical examiner?

16  A.   Based on the available data set, yes.

17  Q.   And in this case, this is actually the cause of death,

18  right?  This is listing oxycodone as one of the many

19  substances that caused Ms. Taylor's death; is that right?

20  A.   Yes.

21  Q.   That's actually a stronger position than Dr. Ralston has

22  taken, that oxycodone, at the least, contributed to her death;

23  isn't that true?

24  A.   I don't recall the position that he took.  If you're

25  referencing his testimony, again, my understanding is this

1    document came from the Kentucky medical examiner's office.

2    Q.   Right.  And all I'm saying is your position is that

3    oxycodone caused Ms. Taylor's death, in addition to these

4    other substances?

5    A.   It was part of the combination of substances that caused

6    her death, yes.

7    Q.   All right.  Now, you also said in your report and on

8    direct examination that you were concerned about a -- what's

9    called a port-a-cath with Ms. Taylor.  Do you remember talking

10   about that in your report and on direct examination?

11   A.   Yes.

12   Q.   I'm going to show you -- I'm just going to show you, not

13   show the jury yet, a demonstrative that I believe is this

14   port-a-cath.  I'm going to show a picture of one.

15        So I Googled port-a-cath --

16             MS. GERDES:  Objection, Your Honor.  I have no

17   objection to it going into evidence if he just wants to

18   introduce it.

19             MR. LYNCH:  I'm not going to introduce it as an

20   exhibit.  I want to ask the witness questions about it.

21             THE COURT:  He mentioned it.  He can show him and

22   explain it.  Overruled.

23   BY MR. LYNCH:

24   Q.   Dr. Baker, is this a fair and accurate representation of

25   what a port-a-cath would look like?

1    A.    To the best of my knowledge, yes.

2    Q.    I'm going to flip the image over, and you remember on

3    direct examination, you talked about how in the autopsy, you

4    think a plausible interpretation of the reference to the

5    foreign object that's referenced in the autopsy is that it was

6    a port-a-cath, right?

7    A.    That would make sense, yes.

8    Q.    Right.  So do you see this picture with sort of a bulb --

9    this is a picture of sort of the upper left quadrant of a

10   body, and you see sort of a bulge on the picture in the lower

11   right-hand corner?

12   A.    Yes.

13   Q.    To your knowledge, this is how a port-a-cath would look

14   in -- this is simply how a port-a-cath would look in an

15   autopsy of somebody like Ms. Taylor; is that fair?

16   A.    For my edification, is this an autopsy photograph of

17   Ms. Taylor?

18   Q.    No, it's not an autopsy photograph of Ms. Taylor.

19   A.    I believe that's how they would look, yeah.  It would

20   depend on the patient's body habitus and how the port-a-cath

21   was placed.

22   Q.    Have you done autopsies on patients who have had

23   port-a-caths in the past?

24   A.    I have.

25   Q.    And it manifests as sort of a foreign object or a bulge

1   in the body; is that fair?

2   A.   Yes.

3   Q.   In a manner similar to what's going on here?

4   A.   Similar to this, yes.

5         MR. LYNCH:  Permission to publish this demonstrative

6   to the jury.

7         MS. GERDES:  I have no objection to it being offered

8   into evidence.

9         MR. LYNCH:  I don't want to --

10        THE COURT:  You don't object to it being offered.

11  He's not offering it.  You can show it, yes.

12     Any objection on your side?

13        MR. GLASSMAN:  No, Your Honor.

14        THE COURT:  Very well.

15        MR. LYNCH:  Now, we've sort of identified this.

16  Let's make sure everybody is on the same page as to what a

17  port-a-cath is and publish this to the jury.

18        THE COURT:  Ladies and gentlemen, just like other

19  demonstrative, this is not going to be admitted.  It's being

20  used to illustrate and help explain the testimony of a

21  witness.

22  BY MR. LYNCH:

23  Q.   Okay.  So to orient everyone, this is sort of the

24  demonstrative picture of what you identified to be a

25  representation of what a port-a-cath is.  Fair?

1    A.    Yes.

2    Q.    Okay.  And so the idea is that you would use a needle to

3    inject whatever medicine you need into the catheter -- into

4    the port?

5    A.    When you say "you," when you would use --

6    Q.    When the person, the patient who needs the use of the

7    port-a-cath.

8    A.    My understanding would be it's usually used by a health

9    care provider.

10   Q.    Okay.

11   A.    I don't know if patients are trained to use them

12   themselves.  That might be the case.  I don't know.  I usually

13   think of a health care provider utilizing it.

14   Q.    Okay.

15   A.    For home use, it may be that a caretaker or a patient

16   themselves might actually use it.

17   Q.    So a health care provider would be using this port to

18   inject medicine; is that right?

19   A.    That's my understanding of how they're generally used,

20   yes.

21   Q.    Okay.  And this port is actually underneath the skin; is

22   that right?

23   A.    Correct.

24   Q.    Okay.  So you need the syringe, the needle to actually

25   puncture the skin and go into the catheter?

1    A.    Yes.

2    Q.    Or the port, excuse me.

3          And just for everyone's benefit, this picture with the

4    bump here is what the port-a-cath would look like underneath

5    the skin.  This is one representation of that?

6    A.    Generally something like this, yes.

7    Q.    So, again, you'd have to puncture the skin to go -- stick

8    a needle into this bulge to get to the port-a-cath; is that

9    right?

10   A.    Yes.

11   Q.    Okay.  Now, your opinion, you offered this opinion that

12   Ms. Taylor must have been, what, crushing up her oxycodone,

13   putting it in a syringe, and injecting it into the

14   port-a-cath?  That's your position, right?

15   A.    No, I never said must have.

16   Q.    You said that's a possibility; is that right?

17   A.    Well, that's very different than must have.

18   Q.    Sure.  It's a possibility -- your opinion, you spent --

19   you know, you've got a three-page report on Ms. Taylor in

20   which you are agreeing that oxycodone caused her death, and a

21   third of that report is dedicated to the port-a-cath issue; is

22   that right?

23   A.    So I didn't say the oxycodone caused her death.  I said

24   it was part of the mixture of medications that caused her

25   death.

1   Q.   Okay.

2   A.   And I simply pointed out in the report that she had

3   intravenous access through the port-a-cath, and this is a

4   well-known phenomenon to almost all forensic pathologists.  I

5   never said she must have been doing this.  I just said it's a

6   possibility that's trivially easy to rule in or rule out at

7   autopsy with a lung biopsy.

8   Q.   You obviously didn't perform the autopsy on Ms. Taylor,

9   right?

10  A.   Correct.

11  Q.   Normally, if you were using -- if you were doing what you

12  think is a possibility Ms. Taylor was doing, crushing up

13  oxycodone, putting it in a syringe, injecting into the

14  port-a-cath, you would have to puncture the skin; is that

15  correct?

16          MS. GERDES:   Objection.  Asked and answered three

17  times.

18          THE COURT:   Sustained.

19  BY MR. LYNCH:

20  Q.   Let me cut to the chase.  In the autopsy report -- in

21  autopsy, NAME instructs forensic toxicologists to look for

22  needle marks and evidence of drug abuse when performing a

23  toxicology report; isn't that correct?

24  A.   So you mixed up a bunch of things in the question,

25  counselor.  You said forensic toxicologist.  I think you

1    actually mean forensic pathologist in the --

2    Q.   Forensic --

3         (Indiscernible crosstalk.)

4              THE COURT:  One at a time.

5    BY MR. LYNCH:

6    Q.   A forensic -- the person performing the examination on

7    the body would be looking for needle marks as part of their

8    examination, correct?

9    A.   Correct.

10   Q.   In the autopsy report -- and if a person like Ms. Taylor

11   was using a syringe in this fashion that we've talked about

12   and was puncturing her skin repeatedly, that could be done in

13   a non-sterile manner, correct?

14   A.   Correct.

15   Q.   And that could cause an infection or a rash around where

16   the port-a-cath is, right?

17   A.   I don't know that it would cause a rash, but you could

18   definitely get an infection from it.

19   Q.   You could definitely get an infection, and you would also

20   see -- you would also potentially see needle marks around the

21   site of the port-a-cath, correct?

22   A.   It would depend on how recent the needle puncture was.

23   If it was an acute needle puncture, ideally, you would

24   identify it at autopsy, particularly if the gauge of the

25   needle was big enough.

1    Q.   There's no evidence in Michelle Taylor's autopsy of any

2    needle marks near this foreign object that the medical

3    examiner noted on the autopsy report, correct?

4    A.   I do not recall any notation of needle marks in the

5    autopsy.  I don't have the autopsy report in front of me.  I

6    also don't recall if I saw the autopsy photographs myself.

7    Q.   I'm not sure there are -- I will represent to you, I do

8    not believe there were autopsy photographs available for

9    Ms. Taylor, Dr. Baker.

10        I appreciate your going through a number of different

11   patients here.  But fair to say, to your recollection, there

12   is nothing in the autopsy report indicating puncture marks

13   near what you're describing as the port-a-cath, correct?

14   A.   Correct.

15   Q.   And then you reference that in some of the medical

16   records for Ms. Taylor, there's a reference to the patient

17   needing to get it taken out; is that correct?  You referenced

18   that in your report?

19   A.   Yes.

20   Q.   The health care provider, Dr. Coe, says the patient needs

21   to get it taken out, correct?

22   A.   He said, "patient needs it removed."

23   Q.   Needs it removed.  Fair to say that if the patient was

24   using the port-a-cath in the way that you're suggesting she

25   might have been using it, she wouldn't be asking -- she

1  wouldn't be representing that she needs it removed, correct?

2  A.   I don't recall the interaction with Dr. Coe being him

3  wanting it removed or her asking to have it removed.

4  Q.   There's nothing in the interaction with Dr. Coe that

5  suggests that the patient was insisting don't remove it,

6  correct?

7  A.   I don't recall that conversation.

8  Q.   Wouldn't that be an important fact to know one way or the

9  other, Doctor?

10  A.   I guess I don't really know how to answer that question.

11  Q.   Fair enough.

12  A.   The point of my evaluation was, is it still there at the

13  time she passed away.

14  Q.   Okay.  Your report, though, doesn't reference one way or

15  the other the issue about the lack of needle marks on the

16  autopsy report for Michelle Taylor, correct?

17  A.   Correct.

18  Q.   First time you'd be talking about that is on this

19  examination, correct?

20  A.   Yes.

21  Q.   All right.  Now, another potential cause of death,

22  another potential way that Ms. Taylor could have died is that

23  she could have just taken too much of her oxycodone, correct?

24  A.   In combination with the other things that were present,

25  yes.

1    Q.   Sure.  But part of the way that she got to a very high

2    level of oxycodone, as reported in her blood toxicology, was

3    just taking too many of the pills, correct?

4    A.   I don't know that I can make that statement because you

5    can't calculate from a postmortem concentration to figure out

6    how much somebody must have taken to get there.

7    Q.   It is possible, Dr. Baker, that the reason that she has

8    the level of oxycodone in her blood is because she was taking

9    more of her medication than she was supposed to be, correct?

10   A.   It's possible, yes.

11   Q.   Right.  You reviewed all the medical records from

12   Northern Kentucky Center for Pain Relief for Ms. Taylor,

13   correct?

14   A.   I believe so, yes.

15   Q.   Do you know in how many instances Ms. Taylor had failed

16   urine drug tests or inconsistent urine drug tests, unexpected

17   results in her urine drug tests because she was negative for

18   her prescribed medications?

19   A.   I don't know the answer to that.

20   Q.   You don't know the answer to that.

21        Did you look at the urine drug tests at all?

22   A.   Oh, they would have passed by as I was reviewing her

23   medical records, but those wouldn't be relevant to me in

24   figuring out her cause of death based on an autopsy report and

25   postmortem toxicology.

1    Q.   But you're offering the port-a-cath explanation.  You

2    don't point out in your report that another possibility is

3    that she was just doing what she had done at Northern Kentucky

4    Center for Pain Relief, taking more of her medication than was

5    prescribed, correct?

6    A.   Could you repeat the question, counselor?  That was a

7    long one.

8    Q.   You do not put in your report -- you do not point out in

9    your report that a possible explanation for why Ms. Taylor had

10   elevated levels of oxycodone in her blood is because she was

11   over-taking her medication, correct?

12   A.   Correct.  That's not in my report.

13   Q.   The only thing you put in your report is this port-a-cath

14   explanation of how she was taking her oxycodone, correct?

15   A.   No, that's incorrect.  I actually put in my report that

16   with the exception of the oxymorphone with the available data

17   set, I largely agree with the wording of the Kentucky state

18   medical examiner.  Then I offered the possibility of a

19   different mechanism of death.

20   Q.   The only possibility that you explore in your report is

21   the port-a-cath possibility, correct?

22   A.   I don't know what you mean by the term "explore," but I

23   literally put I agreed with the death certificate based on the

24   available data set.  That was the first thing I put in my

25   report.

1    Q.   Fair enough.  Let's move on to talk about Mr. Stima.

2    There's also an autopsy for -- do you need a moment,

3    Dr. Baker, to get Mr. Stima?

4    A.   No, I have the right report in front of me.  Thank you,

5    though.

6    Q.   Fair enough.  I just want to make sure.  I think I heard

7    this right on direct examination, and I just want to make sure

8    I've got it right.  Your conclusion as to Mr. Stima is that

9    "mixed fentanyl and oxycodone toxicity explains his death."

10   Is that a fair summary of your opinion on Mr. Stima?

11   A.   That's fair.

12   Q.   Okay.  Your main disagreement with Dr. Ralston is that he

13   should have called out the fentanyl as the illegal drug that

14   contributed to his death instead of the cocaine; is that

15   correct?

16   A.   That is a disagreement I have with Dr. Ralston, yes.

17   Q.   That he lists illegal drugs, plural, but then says

18   oxycodone illegal drugs contributed to the death.  That's the

19   area of your disagreement?

20   A.   That is an area of disagreement with him.

21   Q.   But in sum -- just put this up on the ELMO -- with

22   Mr. Stima, you and Dr. Ralston are in agreement that the

23   fentanyl and the oxycodone together at least contributed to

24   his death, right?

25   A.   Correct.

1   Q.   Okay.  And it's fair to say, just for the record, that

2   the fentanyl that was reported in the blood toxicology for

3   the -- for Mr. Stima was not prescribed by Dr. Siefert, right?

4   A.   Correct.  I doubt it's prescribed by anyone.

5   Q.   Right.  It was a -- fair to say that the most plausible

6   interpretation of why fentanyl was in Mr. Stima's blood was he

7   was taking illegal street drugs that had fentanyl?

8   A.   Correct.

9   Q.   Okay.  And Dr. Ralston, to be clear, said in his report

10  illegal street drugs, including such as cocaine, contributed

11  to Mr. Stima's death; is that right?

12  A.   He didn't use the word street drugs.  He just said

13  consumption of illegal drugs --

14  Q.   Illegal drugs.

15  A.   -- like cocaine was the principal contributing factor.

16  Q.   But another illegal drug in this case would be fentanyl,

17  correct?

18  A.   Fentanyl could be legal or illegal, depending on how you

19  got it.  It's most likely illegal.

20  Q.   Illegal drug -- here it's an illegal drug, right?

21  A.   In all likelihood, yes.

22  Q.   Okay.  The other issue with Mr. Stima is that the level

23  of fentanyl in his blood is technically within the therapeutic

24  range, according to the blood toxicology report; is that

25  right?

1    A.   It is in their particular range, yes.

2    Q.   In their particular range.  But here, the fentanyl is

3    interacting with the oxycodone.  And the additive effect of

4    both is, in your opinion, what caused the death?

5    A.   In a general sense, yes.

6    Q.   All right.  And that information is available on the

7    first page of the autopsy report for Mr. Stima; is that

8    correct?

9    A.   If you're referring to the toxicology results, they were

10   retyped on the first page of the autopsy report, yes.

11   Q.   Okay.  And that's the principal piece of evidence that is

12   guiding your conclusion as to what caused Mr. Stima's death,

13   correct?

14   A.   I would say I needed the entire autopsy report before I

15   would have put my nickel down.  But yes, the toxicology

16   results are correctly retyped on the front page of the autopsy

17   report.

18   Q.   Great.  All right.  Now, let's talk about this issue with

19   autopsies.  For two of these patients, for Casebolt and

20   Stewart, one of the areas of disagreement with Dr. Ralston is

21   that, you know, the lack of autopsies, to your view, makes it

22   impossible to determine contributing factor or cause of death;

23   is that fair?

24   A.   That's correct.

25   Q.   And, in fact, a criticism that you appear to have of the

1    state of Kentucky is that it did not perform autopsies on all

2    of the suspected overdose cases at issue here; is that fair?

3    A.   I'm not here to criticize the state of Kentucky.  I'm

4    just pointing out that these individuals didn't have

5    autopsies, and they should have.

6    Q.   Okay.  And that's based, in part, on this standard 3.7

7    from the NAME standards that you talked about on direct

8    examination that says that you shall perform an autopsy in the

9    case of apparent intoxication by drugs; is that fair?

10   A.   I don't know the exact number of the standard.  But yes,

11   it says you shall perform an autopsy in that circumstance.

12   Q.   Okay. Fair enough.  All right.  Let me ask you a couple

13   of statistics about overdose deaths, Dr. Baker.  How many

14   overdoses occurred in Hennepin County, where you work, in

15   2021?

16   A.   Fatal overdoses?

17   Q.   Yes.  Fatal overdoses.

18   A.   I don't have our data in front of me, but I want to say

19   it was close to 400, give or take.

20   Q.   Close to 400.  Would showing you a copy of the Hennepin

21   County website refresh your recollection as to the exact

22   number?

23   A.   Yes.

24   Q.   All right.

25            MR. LYNCH:  Permission to show the witness.  Just the

1  witness.

2  Q.   So this is from the Hennepin County coroner website and

3  has a bunch of statistics.  Do you recognize this document?

4  It's a summary.

5  A.   I don't recognize this document.  Are you sure this isn't

6  from the Minnesota Department of Health?

7  Q.   I believe it's from -- well --

8  A.   Yeah, we wouldn't have anything about syringe services or

9  Narcan on our website.

10        THE COURT:  The last page, go up a little bit.  Push

11  the page up a little bit.  Maybe down.  I saw something on

12  there.

13        MR. LYNCH:  Oh, Minnesota Department of Health.

14  Excuse me.

15  BY MR. LYNCH:

16  Q.   Regardless of the source, is it fair to say that you

17  suggested around, what, 400, I think you said?

18  A.   Well, let me be clear.  When I said 400, I'm talking

19  about all drug and alcohol related fatalities.  This one

20  specifically says Hennepin County residents died from an

21  opioid overdose.

22  Q.   Opioid.  Fair enough.

23  A.   Right.  So I don't know who is doing the data extraction

24  at the Health Department, but this is almost certainly from

25  their opioid dashboard that they'd stood up.  So they have

1    obviously culled out the drug fatalities that didn't include

2    an opioid to come up with the number.

3    Q.   In terms of opioid overdoses, it's 340 or 400.  It's in

4    that ballpark between 300 and 40 opioid overdoses in Hennepin

5    County.  Is that a fair approximation, based on what you know?

6    A.   I'm going to take this number to be true because I trust

7    the folks at Minnesota Department of Health.  The number I

8    gave you, 400 or so, includes cases that were drug fatalities

9    that didn't involve an opioid.  We record all those, not just

10   the opioids.

11   Q.   Fair enough.  So for opioid overdoses, we're in agreement

12   it's between 300 and 400.  Fair enough?

13   A.   Yeah.  I have no reason to disagree with my state health

14   department.

15   Q.   Okay.  Great.  How about, do you know the statistics for

16   the state of Minnesota as a whole?

17   A.   I do not because I only cover about a third of the state.

18   Q.   Okay.  If I were to give you -- are you familiar with

19   statistics collected by the Minnesota attorney general's

20   office?

21   A.   No, I'm not.

22   Q.   You're not, okay.  Would you have any reason to disagree

23   that in 2021, the Minnesota attorney general's office reported

24   978 opioid involved overdose deaths?

25   A.   So I don't frequent the attorney general's website.  I

1  don't know who does their data extraction.  I have no basis to

2  agree or disagree with that.  I have no particular reason to

3  think it's not accurate.  This is the first time I've heard

4  it.

5  Q.  You have no reason to disagree it's a little under 1,000

6  overdose deaths?

7  A.  If that's what it says.

8  Q.  All right.  Do you know how many opioid overdose deaths

9  occurred in 2021 in Kentucky?

10 A.  I do not.

11 Q.  I'm going to go ahead and pull up Dr. Ehn's exhibit.  I'm

12 forgetting which number it is, but it's the opioid overdose

13 fatality report document.

14             THE COURT:  Is this the one with the --

15             MR. LYNCH:  The map.

16             THE COURT:  The map, okay.

17             MR. LYNCH:  This one can be published to the jury,

18 Your Honor.  It's in evidence.

19 BY MR. LYNCH:

20 Q.  Do you see the number at the top of the page, Dr. Baker?

21 A.  I do.

22 Q.  According to this document in evidence, how many opioid

23 overdoses occurred in just 2021 in the state of Kentucky?

24 A.  So we're talking about fatal overdoses?

25 Q.  Fatal overdoses.

1  A.    Looks like 2,250.

2  Q.    That's, like, seven times more than in Hennepin County,

3  based on what you understand to be the number for part of your

4  jurisdiction; is that right?

5  A.    Back of the envelope calculation, yeah, about seven.

6        THE COURT:   That's the entire state of Kentucky.

7        MR. LYNCH:   That's the entire state of Kentucky.

8  BY MR. LYNCH:

9  Q.    As to the entire state of Minnesota, that's over double,

10 right?

11 A.    Correct.

12 Q.    All right.  Now, were you ever interviewed by local news

13 on trying to keep up with -- the number of overdose deaths,

14 you talked about on direct examination how the number of

15 overdose deaths nationwide is putting a strain on your

16 profession.  Fair?

17 A.    Definitely.

18 Q.    And part of the reason is because you have so many more

19 people overdosing and dying and, to your view, you need to

20 perform an autopsy on all of those individuals who are

21 suspected of overdosing and dying; is that right?

22 A.    Again, that's not my view.  It's the view of my

23 professional organization.  I clearly share that view.  But

24 yes --

25 Q.    So it is your view as well?  You share that view?

1    A.   It is.

2    Q.   And, in fact, fair to say that you've been quoted in the

3    past in local media about how you, even with just 340 overdose

4    deaths in your jurisdiction, are coming under strain to

5    perform all of those autopsies for the overdose, the suspected

6    overdose deaths?

7    A.   Yes, but it's a little misleading to use the number --

8              MR. LYNCH:  Your Honor, move to strike.

9              MS. GERDES:  Objection, Your Honor.

10             THE COURT:  I'm not going to strike.  He's trying to

11   understand your question.

12   A.   I just want to be clear.  340 is the cases that we

13   figured out were opioid overdoses after you did the autopsy.

14   There's many more autopsies that get done because of the

15   concern of drug abuse that actually turn out to be natural.

16   That's a number that's not reflected in that 340, but those

17   are obviously autopsies that are adding to our caseload.

18        It's not just the cases that turn out to actually be drug

19   fatalities that are driving this.  It's all the cases that

20   might be drug fatalities that also have to come in and get

21   autopsied that drive the workforce issue.  So it's

22   considerably more than 340.

23   Q.   So even that higher number is actually putting a

24   significant strain on your office, right?

25   A.   It was, but I was able to expand my staff to accommodate

1    the workload.

2    Q.   Right.  But other jurisdictions, potentially Kentucky,

3    might be strapped to be able to expand those same services;

4    isn't that right?

5    A.   That may very well be the case, yes.

6    Q.   And, in fact, given the statistics that we've talked

7    about here today, it appears that Kentucky is dealing with a

8    significantly higher number of overdose deaths than the entire

9    state of Minnesota; is that right?

10   A.   So we were comparing, what, 2021 numbers?

11   Q.   Yes, we were.

12   A.   So in 2021, yes.

13   Q.   Okay.  All right.  I think you talked about on -- and the

14   NAME organization also recognizes this strain that has been

15   placed on coroners' offices; is that right?

16   A.   Yes.

17   Q.   All right.  In fact, you're familiar with an article, a

18   position paper I think you've cited in your report on the

19   Recommendations for Investigation, Diagnosis, and

20   Certification of Deaths Related to Opioids and Other Drugs?

21   A.   Yes, I'm familiar with that.  Which version are you

22   referencing, counselor?

23   Q.   I'm referencing the version that has a date range at the

24   top of December 17, 2019, to December 17, 2024.

25   A.   Got it.

1    Q.   You're familiar with that?

2              THE COURT:  We're not even to December 2024 yet.

3              MR. LYNCH:  Say again?

4              THE COURT:  2024?

5              MR. LYNCH:  I believe the range -- this is a

6    recommendation that I believe covers this five-year range.

7              THE COURT:  All right.

8    BY MR. LYNCH:

9    A.   Just to clarify, counselor, NAME position papers sunset

10   after five years.  So once they're ratified by the Board of

11   Directors, they get a five-year life cycle, which is why this

12   one says 2019 to 2024.

13   Q.   Thank you for the clarification.  Fair enough.

14        So this position paper also recognizes the strain on

15   coroners -- on death investigations created by the opioid

16   crisis, correct?

17   A.   Yes.

18   Q.   I want to read, and I want to just -- the question is do

19   you agree with the statement after I read the following.  This

20   is from the NAME recommendations.

21        "In an ideal world, every death investigation would have

22   the resources and personnel to investigate each death reported

23   to the office with an autopsy, but not every office operates

24   in ideal circumstances.  This leaves an office in the

25   difficult position of not autopsying bodies that are best

1   evaluated with an autopsy or else exceeding the NAME standard

2   for maximum number of autopsies per pathologist per year," and

3   the maximum number is 250.

4       Do you agree with that statement, that in an ideal world,

5   as this document says, you would be able to perform those

6   autopsies.  But given the reality of the opioid crisis, you

7   just might -- you just don't have enough personnel to perform

8   all the autopsies?

9   A.   I will freely acknowledge there are offices out there

10  understaffed and underfunded who can't keep up.  When I

11  referenced in direct about how I talk about the opioid crisis,

12  that is how I frame it when I'm talking to elected leaders.

13  That is exactly the problem I'm addressing.  We need more

14  people, we need more money.

15  Q.   And you're facing this issue from a jurisdiction that has

16  half the number of deaths as the Commonwealth of Kentucky,

17  according to the -- half the number of overdose deaths as the

18  state of Kentucky, according to the statistics we've talked

19  about here today?

20  A.   I think that we agreed my jurisdiction was approximately

21  one-seventh of the state of Kentucky.

22  Q.   One-seventh.

23  A.   I'm only a third of the state of Minnesota.

24       MR. LYNCH:  Your Honor, this might be a good -- I

25  have a couple other areas I want to get into.  I don't

1    anticipate it going too long.  I am aware of the time.

2         THE COURT:  We're going to break at this time.  We'll

3    be in recess until 1:45 with the jury.  Continue to heed all

4    the prior admonitions of the Court.

5         (The jury exited the courtroom at 12:32 p.m.)

6         THE COURT:  I am considering, given the testimony

7    we've heard, giving the limiting admonition on uncharged

8    patient deaths.  They've heard so much minutiae about a

9    variety of topics.  I feel like it might be appropriate to

10   give them that admonition again.  But I'm not going to give it

11   unless you all think, at least from your perspective, you

12   think it's a good idea or bad idea.

13        MS. GERDES:  I think it's fine, Your Honor.

14        MR. GLASSMAN:  No objection.

15        THE COURT:  He's not charged with causing the deaths.

16   The uncharged deaths were -- pretrial I allowed them to be

17   admitted for a limited purpose.

18        MR. LYNCH:  Right.

19        THE COURT:  I want the jury to understand that.

20        MR. LYNCH:  We have no objection to that either, Your

21   Honor.  I just want to -- the one thing I want to clarify is I

22   believe in the instruction that the wording of the

23   instruction, I think --

24        THE COURT:  Okay.

25        MR. LYNCH:  -- references -- to my recollection, the

1  wording of the instruction references the law on controlled

2  substances violation --

3  THE COURT:  What instruction are you referring to?

4  I'm talking about the limiting instruction.  I'm not talking

5  about the final instruction.

6  MR. LYNCH:  In the limiting instruction, the law

7  dictates that we have to prove in the disjunctive, and I

8  believe the version of the limiting instruction that was read

9  before included language in the conjunctive.  So I think --

10  and if I'm wrong on this, I apologize, but I think the

11  language of the instruction said knowingly and intentionally,

12  and it should be -- if I've got it wrong, Your Honor, I

13  apologize.

14  That would be the only -- the law is that it's the

15  disjunctive, not the conjunctive, as to that issue and as to

16  the outside the usual course.

17  THE COURT:  Again, I will review -- the only

18  transcript that's been prepared is the one for Ralston so I

19  don't have the specific language of the limiting instruction.

20  There will be a final instruction in the final draft set.  I'm

21  just trying to give them the mooring, how they are -- or the

22  instructions on the proper consideration of this.

23  Based on the testimony, they may think these two, Ralston

24  and Baker, agree that contributing -- he's not charged with

25  that.  He's not charged with causing the death.  It's being

1   admitted for the limited purpose that I previously told them
2   about.
3           MR. LYNCH:  Yes, Your Honor.  Absolutely in
4   agreement.
5           THE COURT:  To the extent it had some -- okay.
6           MS. GERDES:  Your Honor, I think what the Court is
7   getting at is, frankly, the reason why we --
8           THE COURT:  I understand.  I understand exactly --
9           (Indiscernible crosstalk.)
10          THE COURT:  Go ahead.  Say it again.  There's a
11  reason why you moved in limine pretrial.
12          MS. GERDES:  This is exactly why we thought this
13  evidence should not come in.  The government's two experts
14  don't even agree with each other on the contributing causes of
15  death in this case.  Dr. Baker has obviously offered a
16  different opinion.  And really, the testimony about the deaths
17  in this case has far outweighed the testimony about the actual
18  prescribing, which is charged.
19      If you look at the proportion of evidence that has been
20  presented by the government, when you're talking about
21  prescribing versus death, you think about which witness they
22  started with, which witness they ended with, we heard from one
23  patient in this case.
24      I mean, it's highly, highly prejudicial to the defendant.
25          THE COURT:  All right.  Well, I'll take a look at the

1     proposed -- the one that I gave before.  Hopefully I can find

2     it, and I'll check about the conjunctive/disjunctive.

3          How long do you have on cross?

4          MR. LYNCH:  He will not miss his flight.  I think

5     probably 15 to 20 minutes.

6          THE COURT:  And then we have the other witness.  Your

7     other witness is here?

8          MS. GERDES:  Yes.

9          THE COURT:  We'll be in recess until 1:45.

10    (Recess from 12:38 p.m. until 1:46 p.m.)

11         THE COURT:  All right.  I did, with the assistance of

12    my court reporter, find two times I've given the limiting

13    instruction, once before opening, once, I think, right before

14    Ralston testified, and I will give it again, consistent with

15    what we've talked about.

16         Go ahead and bring the jury in.

17         MS. GERDES:  Your Honor, upon further reflection, I

18    don't think there's a need to give the charge again now unless

19    Mr. Glassman wants to hear it.

20         MR. GLASSMAN:  I'll defer to counsel.

21         THE COURT:  You don't want me to give it?

22         MS. GERDES:  No.

23         THE COURT:  I won't, then.

24         MR. LYNCH:  We're happy to have it read, Your Honor.

25         THE COURT:  I know you are.  But I'm just trying

1    to -- well, I don't want to overly emphasize it, but I want to

2    make sure they consider it for the proper purpose.  Given the

3    fact that I've already given it to them twice, I will

4    definitely include it in the final instructions.

5              MS. GERDES:  Absolutely.

6              THE COURT:  All right.

7          (The jury entered the courtroom at 1:48 p.m.)

8    BY MR. LYNCH:

9    Q.   Good afternoon, Dr. Baker.

10   A.   Good afternoon.

11   Q.   Before the break, just to remind you, we talked about

12   sort of differences in statistics on opioid overdose deaths as

13   between Minnesota and Kentucky.  Remember that testimony

14   generally?

15   A.   I recall that, yes.

16   Q.   I want to move into a slightly different area about

17   questions you brought up -- testimony you brought up on direct

18   examination about the accuracy of determining cause of death

19   or contributing factor to death in the absence of an autopsy,

20   moving into a new area, okay?

21   A.   Okay.

22   Q.   We talked before the break about this same -- the

23   recommendations for investigation, diagnosis, and

24   certification of deaths related to opioid and other drugs,

25   that same article we talked about before the break.  Remember

1    that?

2    A.    Yes.

3    Q.    And I think you have a copy of that article --

4    A.    I do.

5    Q.    -- with you?

6          Okay.  So in that article, one of the authorities that is

7    cited, it's in footnote 15 on page 16 of the article, if you

8    want to take a look at it -- in my copy, at least, it's on

9    page 16.  I can pull it up for you on the ELMO if it's easier.

10   A.    I have it here.

11   Q.    So I'm talking about this article by Dr. Dye on correctly

12   identifying deaths due to drug toxicity without a forensic

13   autopsy.

14         Do you see that citation there?

15   A.    I do.

16   Q.    Okay.  Have you read that article before?

17   A.    I may have read it when it came out, but I have no

18   independent recollection of it.

19   Q.    Okay.  Are you kind of familiar -- I mean, if you haven't

20   read it since it's come out, are you sort of familiar that the

21   idea behind the article was to take a group of deaths, okay,

22   where there was an autopsy performed and take a group of

23   medical examiners, give them all the information related to

24   the death except the autopsy, and figure out how much

25   agreement there is between what the cause of death was

1     determined to be with the autopsy and without the autopsy.

2     Are you generally familiar with that concept in the article?

3     A.   Again, I have no independent recollection of having read

4     the article so I --

5     Q.   Okay.  Let me just ask you a couple questions about the

6     article, which is referenced in the NAME materials you talked

7     about on direct and on cross-examination.  Fair to say?

8     A.   It is.  It is referenced in the NAME position paper.

9     Q.   Okay.  So in this article, and I will represent to you

10    that was the general idea behind the study, give one group of

11    medical examiners --

12         THE COURT:  You've already summarized what the groups

13    are.

14         MR. LYNCH:  Okay.  So can the witness see the

15    document?

16    BY MR. LYNCH:

17    Q.   All right.  So are you aware of the finding in that study

18    which says, "When the reviewers knew that the decedent had a

19    history of drug use or drug paraphernalia was discovered at

20    the scene, the percent agreement between the reviewer and the

21    case file for COD" -- cause of death -- "ranged from 80 to 83

22    percent."

23         Were you aware of that finding?  Have you heard of that

24    finding before?

25    A.   Not until today, no.  Again, I have no independent

1    recollection of having read this paper.

2    Q.   All right.  So in some instances, in just 17 percent of

3    the cases, reviewers who didn't have access to the autopsy

4    were in agreement with those that did have access to the

5    autopsy, if what I've represented to you is correct.  Is that

6    right, sir?

7    A.   That appears to be what it says here.  The agreement

8    ranged from 83 -- excuse me, 80 to 83 percent.

9    Q.   And in fairness, I will tell you that at the end of the

10   article, they do, again, recommend, sort of in the last

11   paragraph there -- I'll give you a moment to read that.

12   A.   Okay.

13   Q.   Okay.  So in fairness, their recommendation is still to

14   follow those NAME guidelines on performing an autopsy.  I just

15   wanted to give you the benefit of that information as well.

16   That's a fair sort of summary of that last paragraph; would

17   you say?

18   A.   Just to be fair, they're not guidelines.  They're

19   standards.

20   Q.   They're standards, okay.  But fair to say that based on

21   this study, at least how I represented it to you, in a

22   significant number of instances, medical examiners were able

23   to reach the same cause of death that was reached with an

24   autopsy without the benefit of having that autopsy?

25   A.   So I don't know what the word "significant" means in this

1    context.  I'll agree it was 80 to 83 percent, based on what's

2    in the paper.  In what context is 80 percent good enough?

3    Q.   Or 83 percent.  Okay.  Fair enough.

4         All right.  Fair to say that both Mr. Casebolt and

5    Ms. Stewart had indicators in their coroner's report that they

6    were using or abusing some type of drug?

7    A.   Yes.

8    Q.   Yes.  For example, Ms. Stewart, I think the coroner

9    performed a pill count after her death, and it was off; is

10   that correct?

11   A.   That's my recollection, although I'm not sure how

12   sensitive that is for evidence of medication misuse.

13   Q.   Okay.  And for Mr. Casebolt, obviously, he was also --

14   there was the metabolite of cocaine in his blood, correct,

15   indicating some level of drug use?

16   A.   Yes.

17   Q.   All right.  Next, you mentioned on direct examination

18   your dispute with Dr. Ralston specifically about the levels of

19   what constitutes a toxic or lethal level of oxycodone.

20        Do you remember that testimony on direct?

21   A.   In mine or his?

22   Q.   Your testimony.

23   A.   I mean, I recall I testified about that this morning,

24   yes.

25   Q.   Right.  And I think that the level that you referenced

1    was around 400 nanograms per milliliter; is that right?

2    A.    Again, it depends on what reference you look at.  Tennant

3    has said 400.  The lab that Dr. Ralston uses is 200.  I think

4    some of the named position papers are pretty clear that you

5    have to interpret reference ranges with a grain of salt when

6    you're dealing with chronic opioid patients because those are

7    going to be different than the acute reference ranges for

8    people who are not long-term opioid users.

9    Q.    Fair enough.  I want to talk about two of the authorities

10   you cited in your analysis of Mr. Stima.  So if you want to

11   pull that up.

12   A.    Okay.

13   Q.    Just for your benefit, I'm going to pull it up on the

14   ELMO as well.  So with Mr. Stima, you cite -- in footnotes 3

15   and 4 of your report, you cite to Dr. Spiller, and then you

16   also cite to a Dr. Wolf.  I assume you're familiar with those

17   authorities because you cited them in your report?

18   A.    Yeah.  I can't quote them chapter and verse, and I don't

19   have them with me, but yes.

20   Q.    Fair enough.  But those are authorities you find to be

21   reliable and you've relied upon in your expert report; is that

22   right?

23   A.    Generally, yes.

24   Q.    Okay.  So let me just bring up Spiller and Wolf.  So

25   you're familiar with the fact, because you cite them in your

1    report, that those are two studies that survey a number of

2    deaths attributed to oxycodone or hydrocodone over a period of

3    time and address the concentration that was deemed to be toxic

4    of oxycodone or hydrocodone; is that correct?

5    A.   As I recall, yes.

6    Q.   So I'm going to pull up the Wolf study first.

7         So with Wolf first, you see that highlighted portion

8    of -- and is that too small for you to read, Dr. Baker?

9    A.   No.  I can read it.

10   Q.   So that highlighted portion says, fair to say, for Wolf,

11   it was a survey of 172 cases identified in which oxycodone was

12   detected in postmortem blood specimens, right?  This is a

13   survey of that number of cases.  Fair to say?

14   A.   As I recall, yes.

15   Q.   Okay.  And among those cases, it references that the most

16   common scenario involved an individual with a history of drug

17   abuse and was then found dead.  Fair?

18   A.   Yes.

19   Q.   So that's the type of person who, if they've had a

20   history of drug abuse, under your scenario, they would be at

21   least somewhat tolerant, right, to opioids?  They could be

22   expected to have a higher tolerance for an amount of opioids

23   in their blood, correct?

24   A.   So the general answer to that would be yes, although if

25   the person is abusing the drug, as a medical examiner, you're

1   not going to know if they're doing it every day, if they're

2   doing it intermittently.

3   Q.   Sure, okay.  But some level of use of opioids is likely

4   what was going on with -- at least in some of the people in

5   that survey; is that correct?

6   A.   That certainly seems to be the implication of the

7   sentence you highlighted, yes.

8   Q.   All right.  So then there's a table in this document as

9   well, and it gives a range of oxycodone toxicity.

10      Do you see that?

11  A.   Yes.

12  Q.   And that range there lists -- and the mean is higher, but

13  the range of oxycodone toxicity in this article that you're

14  citing is from 0.21 milligrams per liter to 4.71 milligrams

15  per liter.

16      Do you see that?

17  A.   Correct.

18  Q.   Okay.  And then combined drug toxicity drops to 0.025?

19  A.   Yes.

20  Q.   As the lower end of the range for combined drug toxicity

21  up to 17.5.

22      Do you see that?

23  A.   I do.

24  Q.   Okay.  That's Wolf, okay?  Those are the numbers from

25  Wolf.  You agree those are the numbers listed in Wolf, the

1    authority that you cited, right?

2    A.   Yes.

3    Q.   The second authority you cite is Spiller, and there's a

4    similar table in Spiller.  Now, Spiller puts the table in a

5    slightly different form, right?  And I want to just focus in

6    on the oxycodone again, postmortem concentrations.

7    A.   Okay.

8    Q.   Again, this is cases where there's been a determination

9    that the level was toxic, right?

10   A.   Correct.

11   Q.   Okay.  Here, again, the range for patients who are drug

12   abusers, again, patients who likely have some sort of exposure

13   to drugs before they've tried it once, is 0.12 to 0.9; is that

14   correct?

15   A.   Correct.

16   Q.   That's the range of defined toxicity in this authority

17   that you're citing, right?

18   A.   Yes.

19   Q.   Okay.  So I know -- and you were very helpful in your

20   expert report.  Sometimes you have the numbers in milligrams

21   per liter, and then a lot of the other measurements are done

22   in nanograms per milliliter, right?  These are two different

23   sort of levels that are sort of referenced in some of the

24   reports; is that fair?

25   A.   Yes.

1    Q.   And the more common metric that was used, for example, in

2    the blood toxicology reports in this case was the nanograms

3    per milliliter; is that right?

4    A.   That's the way this lab reports it out, yes.

5    Q.   Yes, sure.  Fair enough.  There's no -- I'm not -- we're

6    just reporting numbers in a slightly different way.  We're not

7    changing the actual underlying numbers, is that right, if

8    we're saying milligrams versus nanograms?

9    A.   Correct.  They're just different units of measurement.

10   Q.   Okay.  So I've just created a demonstrative that

11   summarizes the information from the --

12          THE COURT:  The two reports you just showed, you

13   multiply it by 1,000, is that right, if you're doing

14   milliliters?

15          MR. LYNCH:  That's exactly right.  I'm going to show

16   a demonstrative, no objection from the defense.

17          THE COURT:  All right.

18   BY MR. LYNCH:

19   Q.   It does that conversion, multiplies by a thousand.  We're

20   just focusing in on the lower range here for both of those

21   reports.

22   A.   Okay.

23   Q.   You'd agree with me, Dr. Baker, that I have done the

24   conversion right for the Wolf report and for the Spiller

25   report on the lower level of the range in nanograms per

1    milliliter; is that right?

2    A.   I think so.  I will freely admit that when I'm reading

3    these papers, I frequently have to pull up Google and use a

4    conversion because it gets confusing, and I do this for a

5    living.

6    Q.   Sure, no.  I had to do the same thing last night.  Fair

7    enough.  All right.

8    A.   So just so I understand, counselor, you've done the math,

9    and the four numbers on the right represent the lower range of

10   these two authors' ranges of oxycodone toxicity?

11   Q.   Yes, that's correct.

12   A.   For cases they considered fatal and attributed to

13   oxycodone?

14   Q.   Oxycodone toxicity or -- I've copied and pasted what's in

15   the table in the article into this slide.

16   A.   Understood.

17   Q.   All right.  So according to these articles, then, the

18   lower level of the toxic range would be 210 for oxycodone

19   toxicity for Wolf, 25 for combined toxicity, and it does not

20   say benzodiazepines.  It does say it later in the article.  It

21   doesn't -- I want to make sure I'm clear that one of the

22   elements in the article that it does say is in many of the

23   cases, the other drug involved is benzodiazepines.

24        Would that be a surprising finding for you to learn

25   about?

1    A.   No, but I haven't read the paper in that granular level

2    in a while.

3    Q.   Fair enough.  I'm just repeating the numbers for Spiller

4    there for 120 and 160, okay?  You understand that?

5    A.   I'm trusting your math, counselor.

6    Q.   All right.  So do you remember what the level of

7    oxycodone was for Michael Casebolt, concentration of oxycodone

8    in the blood for Michael Casebolt?

9    A.   I'm sorry.  I thought we were talking about Mr. Stima.

10   Q.   We were talking about you relied on him -- you relied on

11   these authorities for Mr. Stima, but I actually want to talk

12   about these two authorities in the context of Casebolt,

13   Stewart, and Bitter.

14   A.   Roger that.  Okay.

15   Q.   So Casebolt, fair to say that his level of oxycodone in

16   his blood, as reported in the postmortem toxicology, is 249?

17   A.   It is.  And it's the same units, nanograms per ML.

18   Q.   And so that would be above the lower range of toxicity

19   for Wolf and for Spiller; is that right?

20   A.   That is correct, according to their numbers.

21   Q.   Okay.  And then for Stewart, the level, the reported

22   blood toxicity for Stewart was 155.  Is that right?

23   A.   Yes.  The postmortem oxycodone concentration in that case

24   was 155.

25   Q.   And that's again -- okay.  It's below the lower range for

1   oxycodone toxicity alone for Wolf, but it's above the lower

2   range for Spiller; is that right?

3   A.   Yes.

4   Q.   Finally -- and to be fair, we're talking about combined

5   drug toxicity.  The level, if there are other substances

6   involved, appears to drop, according to Wolf, right?  It could

7   be as low as 25; is that right?

8   A.   Correct.

9   Q.   Okay.  The level of blood toxicity for Mr. Bitter, do you

10  remember what that is for the oxycodone?

11  A.   Yeah.  So it's not a level of toxicity.  It's just a

12  measurement the lab gives you.

13  Q.   Sure.

14  A.   So in his case, the postmortem oxycodone concentration

15  was 60.6 nanograms per ML.

16  Q.   So as you said, a little bit lower; but, again, above the

17  lower range, at least according to some of these authorities

18  that you have relied upon where there's been a finding of

19  oxycodone toxicity.  Is that fair?

20  A.   Yes.  But I want to be clear, I relied on these

21  references with regard to Mr. Stima.

22  Q.   Oh, I understand that.  But I looked at -- I'm just

23  asking about these authorities that you cited and the ranges

24  that are cited in these authorities as it relates to other

25  patients, okay?

1    All right.  Thank you.  I'll take that down.

2    Finally, Dr. Baker, you did, at the end of your direct

3    examination testimony, you criticized Dr. Ralston's testimony

4    in the Shields case.

5    Do you remember that?

6    A.   Yeah.  I'm not sure I would use the word criticize, but I

7    certainly disagree with the way he portrayed the toxicology in

8    that case.

9    Q.   All right.  And that case involved an overdose where

10   Dr. Ralston determined that the level of carfentanil was high

11   enough to have caused Mr. Willoughby's death; is that right?

12   A.   That's what I took away from his testimony, yes.

13   Q.   Okay.  Now, you disagree with Dr. Ralston's finding on

14   the cause of death in that case, right?

15   A.   I disagree with his opinion about the cause of death,

16   yes.

17   Q.   But I think you testified on direct examination that you

18   are disagreeing with that cause of death, right, without

19   having been privy to the autopsy report for Mr. Willoughby; is

20   that correct?

21   A.   That's correct.

22   Q.   You didn't review the autopsy in that case, but you did,

23   without having the autopsy, feel you could opine on what

24   Dr. Ralston had testified to; is that correct?

25   A.   Correct.  I did not review this particular case with the

1   idea of doing an over-read of the autopsy.  The question was,

2   was this testimony appropriate, given the laboratory results

3   in this case.

4   Q.   But you gave -- you were able to offer opinion testimony

5   without having looked at the autopsy.  Is that correct, sir?

6   A.   Correct.  I still hold the opinion that his testimony was

7   incorrect.

8   Q.   Okay.  Final question.  I think you mentioned that you're

9   being paid -- I just want to make sure I have the numbers

10  correct.  Your hourly rate is $600 per hour?

11  A.   That's correct.

12  Q.   And you estimate that you're going to get, in total, 36

13  to 37 thousand dollars in this case?

14  A.   Correct.  Approximately, yes.

15  Q.   And what was -- were you paid a flat rate for your

16  testimony here today?

17  A.   So when I have to be away from the Twin Cities for any

18  reason for travel and/or testimony, I charge a rate of $5,400

19  per day, which is equivalent to nine hours of my time.

20  Invariably, travel and testimony days end up being a lot more

21  than nine hours, but I just cap it at nine hours.

22  Q.   So your expectation is for your testimony today, you'll

23  be paid $5,400?

24  A.   Well, I'm not being paid for my testimony.  I'm being

25  paid for my time.

1    Q.   Fair enough.  But $5,400?

2    A.   Correct.

3              MR. LYNCH:  I have nothing further, Your Honor.

4              THE COURT:  Any redirect?

5                        REDIRECT EXAMINATION

6    BY MS. GERDES:

7    Q.   I've put the first exhibit, government demonstrative

8    exhibit, back on the overhead.

9         Do you remember Mr. Lynch was basically asking you broad

10   stroke questions as to whether or not you agreed with

11   Dr. Ralston's opinions in this case, Dr. Baker?

12   A.   Yes.

13   Q.   Do you think that's a mischaracterization of how you and

14   Dr. Ralston stand on these things?

15   A.   I would -- the blanket statement that Dr. Ralston and I

16   agree on Mr. Stima's case would be incorrect because you have

17   to unpack Mr. Stima's toxicology a little bit to understand

18   what the relative contributions of the fentanyl and the

19   oxycodone are.

20        With regard to Ms. Taylor's case, as I think I was very

21   clear on cross, given the available data set, I do agree with

22   the suggested wording of the Kentucky medical examiner, with

23   the exception of the oxymorphone, because that's a metabolite,

24   not a drug she was taking.

25        I wish that someone had done a lung biopsy in her case

1  just to make sure that there was no use of the medications in

2  the way that it wasn't intended.  That wasn't done.  But based

3  on the available data set I do have, I can't disagree with the

4  death certificate.

5  Q.  Let me pause for a minute on Ms. Taylor, and let's talk

6  about that.

7  A.  Okay.

8  Q.  Mr. Lynch was drawing your attention to the fact that in

9  the autopsy report, there was no mention of any recent needle

10  prick marks on her chest, correct?

11  A.  Correct.

12  Q.  In the absence of that information, why do you still

13  believe it's a possibility that she could have been consuming

14  the medication in this form?

15  A.  So I will answer your question just to be fair, I'm not

16  trying to impugn this decedent's character or implying I know

17  she was doing something she shouldn't have.  I'm just pointing

18  out that every medical examiner has seen it enough that you

19  just reflexively take a lung biopsy when you see an indwelling

20  catheter just to make sure you cover all your bases.

21      I have to take the autopsy at face value in terms of no

22  needle punctures on her chest because, as I think we

23  established on cross, I didn't see autopsy photos.  I can't

24  independently verify the lack of needle marks.  I have to take

25  the pathologist's word for it.

1      The other thing I would point out is the use of the

2   catheter to use the medications inappropriately does not have

3   to be contemporaneous with the day of death.  It could have

4   occurred days or weeks before her death.  The telltale

5   findings in the lungs would still be there, and that would be

6   very valuable evidence that this person was not using

7   medications the way that anyone intended.  It doesn't mean

8   that's what she was doing on the day she died or the day

9   before she died.

10  Q.   Okay.  And there was a suggestion that she wanted the

11  catheter out.  Do you recall that?

12  A.   I recall that being brought up on cross, but I don't

13  remember the conversation she had with the physician.  The

14  only reason I took note of that was because I found it

15  interesting that she did have a port-a-cath, and I wanted to

16  document that that was confirmed in her record.

17       MS. GERDES:  Fair enough.  If we can pull up

18  Government Exhibit 130e, page 48.  If everyone can take a look

19  at that briefly.

20  Q.   So this note reflects that Dr. Erickson said that she was

21  not going to write for it, meaning write for the port-a-cath?

22  A.   Yes.

23  Q.   And then the note below from Dr. Coe says, "Will not

24  approve port-a-cath care as we are not using it."  It's the

25  doctor saying the patient needs it removed.  And then the

1    patient says, "She will discuss with pain doctor if it is

2    necessary.  She understands the risks of not having it flushed

3    and not using it."  Correct?

4    A.    Yes.

5    Q.    So what she was telling the people at the hospital was

6    she was going to take it up with her pain doctor as to whether

7    or not it needed to be removed?

8    A.    It does say she will discuss with the pain doctor if it

9    is necessary.

10   Q.    Okay.  The two studies by Wolf and Spiller, I'm going to

11   put this other demonstrative back on the screen, if we could

12   switch to the ELMO.

13        Why did you rely on these studies in the case of

14   Mr. Stima?

15   A.    The reason I cited these in the case of Mr. Stima was to

16   illustrate just how low his postmortem oxycodone concentration

17   was, not to use these as be-all and end-all ranges for the

18   patients who had higher concentrations of oxycodone that we

19   just discussed on cross.

20   Q.    Okay.  And in these studies -- and if you need to see, I

21   think you might have said you don't have a copy of them.  If

22   you need to see, do you know if these studies involved chronic

23   opioid users, or were these studies just of individuals who

24   died with oxycodone and other substances in their body?

25   A.    I would have to go back and read the studies in their

1    entirety to know what the patient population was.

2    Q.   Okay.  I'm going to hand them up to you.

3         THE COURT:  Very well.  You can do so.

4    A.   Should I address them one at a time to the best I can?

5    Q.   Sure.

6    A.   I'm reading as quickly as I can.  So the Wolf paper

7    Methods section says, "172 consecutive cases in which

8    oxycodone was detected in their office between January of 2000

9    and 2003.  The cases had all been investigated initially by a

10   forensic investigator from the medical examiner's office, and

11   a complete autopsy was performed by the office."

12        It then goes on to say, "the investigative reports as

13   well as the reports of the postmortem examination" --

14        THE COURT:  Slow down.

15   A.   -- "and postmortem toxicologic studies were reviewed.

16   Demographic data collected included the decedents' ages, race,

17   and sex.  The autopsy reports were reviewed for cause and

18   manner of death and the presence of trauma, preexisting

19   natural disease, et cetera."

20        Unless it's buried somewhere else in the paper, it

21   doesn't really say how these people ended up in the medical

22   examiner's office; i.e., were they getting oxycodone on the

23   streets?  Was it being diverted from a medical source?  Were

24   they chronic pain patients?  Unless that context is buried

25   somewhere else other than the Methods section, I don't know

1    that this is a population comparable to the people we're

2    talking about today.

3    Q.   Fair enough.  And would you typically see that type of

4    information in the Methods section, where it's describing the

5    patients?

6    A.   You would if it was a unique patient population.  This is

7    just them literally taking 172 consecutive cases in which they

8    found oxycodone.  And I hope it became clear when I emphasized

9    this.  Every one of these patients had an autopsy.

10   Q.   What is the significance of that?

11   A.   Well, it meets the standard that we've been talking about

12   extensively this morning and this afternoon.

13   Q.   So in these cases, they were able to rule out other

14   causes of death?

15   A.   Well, that would appear to be the case because every one

16   of them had a complete autopsy.

17   Q.   Fair enough.  And what about the Spiller study, if you

18   can just take a look at that patient population.

19   A.   So the Spiller study Methods, "All death records from ten

20   counties were reviewed to locate and select any cases that

21   involved oxycodone or hydrocodone on the postmortem toxicology

22   reports."

23        I'm just reading onward to see if it says anything about

24   these individuals.  I do not see anything in here that tells

25   me whether these patients were at all analogous to the

1    decedents that we're discussing today.

2    Q.   And when you were discussing the Tennant paper you relied

3    on that gave the higher concentrations of therapeutic levels

4    in people, did it specifically say that the patient population

5    tested there was patients on chronic opioid therapy?

6    A.   Yes.

7    Q.   So fair to say that is more analogous to what we're

8    discussing today?

9    A.   Yes.

10   Q.   We've now heard error rates, absent autopsy reports,

11   anywhere from 17 to 25 percent.  Is that fair to say?

12   A.   That seems like an accurate summary of what we've talked

13   about today, yes.

14   Q.   In those studies, do we know how many -- when the error

15   rate is as high as 25 percent, and if we want to call 17

16   percent low, I'll go ahead and call 17 percent low.  But when

17   we're talking about error rates in the double digits, and we

18   are in a federal criminal court, how would comorbidities

19   potentially affect error rate?

20        If a patient has comorbidities, would you expect that to

21   complicate findings and increase the likelihood that death

22   could be attributed by something else, or to decrease the

23   likelihood?

24   A.   So I hope I understood your question correctly.  So we're

25   talking about people who didn't get autopsies but had one or

1    more significant comorbidities.

2        If that was the thrust of the question, then yes, you

3    would expect the error rate to be higher if, in fact, they did

4    have autopsies, but you were basing your opinion on them not

5    having autopsies.

6    Q.   So does the fact that comorbidities exist in this case,

7    does that even further complicate this, when you have

8    comorbidities, no autopsies, and kind of the lower level of

9    concentrations that we see in these people?

10   A.   Would you mind repeating that question?

11   Q.   I know it's comp- -- do you understand what I'm getting

12   at?  The studies with these error rates, do we even know if

13   those patients had comorbidities?

14   A.   Again, not having done a deep dive into those individual

15   studies, I don't know the answer to that.  What I do know is

16   an expert panel of my peers who did the deep dives into those

17   studies, who wrote the NAME position paper, quote 20 to 30

18   percent error rate over multiple studies over multiple

19   decades.

20   Q.   Fair enough.  Mr. Lynch was showing you Defendant Ehn

21   Exhibit 17, and he was talking about the drug overdose, and I

22   think -- the drug overdose number in Kentucky, and I believe

23   the number was 2,250.

24       Do you recall that?

25   A.   I do.

1    Q.   Is the category of drug overdoses more expansive than the

2    category of opioid overdoses?

3    A.   Yes.

4    Q.   And I think there was a line of questioning that was

5    getting at this point.  Somebody like Dr. Ralston sees more

6    opioid overdose cases than you because he sits in Kentucky

7    versus Minnesota so we can kind of go with that logic.

8         In this case, we see that of the seven deaths, only two

9    of them are autopsied, correct?

10   A.   Correct.

11   Q.   So that's only 20 percent -- excuse me, 28 percent of the

12   cases that are autopsied, correct?

13   A.   In this limited cohort of seven, yes.

14   Q.   Fair enough.  So can we kind of place Dr. Ralston

15   anywhere on this spectrum of how often does he get it right or

16   wrong, absent an autopsy, just because he sits in a state

17   where there's more opioid overdose deaths?

18   A.   I'm not sure I understood the question, counselor.

19   Q.   Do you think that just because Dr. Ralston is in

20   Kentucky, he somehow would have a lower error rate because

21   there are more opioid overdose deaths here versus in

22   Minnesota?

23   A.   I don't know why the number of overdose cases you have in

24   your state would have any effect on your error rate if you're

25   doing cases to national standards.

1          And just to be clear, A, I'm not here to criticize

2     Dr. Ralston directly.

3          And B, given the way the system is set up in Kentucky, I

4     don't know that he literally sees every one of these cases,

5     which was sort of implied in the question, because I don't

6     know how much central control there is over the decentralized

7     coroner system that operates on a county-by-county basis.

8     Q.   And --

9     A.   It certainly appears, for many of these cases, that the

10    coroners make the decision at the local level whether or not

11    they're going to do an autopsy and whether or not they're

12    going to seek any postmortem toxicology testing.

13    Q.   And it sounds like you're sympathetic to the situation in

14    Kentucky, where there's a lack of resources to conduct

15    autopsies.

16          Is that fair to say?

17    A.   I'm sympathetic to the lack of staffing and resources in

18    many jurisdictions across the country, including Kentucky.

19    Prior to COVID, you would not have found a more vocal advocate

20    than me at the national level lobbying for the attention of

21    our elected leaders to this very problem, our workforce and

22    staffing and funding issues in my line of work.

23    Q.   When we started, Judge Bunning quickly gave that analogy

24    of the airplane.  You know, somebody drops out of an airplane

25    and smacks the ground and is that what caused their death, or

1    the drugs in their system?

2         Is there any kind of comparison you can draw for us to

3    just make this idea of offering opinion testimony in cases

4    like this without an autopsy?  Is there kind of any parallel

5    you can draw with that to make that more real for us

6    non-medical examiners?

7    A.   I think I could come up with a reasonable analogy.

8    Q.   Okay.  Please do.

9    A.   So we're talking about a medical examiner and coroner

10   system here that in cases, for a variety of reasons, elected

11   not to perform autopsies.  So these deaths, by definition,

12   were not investigated to national standards.  By definition,

13   that means you don't really know why these people died.

14        And, yet, an opinion was placed on death certificates,

15   and now I'm seeing those death certificates being shown in

16   court as this is why this person died.

17        Imagine, instead of a medical examiner, if I ran a crime

18   lab, and I didn't have enough DNA analysts, I didn't have

19   enough crime scene techs to properly collect DNA.  I knew this

20   was going on, and yet I was still willing to call DNA matches

21   in my lab and say, well, I wish we could do better, but I

22   don't have the personnel or the funding to do it.  And then I

23   went into court and testified that this DNA was a match or

24   this was a very high probability this was a match.

25        I think that's a reasonable analogy.  I'm sure there's

1   flaws with it.  The fact that you don't have enough people to

2   get the work done to national standards, I totally understand

3   that.  It does not automatically translate into, well, we'll

4   go ahead and put these drugs on the death certificate anyway

5   and call it that.

6   Q.  Or in the case of fingerprints, we don't have good enough

7   cameras to take clear prints and, therefore, we're just going

8   to call it a match anyway despite the fact that you can't --

9             MR. LYNCH:  Objection to leading, Your Honor.

10            MS. GERDES:  I have no further questions.  I

11  appreciate your time, Dr. Baker.

12            THE COURT:  Anything further?

13            MR. LYNCH:  No, Your Honor.

14            THE COURT:  Very well.  May this witness be finally

15  excused?

16            MS. GERDES:  Yes.  Thank you.

17            MR. LYNCH:  Yes, Your Honor.

18            MR. GLASSMAN:  Yes, sir.

19            THE COURT:  Thank you, sir.

20      (Witness excused.)

21            THE COURT:  Next witness.

22            MR. FERRERA:  Your Honor, Dr. Siefert calls Ms. Linda

23  Fisher.

24            THE COURT:  All right.

25              LINDA FISCHER, DEFENSE WITNESS, SWORN

1          THE COURT:  Good afternoon, ma'am.

2          THE WITNESS:  Good afternoon.

3          THE COURT:  Try to keep your voice up as much as you

4    can and speak very clearly into a microphone.

5          THE WITNESS:  Is that better?

6          THE COURT:  Yes.  You may proceed.

7                        DIRECT EXAMINATION

8    BY MR. FERRERA:

9    Q.   Ms. Fischer, you can lower it a little bit too.  Can you

10   please introduce yourself to the ladies and gentlemen of the

11   jury and spell your name for the benefit of the court

12   reporter.

13   A.   Hello.  My name is Linda Fischer.  F-i-s-c-h-e-r.  First

14   name Linda, L-i-n-d-a.

15   Q.   Ms. Fischer, what do you do for a living?

16   A.   Right now, I work as an administrative assistant at

17   University Health.

18   Q.   Which university?

19   A.   I'm sorry.  Yeah, the one on main campus.  I'm sorry,

20   yes.

21   Q.   But which university is it?

22   A.   I'm sorry, it's U.C. Health.

23   Q.   University of Cincinnati?

24   A.   Yeah.

25   Q.   Sorry if I just didn't hear you.

1    A.    Sorry.

2    Q.    Before -- well, actually, let me back up for a second.

3    Could you give the ladies and gentlemen of the jury just a

4    very brief overview of your education after high school?

5    A.    Okay.  It's quite extensive.  I have many degrees.  I

6    have a degree in animal health technology, sanitation,

7    dietitian, nutrition education, pharmacy technician.

8    Q.    All right.  I'd like to direct your attention to the time

9    period of June of 2018 to February of 2019.  Where did you

10   work at that time?

11   A.    I worked at Northern Kentucky Center for Pain Relief.

12   Q.    Okay.  And what was the Northern Kentucky Center for Pain

13   Relief?

14   A.    It was a clinic for -- where we helped people with their

15   pain.  Chronic pain.

16   Q.    For your testimony, if I call it "the clinic" for short,

17   you'll know what I'm talking about --

18   A.    Absolutely.

19   Q.    -- correct?

20   A.    Yes.

21   Q.    What was your specific job at the clinic?

22   A.    I was hired to be Dr. Siefert's scribe.

23   Q.    And I'm going to break that into two parts.  The first

24   part, Dr. Siefert.  I'll ask if you could look around the

25   courtroom, see if you see Dr. Siefert in court today.

1   A.   Yes, he's right there.

2          THE COURT:   Record will reflect identification of

3   Defendant Siefert.

4          MR. FERRERA:   Thank you, Judge.

5   BY MR. FERRERA:

6   Q.   And Ms. Fischer, the second part, you said that your job

7   was as a scribe.  Could you please describe for the ladies and

8   gentlemen of the jury, what does a medical scribe do?

9   A.   It's kind of like the doctor's right hand and his left

10  hand.  I would interview the patients when they came into the

11  office for their visit.  I would take those for the doctor,

12  enter that on to electronic records.  And then I just did

13  things that would help him out to do his job.

14  Q.   And we'll unpack that a bit further, but I do want to be

15  precise.  I think both times you said that you were

16  Dr. Siefert's scribe and that you helped him.

17         Are you referring specifically to Dr. Siefert?

18  A.   Yes.  He was the only doctor I helped.

19  Q.   And so the entirety of your function at the clinic was to

20  assist Dr. Siefert and no other provider?

21  A.   Yes.

22  Q.   All right.  So going a little bit deeper into the work

23  that you performed as Dr. Siefert's medical scribe, is it fair

24  that it's been several years since you worked there?

25  A.   Yeah, quite a few.  2019, so five years.

1    Q.   Okay.  And so is it fair that you don't have specific

2    recollections of specific patients on specific dates?

3    A.   True.

4    Q.   And is it also fair that prior to your testimony today,

5    you have not reviewed any medical records, charts, anything

6    like that?

7    A.   No, I have not.

8    Q.   Is it fair that you're just testifying based on your

9    recollections?

10   A.   Yes.

11   Q.   When did you and I meet for the first time?

12   A.   About an hour and a half ago.

13   Q.   And was that the first time we'd ever spoken?

14   A.   Yes.

15   Q.   Is it fair that prior to that, you had one substantive

16   conversation with my partner, Ms. Gerdes?

17   A.   Yes.

18   Q.   All right.  Now, getting back to your independent

19   recollections of what you did as Dr. Siefert's medical scribe,

20   I'd like to break that into a little bit more detail.  So if

21   you could please provide the ladies and gentlemen of the jury

22   with a summary of a typical patient interaction.  What did you

23   personally do?

24   A.   Okay.  Should I start before it gets to me, because

25   otherwise a piece will be missing.

1      Anyway, when they came in, they gave a urine sample that

2  would be tested.  The results, the technician who ran the test

3  would highlight if there's anything suspicious.  They would

4  give that to me.

5      I would interview the patient while that's being run.  I

6  would interview the patient.  I had a sheet of paper with

7  questions to ask and mostly about how their pain management is

8  going, if they're having any side effects, if they have other

9  medical issues that we've not addressed yet.

10      So I would enter all that into the computer.  If the

11  urinalysis was suspect, there was something not right in

12  there, I would let Dr. Siefert know, and I'd give him the

13  results.  He'd review all that, he would go see the patient.

14  Q.  I'm going to stop you there so we can break it into

15  manageable chunks for the jury.

16  A.  Sure.

17  Q.  So you said that you gathered the results of urinary drug

18  screens from somebody else, correct?

19  A.  Um-hmm.

20  Q.  But you personally took information directly from the

21  patient?

22  A.  Yes.

23  Q.  All right.  And then what did you personally do with the

24  information that you collected and wrote down and information

25  that you got from the urinary drug screen?

1    A.    Urinalysis, I didn't do anything with.  It was already in

2    the computer.  But the information that I took from the

3    patients, I would enter that into electronic records.

4    Q.    Okay.  And then did you bring those records that you had

5    prepared to Dr. Siefert's attention?

6    A.    They would go automatically to his computer, and he was

7    waiting in his office to receive them.

8    Q.    Waiting in his office before what?

9    A.    Before seeing the patient.  Between patients, he would be

10   in his office.

11   Q.    Did you observe Dr. Siefert review the information that

12   you had provided?

13   A.    Yes.

14   Q.    At times, did you accompany Dr. Siefert into the actual

15   examination room with patients?

16   A.    Yes.

17   Q.    Could you tell the ladies and gentlemen of the jury about

18   that part of your job?

19   A.    That's a little fuzzy.  It didn't happen very often.  It

20   happened a really long time ago.  I don't remember exactly the

21   circumstances, but sometimes Dr. Siefert would ask me to

22   accompany him.  Like I said, I don't remember what the details

23   were.

24   Q.    Okay.  But were you able to observe, even if you don't

25   remember I saw John Smith on this date, were you able to

1    observe just the types of interactions that occurred?

2    A.   Yes.

3    Q.   Could you please describe the types of interactions that

4    occurred to this jury.

5    A.   Dr. Siefert was very compassionate with his patients.  He

6    had a big heart for them.  He was also strict to compliance of

7    the law.  He really wanted to make sure that he was doing

8    everything correct.  And if he had to discharge a patient, he

9    would talk to me first because he felt bad about it because he

10   wanted to help them.  But because of his compliance, he could

11   no longer.

12   Q.   So these two components of you gathering information and

13   then you providing it to Dr. Siefert, based on the things that

14   you personally saw and the things that you personally heard,

15   was it clear to you whether Dr. Siefert had actually reviewed

16   and processed the information that you provided?

17   A.   Yes.  A lot of times, he would talk to the patient about

18   those things or he'd talk to me about them.

19   Q.   All right.  Now, so again in just these instances where

20   you personally observed these interactions, at times did you

21   observe patients actually receive prescriptions from

22   Dr. Siefert?

23   A.   Yes.  I would actually write the prescription what he

24   said -- he put in the chart what he wanted written out.  I

25   would write it out.  He would review it and sign it.

1    Q.   When did that process of you preparing the prescription

2    for Dr. Siefert's review and signature for approval, did

3    that -- when did that occur in the order of the visit?

4    A.   Right before they left.  After everything else was done

5    and they were cleared, it was right before they left is the

6    last thing that -- besides making the next appointment, it was

7    the last thing that happened.

8    Q.   At any point, did you ever observe Dr. Siefert provide a

9    prescription to a patient who had not been seen and evaluated

10   as you just described?

11   A.   Never.

12   Q.   Now, in addition to you working at the clinic and working

13   specifically for Dr. Siefert, did you have any other form of

14   relationship with Dr. Siefert?

15   A.   No.

16   Q.   What I mean by that is were you personally a patient of

17   Dr. Siefert's?

18   A.   Oh, yes.  Yes, I was.

19   Q.   Tell the ladies and gentlemen, what did you see

20   Dr. Siefert for?

21   A.   I have chronic back pain, and I have a crunched disk.  I

22   can't think of the word.  It's a crunched disk, pinched

23   nerves.  So he gave me a cortisone shot in my back.  I had

24   several before him, had several since him.  But he was -- the

25   way he did it, I had no side effects.  It worked.  I had no

1  pain.

2  Q.   And that injection that Dr. Siefert performed, was that a

3  form of an opioid?

4  A.   No.  It was cortisone.

5  Q.   At any time while Dr. Siefert treated you personally, did

6  Dr. Siefert ever prescribe you any opioid pain medications?

7  A.   No.

8          MR. FERRERA:  Your Honor, just one moment.

9          THE COURT:  Very well.

10  BY MR. FERRERA:

11  Q.   After you left the clinic in February of 2019, did you

12  still continue to interact with Dr. Siefert?

13  A.   I did for a very brief time because he was my job

14  reference for getting another job.  So for a brief period of

15  time, I would let him know I applied for this job, could you

16  please be a reference.  That was the extent of our

17  relationship, like maybe six months.

18  Q.   When did you first learn that Dr. Siefert had been

19  charged with a crime?

20  A.   On February -- I got an email from Lindsay Gerdes on the

21  21st of February, and she said she was his attorney in a case.

22  Didn't specify what it was.  That was the first I'd heard that

23  there was any issues.

24  Q.   Was it not until you spoke with Ms. Gerdes that you

25  learned this was a criminal matter?

1   A.  Yes, it was the first time, and it was probably about a

2   week ago.

3           MR. FERRERA:  Nothing further, Judge.

4           THE COURT:  Who's got this one?

5           MR. LYNCH:  I will.

6           THE COURT:  Mr. Lynch.

7                        CROSS-EXAMINATION

8   BY MR. LYNCH:

9   Q.  Good afternoon, Ms. Fischer.  My name is Dermot Lynch.

10  I'm with the Department of Justice.  We've never met, correct?

11  A.  No, never.

12  Q.  First time I'm talking to you?

13  A.  Absolutely.

14  Q.  Few quick questions.  I want to make sure I got the dates

15  of your employment right.  June of 2018 to February of 2019?

16  A.  Yes.

17  Q.  Are you aware that for almost that entire period of time,

18  Dr. Siefert was under investigation by the Kentucky Board of

19  Medical Licensure?

20  A.  No, I had no idea.

21  Q.  Did Dr. Siefert -- okay.  You mentioned that you had one

22  substantive conversation with Ms. Gerdes.  Is that right?

23  A.  Yes.

24  Q.  And that was the first time you learned about this

25  criminal matter; is that right?

1    A.   Yes.

2    Q.   Okay.  Are you aware one way or the other as to whether

3    or not Dr. Siefert had prescribed to patients who later

4    suffered -- under circumstances -- you know what?  Strike that

5    question.

6         You left Northern Kentucky Center for Pain Relief in --

7    A.   Sorry.  He coughed.

8    Q.   So sorry.  You left Northern Kentucky Center for Pain

9    Relief in February of 2019?

10   A.   Yes.

11   Q.   Okay.  And that's the last contact you, in essence, had

12   beyond those references --

13   A.   Yes.

14   Q.   -- with Dr. Siefert?

15   A.   Yes.

16             MR. LYNCH:  I have nothing further, Your Honor.

17             THE COURT:  Anything else?

18             MS. GERDES:  No, Your Honor.

19             MR. GLASSMAN:  No cross-examination.

20             THE COURT:  All right.  Thank you, ma'am.  You may

21   step down.

22             THE WITNESS:  You're welcome.

23        (Witness excused.)

24             THE COURT:  Next witness, please.

25             MS. GERDES:  Dr. James Murphy, Your Honor.

1          MR. FERRERA:  Your Honor, with apologies, the

2     witness, the next witness just stepped out.  It will probably

3     take him a few minutes to get through security if it's an

4     appropriate time for a break.  We just wanted to let Your

5     Honor know.

6          THE COURT:  Okay.  We'll be in recess for ten

7     minutes, and then we'll go until -- we'll be in recess for ten

8     minutes.  During the recess, heed the prior admonitions of the

9     Court.

10         (The jury exited the courtroom at 2:40 p.m.)

11         THE COURT:  Anything we need to take up?  This is

12    going to be the last break.

13         MS. GERDES:  I'm going to power through this quickly.

14    One thing I want to flag for the cross.  I talked to

15    Dr. Murphy.  The answers should be to the questions, direct

16    and concise.  The Court permitted Dr. Thomas, when he needed

17    to, to explain.  I would ask the Court give that same ability

18    to Dr. Murphy if there are certain questions posed to him.

19         In the interest of moving this along, I think everyone

20    wants to get short, precise, responsive answers.

21         THE COURT:  I'll certainly give him an opportunity to

22    explain his answers.

23         MS. GERDES:  Thank you.

24         MR. LYNCH:  For clarification, is it -- we're going

25    until 4:30 today?

1          THE COURT:  Approximately, yes.  It's an approximate
2     time.  They didn't want to go past 4:30.  If it's 4:25 or
3     4:35, I don't know when the witness is going to be finished.
4     So if we can finish this witness today.
5          MS. GERDES:  Your Honor, is there ever a chance that
6     we would stay a little bit past 4:30 if we could finish the
7     witness today?
8          THE COURT:  I'm not averse to that.  I'm trying to
9     keep --
10          MS. GERDES:  I don't want to waste too much time.
11    Dr. Murphy has to be back in Nashville on Monday.  To the
12    extent we can try to get him done today, that would be great.
13    Otherwise, I'm going to need the Court's help in possibly
14    making sure he's here on Monday, versus Nashville.  And then
15    he goes to Nashville Tuesday.
16          THE COURT:  We'll do the best we can.
17       Bring the jury in.
18       (The jury entered the courtroom at 2:55 p.m.)
19          THE COURT:  Call your next witness.
20          MS. GERDES:  Your Honor, United States calls
21    Dr. James Murphy.
22          THE COURT:  While he's coming around, ladies and
23    gentlemen, I'm going to do my best to keep you not as long on
24    Friday.  But if we need to go a little bit longer to finish
25    this witness, he's from out of town, I may do that.  But I'll

1    try to do the best I can.

2        You may proceed.

3            MS. GERDES:  Thank you, Your Honor.

4        JAMES PATRICK MURPHY, M.D., DEFENSE WITNESS, SWORN

5            THE COURT:  Good afternoon, sir.

6            THE WITNESS:  Good afternoon.

7            THE COURT:  You may proceed.

8                        DIRECT EXAMINATION

9    BY MS. GERDES:

10   Q.   Dr. Murphy, what kind of physician are you?

11   A.   I'm an anesthesiologist, I'm a pain management

12   specialist, and I'm an addiction medicine specialist.

13   Q.   And are you Board certified in any of those areas?

14   A.   Yes, I am.

15   Q.   Which ones?

16   A.   All three of them.

17   Q.   And what is a Maintenance of Certification?

18   A.   Maintenance of Certification is a process that we go

19   through every year in a continual basis to show that we are

20   maintaining current and, thereby, we can keep our Board

21   certification current.

22   Q.   Is it known as an MOC?

23   A.   It's known as MOC.

24   Q.   Do you have your Maintenance of Certification in any of

25   those three fields?

1   A.   Yes.  I have a lifetime certification in anesthesiology.

2   In my subspecialty in pain management and my subspecialty in

3   addiction medicine, I have the Maintenance of Certification.

4   Q.   And have you written and spoken on the topic of pain

5   management and addiction?

6   A.   Yes.

7   Q.   Have you held any leadership positions in any

8   professional organizations related to the work that you do?

9   A.   Yes.

10  Q.   One specific one I want to talk about, the Kentucky

11  Displaced Patient Task Force.  Tell us what that is and what

12  your role was briefly.

13  A.   The Kentucky Displaced Patient Task Force was from the

14  Kentucky Department of Health, and I helped form that work

15  group.  And it's a work group that consists of members of the

16  Department of Justice, the medical board, the nursing board,

17  Medicare, Medicaid, and the Department of Health as well.  And

18  other interested parties as well.

19       And it's designed to intervene or to participate when a

20  practice is closed down abruptly for whatever reason and the

21  patients are left without their doctor.  That can create a

22  public health crisis.  So the task force has brought together

23  all of these entities, and we work together to help minimize

24  any impact that is on the community and the patients that are

25  suddenly left without their doctor.

1  Q.   Have you seen an increase in the number of pain clinics

2  that have been shut down since 2018?

3  A.   Yes.

4  Q.   And why is that?

5        MR. LYNCH:  Objection.

6  Q.   Let me ask it another way.  Was there any type of

7  government task force created --

8        MR. LYNCH:  Objection, Your Honor.  Relevance.

9        THE COURT:  Overruled.

10  BY MS. GERDES:

11  Q.   Was there any type of government task force created in

12  this area in 2018?

13  A.   Yes.  There was -- forget exactly what it was called, but

14  there was an acronym.  But a task force that was dispatched to

15  this area of the country, maybe some other areas too, but

16  certainly to our area, to look into and investigate drug

17  trafficking and doctors that may be prescribing outside the

18  bounds of medical practice and things of that nature.

19        So, yeah, there was a task force that was dispatched to

20  this area.

21  Q.   Have you publicly expressed your views on enforcement

22  actions by the government in this area?  When I say publicly,

23  have you written a poem that somebody read on a video?

24  A.   Yeah, but -- I did, but that's not about this task force.

25  Q.   This subject matter.  Government crackdown and

1   legislation crackdown in the context of opioid prescribing.

2   A.   No, it wasn't.  It wasn't aimed about any government

3   crackdown.

4   Q.   Tell the jurors what the video was and what the poem was

5   about.

6   A.   I was president of the Greater Louisville Medical

7   Society; and obviously, I'm an addiction and pain specialist.

8   And it was, like, Halloween, and I wrote a poem that was based

9   on How the Grinch Stole Christmas.  It was How the Ghost Stole

10  Pain Care.

11       And it was -- I thought it was pretty good, but they

12  liked it, and they -- the medical society made a video of it

13  and had somebody read it, and they had music with it.  It's

14  about how this ghost, through this journey, understands --

15  comes to understand that pain care is more than just pills.

16  It's more than just injections.  It's more than just drug

17  screens.  It's about caring for people.  So that's what it was

18  about.

19  Q.   And speaking of pain and pain care, approximately how

20  many Americans suffer from chronic pain?

21  A.   They estimate that about one in five Americans, adults,

22  suffer from chronic pain.  And that comes to be anywhere from

23  around 80 million Americans or so have chronic pain.

24  Q.   Have you commented about pain care on your Twitter

25  account?

1    A.   Oh, yes.  Definitely.

2    Q.   And the reason I'm asking you these, have you testified

3    in cases involving the ARPO prosecutors before?

4    A.   Yes.

5    Q.   And has Mr. Lynch cross-examined you before?

6    A.   Yes.

7    Q.   And are these subjects that he's asked you about on your

8    cross-examination?

9    A.   Yes.

10   Q.   Have you tweeted articles about things related to pain

11   care?

12   A.   Yes.

13   Q.   And did one of the articles you tweeted about involve --

14   tell us one of the articles you tweeted about that Mr. Lynch

15   cross-examines you on.

16   A.   Well, last time, for sure, it was an article that I

17   retweeted -- it wasn't my article -- about somebody had

18   written -- I think his name was Josh Bloom, I think, was the

19   author.  It was a brief article about a law that had just been

20   passed, and the graphic was -- looked like the secret police

21   or something like that, the Gestapo or something like that.

22        So it was his article, and I retweeted that.

23   Q.   Have drug classifications changed over time?

24   A.   Oh, yes.

25   Q.   And, for example, was heroin something that was legal in

1    the 1900s?

2    A.    Yeah.  When you speak of heroin, there's two terms.

3    Heroin, lower case, lower "h" heroin is street heroin.  That's

4    not medicine.  It's manufactured illicitly and abused,

5    obviously.

6         But back in the first part of last century, Heroin, might

7    surprise you, was a medicine.  Capital "H" Heroin.  They

8    called it Heroin because they thought it was a heroic drug.

9    That's how it got its name.  Manufactured by the Bayer

10   company, who make Bayer aspirin.

11        So they manufactured this medicine called Heroin, and

12   they used it for numerous things, including fussy babies, for

13   example, to make them not, you know, cough so much at night.

14   They gave them this elixir that had heroin in it.  It was

15   called heroin because they thought it was a heroic drug.

16        Back in that time, opium was a big issue in this country.

17   A lot of addiction to opium.  And the thought process from

18   experts was that if you took Heroin, this heroic drug, you

19   would be less likely to abuse and be addicted to opium, and

20   that became the fact.  People were less likely to use opium

21   when they had the drug Heroin to use.

22        Unfortunately, Heroin itself is a very addictive drug,

23   and it became a big problem with people getting addicted to

24   Heroin so they later then had to outlaw Heroin.  In 1924, the

25   government passed a law and they outlawed that drug, Heroin,

1    and it went away in this country.

2    Q.   Dr. Murphy, are you actively treating patients?

3    A.   Oh, yes, I am.

4    Q.   And do you have your own practice?

5    A.   Yes.

6    Q.   What state is it in?

7    A.   It's -- -- my office is in Indiana.

8    Q.   Was there a time you had an office in Kentucky?

9    A.   Yes.

10   Q.   When, approximately, was that?

11   A.   Starting 2000 up until about 2013, maybe.

12   Q.   And approximately how many years have you worked as a

13   pain management physician?

14   A.   About 20.  No, closer to 30 years.  About 30 years.

15   Q.   Approximately how many patients would you say you've

16   treated over the course of your career for chronic pain?

17   A.   Hard to put a number on that.  Tens of thousands.

18   Q.   Fair enough.  During the course of your 30-year career,

19   have you relied on nurse practitioners and other personnel

20   like nurse practitioners to help you treat your patients?

21   A.   Yes.

22   Q.   Who else besides nurse practitioners do you rely on?

23   A.   It's team-based care.  As I said, I'm an

24   anesthesiologist.  Those of you who may have had anesthesia

25   before recognize there are nurse anesthetists.  They're like

1  nurse practitioners as well.  They're advanced practice nurses

2  so they're able to evaluate and give treatments.  We work as a

3  team.  There's a whole team.  I have nurses that I work with,

4  registered nurses.  I've had --

5  Q.  What about physician assistants?  Do pain management

6  doctors rely on physician assistants?

7  A.  I've had PA, physician assistants.  A physician's

8  assistant, a PA, is like a nurse practitioner.  They're able

9  to see patients independently, working with a physician, under

10  a physician.  But they're able to make assessments and

11  diagnoses as well and prescribe medications.

12      Medical assistants can be licensed, but they are helpers

13  in a sense, and they can help these other providers gather

14  information and help with patients and do some treatments as

15  well.  But they don't have the same licensure and the ability

16  to care as do the physician's assistants and the nurse

17  practitioners.

18  Q.  Do you rely on the judgment and the clinical

19  decision-making of physician's assistants and nurse

20  practitioners in your work?

21  A.  Absolutely.  They are our colleagues.  We work together.

22  Q.  Now, have you testified as an expert in these cases

23  before, these opioid prescribing cases?

24  A.  Yes.

25  Q.  In the last four years, approximately how many times have

1  you testified?

2  A.   In the last four --

3  Q.   Ballpark.

4  A.   Probably 16 times.

5  Q.   And have you testified for the defense or the government?

6  A.   The defense.

7  Q.   Has the government ever asked you to testify?

8  A.   No.

9  Q.   Has the government consulted with you before in some

10  capacity?

11  A.   Yes.

12  Q.   Now, in the cases in which people come to you and consult

13  with you, do you take all of those cases, meaning do you

14  become retained on those cases and testify in all of them?

15  A.   No.

16  Q.   Is it fair to say you get paid for your work that you do

17  on these cases?

18  A.   Most of the time, yes, I am compensated.

19  Q.   When you say most of the time, are there certain cases

20  where you do it for no pay?

21  A.   Yes.

22  Q.   What cases are those?

23  A.   I'll do a lot of consultation, and I won't charge for

24  that.  People will call me, lawyers will call me, other

25  doctors will call me, hospital administrators and police will

1   call me and ask my opinion on things.  I freely give that.

2   It's part of my duty as an experienced pain specialist and a

3   physician leader in this community.  I do that.  That's part

4   of my professional obligation.  I don't charge for those

5   things usually.

6   Q.   Approximately how much have you billed for your work in

7   this case to include your testimony in this case?

8   A.   Total of $26,000.

9   Q.   What kind of doctor is Dr. Siefert?

10  A.   Dr. Siefert is an anesthesiologist, like I am.  He's a

11  Board certified anesthesiologist.  He's also a pain

12  specialist, like I am.  And he has done a pain fellowship,

13  like I did, and so he is -- he's not addiction certified, but

14  he is a highly educated and trained pain specialist.

15  Q.   And is he also Board certified in pain medicine?

16  A.   Yes.

17  Q.   And does Dr. Siefert also have his MOC certification,

18  like you do, in pain medicine?

19  A.   Dr. Siefert is maintaining his certification as well,

20  like I am.

21  Q.   Does the CDC speak to whether deference should be given

22  to a pain management physician?

23  A.   It does.  Yes, it does.

24  Q.   Is practicing medicine in any context black and white?

25  A.   No, it is not.

1    Q.    Is it an exact science?

2    A.    It is a science of uncertainty.

3    Q.    And can you tell the jury, just at a high level, a little

4    bit about how the climate and perspectives on how opioid

5    prescribing has evolved since, say, just prior to 2016 through

6    now?  And I want to kind of draw your attention to hit the

7    2016 CDC guidelines and the 2022 CDC guideline.

8    A.    Okay.  So that's an important date, 2016, when the CDC

9    finally put out a guideline.  It was really the first time the

10   CDC put out a recommendation or a guideline on how to treat

11   pain with opioids.

12        There had been other guidelines up to that point and, I

13   mean, all across the board.  But the CDC came out in 2016.

14   Prior to that, especially the first part of the century,

15   prescribing was very high volume, and we were treating pain

16   aggressively with lots of things, including medications, and

17   the pendulum was already starting to swing back to where we

18   were starting to prescribe less because we saw there were a

19   lot of issues related to that.

20        And then the CDC came out with their guideline, which was

21   a guideline.  It was a recommendation.  It was not

22   hard-and-fast rules.  However, many organizations, many

23   regulatory bodies, medical boards, pharmacies used those

24   guidelines and changed the language into hard-and-fast,

25   black-and-white limits.

1    For example, a limit to how much medicine you could

2    prescribe somebody.  It was never meant to be that way.

3    And because of the misinterpretation or misapplication of

4    that guideline, a lot of patients were discharged from pain

5    practices.  Patients were force tapered, and doctors became

6    very wary or scared of prescribing to patients that really

7    needed the medicine because -- fearful they would hold that

8    guideline against them.  It was never meant to be that way.

9    Q.   So in 2022, how did the CDC address that?

10   A.   The CDC came out with a new, updated guideline in just

11   last year, 2022, which did address some of these issues and

12   improved upon the language that was in 2016, which, by the

13   way, when I read the 2016 guidelines, when you read what it

14   actually says, I am very much in favor of it.  I think it's

15   well written.  I think it's very honest.  But you've got to

16   read the guideline.  You can't just have somebody tell you

17   what it says.  You have to understand what they're saying

18   because they tell you in their own language there, this is a

19   recommendation.  It's not hard and fast, that this is not

20   designed to be an absolute, and physicians are expected to

21   deviate from this in order to treat patients as individuals.

22   And unfortunately, that's not what happened with this.

23   So in 2022, they redid the guideline.  It's much more clear

24   about what their intent is.

25   Q.   Who is the audience of the 2016 guideline?

1    A.   It is indicated for primary care doctors.  It says

2    specifically, in the opening of that, this is for primary care

3    physicians.

4    Q.   Okay.

5    A.   Clinicians.  So it includes nurse practitioners as well.

6    Primary care clinicians.

7    Q.   Do pain management physicians and really anyone

8    prescribing opioids rely on risk mitigation tools in their

9    practice?

10   A.   I think that most rely on certain -- some of these risk

11   mitigation tools.

12   Q.   Are pill counts a form of a risk mitigation tool?

13   A.   Yes.

14   Q.   Are urine drug tests a form of a risk mitigation tool?

15   A.   Yes.

16   Q.   And narcotic agreements or controlled substance

17   agreements, patient agreements, are these all forms of risk

18   mitigation tools?

19   A.   Yes.

20   Q.   Is there any hard and fast rule about how mitigation

21   tools are incorporated into prescribing?

22   A.   There again, some states might mandate certain numbers of

23   drug screens, for example.  It varies from jurisdiction to

24   jurisdiction.  But the CDC guideline, which is the national

25   standard there, does not have any hard and fast mandates on

1    how you use those things.

2    Q.   Is there any -- are there any studies that predict the

3    reliability of risk mitigation tools and actually predicting

4    risk?

5    A.   There are none.

6    Q.   Okay.

7    A.   There is no evidence that's compelling, and this is what

8    the CDC -- they said this in the guideline.  There is no

9    evidence that's compelling to show that these risk mitigation

10   tools we just mentioned there, the pill count and drug

11   screens, these things, there's no evidence they actually

12   benefit patient care.

13   Q.   Okay.  Is there any universal number of, say, urine drug

14   tests a physician has to do that's clear across the board?

15   A.   No.

16   Q.   What's the difference between dependence and addiction?

17   A.   Dependence, physical dependence is a naturally occurring

18   phenomenon that would happen to anybody who takes an opioid or

19   a benzodiazepine.  And there's other medicines as well.  Some

20   blood pressure medicines, for example, can make you physically

21   dependent upon them.

22        All that means is when the body's been exposed to it,

23   after a while, it develops tolerance to the medication.  And

24   then when it's withdrawn, there's a withdrawal syndrome.

25   Oftentimes, the withdrawal syndrome is the opposite of what

1    the drug does to you, and it can be worse.  It can be a

2    rebound phenomenon so it can be worse.

3        For example, opioids can calm you down.  You know,

4    narcotic means sleep.  And even if I'm not sleepy or I'm not

5    anxious when taking one, if it's suddenly taken away, I can

6    become very anxious, very depressed.  So that would be a

7    rebound phenomenon.

8        If I'm taking propranolol, a blood pressure pill, it

9    lowers your heart rate.  My heart rate is fine.  But if you

10   suddenly take it away, I can rebound and have a fast heart

11   rate.  So that's what physical dependence is.  It's natural.

12   We expect it.

13       Addiction, however, is brain damage.  Addiction is part

14   of the brain.  It's when part of the brain called the reward

15   system has gone off the rails.  It's been damaged.  And the

16   pathways from that subconscious reward system to the frontal

17   part of the brain, we call it the executive part of the brain,

18   when that pathway is damaged, that decision-making becomes

19   very, very difficult.

20       People who have addiction because of these brain changes,

21   because of this damage to that part of the brain -- which, by

22   the way, we believe is irreversible.  Because of this damage

23   to the brain, they have compulsive use of the medication or

24   the drug or whatever it is they're addicted to.  Could be

25   pornography, for example.  The addiction, it's compulsive.

1    They have loss of control over the use of the substance.  They

2    continue to use it despite the knowledge that it's harmful to

3    them, but they will continue to use it, and there's a craving

4    for it.

5    Q.    Let me stop you there for a second.  Since you're an

6    addiction specialist, let us know, in your practice, have

7    there been circumstances where addicts are treated with

8    opioids or people with substance use disorder are treated with

9    opioids?

10   A.    Yes.

11   Q.    Now, do the CDC guidelines say that clinicians should not

12   use urine drug testing results punitively?

13   A.    It is unethical and it is wrong to use a urine drug

14   screen, drug testing in the clinic setting, to use it

15   punitively.  That is not the practice of medicine.

16   Q.    Are there studies that show somewhere between 50 and 56

17   percent of patients exhibit aberrant behaviors?

18   A.    Yes.  I'm definitely aware of one study done in Kentucky

19   in a pain clinic that showed that; that at least half of the

20   people that came in -- they did a hundred patients.  I think

21   it was a hundred patients in a row.  It was at a respectable

22   pain clinic in Paducah, Kentucky.  And they did drug screens

23   on them, and they found that more than half of them showed an

24   unexpected result.

25   Q.    Dr. Murphy, is a physician required to see a patient each

1    month to give them a prescription for opioids?

2    A.   No.

3    Q.   If you're aware, what is the requirement on that?

4    A.   The overall requirement is that you see a patient as

5    often as you feel that, in their circumstances, it's

6    necessary.  It's the practice of medicine.  If I feel like I

7    have to see you every day, I'll do it, or if I feel like I

8    have to see you once a week.

9         What if I don't have to see you that often?  Indiana is

10   where I practice.  They have a regulation that says you've got

11   to see somebody face-to-face at least every four months.

12        Kentucky, after the first three months, they leave it up

13   to the doctor how often you have to see them.  The CDC

14   guideline recommends that perhaps three months is a good

15   interval.  So it varies.

16        So I'm only aware of Indiana requiring every four months,

17   but there may be other states.  But I think it varies from

18   jurisdiction to jurisdiction.

19   Q.   Have you considered Dr. Siefert's clinical judgments in

20   certain circumstances in this case in prescribing decisions?

21   A.   Yes.

22   Q.   Talk to us about how you evaluate a physician's

23   prescribing or clinical judgment decisions that they make.

24   A.   When I am asked to look at a case like this in federal

25   court, so I do know that the standard in federal court, in a

1    federal case like this, is that the drug must be prescribed

2    for a legitimate medical purpose in the usual course of

3    professional practice.  That's not my words.  That's words I

4    read over and over again.

5         So it's two things.  It has to be for legitimate medical

6    purpose and in the usual course of professional practice.

7         So to me, I've been doing this for 37 years.  I mean,

8    I've talked to my colleagues.  I've read about the ethics of

9    this.  I study the AMA Code of Ethics, and I'm asked about

10   this on numerous occasions.

11        So I may not know every detail about every regulation or

12   every specialty, but I know what being a doctor is.  I know

13   what it looks like to be a doctor, and so I wanted more than

14   that.

15             MR. LYNCH:  Objection.  This is narrative at this

16   point.

17             THE COURT:  I think it is as well.

18   BY MS. GERDES:

19   Q.   Just tell us exactly what you do.  Do you use an approach

20   called the SOAP --

21   A.   Well --

22   Q.   -- approach?

23   A.   I'm sorry about that.  I was getting --

24             THE COURT:  Trying to --

25             MS. GERDES:  It's late on a Friday.  I think everyone

1    wants to cut to the chase.

2    A.   I use three Ps.  There are three Ps.  The first is

3    physician characteristics, the second is patient

4    characteristics, the third is process.

5        So I'm looking at it, I've got to make sure -- to

6    practice medicine, the doctor has to have a license and

7    education to do it and a scope of practice.  So they're

8    practicing in their scope of practice.

9        The patient characteristics, does the patient have a

10   medical need?  Is there a doctor/patient relationship there

11   that's reasonable?  Doctor/patient relationship, and are they

12   working toward a goal of benefiting the patient?  So that has

13   to be there.

14       And the third thing is the process.  What are they doing?

15   Not so much what the doctor did, but how the doctor does it

16   and why the doctor does it.  The how and the why.

17       And for those of you who may be in the medical field, you

18   recognize a SOAP note.  S-O-A-P.

19       Well, the S stands for the subjective information.

20   That's what the patient tells you.

21       The O is the objective information, things like labs,

22   x-rays, examinations, other causes from other doctors,

23   objective information.  That's information that's gathered by

24   the physician.

25       And then the A -- that's S-O.  The A is the assessment is

1    made, a working diagnosis.

2         And then the P part of that is the plan of care.

3         So the process is S-O-A-P.  So I look to see that the

4    physician characteristics are there, the patient

5    characteristics are there, and the process characteristics are

6    there.

7    Q.   And did you evaluate prescribing decisions that

8    Dr. Siefert made in the cases of Michelle Taylor, Gary Bitter,

9    Judy Stewart, Michael Casebolt, Barbara Works, and James

10   Stima?

11   A.   Yes.

12   Q.   Okay.  And as part of that review, do you also kind of

13   consider what the doctor's intent was?  Like did the doctor --

14            MR. LYNCH:  Objection, Your Honor.  Testifying to

15   intent --

16            MS. GERDES:  I'll move on.

17            THE COURT:  Ladies and gentlemen, I'll instruct you

18   on the law at the end of the case as to what is necessary and

19   what you'll evaluate in making that determination yourselves.

20   BY MS. GERDES:

21   Q.   Putting up the particular counts, we see this.  Did you

22   evaluate whether the three Ps and the SOAP process that you

23   just walked us through were met in these circumstances?

24   A.   Yes, I did.

25   Q.   Let's first look to Michelle Taylor.  As we're looking at

1    hers -- this is 130a, 121 -- did you observe referral forms in

2    these cases?

3    A.   Yes.

4    Q.   And what inference would you draw from a clinic that is

5    requiring referrals --

6              MR. LYNCH:  Objection.  Calls for speculation.

7    Q.   -- in your opinion?

8              THE COURT:  Overruled.

9    A.   Clinics that require referrals means that they are

10   accepting patients that have been seen by other practitioners

11   or another doctor somewhere else and is asking for their care.

12   Q.   And in almost all of these files that you reviewed, did

13   you see evidence that there were prior medical records

14   gathered for all of these patients?

15   A.   Yes, I did.

16   Q.   Is that required?

17   A.   No.

18   Q.   And did you also see evidence that the practice and

19   Dr. Siefert were collecting information about the patient's

20   personal history?

21   A.   Yes.

22   Q.   And, also, asking questions that relate to a risk

23   analysis, like if they've ever had problems with substance

24   abuse?

25   A.   Yes.

1    Q.   And did you see evidence in these files that the practice

2    was using patient compliance agreements and medication and

3    narcotics agreements?

4    A.   Yes.

5    Q.   Would you characterize those as responsible practices of

6    a pain clinic, things that we just described?

7    A.   Yes.

8    Q.   Now, for Michelle Taylor, did you also observe in these

9    files that there was evidence that the patients were getting

10   treatment beyond just opioid treatment?

11   A.   Yes.  All of these patients were receiving what we call

12   multimodal treatment.  So they were all receiving treatments

13   other than opioids.  It wasn't just opioids.  They were mostly

14   getting helper medicines as well.  There were consults so

15   other specialists were brought in, and they were getting

16   injection therapies and then physical medicine as well, like

17   the chiropractic care as well.

18   Q.   And in the circumstances where Dr. Siefert was

19   prescribing opioids, did you see evidence in the record that

20   would have corroborated or supported these patients' claims of

21   pain?

22   A.   Yes.

23   Q.   Like, for example, Government Exhibit 130a, page 75.

24   This is a diagnostic result for Ms. Taylor?

25   A.   Yes.

1  Q.   Why do you consider the diagnostic results as you're

2  forming your opinions?

3  A.   Okay.  Well, the thing about this concept of legitimate

4  medical purpose, it's not necessary that somebody have a big

5  herniated disk or something physical.  If somebody has

6  significant pain, even if it's from an apparently minor

7  injury, their pain is theirs, and it's personal, and it's a

8  subjective complaint.  But you have to believe the patient.

9  You have to give credence to that.  Somebody has pain, you

10  work with them.  That is suffering.  We need to help resolve

11  that.

12      However, it's nice to look for the reason why because you

13  might be able to help them with the actual cause of the pain.

14  So we look to things like MRIs to give us a cause of the pain.

15  It's not required in every case, but it's something that is

16  very helpful to have.

17  Q.   Now, in the case of Ms. Taylor, let's look at one of her

18  forms.  This is from January 12th of 2017.  Are you able to

19  observe evidence of that SOAP analysis going on within these

20  pages, 17 and 18?  And if the answer is yes, kind of point us

21  to where you see that happening.

22      THE COURT:  You can mark on the screen, but be

23  advised when you use your finger, it's very large.

24  A.   Okay.  Up at the top there, there's the HPI, history of

25  present illness.  And even above that, where it says chief

1    complaint, that's part of the subjective information.  That is

2    why are you there?  Why are you back again?

3        And then on the left-hand side, there's a review of

4    systems.  And that is going down, and that's where the patient

5    and the physician can discuss what they're there for again.

6    So that, again, can be part of the subjective information as

7    to, you know, what's going on with them.

8        For example, on this one, there's a yes on the top one,

9    which is migraines.  So the patient is talking about having

10   migraine issues.  That's, again, patient is giving information

11   to the doctor.

12       And then there's more checks here where you can circle

13   things yes or no about symptoms, sleep pattern, things of that

14   nature.  And then there's a pain scale down there, zero to

15   ten.  That's entirely subjective.  What is your pain?  That's

16   personal to the patient.  That's assessed on this case.

17       Then we go down below that into "O," the objective

18   information, the physical examination is part of the objective

19   information.  So they're examining the patient, they're making

20   notations there.  And then there's -- on the next page, this

21   is not the only page to it.  There's another page that is,

22   again, more of the review of systems, the history there.

23       Then under the third segment down there, where it says

24   assessment/plan, that is the A and the P.  That's the

25   assessment, the diagnosis, and then the plan of care.  We have

1    the S-O-A-P on this record.

2    Q.   Did you --

3    A.   By the way, there's more to this visit than just this as

4    well.  There's a self-assessment, which is a whole page, if

5    not two pages.  I think it's one page of the patient telling

6    the doctor how they're doing.

7    Q.   And did you see self-assessments being completed

8    virtually across the board for these patients each time they

9    came in?

10   A.   Yes, I did.

11   Q.   Okay.  And here, this is where Ms. Taylor has blocked out

12   kind of her pain and how she's feeling?

13   A.   Well, somebody did.  Generally, the patient does write

14   this down.  And there's another pain scale there about the

15   rate your pain with current medication and rate your pain

16   without the medication.  That's the way the patient can tell

17   the doctor that the medication is helping me.  Without it, I'm

18   worse, if that is the case.

19        So she's been able to give that information, again, which

20   is subjective information for the doctor.

21   Q.   And on February -- I believe this says 2/9 here.  Up

22   here, we see two dates.  Based on the dates in the indictment,

23   I believe it's the visit from February 9th of 2017.  Again, do

24   you see evidence that the SOAP process is something that the

25   clinic is going through here?

1   A.   Yes.

2   Q.   And what do you think about pre-printed forms where

3   people are writing on and circling, versus practices that are

4   using exclusively electronic medical records?

5   A.   They both have their advantages and disadvantages.  The

6   advantages to a pre-printed form like this is it gives you a

7   stable policy on how to evaluate the patient at each visit.

8        So each visit is going to look similar in terms of the

9   information we're gathering, as opposed to just writing a

10  paragraph or what we think each time.

11       I used to write on my handwritten notes, I used to write

12  S, O, A, P, and then I'd fill it in every time.  When I was in

13  the Navy -- I was a Navy doc.  When I first started doing

14  that, I wrote those down.  Then we did that in medical school

15  too.  We're still taught that.

16       And then in these, however, though, it gives me a

17  template to write on, or this doctor it did, and they're not

18  writing handwritten notes.  The electronic medical record

19  generally brings over information from the previous visit so

20  it's kind of cut and paste things.

21       Everything that is handwritten on here is new.  So I know

22  that somebody -- there's different handwritings on here so

23  it's a team approach.  Somebody has assessed the patient.

24  the patient writes things, other people write things, the

25  doctor writes things.  But they're writing new information on

1    this.

2    Q.  Let me stop you for a second, Dr. Murphy.  Where we see

3    "urine drug screen showed" and there's handwriting, "illegal

4    drugs nor any other medication not prescribed by our office or

5    any other provider" and then a check of the KASPER.

6         Based on the fact that there's handwriting on these boxes

7    and the other forms that you viewed, what does that tell you

8    about what considerations, if any, were made with respect to

9    the urine drug screen and the KASPERs before prescriptions

10   were issued?

11   A.  Well, that tells me that --

12        MR. LYNCH:  Your Honor, this is speculative.

13   Handwriting speaks for itself.

14        THE COURT:  I'm going to sustain the objection.

15   BY MS. GERDES:

16   Q.  Okay.  Dr. Murphy, given that there is handwriting here,

17   do you believe that the urine drug screen was considered?

18   A.  Yes.

19   Q.  And given the fact that there's markings here, do you

20   believe that the KASPER results were considered before the

21   prescribing decision was made?

22        MR. LYNCH:  Objection, Your Honor.  This is again

23   speculative.  We're deciphering --

24        THE COURT:  I'm going to overrule that one.  This is

25   a more specific question.

1    BY MS. GERDES:

2    Q.   Go ahead, Dr. Murphy.

3    A.   Can you ask me that again, please.

4    Q.   Sure.  Given the fact that after KASPER and OARRS are

5    reviewed, there's handwriting and it says "discrepancy," in

6    your medical judgment, do you believe that means that there's

7    consideration given to those things before the prescribing

8    script went out the door?

9    A.   Yes.

10   Q.   And did you see that in all of the records that you

11   reviewed, that there was a consideration of a urine drug

12   screen and the KASPER reports?

13   A.   Yes.

14   Q.   Now, based on the records that we just reviewed for

15   Ms. Taylor, do you believe that you saw evidence that these

16   prescriptions were for a medically legitimate purpose and

17   within the usual course of professional practice?

18   A.   Yes.

19   Q.   Let's turn to Mr. Casebolt.  This is Government

20   Exhibit 151.  Again, we see the referral forms, and I'm going

21   to go to the pages that are marked.  I'm going to draw your

22   attention to January 19th of 2017.

23        Do you see that date?

24   A.   Yes.

25   Q.   And then in addition to being seen on January 19th of

1  2017, as well as February 16th of 2017, on those dates, were

2  there other dates that Mr. Casebolt was seen and received

3  nonopioid therapies?

4  A.  Yes.

5  Q.  And is this page 23 evidence of him getting an injection?

6  A.  Yes.

7  Q.  Are injections painful, sir?

8  A.  They certainly can be.

9  Q.  Again, we see all of the accompanying forms and records

10  of the prescriptions being kept.  Fair to say?

11  A.  Yes.

12       MS. GERDES:  I'm going to pull up the initial

13  evaluation of Mr. Casebolt.  We can display it for the jury.

14  I'll have the page number in a moment.

15       THE COURT:  This is part of what exhibit?

16       MS. GERDES:  Sorry.  I showed this to Dr. Baker at

17  the end.  It got out of order in my file.  This is

18  Exhibit 140.

19       THE COURT:  140, thank you.

20       MS. GERDES:  If we can display this for the jury.

21  This is the initial evaluation of Mr. Casebolt.

22  BY MS. GERDES:

23  Q.  Did you see evidence of Dr. Siefert conducting initial

24  evaluations of these patients?

25  A.  Yes.

1   Q.   And what is the significance of these to you when you're

2   evaluating a prescriber's practices?

3   A.   Well, the initial evaluation can be very helpful in

4   determining what the process was from the beginning.  You

5   expect initial evaluation usually more robust.  There's more

6   information there in the follow-up visits.

7   Q.   Fair enough.  And did you see a substantial amount of

8   information in these initial evaluation reports for these

9   patients?

10  A.   Yes, I did.

11  Q.   And based on the history of the present illness and the

12  diagnostic records that were in here, was there evidence that

13  Mr. Casebolt was suffering from pain --

14  A.   Yes.

15  Q.   -- that he'd complained of?

16  A.   Yes.

17  Q.   Now, looking at page 29 of Government Exhibit 140, this

18  is the note from 1/19/17.  Do you see evidence --

19       MS. GERDES:  We can switch to the projector again.

20  Q.   Do you see evidence that the SOAP method was being

21  employed at this visit?

22  A.   Yes.

23  Q.   And they're gathering subjective information from the

24  patient.  He's complaining of his neck getting worse, neck

25  pain?

1    A.   Yes.

2    Q.   Okay.  And again, all of the information written on here,

3    what does this tell you when there's a plan set forth in the

4    assessment and plan section?

5    A.   Well, over here is the assessment, and those are the

6    diagnoses.  And then this is the plan, and there's several

7    things there.  Again, it's a multimodal treatment.  It's not

8    just opiates.  It's a multimodal treatment to address this

9    patient's pain.

10   Q.   Okay.  And, again, consideration of the urine drug screen

11   and the KASPER report before any prescribing decisions were

12   made?

13   A.   Yes.

14   Q.   And on 2/16/17, do you see evidence of the same SOAP

15   process being employed?

16   A.   Yes.

17   Q.   Is it fair to say that we're always going to see the

18   evidence of the physical assessment on the first page of the

19   form towards the bottom here?

20   A.   In all -- in the ones that I recall, that is correct.

21   Q.   And, again, getting the subjective information from the

22   patient when they're asking about how they're feeling and in

23   those individual sheets that the patients filled out in each

24   visit, like page 28, that corresponds with this visit; is that

25   correct?

1    A.   Yes.

2    Q.   And then we see, again, the assessment and the plan that

3    is going into this visit; is that correct?

4    A.   Yes.

5    Q.   And for Mr. Casebolt, he received prescriptions on those

6    two dates that we just spoke about, January 19th of 2017 and

7    February 16th of 2017.  And based on the evidence of the SOAP

8    process being employed here and what you just walked us

9    through, do you believe that those prescriptions were for a

10   medically legitimate purpose in the usual course of

11   professional practice?

12   A.   Yes, I do.

13        MS. GERDES:   And just for the record, the initial

14   assessment is at Government Exhibit 140, page 145 to 147?

15   Q.   Dr. Murphy, are you aware if this practice discharged

16   patients?

17   A.   Yes.

18   Q.   Now I'm going to turn towards Mr. Bitter.  Fair to say

19   that you evaluated the decisions made to prescribe to

20   Mr. Bitter on February 25th of 2016?

21   A.   Yes.

22   Q.   Did you consider the information in Mr. Bitter's whole

23   file at the Northern Kentucky clinic in evaluating the

24   prescribing decisions for that date?

25   A.   I considered all the information that I was given.  So

1    not just that record, but all of the file I was given.

2    Q.   Fair enough.  And, again, for Mr. Bitter --

3         MS. GERDES:  And while Dr. Murphy is looking at this,

4    if we could pull up Mr. Bitter's KASPER report and scroll to

5    the bottom where we'll see Dr. Blecher's last prescription and

6    Dr. Siefert's first prescription.

7    Q.   What's written on the initial evaluation form, are those

8    complaints of pain supported with any other information from

9    the patient in the file?

10   A.   Yes.

11        MR. LYNCH:  You're showing Casebolt.

12        MS. GERDES:  Oh, there it is.  I'm sorry.  This is

13   what got misplaced from Baker.

14        THE COURT:  What was that?

15        MR. LYNCH:  No objection.  Just a miscue.

16        MS. GERDES:  Remember, I said that Casebolt got

17   misplaced from Dr. Baker's testimony.  I'm sorry.

18   BY MS. GERDES:

19   Q.   The Gary Bitter record from October 12, 2015, do you see

20   evidence that the history of Mr. Baker -- Mr. Bitter's present

21   condition was considered?

22   A.   Yes.

23   Q.   And, again, collected information on his past medical

24   history, including medications he'd been on?

25   A.   Yes.

1   Q.   This is 110a, page 19, and a physical exam was performed

2   by Dr. Siefert; is that correct?

3   A.   Yes.

4   Q.   And there were diagnostics in the record that supported

5   his complaints of pain; is that fair to say?

6   A.   Yes.

7        MS. GERDES:   If we can show the witness the KASPER

8   report.

9   Q.   Now, was Mr. Bitter on opioids at the time when he saw

10  Dr. Siefert, or had he been recently prescribed them by

11  another physician?

12  A.   He had been prescribed opioids by another physician.

13  Q.   And is it fair to say he'd been on opioids and

14  benzodiazepines for a period, a significant period of time

15  prior to Dr. Siefert prescribing opioids to him?

16  A.   Yes.

17       MS. GERDES:   And if we can scroll down to where we

18  see the last Blecher prescription and the first Siefert

19  prescription.

20  Q.   So we're kind of in between lines 146 and 147, and then

21  even above that.  What observations do you make with respect

22  to the levels of opioids that Dr. Siefert prescribed to

23  Mr. Bitter relative to the earlier levels of opioids that he

24  was getting?

25       MS. GERDES:   Can we publish to the jury?

1              THE COURT:  Yes.

2    A.   I think you have to go --

3    Q.   Do you want to see earlier?

4    A.   Yes.  That's enough.

5    Q.   What observations did you make as you were looking at the

6    earlier prescribing?

7    A.   The previous doctor had prescribed Mr. Bitter a much

8    higher dose of opiate than Dr. Siefert did when they came to

9    Dr. Siefert.

10   Q.   Which doctor was prescribing the higher dose?

11   A.   Dr. Blecher.

12   Q.   Okay.  And so he was the doctor just prior to

13   Dr. Siefert, and so Dr. Siefert brought him down in dose --

14   A.   Yes.

15   Q.   -- based on these records?

16        Okay.  And on 11/19, do you see evidence that Mr. Bitter

17   was seen at the practice that day?  This is page 16 and 17.

18   A.   Yes.  Can I see the name?  Yes, 11/19/15.

19   Q.   And, again, do you see evidence of the SOAP process

20   working its way through on this chart?

21   A.   Yes.

22   Q.   Now, the KASPER records show that Mr. Bitter got a

23   prescription in December of 2016.  I'll represent to you that

24   Mr. Bitter was at the clinic that day as per the records for a

25   chiropractic visit.  Again, is the physician required to --

1    well, let me withdraw that.

2         Let's look now to 2/25 of 2016.  Let's assume for the

3    purposes of these questions that Dr. Siefert did not prescribe

4    anything to Mr. Bitter from December until 2/25 of 2016, okay?

5         Now, did you review Mr. Bitter's urine drug test from

6    2/25 of '16?

7    A.   Was that his last visit?

8    Q.   Yes.

9    A.   Yes, I did.

10   Q.   What was the result of the urine drug test, the

11   presumptive test related to that last visit?

12   A.   It was positive for amphetamine, benzodiazepine, and

13   opioids.

14   Q.   Okay.  And were those the medicines that Mr. Bitter had

15   been on previously?

16   A.   Yes.

17   Q.   Who had been prescribing Mr. Bitter, up to that point,

18   the benzodiazepine?  If you need to see the KASPER report,

19   just let us know.

20   A.   I need to see the KASPER, please.

21   Q.   If we pull that back up, do you see line 146?

22   A.   Yes.

23   Q.   The clonazepam on 11/5/2015, who prescribed that?

24   A.   Dr. Blecher.

25   Q.   Fair to say he had been getting the benzodiazepines from

1    another physician in the fall of 2015?

2    A.    Right.  There's another one later on, on 12/14/15, from

3    Dr. Blecher as well.

4    Q.    And he'd gotten 90 pills, and that was a 30-day supply on

5    12/14?

6    A.    Yes.

7    Q.    The prescription he'd gotten from the clinic in December,

8    do you see that on this report on 12/16?  I believe it's

9    line 153.

10   A.    Yes.

11   Q.    And so he got opioids from the clinic in December?

12   A.    The KASPER would indicate that.

13   Q.    Okay.  And if we can scroll down, does it appear that

14   Dr. Siefert then issued the benzodiazepine prescription in

15   February of 2016?

16   A.    Yes.

17   Q.    And is there an increase in dose from the December

18   clonazepam prescription to the February prescription?

19   A.    Yes.

20   Q.    And by what?

21   A.    It's gone from 1 milligram to 2 milligram.

22   Q.    Give the jury some context for increasing the dose of

23   clonazepam from 1 to 2 and then give a comparison to

24   increasing -- doubling a dose of opioids, please.

25   A.    Clonazepam is a benzodiazepine.  It's like a Valium-type

1   drug.  Mr. Bitter had been on that dose, the 2 milligram dose,

2   earlier.  So on the KASPER report, it shows that he has

3   received that in the past.  So that wasn't a new regimen for

4   him.  He'd been on that in the past.

5        Benzodiazepines are one of the medications that has what

6   we call a high therapeutic index.  What that means is that the

7   distance from the therapeutic dose to the toxic dose, the dose

8   that would harm you, is a wide range there.  So it's

9   considered a relatively safe drug.

10            MR. LYNCH:  Your Honor, may we approach?

11            THE COURT:  About what?

12            MR. LYNCH:  This wasn't disclosed in his expert

13   report.

14            MS. GERDES:  We can approach.

15            THE COURT:  That's fine.

16        (Sidebar conference.)

17            THE COURT:  We're at the bench.

18            MR. LYNCH:  I wasn't allowed to go outside the four

19   corners of the expert report.

20            MS. GERDES:  This is not an opinion.  This is just

21   medical fact.  What I would say is you made a big issue of

22   black box warnings, about doubling the dose in your direct

23   case.  I am directly responding to this.

24            THE COURT:  I'm going to overrule the objection.

25            MS. GERDES:  Thank you.

1      (Sidebar concluded.)

2    BY MS. GERDES:

3    Q.   Please continue, Dr. Murphy.

4    A.   The benzodiazepine has a wide range from the therapeutic

5    dose to the toxic dose.  It's considered a relatively safe

6    drug as compared to opioids, which have a more narrow

7    therapeutic index.  In other words, if I increase the opioid

8    dose too rapidly, I'm more at risk of making the patient have

9    a bad outcome, like not breathing very well.

10      That's one of the reasons why, back in the '70s, when the

11   benzodiazepines, Valium, and drugs like that first came out --

12   think about the Valley of the Dolls, back in that era.  They

13   were actually the most prescribed drug in the country because

14   patients felt like they were doing well with them.  They were

15   coping with the medications.  And prescribers, mostly family

16   practice doctors, felt they were relatively safe.

17      But they're habit forming.  They're very habit forming so

18   we try to pull back on that some.  But the fact that you

19   increase the benzodiazepine dose in this case is much less of

20   a serious sort of decision than were he to double the dose,

21   for example, of the opioid.  Potentially.  Again, all of this

22   depends upon the circumstances at the time.  Why are you

23   prescribing it?

24      To your question, there is a wider therapeutic index with

25   the benzodiazepines than with other medications.

1  Q.   Is there evidence that there was conversation between

2  Dr. Siefert and Mr. Bitter on 2/25/16?

3  A.   Well, there's notes about his hand and --

4  Q.   Right.  What observations were made about Mr. Bitter's

5  hand right here by Dr. Siefert?

6  A.   Looks like he has a fracture of his -- one of the bones

7  in his hand.

8  Q.   Okay.  And did Dr. Siefert order an x-ray for his hand?

9  A.   Yes.

10  Q.   And it looks like "sleep study" is checked.  What does

11  that indicate to you, that sleep study is checked?

12  A.   Well, that's -- if you have insomnia, which I think he

13  complained of at this visit, then to find out why they're not

14  sleeping well, you can enlist in a sleep study.  It might be

15  due to various causes.  But a sleep study is a way to evaluate

16  why you're not sleeping well.

17  Q.   In any of these medications that we see Dr. Siefert

18  prescribing to Mr. Bitter that day, do any of them address

19  issues related to sleep?

20  A.   Yes.

21  Q.   Which ones?

22  A.   There's the Klonopin here, the clonazepam we were talking

23  about.  That's a benzodiazepine.  That's a sedative that can

24  help you sleep.  Then also the Elavil is a medication that's

25  an antidepressant medicine that is oftentimes used to help

1    people sleep also.  It's used off-label for that reason.

2        And there was also a prescription for oxycodone, which

3    was a nighttime prescription.  It said QHS, meaning at

4    nighttime.  And that was prescribed so that Mr. Bitter could

5    take that medicine in the evening to deal with his pain, help

6    him -- perhaps help him sleep through the evening.

7    Q.   This is page 2.  We see two oxycodone prescriptions here.

8    One says the 30 milligrams, and then the one says the 15

9    milligrams.

10       Which one is the evening one?

11   A.   The one that says QHS right here.

12   Q.   Okay.  The middle one on the page, then?

13   A.   That means at bedtime or in the evening.

14   Q.   And then this one, how do you know the difference between

15   evening and midday, or why would one be for one period of the

16   day versus another?

17   A.   Well, he said he couldn't sleep.  So he has chronic pain.

18   It would be very -- I can't know exactly why he did that, but

19   it makes sense to me that a doctor would prescribe a higher

20   dose in the evening to help somebody sleep if they have

21   chronic pain.

22   Q.   And is it common that chronic pain can prevent people

23   from sleeping or keep them up or wake them up?

24   A.   Yes.

25   Q.   Okay.  And, again, the prescriptions that went to

1    Mr. Bitter on 2/25 of 2016, do you believe that those were for

2    a legitimate medical purpose and in the usual course of

3    professional practice?

4    A.   Yes, they were.

5    Q.   Looking at Ms. Works, she's Government Exhibit 160.  This

6    is her referral, sir.

7    A.   Yes.

8    Q.   And more information about the referral from Jonathan

9    Byers?

10   A.   Yes.

11   Q.   The diagnoses that he has listed here, are these

12   diagnoses consistent with somebody who has chronic pain?

13   A.   Yes.

14   Q.   One question that I actually wanted to -- I left this

15   out, I'm sorry, with Mr. Bitter.  If Dr. Blecher wanted to

16   convey something to Dr. Siefert when he was making that

17   referral, how could that be done?

18   A.   Any of a number of ways.  He could have put it on the

19   referral.  He could fax over something.  He could call the

20   doctor.  There's a number of ways.

21   Q.   If he wanted to convey to Dr. Siefert that he did not

22   believe opioids are an appropriate form of treatment for this

23   patient, is that something that he could have done on the

24   referral form?

25   A.   Sure.

1  Q.   Okay.  The initial evaluation for Ms. Works, 160,

2  page 61.  The injuries that she sustained from the motor

3  vehicle accident in 2006 that are described here, and then the

4  results of the diagnostic testing, do these diagnostic tests

5  support or corroborate her complaints of chronic pain?

6  A.   Yes.

7  Q.   Again, do we see a plan of care outlined here?

8  A.   Yes.

9  Q.   For Ms. Works, the date that's relevant for the purposes

10  of the indictment are March 27th of 2017 and May 2nd of 2018.

11       So just getting to those first, prior to testifying here

12  today, did you review Ms. Works' earlier records?

13  A.   Yes.

14  Q.   Okay.  And now again, on 3/27 of 2017, do you see the

15  SOAP method being employed?

16  A.   Yes.

17  Q.   Page 23, do you see that also with the assessments and

18  the plans?

19  A.   Yes.

20  Q.   And considerations of her urine drug screen results and

21  the KASPER reports?

22  A.   Yes.

23  Q.   And on 5/2 of 2017, do you see the same thing going on

24  here, Dr. Murphy?

25  A.   Can I see the date at the top?

1    Q.   Yes.  Page 19 of the exhibit.

2    A.   Yes.  Same process is there, SOAP.

3    Q.   Now, were there situations where these patients that you

4    looked at had unexpected drug screen results?  And I'm

5    defining right now unexpected as either the prescribed drugs

6    were not in the system or other drugs were in the system.

7    A.   Yes.

8    Q.   And did you look at those urine drug tests and consider

9    them in the scope of looking at the visit reports?

10   A.   Yes, I did.

11   Q.   And did you find evidence that the urine drug tests were

12   considered prior to the prescriptions being issued to these

13   patients?

14   A.   There was plenty of evidence that they were looking at

15   drug screen results in -- prior to the prescriptions.

16   Q.   And as one example of the evidence of that, we saw

17   handwriting on the urine drug screen results?

18   A.   Yes.

19   Q.   As another example, we see information and boxes checked

20   here on the urine drug screen?

21   A.   Yes.

22   Q.   When I say "here," on page 20 of this exhibit.

23   A.   There were also some notes in other places as well, brief

24   notes about drug screen results.

25   Q.   Okay.  And when Ms. Works got her prescription on May 2nd

1   of 2017, was she still complaining of pain?

2   A.   Yes.

3   Q.   And she said that with her pain medicine, she was at a 4.

4   But without it, she was at a 10?

5   A.   Yes.

6   Q.   And, again, based on the diagnostic tests in here, the

7   diagnostic tests would support that this was somebody who was

8   suffering from legitimate pain?

9   A.   Yes.

10  Q.   Are urine drug screens in the context of presumptive

11  screens reliable, Dr. Murphy?  Are presumptive drug screens

12  reliable?

13  A.   No, they're not.

14  Q.   And do we see a high rate of false positives and false

15  negatives?

16  A.   Yes.

17  Q.   Did you see that in these patient records?

18  A.   I saw some false positives and false negatives.

19  Q.   Would an example of a false negative be if we see an

20  unexpected result at the presumptive level and then an

21  expected result at the definitive level?

22  A.   I'm sorry.  Ask that again, please.

23  Q.   Sure.  Would a false negative be an unexpected result at

24  the presumptive level and then an expected result at the

25  definitive level?

1    A.    False negative would be --

2    Q.    Tell the jury what a false negative is.  Maybe that's

3    easier.

4    A.    False negative is the presumptive, the pee in the cup

5    one, that's like a pregnancy test.  It's the same technology.

6    Pee in the cup, peel off a label, and there's a line there or

7    there's not.

8          If it indicates that there is no drug there, but the more

9    sophisticated test shows it's there, then that cup was a false

10   negative.  It said negative, but it was false.  It was a false

11   negative.  It really was there.  False negative.

12   Q.    Fair enough.  And then the reverse for a false positive?

13   A.    Yes.  False positive means it shows it is there.  You do

14   the really sophisticated test, and it's not there.  Well, the

15   sophisticated test is the accurate one.  That was a false

16   positive test.

17   Q.    And Judy Stewart, we see that her initial evaluation

18   showed, again, Dr. Siefert doing a physical examination of her

19   and documenting her past medical history, her current

20   medications -- this is 120a, page 96 and 97 -- the results of

21   his physical exam.

22         Do the diagnostic tests here support her complaints of

23   pain?

24   A.    Yes.

25   Q.    And to be clear, does a physician have to have a

1    diagnostic test result before they can issue an opioid

2    prescription?

3    A.    No.

4    Q.    Okay.  But in these cases, we're seeing that?

5    A.    Yes.

6    Q.    And, again, that corroborates what the patient is saying

7    about their complaint?

8    A.    Yes.

9    Q.    And the plan is outlined?

10   A.    Yes.

11   Q.    For Ms. Stewart, I'm going to look at page 45 of this

12   exhibit.  We see information in handwriting that the patient

13   was taking two at a time, ran out of meds a week ago.

14        Is it acceptable for a physician to prescribe to a

15   patient after they do something like this?

16   A.    It can be.  It depends upon the circumstances.  It

17   depends upon if you feel like continuing the prescription is

18   in that patient's best interest.  Based upon your relationship

19   and what you know about the patient, it can be an appropriate

20   decision to continue on the medication.

21   Q.    And, again, we see that the urine drug screen was

22   considered, the KASPER was reviewed, and the risks and

23   benefits were discussed with the patient.

24             MR. LYNCH:  Objection, Your Honor.  Leading.  This is

25   all leading.

1    Q.   Do you see evidence of the SOAP method being employed
2    here before prescribing decisions were made?
3    A.   Yes.
4              THE COURT:  I know we're just trying to get through
5    the evidence, but let's try not to lead as much.
6              MS. GERDES:  I know.  I'm trying, Your Honor.
7              THE COURT:  I understand.
8    BY MS. GERDES:
9    Q.   Now, for Ms. Stewart, the last visit she had at the
10   clinic was on 10/26 so I'm just going to go to the visit right
11   before that, 9/28.  Is this presumptive test from her second
12   to last visit at the clinic, if her last visit is on 10/26?
13   I'll show you.  This is the last, and this is from
14   September 28.
15   A.   This is September 28.  This looks to be the presumptive
16   test.
17   Q.   Based on the handwriting here, do you believe that the
18   results of this test were considered before a prescribing
19   decision was made to this patient?
20   A.   Yes.
21   Q.   And then we're going to look at 10/26.  Again, evidence
22   that there was a discussion with the patient about the pain
23   medications as evidenced by the handwriting on 120a, page 163?
24   A.   Yes.
25   Q.   And that on this date, page 30, that the SOAP -- do you

1    call it a SOAP analysis or SOAP procedure?

2    A.   SOAP note.

3    Q.   SOAP note.   There was a SOAP note documenting the

4    clinical judgment exercised that day?

5    A.   Yes.

6    Q.   And, again, evidence that the urine drug screen and the

7    KASPER results were considered based on the handwriting here?

8    A.   Yes.

9    Q.   And do we see a plan of care and assessment for

10   Ms. Stewart written out here?

11   A.   Yes.

12   Q.   And based on your review of this whole file for

13   Ms. Stewart, do you believe that the prescriptions to

14   Ms. Stewart were for a legitimate medical purpose and in the

15   usual course of professional practice, Dr. Murphy?

16   A.   Yes.

17   Q.   We're going to look at Mr. Stima.  We see his referral

18   form at 100, page 66.  Do you see that?

19   A.   Yes.

20   Q.   And a concern with handwriting on it.  We're going to

21   review some things leading up to this.

22        Does it appear he was being seen at the practice

23   beginning in or about August 20 of 2015?

24   A.   Yes.

25   Q.   Okay.  And as evidenced by page 35, was Mr. Stima also

1   getting treatment at the practice other than just opioid

2   therapy?

3   A.   Yes.

4   Q.   And do we see evidence in this file, as well as other

5   files, that proper referrals were being made when necessary,

6   such as a several to neurology at page 45 of this exhibit?

7   A.   Yes.

8   Q.   Okay.  On 10/19, it does appear that the patient was seen

9   at the clinic?

10  A.   Yes.

11  Q.   And do we see evidence of the SOAP process, the SOAP

12  note?

13  A.   Yes.

14  Q.   That's 10/19.  The procedure was on 11/19 of 2015.  And

15  then 11/24, we see a note.  Does that appear to be from

16  Dr. Siefert?

17  A.   Yes.

18  Q.   And what does this note say?

19  A.   "Will need to speak to patient about negative urine drug

20  screen for Percocet.  Was positive for THC 2 -- looks like

21  21/15, perhaps."  Hard to say what the date is.

22  Q.   Okay.  Do you recall an instance where the patient was

23  positive for THC and what prescribing decisions Dr. Siefert

24  did or didn't make at that patient's initial evaluation?

25  A.   I would need to see the chart.

1   Q.   Sure.

2   A.   Or the record.

3          MS. GERDES:  One moment, Your Honor.

4          THE COURT:  Very well.

5          MS. GERDES:  I apologize, Judge.  Judge, I don't

6   think we're going to get through the whole cross today.  I

7   think it might make sense for everyone's sanity level if we

8   call it a day today.

9          THE COURT:  That's fine.  Ladies and gentlemen, we're

10  going to break for the afternoon.  I just want to verify.  I

11  have some court other than this trial, but I think it's

12  Tuesday.  Monday, we'll be in session at 8:30 with you.  Have

13  a great weekend, and we'll see you back here at that time.

14     Continue to heed all the prior admonitions of the Court.

15  Don't talk about it.  Don't do any research, anything like

16  that.  See you back here at 8:30 Monday morning.

17     (The jury exited the courtroom at 4:15 p.m.)

18          THE COURT:  You may step down.

19          THE WITNESS:  I have an issue on Monday.

20          THE COURT:  Ms. Gerdes, you indicated you might want

21  me to --

22          MS. GERDES:  If I could have the Court's help in

23  securing Dr. Murphy's appearance.

24          THE COURT:  Who is he supposed to appear in front of?

25          MS. GERDES:  What's the judge's name?

1      THE WITNESS:  I don't know the judge's name.  It's

2 federal court.

3      THE COURT:  Waverly Crenshaw?  Does that ring a bell?

4      THE WITNESS:  I think so.

5      THE COURT:  What time are you supposed to appear and

6 when are you appearing?

7      THE WITNESS:  I'm sworn in right now.  He took the

8 week off for spring break, and I'm still on the stand.  I'm

9 still --

10      THE COURT:  Mr. Lynch, it's a similar case.  I'm sure

11 it's someone else in the division that you work at trying a

12 case in the Middle District of Tennessee?  No?

13      MR. LYNCH:  No.  We have another -- it's not my case

14 in the Middle District of Tennessee is the -- it's not the

15 Young case, right?

16      THE WITNESS:  The doctor's name is Gehring.

17      THE COURT:  Not involved in that one?

18      MR. LYNCH:  No, I don't think that's the same case.

19      THE COURT:  Well, I will reach out to Judge Crenshaw.

20 You'll need to be here Monday at 8:30.  Before you exit,

21 though, let me get a canvassing of the lawyers.

22      From your perspective, Ms. Gerdes, is he your last

23 witness?

24      MS. GERDES:  Yes, Your Honor.

25      THE COURT:  Now, I did speak with the marshal this

1    morning on a variety of topics.  Among them was your

2    subpoenas.  Other than two that he's been unable to find, the

3    others have all been served.

4        Mr. Glassman?

5        MR. GLASSMAN:  Yes, Your Honor.  That's consistent

6    with my conversations with the marshal service as well.  And

7    I'll go ahead and put on the record briefly, so that the

8    government knows that I'm telling you the same thing I'm

9    telling them, Mr. Lynch asked me for our witnesses earlier

10   today.  Ms. Kootman had previously asked for our witnesses.

11       THE COURT:  Fair request.

12       MR. GLASSMAN:  I'm not trying to be discourteous in

13   not answering the question.  I just think that if the rules

14   don't require it, I don't want to disclose more and,

15   therefore, have some claim of ineffective assistance or --

16       THE COURT:  You didn't even mention the names of the

17   witnesses to the jurors.

18       MR. GLASSMAN:  Correct.  And that's my point.  I'm

19   not planning on that.

20       THE COURT:  I understand.  Let's say, hypothetically,

21   let's say one of the jurors knows one of your witnesses.

22   Let's say four of them do, hypothetically.  So we're down to

23   11.  Again, the chances of that are slim.  But hypothetically,

24   if that were to be the case, I mean, I know it was within your

25   right not to mention witness names.  I told the jurors you

1    don't have to do that.

2        2255 avoidance tends to overwhelm every docket of every

3    federal judge in the United States.  I tend to just try to do

4    things the way I've always done them and not worry so much

5    about that.  Your situation is perhaps a little different

6    because of where you're sitting and where I'm sitting.

7        But is this a situation you think from a security

8    standpoint?

9            MR. GLASSMAN:  No.

10           THE COURT:  You just don't want to give them the

11   names of your witnesses?

12           MR. GLASSMAN:  That's right.

13           THE COURT:  These are fact witnesses?

14           MR. GLASSMAN:  That's right.  Exactly.  And I would

15   also say for everyone's benefit that I would anticipate that

16   we will conclude the case on Monday.

17           THE COURT:  Okay.  Do you have any prior statements

18   that you're going to share with him?

19           MR. GLASSMAN:  No.  No prior statements.

20           THE COURT:  No.  Well, all right.  Mr. Lynch?

21           MR. LYNCH:  I mean, I don't think it's ineffective

22   assistance of counsel.  We've been giving the batting order

23   every day.  I don't think not -- I think we would like to be

24   able to prepare for this, you know, cross-examination.  I

25   don't think it's, you know, ineffective assistance to allow us

1  to effectively prepare our case, and I think it would add to a

2  smoother, you know, trial presentation so we don't have to go

3  cold.  I mean, this is --

4       THE COURT:  You know, Dr. Ehn could sit there and

5  tell them if you don't want to tell them anything, you don't

6  have to.  Is that good?

7       You like that?

8       Okay.  I bet you do.

9       All right.  Jury hasn't been in for any of this.

10      Let's see.  Do you have rebuttal witnesses?

11      MR. LYNCH:  Hard to tell based on the mystery

12  witnesses, but I don't anticipate a lengthy rebuttal.  I

13  wouldn't imagine we would have much, Your Honor.

14      THE COURT:  We are still finalizing a draft set of

15  instructions.  I meant what I said earlier about the Eleventh

16  Circuit's *Kahn* decision, post-*Ruan*, kind of informing the

17  Court.  I do not think this is just going to be a

18  regurgitation of Suetholz instructions because we have more

19  information now than we had before regarding the explanatory

20  nature of the instructions.

21      So I'm still trying to massage those.  I do plan on

22  looking at those again over the weekend.  So my thought

23  process would be to give you a set, a draft set on Monday,

24  perhaps during the luncheon recess, and then you all can

25  review them.

1    Because they're the draft, that doesn't necessarily mean

2    that it's the final set.  The draft is going to incorporate

3    some of what you have requested in the prior filed

4    instructions.  If you anticipate any supplemental instructions

5    that you want us to consider, it might behoove us to have

6    them.

7         MS. GERDES:  Judge, does the Court have the revised

8    version or any kind of additional information on the KBML

9    language that was being admitted for 404(b)?  There's no

10   direction to the jury on how they're supposed to be

11   considering that evidence, like intent, knowledge, mistake.

12        THE COURT:  Well, I think I did give a limiting

13   instruction on that at the time, as I recall.  I've given

14   three separate ones.  One for KBML, one for settlement

15   agreements/kickback, and one for the patient --

16        MS. GERDES:  I would ask the Court to supplement that

17   instruction for the jury instruction.  Both sides submitted

18   charges.  The Court never ruled on the submissions, and then

19   the Court just gave that instruction.  It's coming in as

20   404(b), and I don't think the Court 's instruction addresses

21   that.

22        THE COURT:  I will certainly include it.

23        MS. GERDES:  Thank you.

24        THE COURT:  That will be among the 404(b)

25   instructions I give you.  I think we've already started look

1    through that section of the instructions.

2        Anything else today?

3            MR. LYNCH:  Nothing from the United States, Your

4    Honor.

5            MS. GERDES:  So, Your Honor, the summations will be

6    Tuesday?

7            THE COURT:  Likely Tuesday.  I instruct before.

8    Summations, I presume, will be a couple hours each.  I can't

9    believe I'm saying that.  The last time I had a case like that

10   was 2016.  That case was longer than this one, of course.

11       I'm just trying to figure out how much time you think you

12   really would need.  There's so much evidence here.  If you

13   want to specifically drill down to a particular patient, a

14   particular day, a particular KASPER report on a particular

15   urine drug test and whether it was presumptive or definitive,

16   what the results were and this and that, it's going to be a

17   lot to digest.

18       I would note, and I don't know if you all recall, the two

19   women in the back who have been taking the most notes are both

20   alternates.  So just thought you might have observed that.

21   There's one gentleman in the front here who is not, but I

22   always find women jurors are better note-takers than men.  I

23   think it's just an observation.  I'm not going to say anything

24   more than that on the record.

25       Yes?

1    MS. GERDES:  I don't know if I need to be ready for

2    summation Monday.

3    THE COURT:  No, you don't need to be ready Monday.

4    Be thinking over the weekend of how much time you think you'll

5    want.  Case like this, I'm likely not going to cut you off --

6    we're not going to give five-hour closings.  No case deserves

7    that.  Very few cases would rise to that level, in my view.

8    MS. GERDES:  Thank you, Your Honor.  Thank you to the

9    court staff.  It's been a long two weeks.  I can hardly form

10   sentences, but thank you to everyone for understanding.

11   THE COURT:  You're welcome.

12   Mr. Glassman?

13   MR. GLASSMAN:  Nothing further, Your Honor.

14   THE COURT:  See you back here at 8:15, trial at 8:30.

15   (Proceedings adjourned at 4:26 p.m.)

16                              - - -

17

18                   C E R T I F I C A T E

19        I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
20   proceedings in the above-entitled case.

21

22   _/s/ Lisa Reed Wiesman_              ____June 8, 2023____
     LISA REED WIESMAN, RDR-CRR              Date of Certification
23   Official Court Reporter

24

25

1                                INDEX

2  **GOVERNMENT'S WITNESSES**

3  TIFFANY KILLION
   Direct Examination.............................. Page 7
4  Cross-Examination by Ms. Pinto.................. Page 15

5                              - - -

6  **DEFENDANT SIEFERT WITNESSES**

7
   ANDREW BAKER, M.D.
8  Direct Examination.............................. Page 23
   Cross-Examination............................... Page 110
9  Redirect Examination............................ Page 164

10 LINDA FISCHER
   Direct Examination.............................. Page 176
11 Cross-Examination............................... Page 185

12 JAMES MURPHY, M.D.
   Direct Examination.............................. Page 189

13

14                             - - -

15

16

17

18

19

20

21

22

23

24

25