10-1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                   NORTHERN DIVISION at COVINGTON
                                - - -
 3
     UNITED STATES OF AMERICA,    : Docket No. 21-cr-2
 4                                :
                      Plaintiff,  : Covington, Kentucky
 5                                : Monday, March 20, 2023
                                  : 8:30 a.m.
 6   versus                       :
                                  :
 7   WILLIAM LAWRENCE SIEFERT, M.D.:  Jury Trial Day 10
     TIMOTHY EHN, D.C.            :
 8                                :
                      Defendants. :
 9
10                                - - -
                      TRANSCRIPT OF JURY TRIAL
11                  BEFORE DAVID L. BUNNING
            UNITED STATES DISTRICT COURT JUDGE
12                                - - -
13   APPEARANCES:
     For the United States:        DERMOT WILLIAM LYNCH, ESQ.
14                                 U.S. Department of Justice - 1400
                                   Public Integrity Section
15                                 Criminal Division
                                   1400 New York Avenue NW
16                                 Washington, DC 20005

17                                 LAUREN BRENNA KOOTMAN, ESQ.
                                   LINDSEY CARSON, ESQ.
18                                 U.S. Department of Justice
                                   Criminal Division, Fraud Section
19                                 1400 New York Avenue NW
                                   Washington, DC 20005
20
     For Defendant Siefert:        LINDSAY K. GERDES, ESQ.
21                                 MADELINE PINTO, ESQ.
                                   Dinsmore & Shohl, LLP - Cincinnati
22                                 255 E. Fifth Street
                                   1900 First Financial Center
23                                 Cincinnati, OH 45202

24

25   Appearances continued on page 2
```

```
 1    APPEARANCES: (continued)

 2
      For Defendant Siefert:        MICHAEL J. FERRERA, ESQ.
 3                                  Dinsmore & Shohl, LLP - Columbus
                                    191 W. Nationwide Blvd., Ste. 300
 4                                  Columbus, OH 43215

 5    For Defendant Ehn:            BENJAMIN C. GLASSMAN, ESQ.
                                    GLENN LUKUS BURTON, ESQ.
 6                                  Squire Patton Boggs LLP
                                    201 East Fourth Street
 7                                  Suite 1900
                                    Cincinnati, OH 45202
 8
      Court Reporter:               LISA REED WIESMAN, RDR-CRR
 9                                  Official Court Reporter
                                    35 W. Fifth Street
10                                  Covington, KY 41011
                                    (859) 291-4410
11

12

13

14

15

16

17

18

19

20

21

22

23

24
           Proceedings recorded by mechanical stenography,
25    transcript produced by computer.
```

1          (Proceedings commenced at 8:36 a.m.)

2          THE COURT:  All right.  Good morning, everyone.  We

3     can have the witness come around.

4          MS. GERDES:  Sure.  I'll go get him.

5          THE COURT:  Thank you.

6     You can bring the jury in.

7     Before I forget, you need to be before Judge Campbell

8     tomorrow.

9          THE WITNESS:  Yes, sir.  There was a lawyer down

10    there which was very upset that I wasn't there today.

11         THE COURT:  I talked to the judge himself, and

12    they're starting back tomorrow.

13         THE WITNESS:  I appreciate that.  Thank you.

14         MS. GERDES:  Your Honor, when the jury comes out,

15    there's just a housekeeping matter.  I never formally moved 7d

16    into evidence.  Remember, we spoke about this with Special

17    Agent Ragozzino.  We had talked about it on her testimony.  I

18    said there's no need to bring her back that following Monday

19    just to put this in because we already laid the foundation.

20         THE COURT:  That's right.

21         MS. GERDES:  I just didn't get to do that yet, and

22    the court staff reminded me.  So I'll just formally move to

23    admit that, and then we'll go on with Dr. Murphy's direct.

24         THE COURT:  Very well.

25         MR. LYNCH:  What is 7d?

1          MS. GERDES:  The series of discharge letters.

2          MR. LYNCH:  Oh, okay.  That's fine.

3          THE COURT:  Very well.

4       (The jury entered the courtroom at 8:38 a.m.)

5          THE COURT:  Good morning, ladies and gentlemen.  I

6    really hope to have a good day today and tomorrow, and I'm

7    thinking that perhaps we might be able to get you the case

8    sometime late tomorrow afternoon, my tentative guess.  But

9    we'll see where we are at the end of today and we'll have a

10   better idea.

11      So you were going to move to admit a document that you

12   failed to do so?

13         MS. GERDES:  Yes, Your Honor.  At the end of Special

14   Agent Ragozzino's testimony, I just forgot to formally admit

15   Exhibit 7d.  This is the series of discharge letters recovered

16   from the clinic during the course of the search warrant.

17         THE COURT:  All right.  Without objection?

18         MR. LYNCH:  No objection, Your Honor.

19         THE COURT:  All right.  Defendant Siefert Exhibit 7d

20   is admitted without objection.

21      You may resume your direct examination.

22         MS. GERDES:  Thank you, Your Honor.

23      Welcome back, Dr. Murphy.

24      If just the witness only can please be shown the

25   demonstrative on the overhead.

1    JAMES PATRICK MURPHY, M.D., DEFENSE WITNESS, previously sworn

2                         DIRECT EXAMINATION

3    BY MS. GERDES:

4    Q.   Dr. Murphy, you spoke about the kind of process that you

5    use to analyze clinical decision-making when we broke on

6    Friday, and you talked about the three Ps and then that, under

7    the process "P", that SOAP note.

8         Do you recall that testimony?

9    A.   Yes, I do.

10   Q.   Would it be fair to say that this generally outlines that

11   process that you have described?

12   A.   Yes.

13        MS. GERDES:  Your Honor, if this could be displayed

14   to the jury for demonstrative purposes.

15        THE COURT:  Any objection?

16        MR. LYNCH:  No objection, Your Honor.

17        THE COURT:  Let it be shown to the jury.  Thank you.

18   BY MS. GERDES:

19   Q.   So, Dr. Murphy, at a high level, when you were speaking

20   about the three Ps, that was the physician, the patient, and

21   the process, correct?

22   A.   Yes.

23   Q.   And I'm going to do just a brief recap so we can all kind

24   of pick up where we left off.  Under the physician, you

25   analyze their education, their licensing, and the scope of

1   their practice; is that correct?

2   A.   Yes.

3   Q.   And why do you consider those things when you're

4   evaluating the decision-making of the particular clinician?

5   A.   Well, that's the understanding, the baseline.  We're

6   talking about a physician's usual course of professional

7   practice.  So as a physician, they've always graduated medical

8   school, they've got a license, and they've a scope of

9   practice, depending upon their specialty.

10  Q.   Fair enough.  And under the "patient" prong, you consider

11  whether there's a medical need for the treatment, whether

12  there's a patient-physician relationship, and whether there's

13  a purpose to help the patient; is that fair to say?

14  A.   Yes.

15  Q.   And then under the "process," that's where you rely on

16  the SOAP note; is that correct?

17  A.   I use the SOAP note as an example of the process.  The

18  process is simply they evaluate and they treat.  They gather

19  information and they treat.  So the SOAP note is a way of

20  breaking that down.

21  Q.   Fair enough.  And, again, there's the four components of

22  the SOAP note:  the subjective element -- maybe what the

23  patient is telling the doctor is an example of the subjective

24  element; the objective element -- and give us an example of

25  the objective element.

1    A.   That would be a physical examination.  That would be lab

2    tests, MRIs.  It could also be other evaluations by other

3    specialists.

4    Q.   And then the assessment and the plan.  And the forms that

5    the clinic used kind of segmented out some of these four

6    things, correct?

7    A.   Yes.

8    Q.   Okay.  Now, where we left off last week, we were starting

9    to talk about -- in talking about Mr. Stima.  And I'm going to

10   put back up on the overhead the chart of where we were.

11        Now, is it fair to say that there are no charges -- no

12   counts specifically related to JS, James Stima?

13   A.   I'm not aware of any.

14   Q.   Okay.  And fair to say that you're not aware of any

15   charges that are related to Ms. Stewart, based on this chart?

16   A.   Correct.

17   Q.   Okay.  But you did take a look at their medical records;

18   is that fair to say?

19   A.   Yes.

20   Q.   And for Mr. Stima, when we're talking about his records,

21   they're contained in Government Exhibit 100.  Did he have a

22   referral to a pain management physician at Northern Kentucky

23   based on this record, page 66?

24   A.   Yes.

25   Q.   And then were there also underlying health records from

1    HealthPoint Family Care contained in the patient file at the

2    clinic?  And this goes through Government Exhibit 100,

3    page 76, these outside records in the clinic file.

4    A.   Yes.

5    Q.   Page 52, would this be an example of a diagnostic test or

6    an objective criteria that you might look at to evaluate

7    whether or not there's a support for this person's complaint

8    of pain?

9    A.   Yes.

10   Q.   This is page 52.  And what kind of diagnostic test is

11   this, Dr. Murphy?

12   A.   This is an MRI of the lumbar spine, of the low back.

13   Q.   And it indicates that there's a mild disk bulge at the

14   L4-L5?

15   A.   Yes.

16   Q.   What part of the back is that?

17   A.   That's the very low part of the back, just above the

18   sacrum.

19   Q.   And is that something that can cause an individual pain?

20   A.   Yes.

21   Q.   Now, this is the note that I had trouble finding on

22   Friday.  The first time Mr. Stima came to the practice on

23   July 29th of 2015 -- this is page 20 in the medical records --

24   does this indicate that something -- some test was performed

25   on him?

1    A.   Yes.

2    Q.   And what was the test?

3    A.   It says the patient immediately tested positive for

4    marijuana so -- and it talks about a urine test.  So this was

5    the presumptive or the screening urine test on the first

6    visit, it appears to be.

7              THE COURT:  Can you reference the actual exhibit

8    number on this?

9              MS. GERDES:  Absolutely, Your Honor.  This is

10   page 20.

11             THE COURT:  The actual --

12             MS. GERDES:  Well, all of Mr. Stima's exhibits that

13   we're talking about are Government Exhibit 100.

14             THE COURT:  Okay.  Thank you.

15             MS. GERDES:  This is page 20.

16             THE COURT:  Just a reminder for the jury.

17             MS. GERDES:  Sure.

18   BY MS. GERDES:

19   Q.   And does this indicate, after he tested positive for

20   marijuana, whether or not he was given any type of opioid

21   prescription?

22   A.   No.  It indicates he was not given prescriptions of

23   opioids that day.

24   Q.   Okay.  And was there a discussion about some other

25   nonopioid therapy that Mr. Stima was going to be getting at

1    the clinic?

2    A.   Yes.

3    Q.   What was that?

4    A.   Physical therapy and possible injection.

5    Q.   Okay.   Now, this is page 14 of the record.   This would

6    have been the visit the following month, in August of 2015,

7    correct?

8    A.   Yes.

9    Q.   What does this stand for at the bottom, TFESI, if you

10   know?

11   A.   That stands for transforaminal epidural steroid

12   injection.

13   Q.   Fair enough.   And that would be an injection used to

14   treat chronic pain?

15   A.   Yes.

16   Q.   Now, we're going to skip through some of the visits

17   towards the back.

18        And on September 10th of 2015, is there an indication

19   that Mr. Stima did get an injection?   This is page 37.

20   A.   Yes.

21   Q.   And tell us about this type of injection and what the

22   purpose of it is.

23   A.   This is a highly specialized, specific epidural at one

24   particular level.   If you recall, he had a disk problem at

25   L4-5.   So this is a specific epidural spinal injection under

1   x-ray guidance at the L4 level.  It's on the low part of his

2   back.  It's an epidural injection at L4.

3   Q.   And is that a form of treatment that's used to treat

4   chronic pain in that area?

5   A.   Yes.

6   Q.   And then page 11 of the record, is there an indication as

7   to whether or not the epidural helped the patient?

8   A.   Yes.

9   Q.   What's the note about that?

10  A.   It said patient had transforaminal epidural steroid

11  injection on September 10, 2015, but states the pain came back

12  in that area.

13       So initially it was helpful, and then the pain has

14  returned.

15  Q.   Is the return of pain something that's typical with

16  chronic pain and what those patients deal with?

17  A.   Yes.

18  Q.   And we see on here, page 11, it appears there's some type

19  of note related to a migraine.  Do you see that?

20  A.   Yes.

21  Q.   At page 45 of the record, what type of referral do we see

22  being made here?

23  A.   Referral to neurology.

24  Q.   And then page 12 of the record, why was the referral to

25  neurology made?

1    A.    "Neurology referral for migraine headache."

2    Q.    Does it also appear that there were additional injections

3    on November 17th of 2015?  And we're looking at page 30.

4    A.    Yes.

5    Q.    And the consent for treatment for that?

6    A.    Yes.

7    Q.    Now, I'll also put -- this is page 39.  We see some of

8    the images from these treatments on page 40.  What are those

9    images that I just showed the jurors at page 39 and 40?

10   A.    Well, as I mentioned, these are highly technical and

11   specialized procedures.  You do them under x-ray guidance.

12   So, generally, the x-ray is continuous and sometimes it's just

13   a picture, but the doctor then has an x-ray.  It looks like a

14   C -- it's called a C-arm, and it's an x-ray on the patient's

15   back, and they can see where the needle's going.  It makes it

16   a very specific and highly -- highly specific injection.

17        So those are pictures that the doctor took during the

18   procedure.  Because you can see that the needle's actually in

19   the spine on one of those, and there's some dark area there.

20   That's what's called contrast, so you can see where the

21   medicine's going to go.  It's a highly specialized, high level

22   of care.

23   Q.    Is it this picture or the other picture where we can see

24   the needle?

25   A.    Both pictures.  That's the better picture.  The other

1    looked like a copy on a Xerox machine, perhaps.  This is a

2    better picture of the actual x-ray.  And you can see on the

3    needle there -- maybe I'll show it to you here.

4        That's the needle right here, and then this area here is

5    the contrast that's actually in the spine.

6    Q.   Thank you, Dr. Murphy.

7        This is page 19 of the record.  What do we see noted

8    here?

9    A.   The date says November 24, 2015.  "Will need to speak to

10   patient about negative urine screen for Percocet."

11   Q.   And what else?

12   A.   "Was positive for THC."  And the date appears to be

13   2/20-something, and I can't tell what the last -- what the

14   year is.

15   Q.   Going back to page 20 of this exhibit, what was the date

16   of the positive test for THC?

17   A.   This would say July 29, 2015.

18   Q.   And then if you need me to zoom in, what date does this

19   appear to refer to here?

20   A.   It certainly could indicate July 29, 2015.

21   Q.   Okay.  And then who's this a note from?

22   A.   That appears to be Dr. Siefert's signature.

23   Q.   So here we see Dr. Siefert reviewing -- an example of him

24   reviewing urine --

25            MR. LYNCH:  Objection.  Leading.

1          THE COURT:  Sustained.

2     BY MS. GERDES:

3     Q.   What is this an example of at a high level?  When you see

4     a date and a reference to a urine drug test result and then a

5     reference back to a prior test, talk to us about what's going

6     on there.

7     A.   Well, the physician -- in this case, Dr. Siefert -- is

8     aware of the unexpected drug screen results, and he's reacting

9     to that, as you would expect a doctor to do.

10    Q.   Okay.  A visit from 12/17/15, Mr. Stima is -- we're not

11    going to go through the whole SOAP note, but do you see

12    evidence of the subjective information conveyed by the patient

13    at the top of this exhibit?

14    A.   Yes.  Could I see higher up on that?

15    Q.   Sure.

16    A.   Because the chief complaint also is generally part of the

17    subjective as well.  So that's the chief complaint here.  And

18    then below it is some more subjective information.

19    Q.   And tell the jurors what LBP stands for as his chief

20    complaint.

21    A.   Low back pain.

22    Q.   And since his last visit, there's been no change in his

23    overall activities of daily living?

24    A.   Right.  That is an assessment of his function.

25    Q.   And then what are we seeing here towards the bottom?

1  A.   That's a physical examination.

2  Q.   And given that we see handwriting here and the boxes

3  circled, does that indicate to you that a physical exam was

4  performed?

5  A.   Yes.

6  Q.   And then -- this won't quite zoom out anymore.  Just so

7  you can see, this is the second page of this record,

8  Government Exhibit 100, page 17.

9       Does it appear to you, based on the documentation here,

10  that the urine drug screen result was looked at and

11  considered?

12  A.   Yes.

13  Q.   And why is that?

14  A.   Well, in this entry, unlike some of the other ones I've

15  seen, there's -- where it says urine screen showed and then --

16  it's not just that zero with the line through it.  There's --

17  it's been scratched out there, and then an arrow.  "UDS" means

18  urine drug screen.  Looks to me like it says "inconsistent"

19  and then "no meds."

20  Q.   And then here, it appears to say "out of medication for

21  two days due to taking more than prescribed"; is that fair?

22  A.   Yes.

23  Q.   And then it says "final warning, call for pill count."

24       When you see the words "final warning," what do you take

25  that to mean as a medical professional?

1  A.  Well, they've explained to the patient that this behavior

2  is something that they're not going to accept, and they're

3  telling the patient what the consequences would be if it

4  continues.

5  Q.  And we saw the note about call for a pill count.  This is

6  page 1 of Government Exhibit 100.  Is there any indication

7  that they actually followed through and did call the patient

8  for a pill count?

9  A.  Yes.

10  Q.  And how do you know that?

11  A.  Well, we've got a couple dates here.  On 12- -- it looks

12  like, perhaps 28/15, left message on patient's voicemail to

13  call back as soon as possible.

14      And then on 12/30/15, called patient for the second time

15  for a pill count and then got their voicemail.

16      And then on January 4, there was apparently an

17  appointment, and the patient did not come for the pill count.

18  Q.  Okay.  So it appears there were how many attempts to call

19  the patient to get them in for the pill count?

20  A.  Well, it looks like at least two attempts to call.  I

21  don't know about the third time because they had an

22  appointment.  But this would indicate at least two times.

23  Q.  And then they documented that the person did not appear

24  for the pill count?

25  A.  Yes.

1    Q.    When you see a clinic and a practice kind of documenting

2    their efforts to employ these risk mitigation tools -- because

3    you told us pill counts are a risk mitigation tool -- what

4    does that tell you about the practice?

5    A.    Just like this sheet says, it's a concern sheet.  So they

6    are trying to employ some of these strategies to keep the

7    patients in their practice safe.

8    Q.    Thank you.  In addition to the opioid therapy Mr. Stima

9    was getting at the practice, was he also getting chiropractic

10   care?

11   A.    Yes.

12   Q.    And if you can just look, this is page 100 -- excuse me,

13   Government Exhibit 100, page 92.  How often does it appear

14   that Mr. Stima was coming for chiropractic treatment?

15         Well, I'll say it another way.  This might be easier.

16   How many times did he come in September of 2015?

17   A.    I count seven.

18   Q.    And how many times in October of 2015?

19   A.    I count nine.

20   Q.    And how many times in November?

21   A.    I count four.

22   Q.    And December?

23   A.    Two.

24   Q.    So this patient came for chiropractic treatment over 20

25   times in a three-month period, based on this record?

1  A.   I would have to count them again.  That sounds about
2  correct.
3  Q.   Okay.  And, again, is chiropractic care another form of
4  treatment for chronic pain?
5  A.   Yes, it is.
6  Q.   And the full chiropractic set of records goes to
7  Government Exhibit 100, page 118.  Does it appear that these
8  records are filled out for each visit that the patient comes
9  for chiropractic treatment?
10  A.   Well, there's -- I'd have to go through them all.  Yes,
11  there's a sheet for -- appears to be a sheet for each visit.
12  Q.   Okay.  I'll just focus on page 101.  And this looks like
13  a sheet for one of the chiropractic visits; is that fair to
14  say?
15  A.   Yes.
16  Q.   Are you familiar with reading chiropractic records?
17  A.   I don't study them so I'm not really an expert on reading
18  chiropractic notes.
19  Q.   Okay.  I do not want to ask you to step out of your swim
20  lane, so to speak.
21       Are there also underlying records in this file, just like
22  we saw for the files on Friday, documenting subjective
23  information conveyed by this patient about their pain?  This
24  is page 84.
25  A.   Yes.

1    Q.    And this is page 85.  It says "circle the following

2    conditions that apply to you."  And not only did this patient

3    circle things, it appears they also added something too.

4          MR. LYNCH:  Objection.  Leading again.

5          MS. GERDES:  Judge, we can be here all day.

6          THE COURT:  I know, I know.  What was circled?  We'll

7    do it that way.  Do you want to read what was circled?  Go

8    ahead.

9    A.    "Arthritis, back aches, depression, nervousness,

10   headaches, neck pain, and pain between shoulders."

11   Q.    And does it appear that any additional issues were

12   flagged by the patient?

13   A.    Yes.  Somebody wrote in here "tremors."

14   Q.    Okay.  Page 86 and 87, what does this appear to be to

15   you?

16   A.    This is a questionnaire that would appear to be something

17   you generally give the patient to fill out.

18   Q.    And what's the purpose of a questionnaire like this?

19   A.    It's -- again, it's gathering that information.  Some of

20   it's subjective, some of it's objective.  So if this is the

21   patient telling you things, this is a collection of subjective

22   information.

23   Q.    In your review of the patient files in this case, did you

24   see any evidence that the practice prescribed opioids to an

25   individual without collecting any information about what was

1  going on with them?

2  A.   No.

3  Q.   Page 21.  And this is a patient history form that goes

4  all the way through page 29.  What, based on this note,

5  suggests happened to this patient?

6  A.   Fell two to three years ago off ladder.  It looks like

7  maybe contusion.  I can't tell -- I can't be sure what that

8  next word is.

9  Q.   And what happened to them?

10  A.   It says "wood dropped on back."

11  Q.   What's this?

12  A.   That says lumbar DDD, and there's an arrow pointing to

13  the lumbar area of the back.  Then the word -- two words,

14  "bulging disk."  DDD stands for degenerative disk disease.

15  Q.   And the type of pain that this patient was expressing

16  that they were enduring, what was it?

17  A.   What's checked here, constant pain.  And the descriptions

18  are knife-like, deep, dull ache, throbbing/jabbing, and spasm.

19  Q.   And did the patient give information about where the pain

20  is affecting them?

21  A.   Yes.

22  Q.   Where is it?

23  A.   Lower left back, running from there to my neck and feet.

24  Q.   This is page 22.  Do we see more examples of subjective

25  information gathering by the practice?

1    A.   Yes.

2    Q.   And based on what this patient is conveying, are these

3    all symptoms that are consistent with somebody suffering from

4    chronic pain?

5    A.   Yes.

6    Q.   And there are sections on this form that talks about how

7    much the pain interferes with the person's activities of daily

8    living?  Is that what we see on page 23?

9    A.   Yes.

10   Q.   And, again, this is a patient who is being treated for

11   some type of mental health struggles?

12   A.   Yes.

13   Q.   And what are those?

14   A.   Anxiety, depression are the two mental health issues

15   listed there.

16   Q.   Page 6 of the record, do we see evidence that the

17   practice was trying to gather information about the patient's

18   potential risk of substance abuse?  Direct you to question 4.

19   A.   Yes.

20   Q.   Really, 3 to 5.

21   A.   Yes.

22   Q.   And what did Mr. Stima indicate?

23   A.   For the question:  Have you had a problem with substance

24   abuse?

25        The answer is no.

1    Q.    Okay.  And did they also attempt to get at that another

2    way by asking question 5?

3    A.    The question:  Have you ever been arrested for narcotics?

4    Example, trafficking, possession, or abuse.

5          And the answer is no.

6    Q.    And did this patient disclose any information at all

7    about their prior criminal history?  Let me zoom in.

8    A.    On question 7, it says:  Have you ever been incarcerated?

9          And the answer is yes.  It says:  26 years ago, burglary.

10   Q.    Okay.  And based on your review of Mr. Stima's medical

11   records, do you believe that the prescriptions given to him

12   were for a medically legitimate purpose and in the usual

13   course of professional practice?

14   A.    Yes, they were.

15   Q.    We're going to turn now to Barbara Works, okay?  11 and

16   12.  Counts 11 and 12.

17         All of her records are going to be contained in

18   Government Exhibit 160.  So I'll give the page numbers for

19   these records.  And the records at 160 were recovered from the

20   clinic, pursuant to the search warrant.

21         Page 122, what is this?

22   A.    It's a referral form.

23   Q.    And what was this patient's diagnosis, based on the

24   referral?

25   A.    First, I'm looking for the patient's name.

1    Q.    You see up here -- this is page 123 -- Barbara Works.

2    Provider, Jonathan Andrew Byers?

3    A.    Yes.

4    Q.    Okay.

5    A.    The diagnoses are -- and they list codes here.  So the

6    codes are put in there, and then the description is created by

7    the code.  So the diagnoses are, number 1, radiculopathy, and

8    it says unspecified spinal region.  The other diagnosis is

9    chronic midline low back pain with bilateral sciatica.

10   Q.    What is radiculopathy?

11   A.    Radiculopathy is damage or pain in the nerve root.  So

12   the spine is in your back, and the nerve roots come out of the

13   spine.  And the nerve roots come together, and they form the

14   nerve down your leg.  So if you have a disk problem or a bone

15   spur that's pushing on a nerve root, you have pain down your

16   leg, it's called radiculopathy.  Because the word "radic" is

17   like, I think, Latin for root.  So it's damage or disease of

18   the root, radiculopathy.

19   Q.    And this chronic midline low back pain with bilateral

20   sciatica, what is that?

21   A.    So radiculopathy is pain down the leg.  And so they're

22   also saying there's pain in the middle of the back as well.

23   And both sides, bilateral, there's sciatica.  The sciatic

24   nerve is the largest nerve in your body.  It goes down your

25   leg.  So there's pain in the sciatic nerve to the legs.

1    Q.   Again, this is page 129.  Does this appear to be more

2    records related to the referral to Dr. Siefert for Ms. Works?

3    A.   Yes.

4    Q.   This is page 91 of the records.  What is this,

5    Dr. Murphy?

6    A.   This is an MRI report of the low back.

7    Q.   So this would be an example of a diagnostic that is an

8    objective criteria for evaluating chronic pain?

9    A.   Yes.

10   Q.   And what are the results of the MRI?

11   A.   There's three they mention.  Number 1, a disk protrusion,

12   so a damaged disk that's bulging.  And a tear in the disk at

13   L5-S1.  That's the lowest disk in your back.

14        Number 2, there's degenerative changes, which is diseases

15   of the disk at L4-5, which is the next higher one.  And that's

16   with a protrusion.

17        And then on number 3, more degenerative disk disease and

18   a protrusion at L3-4.

19        So the bottom three disks of the back all had protrusions

20   or some damage there.

21   Q.   And would diagnostics like this support a patient's

22   complaints of chronic pain?

23   A.   Yes.

24   Q.   This is page 133.  Do you see a progress note from Troy

25   Ashcraft at somewhere -- Dry Ridge.  Does this appear to be

1    outside records related to Ms. Works --

2    A.   Yes.

3    Q.   -- page 133 to 135?

4         And now getting to her initial evaluation at the clinic,

5    tell us about what observations were made with respect to this

6    patient during her initial evaluation on December 21 of 2015,

7    page 16 -- excuse me, page 61 and 62.

8    A.   Well, on this page, this is an example of a very

9    well-done, typed-up, and thorough initial evaluation by the

10   physician.  It starts with the chief complaint.  Again, we're

11   taking subjective information.  Then there's objective

12   information.  So this is the first part -- the first page in

13   building out a very thorough and comprehensive initial

14   evaluation.

15   Q.   And it looks like she had a motor vehicle accident in

16   2006 and is working on concrete in a factory?

17   A.   Yes.

18   Q.   And then this is page 62.  Tell us about this.

19   A.   This is more information; the social history, the family

20   history, a review of systems, what else is going on with the

21   patient medically.  There's a physical examination there as

22   well.

23   Q.   And how long does this indicate that this patient has

24   been smoking and how much is she smoking?

25   A.   She has been smoking one pack per day for 20 years.

MURPHY - Direct                                                    10-26

1    Q.   Page 63, what are we seeing here?

2    A.   Well, this is -- starting with the special examination,

3    that's the lumbar MRI summarizing that.  That's more of that

4    objective information.  Then there's the impression, which is

5    the working diagnosis, what he thinks is going on there with

6    the patient, and then their plan of care.

7    Q.   And she was also going to be getting nonopioid care?

8    A.   Yes.

9    Q.   And that initial evaluation is December 21 of 2015.  Does

10   this appear to be handwritten notes related to the initial

11   evaluation?

12   A.   Yes.

13   Q.   Okay.  We'll go to June 8th of 2016.  Was the patient

14   seen that day?  This is page 36.

15   A.   Yes.

16   Q.   And according to information provided to the clinic, when

17   does it indicate she had last taken her opioid medication?

18   A.   It says Norco, which is the hydrocodone opioid, three

19   days ago.

20   Q.   And this is page 37 of the exhibit.  Does it indicate

21   whether there was a discussion with the patient at all related

22   to the results of her urine drug screen?

23   A.   Yes.

24   Q.   And how do you know that?

25   A.   It says it.  There's a box around the sheet there, and

1     there's an X there.  It's right here.  And then it says,

2     "Benzo positive.  Old prescription.  Warning given."

3     Q.   So how, if at all, does this illustrate that urine drug

4     screens were being considered in making clinical decisions at

5     the practice?

6     A.   It indicates that they apparently did a screening --

7     point of care drug screen that day, and they found something

8     that was unexpected, and then they reacted to it.  In this

9     case, they warned the patient.

10    Q.   Going to February 8th of 2017, this is page 25 of the

11    record.  Does it indicate whether there's been any discussion

12    with the patient about her absence from the office for a

13    period of time?

14    A.   Yes.

15    Q.   And what is the information that's conveyed?

16    A.   Well, in the history part up there that's yellow,

17    "patient hasn't been seen in our office for six months."

18    Q.   And what else?  What happened to the patient?

19    A.   It says patient fell, looks like down steps, and then

20    times two.  So maybe has fallen twice down the steps.

21    Q.   And what information was shared about the patient's

22    medications?

23    A.   Well, it says Norco.  Then it says no meds.  So that

24    would indicate that she hasn't had medications.  And then

25    patient went to hospital two nights ago.

MURPHY - Direct                                                    10-28

1    Q.   Do we see information that her assessment and plan was
2    considered?
3    A.   Yes.
4    Q.   And, again, what is going on with this patient?
5    A.   The A stands for assessment, and that's handwritten.
6    Then it says lumbar DDD, lumbar degenerative disk disease.
7    Under that, lumbar radiculopathy, as we are aware.
8         And then the P is the plan.  The plan is MRI lumbar.  And
9    then under that, LESI, which stands for lumbar epidural
10   steroid injection.
11   Q.   And then information about the medication?
12   A.   Below that -- and this is a continuation of the plan --
13   is a prescription, Norco, and it's a 10 milligram Norco,
14   10/325.  That's -- QID, means four times a day.  Then there's
15   the number that he gives.  It looks like it's 120, which is --
16   would be a 30-day supply.
17        Below that is gabapentin, which is also used for
18   radiculopathy and nerve damage for pain control, and there's a
19   dosage there, three times a day, number 90.
20   Q.   Okay.  So we see the SOAP note in this patient record.
21   Fair to say?
22   A.   Yes.
23   Q.   Okay.  Now, this is March 27th of 2017.  Was the
24   patient -- let me zoom out so you can see.  This is page 22 of
25   the record.  Was the patient seen that day at the practice?

1   A.   Yes.

2   Q.   And do we see again the subjective note here towards the

3   top?

4   A.   Yes.

5   Q.   The objective note towards the bottom?

6   A.   Yes.

7   Q.   And information from the patient about when she had last

8   had medication?

9   A.   Well, somebody has written Norco, which is the

10  hydrocodone pain medicine, March 9th.

11  Q.   So some time ago, we're talking about, from March 27?

12  A.   I would assume that, yes.

13  Q.   Okay.  And evidence that the assessment and the plan was

14  considered?

15  A.   Yes.

16  Q.   And tell us about that in this record.

17  A.   Well, in the assessment here, there's lumbar -- it looks

18  like PLS.  I'm not sure exactly what that means.  But below

19  that's lumbar radiculopathy, lumbar degenerative disk disease,

20  lumbar herniated nucleus pulposis.  That's a herniated disk.

21  And they give the area there at L5-S1.

22       And then to the right is plan, which is schedule MRI,

23  lumbar with contrast.  Below that, prescription, Norco 10/325,

24  one by mouth four times a day, number 120, which is the same

25  thing she'd been on in the past.

MURPHY - Direct                                                    10-30

1    And then it says increase gabapentin, and then they give

2    the dosage, four times a day now, 120 pills.

3    Q.   And what would be the purpose of increasing gabapentin

4    for a patient in this case -- situation, I should say.

5    A.   Gabapentin has an opioid-sparing effect.  So rather than

6    increase the opioid, which you could -- and by the way, this

7    opioid, in particular, has Tylenol attached to it.  So you're

8    giving the patient a combination of the opioid in a stable

9    dose and Tylenol along with it.  So you're getting the

10   nonsteroidal agent with the opioid.  Multimodal care.

11       Add to that the gabapentin, which is for that nerve

12   damage.  Remember, I mentioned earlier, radiculopathy, nerve

13   damage.  So the gabapentin specifically helps treat nerve

14   types of pain.

15   Q.   And what would be the purpose of doing the MRI with the

16   contrast?

17   A.   That's, again, trying to get a more updated objective

18   information to help with the diagnosis.

19   Q.   Now, this is page 19 of the exhibit, the visit on May 2nd

20   of 2017.  And, again, do we see the subjective information

21   gathering going on at the top of the page?

22   A.   Yes.

23   Q.   Okay.  And the objective information gathering going on

24   at the bottom?

25   A.   Yes.

1  Q.   Based on this physical exam, what is going on with this

2  patient, if you can read the handwriting?

3  A.   We can see the patient is able to ambulate, can walk

4  without somebody helping the patient.  But the gait, it's

5  actually slow and the word is "antalgic," and right side.  So

6  favoring -- they're basically limping, favoring the right leg.

7  I think "difficult" is the word there.

8       And then on musculoskeletal, sacroiliitis, which is the

9  sacroiliac joints.  And we mentioned sciatica pain.  This is

10 pain in the joints, the sacroiliac joints.  It's very common

11 in low back pain.  And it looks like right plus left.  I'm not

12 sure exactly what that means.  Maybe right greater than left.

13 So they assessed both sides, but the right side appears to be

14 more painful than the left side.

15 Q.   And do you know what this means?

16 A.   It's -- CW stands for consistent with, and I'm not sure

17 what that word above it means, but L4-L5.

18 Q.   Okay.  And, again, indications with the pluses that a

19 physical exam was performed of this patient?

20 A.   Yes.

21 Q.   And based on the information in the record, when does it

22 appear that this patient had last had her medication?

23 A.   Well, it just says Norco April 27th.  So I'm not sure

24 exactly -- exactly what that means.  But it does say Norco,

25 which is the pain medicine, April 27.

1    Q.   This is page 20 of Exhibit 160, the assessment and the

2    plan.  Tell us about what the assessment was and what the plan

3    of care is for this patient.

4    A.   Again, you have, on the assessment, four things.  Lumbar,

5    and it looks like PLS again.  And, again, I'm not quite

6    exactly sure what that is.  But then there's lumbar

7    radiculopathy; lumbar degenerative disk disease; lumbar

8    herniated nucleus pulposis, herniated disk.  L5-S1 is the disk

9    that's herniated.

10        On the plan on the right side, schedule lumbar epidural

11   steroid injection.  Appears to be left side.  And they give

12   the area, L5-S1.  Continue prescription, Norco, and it gives

13   the dosage there.  It's the same prescription as before.  And

14   then the gabapentin appears to be the same as well.

15        And then below that, start Robaxin, which is a muscle

16   relaxant.  Then below that, Voltaren gel, which is a pain

17   cream that's a -- it's like Motrin.  It's an antiinflammatory

18   pain cream that you put it topically on there.  And it gives,

19   you know, how to do it.  They'll apply four, I guess, grams --

20   it tells where to put it on her back.

21        Also then in the plan above that, here, schedule MRI

22   lumbar.  So they're scheduling that additional test.

23   Q.   And does it appear that the results of the patient's

24   urine drug screen and her KASPER records were revealed -- were

25   reviewed prior to a prescription being issued on May 2nd of

MURPHY - Direct                                                    10-33

1    2017?

2    A.   Yes.  It's at the very bottom there.  It's kind of cut

3    off on your screen, though.

4    Q.   Okay.

5    A.   Yes.  There it is right here.

6    Q.   Okay.  And these last two records that we just reviewed

7    for Ms. Works, the patient visits from March 27th of 2017 and

8    May the 2nd of 2017, were the prescriptions for opioids to

9    this patient on those two dates for a legitimate medical

10   purpose within the usual course of professional practice,

11   based on your review of the records in this case, Dr. Murphy?

12   A.   Yes, they were.

13   Q.   And similar to what we just went through for Mr. Stima,

14   do we have all the underlying documents supporting this

15   patient's complaints of pain?  This is Government Exhibit 160,

16   page 50.  Can you see the top, patient history form?

17   A.   I'm sorry.  Would you ask the question again, please?

18   Q.   Is this what we just saw with Mr. Stima, these underlying

19   documents that the patient has filled out kind of conveying

20   that subjective information about their complaints of pain?

21   A.   Yes.

22   Q.   Okay.  The pain that this patient was experiencing, how

23   was it described?

24   A.   It's constant.  It's burning, fire, shooting, knife-like,

25   throbbing, jabbing, and spasm.

1     Q.   It says, "where you" -- were you -- "where you injured or

2     in an accident that caused your pain to occur?"  This is

3     page 51.  And what did this patient indicate?

4     A.   "Work and car accident."

5     Q.   And the symptoms that this person suffers from as a

6     result of this pain were described as what?

7     A.   Well, these are the associated symptoms that she's

8     experiencing.  Muscle spasms, restless legs, pain with first

9     step in the morning, pain that wakes you up at night, fatigue,

10    leg cramps, and swelling in the legs, and she indicates ankle.

11    Q.   And we don't need to go through all the checkboxes, but

12    she also lists what are the things that exacerbate the pain

13    essentially here at number 7 on page 51?

14    A.   Yes.  There's an acronym for this, PQRST.  What is the

15    pain; what's the quality of the pain; what resolves it, makes

16    it better; what makes it worse; what associated symptoms are

17    there; and what are the timing aspects.  They're all there.

18    All of those are in these notes.

19    Q.   And, again, we saw that consistently through all of these

20    files that you reviewed?

21    A.   Yes.

22    Q.   And at page 52, number 8 -- I know we haven't talked

23    about this for every patient, but do we see information

24    gathering on what these people have tried to do in the past to

25    address their chronic pain?

1    A.   Yes.

2    Q.   And whether those things were helpful or unhelpful?

3    A.   Yes.

4    Q.   Page 126, we see again the new patient questionnaire and

5    attempts to collect information on the risk that the patient

6    faces with respect to substance abuse at 3 to 5?

7    A.   Yes.

8    Q.   And, again, on page 127, questions 6 and 7, do they get

9    at that same point?

10   A.   Yes.

11   Q.   And page 90, we see the compliance agreement.  Page 87,

12   the narcotics agreement.

13   A.   Yes.

14   Q.   Page 67, a log of the medications to the patient; is that

15   right?

16   A.   Yes.

17   Q.   Same thing at page 68.

18        Do you recall in your testimony when we looked at the

19   record from June 8th of 2016 -- I'm going to put it back up

20   just so we all see it.  This is page 37, where the patient

21   gave the information about that old prescription that they had

22   taken for benzodiazepine?

23   A.   Yes.

24   Q.   This is page 107.  Does this appear to be the urine drug

25   screen for that date?

1       Page 107?

2    A.   This is for June 8, 2016.

3    Q.   Right.  And just so we're on the same page, do you see

4    June 8th of 2016?

5    A.   Yes.

6    Q.   And then that note about the old prescription?

7    A.   Yes.

8    Q.   So does this appear to be a similar notation on the urine

9    drug test result from that day?

10   A.   Yes.

11   Q.   And this indicates "old prescription, warning given."

12   And then what does it indicate about the patient's issues with

13   getting medication?

14   A.   I'm not sure what the first thing says, but it says,

15   "issues, out of meds."  The other -- I'm not sure what those

16   mean.

17   Q.   Does this appear to be "appt"?

18   A.   It could -- that usually means appointment.

19   Q.   I don't want to ask you to speculate on anything, but it

20   appears to say "appt issues, out of meds," and then "okay"?

21   A.   Yes, but I'm not -- you know, the first four letters

22   there, that could be two words.  But it's -- I can see

23   "issues" and then "out of meds."

24   Q.   Based on the notes --

25   A.   And that could say "okay."  But, again, I'm not sure.

1    Q.   Completely understand.

2         Based on the notes here, do you believe that the results

3    of this urine drug screen were considered?

4    A.   Yes.

5    Q.   And, again, when we see on the forms kind of the

6    checkboxes that the urine drug screens were considered, what

7    does that tell you, Dr. Murphy?

8    A.   That means to me that at that visit -- they did a

9    screening urine test at that visit, and before the patient

10   completed the visit, they looked at the results and considered

11   those results.

12   Q.   Thank you.  We're going to turn now to Judy Stewart.

13   Again, fair to say no specific counts related to her, but this

14   is a file that you did review?

15   A.   Yes.

16   Q.   All of her records from the clinic are contained at

17   Government Exhibit 120a.

18        What does PCP stand for?

19   A.   Primary care provider.

20   Q.   And who was her primary care provider?

21   A.   Amy Van Milligan.

22   Q.   And you see this outpatient referral to a pain clinic?

23   A.   Yes.

24   Q.   And this came from UC Health Orthopedics?

25   A.   Yes.

MURPHY - Direct                                                    10-38

1    Q.   And what are lumbar facet injections?

2    A.   That's an injection in the back.  It's in the same area

3    that that lumbar epidural would go into.  But in your back,

4    you have two sets of facet joints for each vertebral level.

5    Sometimes you feel them pop when you twist.  And that's --

6    sometimes those little facet joints popping, they are

7    oftentimes arthritic and they get bone spurs on them.  So what

8    the referral there is for, it's for a very specific injection

9    to put some medication on those facet joints.

10   Q.   Government Exhibit 120a, page 155 through 158, what does

11   this appear to be?

12   A.   These are reports from x-rays.

13   Q.   Diagnostic tests?

14   A.   Yes.

15   Q.   Okay.  There's a lot of material here, but if you can

16   just kind of look at what's on the first page and then at a

17   high level tell us what's going on with these diagnostics.

18   A.   Well, the first is the x-ray of the left ankle, and it

19   says there's minimal osteoarthritis.  So osteoarthritis is

20   arthritis, and it's arthritis from wear and tear, basically.

21        And there's mild osteoarthritis, and it gives a specific

22   joint, the tarsometatarsal joints.  That's ankle joints.  It's

23   in the bones in the ankle.  Below that, right knee, and

24   there's moderate degenerative changes in the right knee

25   involving all three compartments.  So the entire knee has

1    degeneration, and the right knee is slightly more affected

2    than the left.

3    Q.    Page 156.

4    A.    It starts with an x-ray of the left knee, and it says

5    moderate osteoarthritis.  Again, that's arthritis in the left

6    knee as well.  Then there's an x-ray of the right ankle again,

7    and the right ankle has no significant issues.

8         Then below that, the x-ray of the lumbar spine.  Now,

9    this is an x-ray, not an MRI.  So you see the bones really

10   well on an x-ray.  And it says a stable grade 1

11   anterolisthesis of L5 on S1.  So what that means is that the

12   bones are not lining up right.  There's a slippage.  So

13   they're not lining up right in the back, and that can cause

14   pain and disability and arthritis later on.

15        There's also degenerative disk space narrowing.

16   Remember, with an x-ray, you can't see the disks, but you can

17   see the bones.  So the space is smaller.  So it indicates

18   there's probably some degeneration in the disk as well.  And

19   the remainder of the spine is normal alignment with mild,

20   scattered degenerative changes, and there's a probable --

21   probable pars defect at L5-S1.  The pars is part of that

22   complex bone down there at L5-S1, and there's apparently

23   something wrong with that bone as well.

24   Q.    Page 157.

25   A.    Here we have an MRI now.  An MRI is more sophisticated.

1    You can see some of what we call the soft tissues like the

2    disks and maybe the nerves as well.

3         And on this report, we see the -- it's kind of fuzzy.

4    Perhaps maybe we could get it better.

5         Thank you.

6    Q.   Sure.

7    A.   We see that there is a grade 1 spondylolisthesis at

8    L5-S1, and that's, again, some slippage of the disks with some

9    problems with the facet joints.  When you see the word

10   "spondylo," it's another word describing the facet joints.  We

11   talked about those earlier.

12        Then L1-2 disk degeneration and early bilateral -- both

13   sides -- facet hypertrophy.  Again, arthritis in those facet

14   joints.

15        L2-3 disk degeneration, and now we have a broad-based

16   disk protrusion with a moderate sized right foraminal

17   protrusion.  The foramen is where the nerve comes out.

18   Remember I talked about radicular pain?  Well, the nerve exits

19   through a hole, and that's called the foramen.  So now we have

20   evidence of foraminal issues there at L2-3.  A protrusion is

21   causing a pinched nerve there, perhaps.

22        There's advanced bilateral facet arthritis -- so at that

23   level, severe arthritis in those facet joints -- with a

24   5-millimeter synovial cyst extending into the area.  So the

25   synovium is the covering, basically, of the joint.  And the

1     capsule covering the joint has a cyst in it, probably from the

2     inflammation and the arthritis there as a response to that.

3          So below that, L3-4, the next disk down, is the mild

4     spondylosis.  Again, I mentioned that's facet problems.  And

5     there's mild to moderate narrowing of the lateral recesses and

6     neural foramina bilaterally.  Again, the next level down also

7     has -- the hole is small where the nerves come out.

8          L4-5, which is the second to the last disk there, disk

9     degeneration.  And desiccation means it's dried out.  They can

10    tell on the MRI that the disk has dried out, and it's smaller,

11    with broad-based disk bulging and hypertrophic bone spurring.

12    You've got a bone spur there as well.  Bone spurs usually

13    occur because of chronic inflammation.  And the lateral facet

14    arthritis.  Then there is a moderate narrowing of the neural

15    foramina bilaterally.  We talked about that.

16         Then L5-S1, which is the bottom disk, there's a

17    spondylosis there.  And there's moderate narrowing of the

18    neural foramina bilaterally, again, at L5-S1.

19         So we've got problems at -- every disk in the low back

20    has a problem.

21    Q.   And based on what you're seeing in this patient's

22    diagnostics, would it be understandable that this person is

23    suffering from chronic pain?

24    A.   Yes.

25    Q.   Okay.  Page 247, you can see, at the top, "Provider, Jon

1    Divine; department, UCH Orthopedics."

2         Does it appear that these are outside records that the

3    clinic obtained?

4    A.   Yes.

5    Q.   And based on this note, how long has this patient been

6    wearing a brace?

7    A.   It says back in the '90s.

8    Q.   Okay.  And what comorbidities does this patient have?

9    A.   So PMH stands for her past medical history, and it's

10   extensive.  It's important.  She has extensive medical history

11   for heart disease.  She actually has a pacemaker.  And

12   hypertension is high blood pressure.

13   Q.   Okay.  Her initial evaluation from the clinic, page 238

14   of the exhibit.

15        Based on the pages of this exhibit, we're looking at

16   page 238.  The second page is at 97 of the exhibit.  The

17   records had skipped there.  And then the third page is at

18   page 98 of the exhibit.  So just so we're clear, her initial

19   evaluation is at 238, 97, and 98.

20        Does this indicate that Dr. Siefert performed an

21   evaluation of this patient on November 18th of 2014?

22   A.   Yes.

23   Q.   And what were the results of his initial evaluation?

24   A.   Well, like we saw previously, this is a typical,

25   thorough, comprehensive new patient evaluation.  It talks

1   about the subjective information, the history of the present

2   illness, why the patient's there, description about her

3   problem.  Goes into family history, the past medical history,

4   allergies again, surgeries, and then lists the medications.

5       On the next page, there's more information that we saw

6   before.  The social history, again, review of systems

7   throughout her body, then a physical examination.  The last

8   page talks about the -- again, the MRI and the examination

9   there.  More objective information.

10      Then the impression is the working diagnosis, and then we

11  have a plan of care.

12  Q.  And for all of these plans of care that we've reviewed

13  over the course of the patients named in the indictment and

14  Ms. Stewart and Mr. Stima, were all the plans of care kind of

15  consistent and what you would expect for patients with these

16  issues that they were dealing with?

17  A.  Yes.

18  Q.  This is page 28.  We're just going to go over this

19  quickly.  This is the new patient questionnaire, again,

20  getting at information related to risk of drug abuse; is that

21  correct?

22  A.  Yes.

23  Q.  That's an insurance form.

24      This is page 100 of the exhibit.  Do we see this is the

25  first page of the patient history form where all the

1    subjective information is collected?

2    A.   Yes.

3    Q.   And how does this patient describe her pain?

4    A.   Constant, shooting, deep, dull ache.

5    Q.   What did she indicate makes her pain feel better?

6    A.   Staying off feet and legs.

7    Q.   What makes the pain worse?

8    A.   Standing.

9    Q.   What does she indicate under "other"?

10   A.   Looks to me like she's saying "can't bend at times."

11   Q.   How often throughout the day is this patient apparently

12   experiencing pain, or what times of day is she experiencing

13   pain?

14   A.   Morning, afternoon, and evening.

15   Q.   Page 1 of the exhibit, is this more information collected

16   about the patient's history?

17   A.   Yes.

18   Q.   Page 3, does it appear that she's also suffering from

19   issues related to mental health?

20   A.   Yes.

21   Q.   And what are those?

22   A.   Nervousness and stress.

23   Q.   Okay.  Page 106, is this more information about the

24   patient's history?

25   A.   Yes.

MURPHY - Direct                                                    10-45

1   Q.    And that continues to page 107.

2         And, again, we see her narcotic agreement at page 147 and

3   148?

4   A.    Yes.

5   Q.    And her patient compliance agreement at page 154?

6   A.    Yes.

7   Q.    Page 109, does this indicate whether this patient was

8   getting -- page 109 and 110 -- nonopioid treatments at the

9   practice?

10  A.    Yes.

11  Q.    And who is listed as the surgeon?

12  A.    Dr. Siefert.

13  Q.    Okay.  And what did she get on March 24th of 2015?

14  A.    A right sacroiliac joint injection.

15  Q.    And what is the purpose of an injection like that?

16  A.    That can have both diagnostic and therapeutic purposes.

17  So, generally, you inject that joint, and then you put numbing

18  medicine in there, as well as some steroid.  So if the patient

19  gets immediate relief from the numbing medicine, that tells

20  you that, well, the pain's probably coming from the sacroiliac

21  joint.  That's a diagnostic benefit.

22        And then, hopefully, the steroid and perhaps the local

23  anesthetic as well will, over time, decrease the inflammation

24  and she'll get some therapeutic benefit.

25  Q.    This is page 111.  What do we see in this image?

1    A.   That is a reproduction of an x-ray, and it's got the --

2    what appears to me to be the needle that's in the right

3    sacroiliac joint.

4    Q.   Page 45, this is a visit from May 16th of 2016.  Does it

5    appear that the patient was conveying information about how

6    frequently she was taking the medicine and how that impacted

7    her supply of medications?

8    A.   Well, it says here "patient was taking two at a time so

9    ran out of meds a week ago."  So taking probably more medicine

10    than maybe was prescribed and has run out early.

11    Q.   Okay.  June 13th of 2016, page 41.  Based on this note,

12    what is the patient indicating that she felt like she needed?

13    A.   Well, it says, "complains of knee pain" -- that's

14    "c.o" on the right side there.  "Wants injection as soon as

15    possible."

16    Q.   And then -- she complained of knee pain, and then do we

17    see anything reflected about that in the assessment?

18    A.   Yes.  The A and then OA means osteoarthritis of the knee.

19    Q.   Okay.  And, again, we see the assessment and the plan for

20    this patient on June 13th of 2016?

21    A.   Yes.

22    Q.   7/13 of 2016, page 38, was there subjective information

23    gathered from the patient about how the meds were helping her?

24    A.   Yes.  On this date of 7/13/2016, there is subjective

25    information.

1    Q.   And what did she say the medicine was doing for her?

2    A.   Helping.  And then she gives an example of how it's

3    helping and her function.  "Able to sweep kitchen."  And then

4    can pull, it looks like bedding up.  But I'm not sure what

5    that -- those words mean, actually.

6    Q.   And is this a patient, Ms. Stewart, who ambulates on her

7    own or with the assistance of anything?

8    A.   She uses a cane.

9    Q.   And what does it indicate about her gait even when she's

10   using a cane?

11   A.   It says "with cane, unsteady."

12   Q.   Okay.  July 13, 2016, indications to you -- again, beyond

13   just the checkbox -- that the urine drug screen was

14   considered?

15   A.   Yes.

16   Q.   And what does this note indicate where it says GI?

17   A.   They have noticed -- on the KASPER report and perhaps

18   OARRS report, it looks like they're noticing a discrepancy.

19   And it says the GI -- it means gastrointestinal doctor --

20   prescribed Phenobarbital for IBS, which means irritable bowel

21   syndrome.

22   Q.   Page 35 of the record, August 29th of 2016, what did the

23   patient indicate on that date?

24   A.   On this date, as is yellowed there, back went out and has

25   two cracked ribs last week.  Seen in emergency room, quote,

1   got a pain shot.  And it says fractured ribs and then it says

2   morphine injection.

3   Q.   And would somebody be potentially given morphine in the

4   ER for pain?

5   A.   Yes.

6   Q.   August 29th of 2016, just remind us what ACME stands for.

7   Or what's that another way of saying?  Let me put it that way.

8   A.   I'm not recalling what ACME means.

9   Q.   When you calculate a patient's level of drugs that

10   they're taking, is there a way to kind of do a calculation to

11   say, oh, this is a level that's consistent with morphine?

12   A.   Yes.

13   Q.   What is that?

14   A.   Well, I've seen it usually written as MME, morphine

15   milligram equivalent, or MED, morphine equivalent dose.  Those

16   are the two ways I've seen it.  I've not really seen ACME

17   written before.

18   Q.   Fair enough.  9/28/2016, was there any information

19   collected from the patient about how she was doing and where

20   she had been?

21   A.   Yes.

22   Q.   What was that?

23   A.   In the HPI, the history, "was in hospital for five days,

24   kidney infection, getting better."

25   Q.   Okay.  And based on this, when does it appear as though

1    the patient last had medication?

2    A.   It says "Percocet, Friday."

3    Q.   Page 34 of the record, does this indicate whether or not

4    an assessment and plan was created for this patient on this

5    date?

6    A.   Yes, it does.

7    Q.   And just can you briefly tell us about that?

8    A.   The assessment is lumbar spondylosis and degenerative

9    disk disease, lumbar radiculitis, osteoarthritis of the knee

10   and knee pain, and bilateral ankle pain.

11       The plan is the pain medication, Percocet, then

12   gabapentin, Robaxin.  And it looks like something with

13   Dr. Ehn, continue -- I'm not sure what the first letter means,

14   but Dr. Ehn is listed there.  It probably means chiro, but I

15   don't know exactly what that means.

16       "Looking for new" something.  I'm not sure what that

17   means, but "schedule right knee injection."

18   Q.   And does this indicate there was any review or discussion

19   with the patient about either her KASPER report or her urine

20   drug screen?

21   A.   Yes.

22   Q.   And why do you say that?

23   A.   Well, it -- again, there's not the typical zero with a

24   line through it for the drug screen.  There's like a box with

25   kind of an X there.  And above that, "must take meds as

1    prescribed," and then I think it says not out of meds.  And

2    then "negative UDS for meds today."  So it tells me that

3    today's drug screen didn't show the medications that she was

4    prescribed.  And then -- or for the opioid medication she was

5    prescribed.

6        But then the -- it says gets Phenobarbital, number 160 --

7    and it's got the doctor's name there -- and clonazepam, which

8    is a benzodiazepine, 0.5 milligrams.  It just says number 3,

9    so just -- is it three pills?  It would indicate to me three

10   pills -- Dr. Wong.  So they list the other medications that

11   they get as well.

12       And then the ACME there is again at 60.  Which, by the

13   way, if she is on 10 milligrams of oxycodone four times a day,

14   the morphine milligram equivalent, by many of the tables,

15   would be 60.

16   Q.   And this is page 32, discussed something PT --

17   A.   I can't see the top of that on my screen.

18       It says "discussed with patient," and I'm not sure --

19   missed something.  I'm not sure what that actually says.

20   Q.   So the question is:  Does your medication control the

21   pain?  It appears the patient circled yes, correct?

22   A.   Yes.

23   Q.   And then writing says, "if I take two at once, it's

24   pretty tolerable."

25   A.   That's what it says.

1   Q.   And then it appears somebody wrote "discuss something

2   patient something take as prescribed"?

3   A.   It says "discussed with patient," and it could say "med."

4   I'm not sure what it says.

5   Q.   Yeah.  I don't either.

6   A.   To me it says -- looks like take as prescribed.  I'm not

7   sure what the other word says.

8   Q.   This is the urine drug screen result from that day.

9   Let's see if this helps us at all.  Page 166, what does this

10  appear to say?

11  A.   Well, that's the drug screen result.  And we see that the

12  opiates are negative.  So if she had been taking it for the --

13  every day like she was maybe expected to, you might see

14  positive for the opiates.  And then it looks like "we

15  discussed with patient must take as" -- I'm not sure what that

16  last word says.  It's -- kind of blends into something else.

17  Q.   Must take as something?  We can't see it?

18  A.   Yes.

19  Q.   And then 10/27/2016, page 30.  Again, we see the

20  subjective and objective on page 30.

21  A.   Yes.

22  Q.   And on page 29, information from the patient, more about

23  the subjective information that's being conveyed to the

24  doctor?

25  A.   Yes.

1   Q.   Okay.  And what does this indicate that she's saying

2   about the Klonopin?

3   A.   It says, "Klonopin for nervous/anxiety until I could get

4   in with a psychiatrist."

5   Q.   Does it appear she's indicating the name of the doctor

6   who prescribed that?

7   A.   Yes.  It says, "Dr. Barnes put me on smallest dose of

8   Klonopin for nervous/anxiety until I could get in with a

9   psychiatrist."

10  Q.   And then some type of note down here, "Patient did urine

11  10/26/16.  OIG had chart per Karla.  Will return on 10/27.

12  And then per Siefert, gave her" -- and then information about

13  a prescription to cover for 10/27?

14  A.   I can't see what all that says.  And I'm not sure -- it's

15  Dr. Somebody above that.  I'm not sure what doctor that is.  I

16  think I said Burns, but it's Dr. Somebody.  And then it says,

17  below that at the bottom, "that doctor is my family doctor."

18       And then below that, it looks like different handwriting,

19  "Patient did urine 10/26/16.  OIG had chart per Karla.  Will

20  return on 10/27/16 per Dr. Siefert.  Gave her Percocet 10/325

21  four times a day, number 8," to cover, looks like, until 10/27

22  when she could see Dr. Siefert.

23       This was apparently a note by one of the associates

24  there, perhaps a nurse practitioner, but I don't see the

25  signature.

1    Q.    Fair enough.   Page 31, do we see evidence that there was

2    an assessment set forth and a plan that day on 10/27 of 2016?

3    A.    Yes.

4    Q.    And can you just tell us about that?

5    A.    The assessment is lumbar spondylosis, and looks like

6    lumbar -- to me that says radiculitis, but I'm not certain,

7    the handwriting.   And then I'm not sure what OH means, but it

8    looks like it's osteoarthritis.   I think that's an OA because

9    that's been there before.   And then it looks like -- I would

10   say going to be knee pain bilateral, because we've seen that

11   before.

12        And then plan is to continue the prescription for

13   Percocet, same dose, 10/325, one by mouth four times a day,

14   stable dose.   Start Voltaren gel, which is that topical

15   antiinflammatory we saw earlier.   And then schedule for knee

16   injection.   And then on the bottom of that is also Robaxin,

17   which is a muscle relaxant that is being prescribed as well.

18   Q.    Okay.   And, again, indications that the urine drug screen

19   and the KASPER reports were considered before prescriptions

20   issued?

21   A.    Yes.

22        THE COURT:   Ms. Gerdes, how much longer on direct, do

23   you think?

24        MS. GERDES:   I think we can wrap it up in probably

25   the next five minutes.

1        THE COURT:  Very well.  We'll break after that for

2    our midmorning break.

3        MS. GERDES:  Okay.

4    BY MS. GERDES:

5    Q.   Page 110, evidence that this patient received nonopioid

6    therapies, which I think you've kind of hit at already,

7    correct?

8    A.   Yes.

9    Q.   What was this?

10   A.   This is a right sacroiliac joint injection.

11   Q.   Evidence at page 114 that the patient also got knee

12   injections?

13   A.   This is a right knee -- procedure note for a right knee

14   injection.

15   Q.   I want to show you some of the urine drug screens.  This

16   is page 202, a urine drug screen on June 4th of 2015.

17        Do you see that?

18   A.   Yes.

19   Q.   It appears this was conducted by USA Medical Toxicology?

20   That's the lab that did this?

21   A.   Yes.

22   Q.   And this is a confirmatory test; would that be fair to

23   say?

24   A.   Yes.

25   Q.   Another one by the same lab on June 4th of 2015.  This is

1    page 203; is that correct?

2    A.   Yes.

3    Q.   Same thing, another confirmatory on August 27th of 2015

4    by USA Medical Toxicology, page 199; is that correct?

5    A.   Yes.

6    Q.   One done by Bluewater at page 198, another confirmation

7    test?

8    A.   Yes.

9    Q.   Flipping through page 190, 187, 183, 180, 177, 172,

10   additional urine drug screens with the patient, is that

11   correct, that are confirmation tests?

12   A.   You went very quickly.  I would --

13   Q.   Let me just pass the exhibit up to you, and you tell me

14   if these are all confirmation tests run by outside labs.

15        Does that appear to be the case, Dr. Murphy?

16   A.   Yes.

17   Q.   Okay.  Now, getting back to the counts, based on your

18   review of the medical records that pertain to Counts 2 through

19   6 and 9 through 12, is it your opinion that those

20   prescriptions were issued within the usual course of

21   professional practice for a legitimate medical purpose?

22   A.   Yes.

23   Q.   For each of those, correct?

24   A.   Yes.

25   Q.   Now, Ms. Ilg, is it fair to say that Dr. Thomas concluded

1    that the prescriptions to her were for a legitimate medical

2    purpose in the usual course of professional practice?  If you

3    recall.

4    A.   I recall that being what he said.

5    Q.   And do you agree with that also for Ms. Ilg, that her

6    prescriptions were for a legitimate medical purpose in the

7    usual course -- we didn't go over her records today -- but as

8    far as the records that you have reviewed?

9    A.   Yes.

10   Q.   Okay.  And now if you can just tell us, kind of as a

11   wrap-up to this, what were the good things that you saw this

12   clinic doing based on kind of the cases that you have

13   reviewed?

14   A.   This clinic was consistent with fundamentally what the

15   CDC guideline says we should look for in chronic pain

16   management.  They treated the pain of their patients seriously

17   and extensively.  They used multimodal care.  Not just

18   opioids, not just the prescriptions, but they used multimodal

19   care, like the chiropractic care.  They have referrals to

20   outside sources.  They used the injection therapy --

21   sophisticated injection therapies by one of the most highly

22   trained specialists that we have in our state, and the

23   chiropractic care as well.  Multimodal care.

24        They provided access to patients.  They took in

25   referrals.  They were there for their patients, and they saw

1    them on a regular basis, and they saw them often when

2    necessary.  So there was access there.

3        They also treated their patients as individuals.  It

4    wasn't a one-size-fits-all.  You could see that the visits,

5    they were assessing information in that S-A-O-P [*sic*] format.

6    And they were reacting to information each visit as it goes

7    along in a team manner.

8        It wasn't just Dr. Siefert.  It was that whole team

9    there.  It included Dr. Ehn.  It included the medical

10    assistants.  It included the nurse practitioners.  Highly

11    trained, highly specialized team.

12        So they came in and they had comprehensive evaluations at

13    the beginning.  I can tell you, as somebody who's done this

14    for 30 years or so, those were some of the best inpatient --

15        MR. LYNCH:  Objection --

16    (Indiscernible crosstalk.)

17    A.   -- that I have seen.

18        MR. LYNCH:  -- this point.

19        THE COURT:  I'll overrule the objection.

20    A.   So those intake forms that you saw there were

21    outstanding.  They were very comprehensive, lots of

22    information there.  And then the follow-up visits, the forms

23    they used were really great forms.

24        Remember I told you, I think, yesterday or maybe last

25    week that when I was at the Mayo clinic, we handwrote our

MURPHY - Direct                                                    10-58

1    notes.  I wrote SOAP, put them in a little pneumatic tube

2    afterwards and sent them on to the next doctor they were going

3    to go see.  Handwritten notes.

4        These were handwritten in a form, and you could probably

5    tell that I could figure out most of what was going on there.

6    And I'm pretty sure that a doctor who writes what they're

7    putting on there can figure out and remember what they wrote

8    there.  So they were using the records which were -- which --

9    there was plenty of information there at each visit that was

10   subjective and objective in order to allow them to come up

11   with a good assessment and a plan of care, which was based on

12   sound medical judgment.

13       So --

14   Q.   Dr. Murphy, let me ask you a quick question too before --

15   go ahead.  Finish your answer and then I'll ask --

16   A.   Well, I was going to say, so in every aspect -- honestly,

17   in every aspect that I would look for in a specialized pain

18   clinic, it was there.  And I'm actually quite impressed at how

19   they set this up and what they did for their patients.

20   Q.   Thank you.  And as part of your work on this case, did

21   you also assist Dr. Siefert with the medical board

22   investigation?

23   A.   Yes.  That was -- well, that was in 2019 --

24   Q.   Correct.  Fair enough.

25   A.   -- I did that.

MURPHY - Direct                                                    10-59

1    Q.   Again, just to bring out the scope.

2              MS. GERDES:  Your Honor, I'm finished, and I

3    appreciate the time.

4              THE COURT:  We're going to take a break, ladies and

5    gentlemen.  We'll be in recess -- it is now 10:13.  We'll be

6    in recess for 15 minutes.

7         During the recess, continue to heed all the prior

8    admonitions of the Court.  Don't discuss the case.  Keep an

9    open mind until all the evidence is in and the case has

10   finally been submitted to you later for your consideration and

11   deliberation.

12        We'll be in recess for 15 minutes.

13        (The jury exited the courtroom at 10:14 a.m.)

14             THE COURT:  We'll be in recess for 15 minutes.

15        (Recess from 10:14 a.m. until 10:31 a.m.)

16             THE COURT:  Anything to take up before we bring the

17   jury back in?

18             MR. GLASSMAN:  Just a programming note, Your Honor.

19   As I've mentioned to Mr. Lynch, our first witness really must

20   leave the courthouse by 2:00 today at the latest.  And I think

21   we're going to be fine on timing, just talking with Mr. Lynch

22   about cross-examination.  But it's just a programming

23   logistical note.

24             THE COURT:  Okay.  That's fine.  I appreciate you all

25   working through that.

1              MR. LYNCH:  I don't think I would be on -- I would

2    anticipate it being finished before lunch, but it kind of --

3    there are factors somewhat outside of my control on that.

4              THE COURT:  Understood.  We'll just have he or she

5    first up or him first up.

6         Very well.  Bring the jury in, please.

7         Is this a witness you anticipate taking long?

8              MR. GLASSMAN:  Short.

9              THE COURT:  Short?  All right.  In the words of Judge

10   Hood, use brief, not short.  But since he's not here, you can

11   say short.

12             MR. GLASSMAN:  Thank you, Your Honor.

13        (The jury entered the courtroom at 10:33 a.m.)

14             THE COURT:  Mr. Lynch, you may proceed, sir.

15             MR. LYNCH:  All right.  Thank you, Your Honor.

16                       CROSS-EXAMINATION

17   BY MR. LYNCH:

18   Q.   Good morning, Dr. Murphy.  We have interacted on several

19   occasions before.  I think you remember that, right?

20   A.   Yes.

21   Q.   I want to start -- and you recall you were testifying in

22   a case last fall on behalf of another doctor accused of

23   overprescribing opioids.

24        Do you remember that?

25   A.   I've done -- I did cases last fall, yes.

1    Q.   Yes.  One case in which I was also involved; is that

2    correct?

3    A.   Would you tell me the case, please?

4    Q.   The Suetholz case.

5    A.   Yes.

6    Q.   In that case, my first question to you was -- the last

7    time I cross-examined you -- was to confirm that you believe

8    that heroin is medicine.  Do you remember that first question

9    I asked you on cross-examination?

10   A.   Not specifically.

11   Q.   Not specifically.  Do you remember your response was:

12   Heroin is absolutely medicine.

13        Do you remember that response?

14   A.   I don't remember exactly what my response was.

15   Q.   Would it refresh your recollection if I showed you the

16   transcript?

17   A.   Probably.

18   Q.   Okay.  I'm just going to pull up page 67 of the Suetholz

19   transcript.  I'm going to just read aloud, and you can read

20   along silently with me, Dr. Murphy.

21            MS. GERDES:  Objection.

22            THE COURT:  You're just using it to refresh his

23   recollection.

24            MR. LYNCH:  Okay.

25            THE COURT:  And once he's had his recollection

MURPHY - Cross                                              10-62

1    refreshed, you can remove it and then ask.

2              MR. LYNCH:  All right.  Fair enough.

3              THE WITNESS:  Yeah, I remember this.

4    BY MR. LYNCH:

5    Q.   So is your recollection refreshed?

6    A.   Yes.

7    Q.   Yes.  So your answer to my question in that last trial --

8    in the Suetholz trial, was, "heroin is absolutely medicine."

9              MS. GERDES:  Objection, Your Honor.

10             MR. LYNCH:  I'm confirming he did not --

11             THE COURT:  Overruled.  You may answer.

12   BY MR. LYNCH:

13   Q.   So the answer to my question, sir, the last time I asked

14   you the question, is heroin medicine, was "heroin is

15   absolutely medicine."  Is that correct?

16   A.   I don't -- could I see it again?

17             THE COURT:  Yes, you can.

18        Why don't you just point out the lines.

19             MR. LYNCH:  Yeah.

20             THE COURT:  And, jury, you're not to see this.  This

21   is just so he can refresh his recollection as to what he may

22   have said on a prior occasion.

23   BY MR. LYNCH:

24   Q.   Do you see line 23 there with your answer?

25   A.   Yes.

1   Q.   Heroin is absolutely medicine.

2           THE COURT:  A medicine.

3   Q.   Excuse me.  A medicine.

4           MR. LYNCH:  Thank you, Your Honor.

5   Q.   All right.  After that cross-examination, you had a

6   conversation with Ms. Gerdes about your opinions on heroin; is

7   that correct?

8   A.   I'm sorry.  What?

9   Q.   You had a conversation with Ms. Gerdes about your

10  opinions on heroin; is that correct?

11  A.   Yes.

12  Q.   And now here today, you -- or on Friday, you were talking

13  about, oh, well, actually, it's Heroin with a capital H,

14  versus heroin with a lower case H.  That was your testimony on

15  Friday; is that right?

16  A.   Yes.

17  Q.   All right.  To be clear, that wasn't a distinction that

18  you drew the first time I asked you that question in the fall;

19  isn't that correct?

20  A.   I don't know.  What you showed me, "Heroin" was a capital

21  H.

22  Q.   It was the beginning of a sentence, Doctor.

23  A.   It's a capital H.

24  Q.   All right.  Did you use the words "capital H" to refer to

25  heroin in that fall 2022 cross-examination?

1    A.   I don't know.  I can't remember.

2            THE COURT:  If he did, it would have been referenced

3    by the court reporter.

4            MR. LYNCH:  Exactly.  Thank you.

5            THE COURT:  But it was the first question asked.  By

6    rule, the court reporter usually capitalizes the first word in

7    every sentence.

8            MR. LYNCH:  Sure, okay.

9    BY MR. LYNCH:

10   Q.   You also believe that, although not ideal, if a person is

11   displaced from their pain clinic and that person thinks --

12   that person thinks they're going to die from withdrawal, they

13   would be justified in taking medicine from a nonmedical

14   source; isn't that true, sir?

15   A.   I can see a situation where that would be justified, yes.

16   Q.   And a nonmedical source -- one example of a nonmedical

17   source that could supply you heroin would be a drug dealer;

18   isn't that right?

19   A.   Unfortunately, that is correct.

20   Q.   Okay.  And that's under a circumstance only where a

21   patient, not a clinic, thinks that they need that heroin to

22   prevent them from having any sort of serious harm; isn't that

23   correct?

24   A.   No.

25   Q.   You haven't previously testified that if a patient thinks

1    they are going to suffer -- they are going to die from

2    withdrawal, that alone would be justification to go see a

3    heroin dealer or get heroin from a nonmedical source?  It's

4    your testimony you haven't testified to that in the past?

5    A.   I would have to see the testimony.

6    Q.   Let's pull up the testimony.  Do you recall testifying in

7    the La case?

8    A.   Yes.

9    Q.   Do you recall that was in -- that was another doctor

10   accused of overprescribing opioids; is that correct?  Or,

11   excuse me, not a doctor.  I believe it was a nurse

12   practitioner; is that right?

13   A.   No.  He was a doctor.

14   Q.   He was a doctor.  Okay.

15        In that case -- and you do recall, though, testifying in

16   that case in Tennessee?

17   A.   Yes.

18   Q.   All right.  I'm going to pull up page 72 of that

19   transcript.

20        Excuse me, page 77.  Apologies.

21        THE COURT:  You're using it to refresh his

22   recollection.  Why don't you identify the page and row.

23        MR. LYNCH:  Sure.

24   BY MR. LYNCH:

25   Q.   And actually, I'm going to start, Doctor, on page -- your

1    answer kind of begins on page 76.  Okay?  And this is all your

2    answer.  Take a moment to look at that.

3    A.    It's a little out of focus.

4    Q.    Oh, I'm sorry.  Is that helpful?

5    A.    Thank you.

6    Q.    So I'm going to flip to page 77, which is --

7    A.    I'm sorry.  I'm still reading.

8          Okay.  I'm done with that.  Thank you.

9    Q.    So this is the top of page 77.  Just to orient you,

10   Doctor, I'm focused on lines 1 through 7.

11   A.    Yes.

12   Q.    So fair to say that you have previously testified that if

13   a patient is displaced from a pain clinic and is worried about

14   going into withdrawal, that -- and potentially suffering

15   death -- they're worried about that, their subjective intent

16   is they're worried about that, they would be justified in

17   going to get heroin from a nonmedical source; is that correct?

18   A.    No.

19   Q.    Let me just -- did you previously testify, and I quote:

20   "If somebody is displaced from their clinic and they are going

21   through withdrawal and they are worried that they're going to

22   die because they're having such a horrible withdrawal, they

23   might have to get heroin from a nonmedical source."

24         Was that your testimony in the La case?

25   A.    Yes.

1    Q.   Thank you.  I'm going to move on from heroin.

2         Dr. Murphy, you testified a bit about this on direct.

3    You consider yourself a passionate activist on behalf of pain

4    patients and their providers.  You previously testified to

5    that?

6         THE COURT:  Why don't you just ask him if he --

7    Q.   You are a passionate activist on behalf of pain patients

8    and their providers, correct?

9    A.   Yes.

10   Q.   Part of your activism involves using your Twitter

11   account, correct?

12   A.   Yes.

13   Q.   And as you mentioned on direct, you do retweet articles

14   on Twitter; is that right?

15   A.   Yes.

16   Q.   All right.  I'm going to just show you very briefly --

17   you talked about this on direct examination as well.  I've

18   previously asked you about a retweet of an article by Josh

19   Bloom.  You referenced it on direct as well.

20        Do you remember that, talking about the retweet of an

21   article by Josh Bloom?

22   A.   Yes.

23   Q.   All right.  Let me just show you, for your benefit, that

24   retweet.

25        Can you see that okay?

1    A.   Yes.

2    Q.   And we've talked about this before, right, Dr. Murphy?

3              MS. GERDES:   Objection, Your Honor.

4              THE COURT:   Overruled.

5              MS. GERDES:   Only about the context of what they've

6    talked about before.  Again --

7              THE COURT:  Yes.  I'll --

8              MR. LYNCH:   Sure.

9              THE COURT:   Why don't you just ask.

10             MR. LYNCH:   Sure.

11             THE COURT:   The prior testimony at prior trials may

12   be relevant under the rules, but just referencing prior

13   testimony is inappropriate.

14             MR. LYNCH:   Okay.

15             THE COURT:   Sustained.

16             MS. GERDES:   Thank you.

17   BY MR. LYNCH:

18   Q.   All right.  This is an article that you retweeted off of

19   your Twitter account; is that right?

20   A.   No.

21   Q.   This is not an article that you retweeted on your Twitter

22   account?

23   A.   Correct.

24   Q.   Is your Twitter handle Confluential Truth?

25   A.   Yes.

*MURPHY - Cross*                                                            10-69

1    Q.   Does the top line of this document say "Confluential

2    Truth Retweeted"?

3    A.   Yes.

4    Q.   Does the content -- and you are Confluential Truth?

5    That's your Twitter handle?

6    A.   Yes.

7    Q.   And the content of this retweet states:  Apparently, the

8    DEA hasn't done enough harm in its war against pain patients.

9    But now, thanks to a new atrocious law, the agency has even

10   more power to screw things up.

11        Did I read that correctly?

12   A.   Yes.

13   Q.   Yes.  Below that content, there's a picture; is that

14   correct?

15   A.   Yes.

16   Q.   And there's a picture of prisoners in the Gulag; is that

17   correct?

18   A.   I'm not sure who the pictures are.  That's not my

19   picture.

20   Q.   The word "Gulag" appears in the picture?

21   A.   Yes.

22   Q.   And there are references to "I just asked for one pill."

23   And the implication behind the picture is that these are folks

24   who are being falsely imprisoned in the Gulag; is that fair?

25   A.   I don't know what that means.

1    Q.   Okay.  But there is a reference to the Gulag and the

2    atrocious regulations from the DEA, is that correct, in this

3    retweet?

4    A.   No.

5    Q.   Okay.  Let's move on.

6              THE COURT:  You can take that off.

7              MR. LYNCH:  Okay.

8    Q.   Do you remember the content of the article that is linked

9    to that Twitter reference?

10   A.   Not fully.

11   Q.   Okay.  Do you remember one way or -- do you remember

12   whether or not that article equates the DEA with the Gestapo?

13   A.   I don't remember.

14   Q.   Would it refresh your recollection if I showed you a copy

15   of the article?

16   A.   Yes.

17             MR. LYNCH:  May I approach and just show --

18             THE COURT:  You may.

19   BY MR. LYNCH:

20   Q.   Is it fair to say this is a copy of the article that

21   you -- that is the subject of the retweet?

22   A.   Yes.

23   Q.   Do you need a moment to review the article?

24   A.   No.

25   Q.   Go to page 3 of the article.  So this article, first of

1    all, is about suspicious opioid orders; is that right?

2    A.   Yes.

3    Q.   Okay.  And there's a reporting requirement for if you

4    order -- if, you know, an opioid prescriber, for example,

5    receives a suspicious order for opioids, the idea behind this

6    new law that's the subject of the article is that has to be

7    reported to the DEA; is that right?  Is that your

8    understanding?

9    A.   No.

10   Q.   Please -- what is your understanding?

11   A.   I don't really know.  This was a tweet that I've since

12   taken down.  And by the way, my --

13   Q.   I didn't ask you -- I just asked you to explain your

14   understanding of SORS, sir.  I didn't ask whether or not

15   you've subsequently taken down the tweet.  I understand that.

16   And that was after I first asked you about this tweet, right?

17   A.   Yes.

18   Q.   Okay.  My only question to you, sir, was SORS -- the

19   acronym SORS refers to suspicious order reports; is that

20   correct?

21   A.   I don't know.

22   Q.   Cut to the chase.  If you go to page 3 of the article, is

23   there a reference in this article to, "In other words" --

24   after the series of bullet points, a reference in the article

25   to, "In other words, anyone who might get within one ZIP code

1    of a Vicodin pill will be required to report any of the

2    following suspicious acts to the SORS Gestapo, where it will

3    go into a database."

4         Is that part of the content of this article?

5    A.   Yes.

6    Q.   The Gestapo were Nazi police during World War II; is that

7    right?

8    A.   I'm not sure who the Gestapo was.

9    Q.   All right.  Let me go into just one other area of your

10   activism that was talked about on direct.  You talked about

11   the poem about the ghost who stole pain care; is that right?

12   A.   Yeah.

13   Q.   All right.  And that poem, generally speaking, is about a

14   ghost that does not like pain care; is that correct?

15   A.   I think the poem -- the ghost doesn't understand pain

16   care.

17   Q.   Okay.  The ghost doesn't understand pain care.  Fair

18   enough.

19        I just want to give you -- do you recall a line in that

20   poem that reads, "The last thing" -- the ghost left.  He left.

21   "The last thing he left was the pain legislation to torment

22   and trigger the doc's resignation.  Then on to his ivory tower

23   he flew to judge those below from his smug point of view."

24        Do you remember that's a line in the poem, sir?

25   A.   I believe that is a line in the poem.

1    Q.    You're proud of the poem and the video that accompanies

2    it, correct?

3    A.    Yeah.

4    Q.    All right.  Let's talk about pain legislation.  In 2012,

5    in response to the opioid epidemic, Kentucky state legislature

6    passed a new series of regulations for pain clinics; is that

7    right?

8    A.    Yes.

9    Q.    And you're familiar with that.  Those are called,

10   generally, House Bill 1; is that right?

11   A.    Yes.

12   Q.    That law required many things.  We don't need to go

13   through every single thing it required, but one example is it

14   required doctors to use the KASPER system before prescribing

15   opioids, right?

16   A.    I'm not sure if that was a law before then or not, but I

17   believe that was part of the law.

18   Q.    Okay.  And there are other -- and, again, my point isn't

19   to go through every single thing that was a part of that law.

20   My main point is, though, that law imposed requirements on the

21   pain clinic that at the time you operated in Louisville in

22   Kentucky; is that right?

23   A.    Yes.

24   Q.    All right.  You think that that law, House Bill 1,

25   constitutes very restrictive pain legislation; is that

1  correct?

2  A.  Yes.

3  Q.  In fact, not only did you oppose that law, part of the

4  reason that you moved your clinic out of Louisville is because

5  of that law; isn't that correct?

6  A.  No.

7  Q.  Part of the reason -- you did not move -- part of the

8  reason.  I'm not saying the entire reason.  Part of the reason

9  that you moved your clinic from Louisville across the river to

10 another state, Indiana, was not because of the very

11 restrictive pain legislation?

12 A.  Correct.

13 Q.  So it's your testimony here today that that's not part of

14 the reason you chose to cease operating your clinic in

15 Kentucky?

16 A.  No.  That's not true either.

17 Q.  Is it your testimony here today that part of the reason

18 you ceased to operate your clinic in Kentucky was because of

19 House Bill 1?

20 A.  Yes.

21 Q.  Okay.  You provided an expert report in advance of this

22 case; is that correct?

23 A.  Yes.

24 Q.  Your expert report does not address any Kentucky laws or

25 regulations on the prescribing of controlled substances; is

1    that correct?

2    A.   I would have to look at it.  I don't know.

3    Q.   Do you have a copy of the report in front of -- your

4    expert report in front of you?

5    A.   Yes.

6    Q.   Do you want to take a quick look?

7    A.   Okay.

8    Q.   Your expert report does not address Kentucky regulations

9    on the prescribing of controlled substances, correct?

10   A.   That is incorrect.

11   Q.   Tell me where in the report it references Kentucky rules

12   on the prescribing of controlled substances.

13   A.   Well, it may be more than one place, but definitely on

14   page 6 and definitely on page 30.

15   Q.   Oh, the reference to House Bill 1 in the References

16   section of the report; is that right?

17   A.   That's on page 6.  I've referenced House Bill 1 -- in the

18   report I gave you, I referenced House Bill 1.  And then on

19   page 30 is where -- it's at least one instance where I talk

20   about something that harkens back to the reference to House

21   Bill 1, which I gave you -- which I gave to counsel, which I

22   assume was for you, in my report.

23   Q.   Aside from those -- is there any reference to Kentucky

24   administrative regulations on, for example, what you're

25   supposed to do if a urine drug test reveals noncompliance?  Is

1    that referenced in your report?  We've got those two

2    references, one reference to House Bill 1, and one

3    reference -- a cross-reference to House Bill 1.  Anything

4    other than that?

5    A.   I'm sorry.  That's a couple questions.  Would you ask me

6    again, please?

7    Q.   Is there any reference in your report to Kentucky

8    administrative regulations related to what a doctor is

9    supposed to do if a urine drug test reveals noncompliance with

10   the prescribing plan by the patient?  Is that referenced in

11   your report?

12   A.   I don't think so.

13   Q.   Thank you.  And to be clear, these Kentucky regulations

14   or rules, whatever you want to call them, on the prescribing

15   of controlled substances, they're stricter than the national

16   guidelines, such as those put out by the Centers for Disease

17   Control; is that correct?

18   A.   Yes.

19   Q.   Okay.  Dr. Murphy, I want to move into a slightly

20   different area about payment.  As you testified on direct, you

21   are often paid to testify on behalf of doctors accused of

22   overprescribing opioids; is that correct?

23   A.   I don't know what the term "often" would mean.  But, yes.

24   I have testified in the past on several occasions where

25   doctors have been accused of prescribing -- of

1    overprescribing.

2    Q.   And if you charge by the hour, you're charging 500 per

3    hour; is that correct?

4    A.   If I were to charge by the hour --

5    Q.   Yes.

6    A.   -- I quoted -- I usually quote a $500 per hour fee.

7    Q.   And generally speaking, at least recently, you're paid a

8    total of about $26,000 for a case that goes to trial?

9    A.   It varies.  I was paid $26,000 for this case.

10   Q.   Right.  Okay.  And I think that you testified on direct

11   that in the last four years, you've testified 16 times on

12   behalf of medical providers accused of overprescribing

13   opioids.  Does that sound about right?

14   A.   I think somewhere in that neighborhood, yes.

15   Q.   Okay.  And so rough math, at 26,000 for a trial, that's

16   around $480,000 you've made for testifying on behalf of

17   doctors accused of overprescribing; is that right?

18   A.   No.

19   Q.   What is the ballpark estimate of how much you've made for

20   that testimony?

21   A.   I don't know.  I don't -- I don't get that much every

22   time.

23   Q.   300,000?  More or less than 300,000?

24   A.   I don't know.

25   Q.   You don't know?  Okay.  You can't -- you have no idea

1  here today how much money you've made from this type of

2  testifying work that you've done?

3  A.   I know how much I was paid for this case and what I

4  generally ask.  I haven't added it all up.

5  Q.   All right.  Now, right after this case, you're going to,

6  I assume, jump in your car and drive to Nashville to testify

7  in another case for another doctor who's accused of

8  overprescribing opioids tomorrow; is that right?

9  A.   That's what I think will happen.

10 Q.   And that will be another, what, $26,000 for your

11 testimony in Nashville?

12 A.   No.

13 Q.   Less?

14 A.   Yes.

15 Q.   Okay.  How much are you making off of the Nashville

16 testimony?

17 A.   I don't know.  I think it's 18,000.

18 Q.   18?  Okay.  All right.

19 A.   But that's for all of the work I've done, not just the

20 testimony.

21 Q.   Okay.  And that also means, if I'm doing this right, you

22 were not able to work on Friday because you were scheduled to

23 testify here; is that right?  You were not able to perform any

24 clinical work on Friday; is that correct?

25 A.   No, that's incorrect.

1    Q.   Okay.  Are you just kind of doing that after hours?  Is
2    that what you're doing?
3    A.   Yes.
4    Q.   Okay.  I think -- moving on to a slightly different area,
5    as you said on direct you've never testified on behalf of the
6    government in a case where a doctor is accused of
7    overprescribing or improperly prescribing opioids; is that
8    right?
9    A.   Yes.
10   Q.   Instead, you've only testified on behalf of doctors
11   accused of improperly prescribing controlled substances; is
12   that right?
13   A.   No.
14   Q.   You haven't only -- well, if you were testifying on
15   behalf of a doctor accused of overprescribing, it's going to
16   be on behalf -- if you're testifying in a case that involves a
17   doctor overprescribing opioids, that testimony would be on
18   behalf of the doctor; is that right?
19   A.   No.
20   Q.   So you have -- is it your testimony that you have
21   testified in the past on behalf of the government?
22   A.   No.
23   Q.   No.  All right.
24        THE COURT:  I think what he means, "on behalf of,"
25   you're calling -- you are testifying -- you were called by

MURPHY - Cross                                                          10-80

1    Defendant Siefert.  You weren't called by Mr. Lynch.  I think

2    what he's getting at -- I mean, your direct exam was by the

3    defendant.  Your cross-exam was by the prosecutor.

4         Have you ever been directed, your first time you

5    testified, by the prosecutor in a case?  Do you recall?

6              THE WITNESS:  No.

7              THE COURT:  Okay.  There we go.

8              MR. LYNCH:  Okay.

9              THE COURT:  If we ask a specific question, we might

10   get a specific answer.

11             MR. LYNCH:  Thank you for clarifying.

12             THE COURT:  Just trying to move this along.

13             MR. LYNCH:  All right.

14   BY MR. LYNCH:

15   Q.  In the last 20 years, there have only been four or five

16   occasions in which you have declined to work on behalf of a

17   doctor accused of overprescribing opioids; is that correct?

18   A.  No.

19   Q.  It's more than that?

20   A.  Yes.

21   Q.  How many more than four or five times?

22   A.  Over what period of time?

23   Q.  Since 2016.

24   A.  It's hard to say.  10, 15, somewhere in that ballpark.

25   Q.  And have you previously testified that it was only

1    four -- as of 2020 -- as of the end of 2020, was it only four

2    or five times?

3    A.   I don't know.

4    Q.   You don't know.  Would it refresh your recollection to

5    look at a transcript of your testimony from late 2020 on that

6    issue?

7    A.   Yes.

8    Q.   Do you recall testifying in the Houdersheldt case in West

9    Virginia?

10   A.   Yes.

11   Q.   And that wasn't a trial.  That was a sentencing hearing;

12   is that right?

13   A.   To my understanding, that is correct.

14   Q.   I'm going to direct you to page 415, lines 11 through 24

15   of this testimony.

16        Just to remind you, Doctor, I'm looking at lines 11

17   through 22.

18   A.   I remember this.

19   Q.   Okay.  Just to refresh your recollection, do you see the

20   date on this?  This is December 10th of 2020?

21   A.   Yes.

22   Q.   All right.  Is it fair to say, as of December 10th of

23   2020, you had only declined to support a doctor accused of

24   overprescribing opioids on four, maybe five occasions?

25   A.   No.

1  Q.   Did you previously testify -- did you previously respond

2  to the following question -- let me just read this question

3  and response.

4       Question:  In any of those circumstances, either in

5  consultation or court, have you declined to support a doctor

6  accused of overprescribing opioids?

7       Answer:  Well, on several occasions.

8       How many, ballpark?

9       Oh, four.

10      Four?  Question.

11      Answer:  Five, maybe.

12      Did I read that correctly, sir?

13 A.   Not really.

14 Q.   Did you respond to the question, "How many, ballpark,"

15 referring to when you have declined to support a doctor

16 accused of opioids, with "four, maybe five"?

17 A.   No.

18 Q.   I'm going to move on.

19      Finally, you have testified on behalf of the

20 pharmaceutical manufacturer, Purdue Pharma; is that correct?

21 A.   I don't think that was testimony.  I'm not sure what that

22 was, really.  That was a long time ago.

23 Q.   You submitted a declaration on behalf of Purdue Pharma;

24 is that correct?

25 A.   I remember writing a letter or something.  And their

1    lawyers asked me to write it so I wrote something for their --

2    that their attorneys asked me to write.

3    Q.   And that's Purdue Pharma, the manufacturer of OxyContin;

4    is that right?

5    A.   Yes.

6    Q.   And that lawsuit, you submitted a declaration in that

7    lawsuit, right?

8                MS. GERDES:  Objection.  That wasn't the testimony.

9                THE COURT:  Hold on.  Let me look.

10       "Writing a letter or something."  Overruled.  Six of one,

11   half a dozen of the other.

12   BY MR. LYNCH:

13   Q.   Did you make a written submission to Purdue's lawyers in

14   litigation between Purdue Pharma and the state of Kentucky?

15   A.   I believe so.

16   Q.   Okay.  And that litigation involved Purdue's

17   manufacturing of the drug OxyContin; isn't that right?

18   A.   No.

19   Q.   Didn't involve -- well, isn't it true that the State of

20   Kentucky in that litigation was suing Purdue Pharma for

21   Kentucky Medicaid having to pay for OxyContin that was being

22   prescribed to people who did not have a medical need for that

23   OxyContin?

24   A.   I don't know what the lawsuit said.

25   Q.   You don't know anything about the lawsuit that you

1    submitted a declaration -- or that you made a written

2    submission on behalf of?

3    A.   Yes.

4    Q.   You don't know anything about it?

5    A.   No, I know something about it.

6    Q.   Okay.  Let me ask you about your written submission.  To

7    be clear, in that lawsuit, you were supporting that opioid

8    manufacturer, Purdue Pharma; is that right?

9    A.   No.

10   Q.   You weren't supporting -- who was paying you -- did you

11   receive payment in exchange for making a written submission in

12   that lawsuit?

13   A.   I'm fairly sure that I did.

14   Q.   You received payment.  And that payment came from Purdue

15   Pharma; isn't that right?

16   A.   I don't know where it came from.

17   Q.   You don't know where the money came from?

18   A.   I think it came from the lawyers.

19   Q.   Who do you think the lawyers got the money from?

20        MS. GERDES:  Objection.

21        THE COURT:  Overruled.

22   BY MR. LYNCH:

23   Q.   Dr. Murphy, if a company, Purdue Pharma, has lawyers and

24   those lawyers are giving you money, don't you think the money

25   is coming from Purdue Pharma?

1    A.   You know, I think perhaps, but I don't -- I mean, I don't

2    know where the money comes from.  I mean, that's not what I --

3    Q.   Okay.  Fine.  You don't know where the money for the

4    Purdue lawsuit came from, but you do know you got it from

5    Purdue's lawyers; is that right?

6    A.   Yes.

7    Q.   The money that you got from Purdue's lawyers, let's talk

8    about the declaration that you submitted in exchange for that

9    money.  Okay?

10        Dr. Murphy, for your benefit, I'd like to give you just a

11   copy of your declaration.  Is that fair?

12             MR. LYNCH:  May I approach, Your Honor?

13             THE COURT:  You may.

14   BY MR. LYNCH:

15   Q.   Dr. Murphy, this is the written submission we were

16   talking about a moment ago; is that right?

17   A.   Yes.

18   Q.   And does this look like -- you know, we're going to

19   clarify this.  This is a little bit more than a letter.  It's

20   a declaration; is that right?

21   A.   It's an affidavit.

22   Q.   It's an affidavit.

23   A.   I'm not sure what that actually means.

24   Q.   Why don't you just go to the last page of that affidavit.

25   And you see you signed it?

1    A.   Yes.

2    Q.   As an affidavit.  You submitted this affidavit after --

3    in this litigation.  Does that make sense to you?

4    A.   Yes.

5    Q.   All right.  I want to go to paragraph 16.  In that

6    affidavit in paragraph 16, it states, "If a physician

7    prescribes an opioid analgesic in doses that are inappropriate

8    for a legitimate pain patient, there should be noticeable

9    consequences that are apparent to the patient.  If the dose is

10    too low, the patient will usually complain of inadequate pain

11    relief.  If the dose is too high, the patient will usually

12    complain of side effects such as excessive sedation, nausea,

13    or euphoria."

14         Do you see that paragraph?

15    A.   Yes.

16    Q.   Your declaration?

17    A.   Yes.

18    Q.   Fair to say that there were plenty of people in Kentucky

19    who had too high of a dose of opioids, and they were not

20    exhibiting the side effects that you refer to here?

21    A.   Correct.

22    Q.   In fact, there were plenty of people in Eastern Kentucky

23    who would complain that they had inadequate pain relief from

24    high doses of oxycodone; isn't that correct, sir?

25    A.   I'm certain that is correct.

1    Q.   And that's because part of what was going on here was

2    that Purdue Pharma was encouraging doctors to overprescribe

3    opioids; isn't that correct?

4              MS. GERDES:  Objection, Your Honor.

5              THE COURT:  Sustained.

6              MR. LYNCH:  I'll move on, Your Honor.

7         Can I retrieve that declaration?

8              THE COURT:  You may.

9    BY MR. LYNCH:

10   Q.   I'll move into a different area, Dr. Murphy.  For the

11   clinic you operate in Indiana, you have a website; is that

12   correct?

13   A.   Yes.

14   Q.   And on that website, there's information related to --

15   there's a new patient packet that you can obtain from your

16   website; is that right?

17   A.   Yes.

18   Q.   And that new patient packet -- you know, it's about a

19   20-ish page document that you give to your new patients.

20   Fair?

21   A.   Yes.

22   Q.   Okay.  And you drafted much of that document; is that

23   right?

24   A.   Yes.

25   Q.   All right.  And you generally stand by what it states in

1    the document; is that right?

2    A.   Generally.

3    Q.   Yes.

4    A.   There are some things that I've changed since that was

5    published.

6    Q.   Okay.  Let me -- I want to ask you a couple questions

7    about the document.  It's a long document.  We'll pull up

8    individual pages on the screen, Dr. Murphy, but I'm going to

9    just --

10             MR. LYNCH:  With the Court's permission, just give a

11   copy of the packet to Dr. Murphy so he can refer to the

12   different pages.

13             THE COURT:  Very well.

14   BY MR. LYNCH:

15   Q.   Take a moment to look through that document, Dr. Murphy.

16        Okay.  This is the document that you can obtain by

17   downloading the new patient packet from your website.  Fair?

18   A.   No.  It's been updated since this.

19   Q.   It's been updated since this?

20   A.   I'm almost -- almost positive that is correct.

21   Q.   Okay.  Well, let's go through -- okay.  Let's go through

22   a couple of -- let's see if there are any issues with the

23   portions that I'm going to cite, okay?

24        And just for your benefit, Dr. Murphy, I've given you

25   sort of this entire packet.  But we can pull up -- we'll pull

1    up the specific pages on the monitor so you can -- because

2    this document is not paginated; is that correct?

3    A.   I'm sorry.  What?

4    Q.   This document is not paginated, right?

5    A.   I'm not sure what you mean by that.

6    Q.   There are no page numbers on the bottom of many pages of

7    the document.  It's not sequentially --

8    A.   Not the whole package you gave me.

9    Q.   Yes.  I want to start on page 6.  At the bottom of

10   page 6, this document as a whole -- the document that appears

11   on page 6, do you see it on the monitor there?

12   A.   Yes.

13   Q.   And it's your Informed Consent for Controlled Substances

14   Therapy document; is that right?

15   A.   It's a combination of the agreement and the informed

16   consent.

17   Q.   Sure, okay.  I want to direct your attention to the

18   bottom of that page in the section note referencing added risk

19   of higher dosages.  Do you see that section?

20   A.   I don't see the word "added risks."

21        Oh, there.  I'm sorry.  Of course, in the title.  Yes.

22   Thank you.

23   Q.   We're on the same page?  You know the section I'm talking

24   about?

25   A.   Yes.

1    Q.   All right.  Is this section -- has this section been

2    updated, to your recollection?

3    A.   Yes.

4    Q.   It has?

5    A.   Yes.

6    Q.   How has it been updated?

7    A.   I have better explained, I think, in the update what

8    morphine equivalent dose means for the patient.  And so I've

9    updated that section.

10   Q.   Okay.  Let me read what this version says, and I'm just

11   going to ask if you stand by generally what's in the

12   statement.

13        It says, "I understand that the use of high-dose opioids

14   for chronic opioid therapy is controversial and is not

15   recommended without a demonstrated need and a plan for

16   appropriate monitoring."

17        Do you still stand by that statement?

18   A.   Yes.

19   Q.   Next sentence, "I understand that many respected

20   clinicians do not believe long-term use of these medications

21   is beneficial for chronic pain."

22        Do you still stand by that statement?

23   A.   Yes.

24   Q.   Next sentence, "The need for progressively higher opioid

25   dosages may be a result of progression of the underlying

*MURPHY - Cross*                                                    10-91

1    condition, the development of tolerance, a psychiatric

2    condition, or may indicate substance use disorder or unlawful

3    diversion."

4         Do you stand by that sentence?

5    A.   Yes.

6    Q.   Okay.  You said you've updated -- you've explained a

7    little better the next sentence, I think, about morphine

8    equivalent dose; is that right?

9    A.   Yes.

10   Q.   The last sentence I want to confirm your understanding of

11   states, "And I understand that if my prescribing clinician

12   elects to provide or continue providing opioid therapy at a

13   morphine equivalent dose of more than 60 MME, my risks

14   associated with opioid therapy, including my risk of dying,

15   are substantially increased."

16        Do you still stand by that statement, sir?

17   A.   No.

18   Q.   You no longer stand by that statement?

19   A.   Correct.

20   Q.   It's a previous statement that you've made, though, in

21   the agreement you sign with your patients; is that right?

22   A.   This was in 2014.  So this was -- this was created by me

23   in -- February 17, 2014.

24   Q.   Okay.  That's a statement that you previously stood by,

25   though; is that correct?

1    A.   I put that in my agreement and my controlled substance

2    therapy so that the patients would understand the risks of

3    higher dose opioids.

4    Q.   Okay.  In a similar vein, you have your patients sign a

5    controlled substance agreement as part of this new patient

6    packet.  I want to go to page 8.  It's going to pop up on the

7    monitor there.

8         Does this look familiar to you?

9    A.   Yes.

10   Q.   Okay.  I want to just highlight the "no illicit

11   substances" section that's being called out to you there.

12        Do you see that?

13   A.   Yes.

14   Q.   That section says, "I will not use any illicit substances

15   such as cocaine, marijuana, et cetera.  I understand that the

16   use of alcohol together with opioid medication is dangerous

17   and can lead to death."

18        Do you still stand by that statement?

19   A.   I ask the patients to acknowledge that, and I agree that

20   it -- that it's dangerous and can lead to death.

21   Q.   All right.  Your new patient packet also refers to the

22   fact that patients can expect mandatory and random office

23   visits for pill counts or urine drug screens; is that correct?

24   A.   Yes.  This says, "Patients should expect mandatory and

25   random office visits for pill counts and/or urine drug

1   screens."

2   Q.  You also can't ignore unexpected results in a urine drug

3   screen, right?

4   A.  Well, you shouldn't.  It can happen, but you should not

5   ignore any lab result regardless of what it is.  Whether it be

6   an MRI or anything.

7   Q.  Right.  But that would include urine drug tests, correct?

8   A.  Yes.

9   Q.  In addition, as part of your treatment, you also

10  typically get records from other medical providers who have

11  treated the patient; is that right?

12  A.  Yes.

13  Q.  And getting all records on a patient is, in your opinion,

14  definitely recommended?

15  A.  No.

16  Q.  Okay.  It's your testimony that getting all medical

17  records on a patient is not generally recommended?

18  A.  I don't agree with that statement.

19  Q.  All right.  Do you recall -- I'm going to pull up your

20  testimony from the Suetholz trial.  I'm going to go to

21  page 115, line 24.

22          MS. GERDES:  Objection.  There's no inconsistency,

23  Your Honor.  I don't believe it's proper impeachment.

24          MR. LYNCH:  Your Honor --

25          THE COURT:  Hold on.

1        MR. LYNCH:  The line that's --

2        THE COURT:  Hold on.

3        MR. LYNCH:  Sure.

4        THE COURT:  I'll allow it.  Overruled.

5   BY MR. LYNCH:

6   Q.   All right.  Dr. Murphy, I'm going to read silently -- I'm

7   going to read aloud while you read along silently with me.

8        The question I asked you in that was:  But the best

9   practice is to get other medical records, correct?

10       Your answer:  It's a good practice.  It's recommended,

11  definitely, that you try to obtain all records.

12       Do I read that correctly, sir?

13  A.   It's gone.  I can't see it anymore.  I apologize.

14  Q.   It's recommended, definitely, that you try to obtain all

15  records.

16       Did I read that correctly, sir?

17       THE COURT:  It's up top with a little line, 1, 2, 3.

18       MS. GERDES:  Line 7, Your Honor.  He's taking this

19  out of context.

20       THE COURT:  So you can certainly inquire on redirect

21  if you wish to go and follow this up, if you want.

22       MS. GERDES:  Sure.

23       THE COURT:  He did mention "all" earlier, and this is

24  just correcting that.  So very specific.  Very specific.

25       Go ahead.

1   BY MR. LYNCH:

2   Q.   Okay.  And you want to -- you generally want to get all

3   these other records because you're not just going to rely on

4   what the patient tells you they've tried before, whether it's

5   worked.  You want to get the other physician's input -- the

6   physician who's created the other records; is that correct?

7   A.   No.

8   Q.   You're generally not going to -- you're generally just

9   going to rely on what the patient tells you?

10  A.   No.  I rely on the records as well.

11  Q.   That's all I was getting at.  In fact, getting what the

12  other physician might have noted about the patient is a very

13  important part of the information-gathering process; is that

14  correct?

15  A.   It can be.

16  Q.   Okay.  I want to talk briefly about benzodiazepines.  In

17  your new patient packet -- we're just going to go ahead and

18  pull that up again real quickly on page 4.

19       In your new patient packet, you include a statement about

20  benzodiazepine use that includes the following:  "You, the

21  patient, are cautioned that ingesting other substances such

22  as" --

23            THE COURT:  That's awfully small.  Can we make that a

24  little bigger for the witness?

25  Q.   While they're looking for the reference, let me just move

1    on to something else.

2        You've previously estimated that you see an average of

3    about 200 patients a month, is that about right, through your

4    clinic?

5    A.   Not anymore.

6    Q.   Not anymore.  How many patients are you seeing now?

7    A.   We see anywhere between -- and by "see," meaning we

8    evaluate.  Because with COVID, we can't really -- we haven't

9    been able to see them on a regular basis, face-to-face.  But

10    we follow up with about 100 to 150 now each month.

11    Q.   So it's a lower month, okay.

12        But of that patient population, say it's 150, you

13    personally would only be prescribing opioids and

14    benzodiazepines to approximately four or five of them; is that

15    right?

16    A.   I'm sorry.  What?

17    Q.   Of that patient population -- of your patient population

18    of about 150, you would only be prescribing a combination of

19    opioids and benzodiazepines to around four or five of them; is

20    that right?

21    A.   That's probably about right.  That's pretty close to.

22    Q.   And when asked to identify the maximum dosage of a

23    benzodiazepine you have prescribed to a patient, you've

24    identified that it's probably around 10 milligrams of Valium

25    per day.  Is that about right?

1    A.   I would say currently, that's correct.

2    Q.   Okay.  Finally, if you're asked to take over

3    benzodiazepine prescribing, you will generally taper out the

4    benzodiazepines; is that correct?

5    A.   Yes.

6    Q.   Okay.  Let me bring up another document.  You previously

7    wrote a letter to the editor of Pain Medicine magazine about

8    compliance; is that correct?

9    A.   Yes.

10   Q.   Okay.  I'll pull that up.  This is that document?

11   A.   Yes.

12   Q.   Okay.  And your letter to the editor includes what's

13   called a mnemonic device; is that right?

14   A.   Yes.

15   Q.   And a mnemonic device is sort of -- you know, the

16   mnemonic device here is COMPLIANCE, the word "compliance"; is

17   that right?

18   A.   Yes.

19   Q.   And the idea behind a mnemonic device is you have

20   something for each of the letters in the word "compliance"; is

21   that right?

22   A.   Yes.

23   Q.   All right.  So just several examples -- and the idea here

24   is this is how a doctor can remain sort of compliant in the

25   way they're prescribing opioids; is that correct?

1    A.   No.

2    Q.   Is the compliance mnemonic helpful, in your opinion, to

3    avoiding problems with regulators, for example, in the

4    prescribing of controlled substances?

5    A.   I believe it is.

6    Q.   Okay.  So in this mnemonic, the "M" in compliance stands

7    for medical records are accurate, complete, and accessible.

8    A.   Yes.

9    Q.   Is that correct?

10    A.   Yes.

11    Q.   I don't think I got a full tally, Dr. Murphy, of this,

12    but I think I counted about 20 times on your direct

13    examination where you struggled to read the medical notes that

14    were talked about on direct.  Is that about -- is that a rough

15    good tally of how many times you struggled to decipher some of

16    those medical notes?

17    A.   I don't know.

18    Q.   You don't know?  You struggled quite a bit with the

19    medical notes you were reviewing on direct examination.  Fair?

20    A.   No.

21    Q.   No?

22    A.   I didn't struggle with them.

23    Q.   You couldn't -- you didn't have trouble deciphering

24    various words at various points during the direct examination?

25    A.   Not very often.

1    Q.   Not very often.   Okay.

2         The "A" in compliance stands for addiction risk

3    assessment is ongoing; is that correct?

4    A.   Yes.

5    Q.   Okay.   Fair to say, Dr. Murphy, that there was a lot of

6    testimony on direct examination about how some of these

7    patients receive, for example, facet joint injections, other

8    types of injections, MRIs, other diagnostic and therapeutic

9    tests.

10        Do you remember that testimony?

11   A.   Yes.

12   Q.   Okay.   Those types of treatments can continue even if you

13   make the decision to stop prescribing those -- a patient

14   opioids; isn't that correct?

15   A.   Yes.

16   Q.   Yes.   You can -- and one of the reasons that you might

17   decide to stop prescribing opioids to a patient who's also

18   receiving facet injections is because you're constantly

19   assessing their risk for addiction.   And if something suggests

20   to you that they are engaging in addictive behaviors, for that

21   patient, it might not make sense to continue prescribing them

22   controlled substances; is that correct?

23   A.   Yes.

24   Q.   Okay.   Finally, the "N" in compliance is that

25   nonaddictive medicines have proven inadequate or unacceptable;

1    is that correct?

2    A.   It's the word "medications."  So it's generally correct,

3    what you said.

4    Q.   Sure.  Fair enough.  Okay.  And at the end of this

5    letter, you state, and I'm just going to quote it.

6         "In this day of, quote, if it wasn't written down, it

7    wasn't done, cognizance of the COMPLIANCE mnemonic should help

8    busy physicians apply and record the recommendations set forth

9    by both of these important clinical guides."

10        Did I read that correctly?

11   A.   Yes.

12   Q.   All right.  I want to move into some of your opinions in

13   this specific case, Dr. Murphy.

14        You were asked to opine on the prescribing to a number

15   of -- the prescribing of controlled substances, excuse me, to

16   a number of Dr. Siefert's patients; is that right?

17   A.   Yes.

18   Q.   Okay.  And those opinions are encompassed in the expert

19   report we talked about earlier; is that right?

20   A.   Yes.

21   Q.   Okay.  How many of the patients that you reviewed --

22   whose files you reviewed were previously incarcerated?

23   A.   I have to correct the last answer I gave.  There were

24   some opinions I gave about patients that I reviewed the

25   records, but I did not include them in my report.

1        I think I just comment in my report to you on the

2    patients that were indicted, to be fair.

3    Q.   Fair enough.  Let me go ahead and reask that question.

4        How many of the patients that you reviewed were

5    previously incarcerated?

6    A.   One I know of.

7    Q.   Okay.  When was that patient incarcerated relevant to --

8    relative to when he or she received opioids from Dr. Siefert?

9    A.   Well, the one I recall is Gary Bitter.  And I saw --

10   noted that he had been incarcerated for, I think, 60 to 65

11   days, something in that ballpark, before he saw Dr. Siefert on

12   the last visit.

13   Q.   Before he saw Dr. Siefert on the last visit.

14   A.   Yes.

15   Q.   Okay.  So that was during the time that he was receiving

16   controlled substance prescriptions from Dr. Siefert or before?

17   A.   Well, it was during the time he was under the care of

18   Dr. Siefert.  I don't think he got prescriptions from

19   Dr. Siefert while he was in jail.

20   Q.   Okay.  How many patients that you reviewed had previously

21   been considered for Suboxone treatment?

22   A.   I know that in Gary Bitter's chart, he talks about

23   Suboxone.  And I recall there may have been one that had been

24   on it, but I don't recall specifically who was on or had been

25   considered for Suboxone.

1  Q.   Did you reference the fact that patients -- in your

2  report, did you reference the fact that patients could be

3  considered for Suboxone treatment?

4  A.   Not to my recollection.

5  Q.   Okay.  How many patients had notes in their medical

6  records indicating that they had had at least one DUI?

7  A.   I recall at least one.

8  Q.   Who is that?

9  A.   I'd have to look at my report or look at the record.

10  I --

11  Q.   You don't remember here today which --

12  A.   I don't -- that may not have been in my report.  So I

13  would have to be just recollecting it so -- but in the

14  patients that we discussed, I do recall there being one

15  patient who had reported a DUI.  But I can't remember which

16  one it actually was.

17  Q.   Okay.  That information, though, about DUI isn't in your

18  expert report; is that right?

19  A.   I don't think it is.

20  Q.   All right.  How many patients had been discharged from a

21  prior practice for testing positive for unprescribed

22  medications of those you reviewed?

23  A.   I know at least one.

24  Q.   Who is that?

25  A.   Because they talked about it.

1      I can't remember exactly which one it was.

2   Q.   You don't remember which one it was?

3   A.   No.  I can't remember with certainty which one it was.

4   Q.   And the fact of the prior discharge is also not mentioned

5   in your expert report; is that correct?

6   A.   I don't think it was.

7   Q.   Okay.

8            THE COURT:  Will the attorneys approach, please?

9            (Sidebar conference.)

10           THE COURT:  Let the record reflect we're at the

11   bench.  I was just looking at the clock and thinking about the

12   possibility of taking your witness out of turn, even though

13   it's still during -- still part of the government -- the

14   defendant's case just to accommodate your witness.

15       We're going to be breaking at some point for the lunch

16   break.  And I know you're just now starting on the patients.

17   So whether or not you're going to get into some other things

18   that -- well, at any rate, I'm not going to suggest anything.

19       But ultimately, your witness is here?

20           MR. GLASSMAN:  He was here.  I think we told him to

21   go out and get something to eat, but we can go get him if you

22   want.

23           THE COURT:  Well, I'm just trying to accommodate your

24   witness.

25           MR. GLASSMAN:  Thank you, Your Honor.

1          THE COURT:  Would you be adverse to that, perhaps

2     figuring out a decent stopping point and then taking him out

3     of turn so that he can be on and off, and then we can take our

4     break for lunch and bring back Dr. Murphy for cross?

5          MR. LYNCH:  Sure.  What time would you want me to --

6          THE COURT:  Well, I'm just trying to figure out -- I

7     thought he was here.

8          MR. GLASSMAN:  He was.  The other possibility, Judge,

9     is if we wanted to take him, like, first right after lunch, if

10    we did lunch until, like, 1:15 or something.

11         THE COURT:  Or just take him out of turn and bring

12    him back.  We can do that.

13         MR. GLASSMAN:  Yeah.

14         THE COURT:  We'll do that.  We'll just plan on -- we

15    can break here -- gosh.  It's just now 11:40.  You probably

16    have an hour more, I would guess?

17         MR. LYNCH:  I can't remember what page I'm on.

18    Maybe, yeah.

19         THE COURT:  You have pages of notes versus reacting

20    on cross?  I guess that the perils of being a DOJ lawyer --

21         (Indiscernible crosstalk.)

22         THE COURT:  One at a time.

23         Okay.  What we'll do, we'll go for about ten more minutes

24    and then break and then we'll -- I'll tell the jury we're

25    going to call a witness out of turn, and then we'll resume

 1    with cross-examination at that time.

 2              MR. GLASSMAN:  Thank you so much, Your Honor.

 3              MS. GERDES:  Thank you.

 4              MR. LYNCH:  So I'll get to a breaking point around

 5    11:50.

 6              THE COURT:  That's fine.

 7         (Sidebar concluded.)

 8              THE COURT:  We have a witness who's here that needs

 9    to be taken out of turn, and I'm trying to coordinate with the

10    lawyers about how we're going to do that.  We're going to go

11    for about ten more minutes and then we're going to break for

12    lunch.

13         Go ahead.

14    BY MR. LYNCH:

15    Q.   How many patients, Dr. Murphy, had months-long gaps

16    between prescriptions from Dr. Siefert?

17    A.   I believe, of the ones I reviewed, at least two.

18    Q.   And who were those?

19    A.   Well, I think Gary Bitter.  And then there was the

20    patient who was gone for six months and then returned.  So --

21    Q.   Okay.  Those gaps in the prescribing are not mentioned in

22    your expert report; is that right?

23    A.   I don't think so.

24    Q.   How many patients were turned away from the St. Elizabeth

25    emergency room after trying to negotiate for a narcotic

1    medication?

2    A.    I seem to recall that Gary Bitter was.

3    Q.    Okay.  That was not referenced in your report?

4    A.    I don't think so.

5    Q.    Okay.  Let's talk about Gary Bitter.  If you go to

6    page 12 of your report.

7          Bottom of page 12, Dr. Murphy, that's where you sort of

8    include your summary of Mr. Bitter; is that right?

9    A.    Yes.

10   Q.    Okay.  And you say in the summary, on the third line of

11   that summary, "GB -- Gary Bitter -- "was a long-time patient

12   of Dr. Siefert."

13         Do you see that?

14   A.    Yes.

15   Q.    How many times did Gary Bitter actually see -- how many

16   prescriptions did Gary Bitter get from Dr. Siefert?

17   A.    I don't know.

18   Q.    He's a long-time patient.  It must be quite a few, right?

19   A.    Not necessarily.

20   Q.    Well, how many, ballpark, do you think he was getting

21   from Dr. Siefert?

22   A.    I don't know.  There's documentation so we could look at

23   it, but I don't recall.

24   Q.    Let me pull up Government Exhibit 1.

25         Actually, before we do that -- take that down.  How

1   long -- I asked you about how many prescriptions did Gary

2   Bitter receive from Dr. Siefert.  Let me ask you a separate

3   question.  Do you remember approximately how many months he

4   was seeing Dr. Siefert?

5   A.   I believe it was less than a year.  But we have

6   documentation that we could find out.

7   Q.   Okay.  How much less than a year?  Do you remember?

8   A.   I would prefer to see documentation to answer --

9   Q.   But you don't independently --

10  A.   -- that correctly.

11  Q.   -- remember how long this long-term patient was seeing

12  Dr. Siefert?

13  A.   I don't recall exactly how long.

14  Q.   All right.  This is Government Exhibit 1, page 4.  And I

15  will represent to you, Dr. Murphy -- you haven't seen this

16  document before, have you?

17  A.   I believe I have.

18  Q.   Oh, you have?  Were you shown this document by

19  Ms. Gerdes?

20  A.   I believe that is correct.

21  Q.   Oh, okay.  So I will represent to you this is a summary

22  of the prescriptions from Dr. Siefert to Gary Bitter.  Let's

23  just count up the prescriptions.  One, two -- and three, four

24  are over two days.  One, two, three, four, five, six

25  prescriptions.

1        Do you see that?

2   A.   That is not correct.

3   Q.   One, two, three, four, five, six.  Six dates on which

4   prescriptions were issued to Gary Bitter?

5   A.   That is correct.

6   Q.   Okay.  And just --

7            THE COURT:  You were asking about the number or --

8            MR. LYNCH:  Fair enough.

9            THE COURT:  If you would have asked eight, he would

10  have answered it yes.

11           MR. LYNCH:  Yes.

12           THE COURT:  But since you asked six, he said that is

13  not correct.

14           MR. LYNCH:  Thank you for the clarification, Your

15  Honor.

16       Just for the record, as Mr. Glassman had pointed out

17  previously, so there's no confusion, this is a typo on this

18  document.  It says 2016.  It should say 2015.

19  BY MR. LYNCH:

20  Q.   So this is a period of time from late October of 2015

21  through February of 2016; is that right?

22  A.   Yes.

23  Q.   That's an approximately five-month time span?

24  A.   Yes.

25  Q.   Okay.  Gary Bitter was not a long-term patient of

1   Dr. Siefert; is that correct?

2   A.   Five months.  That's --

3   Q.   That's long-term to you?

4   A.   That's enough time to know somebody.

5   Q.   And two of those months he was in prison.  Yes?

6   A.   It was represented to me that for two of those months, he

7   was in jail.

8   Q.   Right, okay.  Go to page 13 of your report.

9        MR. LYNCH:  Actually, Your Honor, this is a probably

10  a good breaking point.  I'm moving into a new --

11       THE COURT:  Ladies and gentlemen, we're going to be

12  in recess until 1:15.  When we come back, we're going to have

13  a witness taken out of order, called on behalf of

14  Defendant Ehn.

15    So, Dr. Murphy, if you would, when you're finished -- or

16  when you come back from lunch, just kind of wait in the --

17  wherever you were waiting before.  And then hopefully, it

18  won't take long, and we'll have you called back for cross.

19    We'll be in recess till 1:15 with the jurors.

20    (The jury exited the courtroom at 11:50 a.m.)

21       THE COURT:  Who will the witness be at 1:15?

22       MR. GLASSMAN:  Colin Covey.

23       THE COURT:  Colin Cobey?

24       MR. GLASSMAN:  Covey, C-o-v-e-y.

25       THE COURT:  C-o-b-e-y [sic], all right, very well.

1        Anything else we need to take up before our luncheon

2    recess?

3              MS. GERDES:  Nothing from Dr. Siefert.

4              MR. LYNCH:  The only thing I just remembered in going

5    over this document with the witness, if we could submit just a

6    corrected version of page 4 of the summary exhibit with -- it

7    says 2016.  We can just switch it to 2015 to avoid any

8    confusion.  Is that --

9              THE COURT:  Any objection?

10             MS. GERDES:  Your Honor, it's kind of a continued

11   theme as part of our theory, the mistakes made along the way

12   and the inattention to detail.  So if --

13             THE COURT:  That's fine.  If you want to object, I'll

14   sustain the objection.

15             MR. LYNCH:  Okay.  Fine.

16             THE COURT:  You can just cross it out.  I mean, you

17   prepared the summary, I'm sure.

18             MR. LYNCH:  Yeah.

19             THE COURT:  So it's an error by you, not the witness,

20   per se.

21        But I appreciate the reference that you made.  So I'll

22   sustain the objection.  We'll just keep it as is with the X

23   for the year.

24             MR. LYNCH:  Fine.

25             THE COURT:  Anything else?

1          MS. GERDES:  If he wants to write the 15 so it's

2     clear, but I just don't think a new exhibit with new dates

3     should be given.

4          THE COURT:  Understood.  Mr. Glassman?

5          MR. GLASSMAN:  Nothing further, Your Honor.

6          THE COURT:  Very well.  We'll be in recess until

7     1:15.

8        (Recess from 11:52 a.m. until 1:18 p.m.)

9          THE COURT:  All right.  We're going to go ahead and

10    call the witness out of order, Mr. Glassman?

11         MR. GLASSMAN:  Yes, Your Honor.

12         THE COURT:  We'll go ahead and bring the jury in,

13    please.  And I did tell them we were going to do that already,

14    didn't I?

15       (The jury entered the courtroom at 1:19 p.m.)

16         THE COURT:  Ladies and gentlemen, as I told you, we

17    are going to take a witness out of order so that he can get

18    back to wherever he needs to be.

19      Mr. Glassman?

20         MR. GLASSMAN:  Thank you, Your Honor.  Timothy Ehn

21    calls Colin Covey.

22           COLIN COVEY, DEFENSE WITNESS, SWORN

23         THE COURT:  Good morning, sir.

24         THE WITNESS:  I'm sorry?

25         THE COURT:  Good afternoon.  Try to keep your voice

1    up and speak into the microphone, if you would.

2              THE WITNESS:  Is that better?

3              THE COURT:  It's better, yes.  Thank you.

4              THE WITNESS:  You're welcome.

5              THE COURT:  Go ahead.

6                        DIRECT EXAMINATION

7    BY MR. GLASSMAN:

8    Q.   Mr. Covey, can you please introduce your name and spell

9    it for the court reporter.

10   A.   It's Colin, C-o-l-i-n; Covey, C-o-v-e-y.

11   Q.   Mr. Covey, have you been a patient at the Northern

12   Kentucky Center for Pain Relief?

13   A.   I have.

14   Q.   Why?  What kind of pain do you have?

15   A.   A multitude of it.  I have spinal stenosis, degenerative

16   disk disease.  I've had two shoulder surgeries that were not

17   really successful.  I have half a bicep on my left arm.

18   Q.   How did you earn all of these --

19   A.   Working in a steel mill, keeping America going.

20   Q.   What other health -- do you have other health conditions?

21   A.   I've had triple bypass surgery.  I'm also diabetic.  I

22   have sciatica also, which contributes to my back issues.

23   Q.   What about your liver?

24   A.   I'm sorry?

25   Q.   What about your liver?

1    A.   Oh, yeah.  I got a fatty -- fatty liver, also.

2    Q.   What kind of treatments did you get at Northern Kentucky

3    Center for Pain Relief?

4    A.   I got pain medication, obviously.  Got a TENS, mechanical

5    or manual adjustment.  I had a few injections into my

6    shoulder.

7    Q.   Let me ask you about that.  Do you remember who performed

8    those injections or any of them?

9    A.   Dr. Siefert.

10   Q.   Oh, it looks like you were just looking at somebody in

11   the courtroom.  Do you recognize Dr. Siefert?

12   A.   Yeah.  That's him right there.

13          THE COURT:  The record will reflect the

14   identification of Defendant Siefert.

15          MR. GLASSMAN:  Thank you.

16   BY MR. GLASSMAN:

17   Q.   And then you also mentioned manual adjustment.  Is that

18   chiropractic?

19   A.   Yes.

20   Q.   Who did that?

21   A.   Dr. Ehn.

22   Q.   And do you recognize him in the courtroom?

23   A.   I do.  He's right there.

24          THE COURT:  The record will reflect identification of

25   Defendant Ehn.

COVEY - Direct                                                    10-114

1    BY MR. GLASSMAN:

2    Q.   When you would go in on a visit to Northern Kentucky

3    Center for Pain Relief to get a medication, what kind of stuff

4    would normally happen on a visit?

5    A.   They would, you know, check me out physically and

6    everything.  You know, ask me to do a couple of little

7    different things to check my mobility and just, you know, a

8    general office visit as far as -- you know.

9         I'm nervous as hell here, man.  I'm not used to this

10   stuff, man.  This is the first time I've ever been in a

11   courtroom like this so I apologize.

12             THE COURT:  All good.  You can have one of those

13   waters, if you want.

14             THE WITNESS:  No.  I'm good, man.  I don't drink.

15             THE COURT:  Well, if you don't drink water,

16   you're not going to have a very long life.

17             THE WITNESS:  I drink a lot of tea, man.

18   BY MR. GLASSMAN:

19   Q.   Did they ask you about your pain?

20   A.   Yeah, they'd ask me what level the pain was at.

21   Q.   They'd examine you?

22   A.   Yeah.  They would, like, check my back out and then ask

23   me to do some things to check mobility, how far I could bend,

24   things like that.

25   Q.   And did that include Dr. Siefert from time to time, among

COVEY - Direct                                                    10-115

1    other doctors?

2    A.   Yes.

3    Q.   It's been suggested in this trial that the Northern

4    Kentucky Center for Pain Relief is some kind of assembly line

5    for pills.

6    A.   Not --

7    Q.   What's your reaction to that?

8    A.   Not to my knowledge.  I never seen anything that

9    indicated anything like that.

10   Q.   Would you tell the jury about stigmatizing pain patients?

11   A.   I'm sorry.  I don't hear well from being in that steel

12   mill so you have to speak up.

13   Q.   I think when you and I talked over the weekend, maybe, we

14   talked about stigma for pain patients.

15   A.   Oh, yeah.

16   Q.   Tell them about it.

17   A.   Well, I mean, you know, I got a referral from my family

18   doctor --

19        MR. LYNCH:  Objection.  Relevance as to

20   stigmatization.

21        THE COURT:  Sustained.

22   BY MR. GLASSMAN:

23   Q.   Why was it important for you that Northern Kentucky

24   Center for Pain Relief took measures to make sure that the

25   pain patients were legitimate?

COVEY - Cross                                                    10-116

1    A.   Because I didn't want to be involved in anything like

2    that or this.  And I got a doctor -- my family doctor, you

3    know, he referred me because, you know, there's a stigma with

4    this stuff.  There really is.  Not everybody is out to be

5    breaking the law or anything.

6         I have serious issues, and, you know, I've worked through

7    them my whole life.  It got to the point where I couldn't do

8    it without some help, you know.  I've been a productive member

9    of society my whole life.  I don't abuse drugs.  So it wasn't

10   my intentions to be a part of any kind of a narcotic

11   distribution center or whatever you'd like to call it.

12        Does that answer it for you pretty good?

13            MR. GLASSMAN:  I think that answers the question, and

14   I do not have any further questions.

15            THE COURT:  Thank you.  Mr. Lynch?

16            MR. LYNCH:  Yes, Your Honor.

17            THE COURT:  This is the prosecutor.  He's probably

18   going to ask you a few questions.

19            THE WITNESS:  That's fine.  Got nothing to hide.

20            MR. LYNCH:  Your Honor, we're going to pull up a

21   summary of the 1000 series of the government's exhibits.

22            THE COURT:  All right.

23                          CROSS-EXAMINATION

24   BY MR. LYNCH:

25   Q.   Good afternoon, Mr. Covey.  We've never met before, have

1    we?

2    A.   I don't think so.

3    Q.   No.  My name is Dermot Lynch.  I'm one of the prosecutors

4    in the case.  You had mentioned that -- on direct examination,

5    you mentioned during the office visits that you -- like the

6    visits you went to Northern Kentucky for --

7    A.   Right.

8    Q.   -- that you'd have to do a little bit of range of motion

9    and maybe just talk a little bit about --

10   A.   Pain level, things like that.

11   Q.   -- pain level.

12        Anything else of note that would happen during those

13   office visits that you haven't mentioned yet?

14   A.   I don't know what you're referring to.

15   Q.   No.  Just like -- like anything on the checklist of

16   things that, you know, might be reviewed with you during the

17   course of an office visit.

18   A.   I'm still not following your line of questioning.

19   Q.   You're not?  Okay.  Like, I mean, nothing comes to mind

20   about, like, a test, for example, that you would review every

21   time with an office visit?

22   A.   A test?

23   Q.   Yeah.

24   A.   Yeah.  I just said they would check your range of

25   mobility, bend over, you know, things like that.  See, you

1   know, what kind of a range of mobility you have.

2   Q.   Okay.  Fair enough.  The test that you're talking about

3   the test that comes to the forefront --

4   A.   I also took a urine test every time I came in.

5   Q.   Every time you came in?

6   A.   Every single time.

7   Q.   Every time you came in?

8   A.   Yep.

9   Q.   Was it just one urine test?  Did they just go over one

10  urine test with you when you came in?

11  A.   Per year?

12  Q.   No.  Per --

13  A.   Again, I'm sorry, but I don't -- I really, honest to God,

14  have a hard time hearing.

15  Q.   No problem.  How many urine tests were -- at every visit,

16  do you remember whether or not the urine test was -- how many

17  urine tests were reviewed at every visit with you?

18  A.   I mean, you gave one sample.  Obviously, however many

19  tests they administered on it, I have no knowledge of.  But if

20  anything -- it was adamant that you did not take any other

21  kinds of drugs that might affect the pain medication or any

22  street drugs or anything like that.  It was posted on the

23  walls.

24  Q.   Right.  But did -- yeah.

25  A.   So I really don't understand what you're saying.

COVEY - Cross                                                     10-119

1    Q.   No, no --

2    A.   You either passed it or you didn't.

3    Q.   So is it your understanding you only had one test per

4    visit -- one urine drug test per visit?

5    A.   I peed in a cup one time.

6    Q.   Peed in a cup one time.  And you reviewed the results of

7    one test?  That's what you remember?

8    A.   There was a multitude of things they tested for.

9    Q.   Right.  But how many tests were there?  Was there one

10   test, two tests, three tests?

11   A.   I don't know.

12   Q.   You don't know.

13   A.   I didn't work in the lab.

14   Q.   Do you know how much you were -- do you receive -- are

15   you on Medicaid, sir?  You have health insurance through

16   Kentucky Medicaid?

17   A.   No.  I have Medicare.  I'm retired medically because of

18   my issues.

19   Q.   In 2019, did you have Medicaid or Medicare?

20   A.   I'm not sure.

21   Q.   You're not sure.

22   A.   But when I first started there, I was still working.

23   Q.   Right.

24   A.   I used my personal -- or my company insurance.

25   Q.   Okay.

COVEY - Cross                                                    10-120

1    A.   What are we getting at here?

2    Q.   Well, here's the question.  Do you know how much your

3    insurance was billed for your urine drug tests per month?

4    A.   No, they never did send me anything letting me know how

5    much.  You know, I didn't get any kind of paperwork in the

6    mail saying, hey, here's your bills for, you know, X amount of

7    time period for whatever time frame.

8    Q.   And were you going to -- let me make just sure I've got

9    the dates right.  Were you going to Northern Kentucky Center

10   for Pain Relief from, what, around, what, late 2019 through

11   2021?  Is that about the time period?

12   A.   No.  I started going there probably in 2015 or '16.

13   Q.   2015 or '16, okay.  So maybe we didn't have the full --

14   A.   And I still see Dr. Ehn, you know, for adjustments and --

15   Q.   You're currently seeing Dr. Ehn?

16   A.   Not today, no.

17   Q.   Not today, but you are seeing him --

18   A.   I'm still a patient of Dr. Ehn's.

19   Q.   You're still a patient of Dr. Ehn's?

20   A.   Yeah.

21   Q.   So you have no idea how much you were -- your insurance

22   was billed for urine drug testing?

23   A.   No.  The insurance company never sent me any kind of data

24   to -- again, like I said, telling me what my bills were

25   charged or anything.

1   Q.   Okay.  Would it surprise you to learn that, you know, one

2   urine drug test per month costs -- was paid out at $246.92?

3   A.   Would it surprise me?

4   Q.   Yeah.

5   A.   No, not with the cost of things today, it sure wouldn't.

6   Q.   Do you think -- ballpark, just from Medicaid insurance,

7   would it surprise you to learn that the clinic made $5,200 off

8   of only urine drug tests?

9   A.   Off of me, you're saying?

10  Q.   Yeah.

11  A.   No.  I mean, are you talking about over the entire period

12  of time that I've been seeing them?  No, not at all.

13  Q.   All right.  And you were given a -- your understanding is

14  you were given a drug test every month?

15  A.   Every single time I went in that office.

16  Q.   And, sir, you --

17  A.   For -- to get a prescription for the pain medication.

18  Q.   And I think you've said -- and do not take this question

19  the wrong way.  I don't mean this --

20  A.   Well, it makes me uncomfortable.  Because like I said,

21  there's a stigma attached to this.  Not everybody that seeks

22  help for chronic pain is a junkie.  Okay?  And there's a

23  stigma.  This makes me uncomfortable right now because I'm a

24  very private person.  I don't divulge my information to

25  anybody.  I don't go around saying, hey, I take, you know,

 1    Percocet or whatever, because of the stigma of it.  And I've

 2    been a productive member of society my whole life.

 3    Q.   And you're --

 4    A.   Yeah, I am being defensive about it.

 5    Q.   So but you've never -- during the time you were at

 6    Northern Kentucky Center for Pain Relief, you weren't abusing

 7    any sort of --

 8    A.   No.

 9    Q.   -- street drugs?

10    A.   Absolutely not.

11    Q.   You just took your medication month in, month out --

12    A.   Right.

13    Q.   -- as prescribed, right?

14    A.   Correct.

15    Q.   And you --

16    A.   And there was always the potential -- the possibility of

17    what they call a count.

18    Q.   Right.

19    A.   So if you didn't have your medication --

20    Q.   Exactly.

21    A.   -- then they were -- you know, it's like what's up?

22    Q.   Right.  Exactly.  And I completely agree with you.

23             MS. GERDES:  Objection.

24    BY MR. LYNCH:

25    Q.   And all those urine drug tests that you had -- let me

COVEY - Cross                                                    10-123

1    rephrase the question.

2         They never told you in all the urine drug tests that you

3    had month in, month out that you had an unexpected result in

4    the drug test?

5    A.   One time.  And that absolutely had to have been a false

6    positive because -- and that was -- I remember distinctly.

7    Q.   So what --

8    A.   Yeah.  I was talked to about it.

9    Q.   So we're talking -- you were going to Northern Kentucky

10   Center for Pain Relief from, what, 2015?

11   A.   2015, 2016, somewheres in there.

12   Q.   All right.  From 2016 to, what, 2021 --

13   A.   Whenever they put a hiatus on them being able to do

14   anything.

15   Q.   Okay.  You've had for that -- so we're talking six years,

16   six-year period of time, thereabouts, right?

17   A.   Right.

18   Q.   Six-year period of time, you had one urine drug test that

19   might have been a problem, but you think it was just because

20   of a false positive?

21   A.   I absolutely had -- that's all it could have been.  And

22   that is a probability.

23   Q.   Because, again, I have no --

24   A.   Right.  That's -- right.

25   Q.   Right.

1    A.   So what --

2    Q.   That's -- again, I'm not -- these aren't trick questions.

3    I just wanted to make sure that --

4    A.   You're not going to be able to trick me anyway.

5    Q.   I don't --

6         (Indiscernible crosstalk.)

7              THE COURT:  Look.  He's just trying to ask questions.

8              THE WITNESS:  I know.

9              THE COURT:  No one's trying to trick anybody.

10             THE WITNESS:  I didn't say anybody was.

11             THE COURT:  I know.  And we know no one's going to be

12   able to trick you because you just told us.  So no one's going

13   to try.

14        Go ahead.

15   BY MR. LYNCH:

16   Q.   As you said, you're a productive member of society,

17   right?  You're working.

18   A.   Yeah.  Every day.

19   Q.   There's really --

20   A.   Ten, twelve hours a day.

21   Q.   Would you say you're a risky prospect for abusing any

22   sort of drugs or overtaking your pain medication?

23   A.   No.

24   Q.   No.  I completely agree with you.

25             MS. GERDES:  Objection to Dermot's opinion.

1           MR. GLASSMAN:  Objection.

2           THE COURT:  Sustained as to your opinion, but not to

3      his answer.

4           MR. LYNCH:  Okay.

5      BY MR. LYNCH:

6      Q.   So just so I think we've got this right, you've never

7      abused your prescribed medication at Northern Kentucky Center

8      for Pain Relief?

9      A.   Negative.

10     Q.   Yes.  You've never had a bad urine drug test -- an

11     unexpected result in a urine drug test that wasn't the result

12     of a malfunctioning machine?

13     A.   Of whatever --

14          MR. GLASSMAN:  Objection.

15     A.   -- you call the positive negative.

16     Q.   To your knowledge?

17          THE COURT:  Overruled.

18     BY MR. LYNCH:

19     Q.   And yet, to your recollection, month in, month out, every

20     month you were at Northern Kentucky Center for Pain Relief,

21     you were getting urine drug tested; is that right?

22     A.   Every single time I went in there.

23     Q.   Every single one.  Thank you.

24          MR. LYNCH:  No further questions.

25          THE COURT:  Anything else?

1          MR. GLASSMAN:  No, Your Honor.

2          THE COURT:  Ms. Gerdes, Mr. Ferrera?

3          MS. GERDES:  Nothing from us.

4          THE COURT:  Very well.  Thank you, sir.  Hope you get

5    to your 2:00.  We took you out of order to try to accommodate

6    you.

7          THE WITNESS:  I appreciate it because I have an

8    autistic son that I take care of that I have to get to.

9          THE COURT:  Well, we're glad we were able to

10   accommodate you.

11         THE WITNESS:  I'm just saying I'm a responsible

12   adult.  I'm not a damned drug addict.  It makes me

13   uncomfortable being in here and you guys accusing them of this

14   shit.  Y'all have a good day.

15         MS. GERDES:  Your Honor, I'm just trying to

16   understand --

17         THE COURT:  I'm going to go ahead and strike all

18   that -- what he said.  That wasn't responsive to anything.  He

19   was just ad libbing as he was leaving the courtroom.

20      Did you need something?

21         MS. GERDES:  I'm trying to understand the exhibit

22   number that the government had displayed on the screen.

23         MR. LYNCH:  Yes, Your Honor.  I think it was just

24   displayed for the -- was it not just displayed for the

25   witness?

 1              MS. GERDES:  It was displayed to everyone.  What

 2     was --

 3              THE COURT:  It was part of the -- Exhibit 1000.

 4              MR. LYNCH:  Exhibit 1000 series.  It's an

 5     accumulation of -- the 1000 series is -- you know, it's 1000a

 6     through 1000n, I believe.

 7              THE COURT:  It's been admitted.

 8              MR. LYNCH:  It's been admitted and --

 9              THE COURT:  Yes.  And, frankly, part --

10          Would the attorneys approach?

11          (Sidebar conference.)

12              THE COURT:  Part of the problem, were these related

13     to tests for this witness?

14              MR. LYNCH:  Yes.

15              THE COURT:  Part of the problem is they didn't have

16     any way, until today, of knowing who was being called.  So

17     they couldn't really put together a compilation of tests with

18     respect to a particular witness, and that was at your client's

19     specific request.  They didn't want them to know anybody who

20     was being called.

21          So --

22              MS. GERDES:  Your Honor, all I want to know is --

23     there was something depicted on the screen with amounts at the

24     bottom.  That was 1000 what?  Because I cannot find that.  And

25     I want to know exactly what exhibit the government had posted

1    throughout the entire cross of that witness.

2         MR. LYNCH:  You know what, I'm going to provide the

3    summaries.  We'll admit it as a summary exhibit and we'll

4    provide you the --

5         THE COURT:  Hold on.  Look, there's so much evidence

6    here.  The representation was this gentleman had I don't know

7    how many drug tests.  It was a definitive and a presumptive

8    each time.  At least that's what was displayed on the screen.

9         But if it was something in evidence -- hold on.  If it

10   was something that's been admitted into evidence, it can be

11   shown to the jury.  Why are you jumping up and down?

12        MS. GERDES:  I don't believe that has been admitted

13   in evidence.  I haven't --

14        (Indiscernible crosstalk.)

15        MS. GERDES:  As what number?  1000 what?

16        MR. LYNCH:  So the way it's broken down is the

17   Medicaid beneficiaries -- the Medicaid data is broken down by

18   provider.  So some of the tests were from Siefert, some of the

19   tests were from -- or some of the tests here were from

20   Durrett, some of the tests were from Sanders, and we just

21   copied and pasted the individual Excel spreadsheets.

22        THE COURT:  How did you search it so quick?  You

23   didn't have the name until before the break.

24        MR. LYNCH:  This was not hard.  It's like five Excel

25   spreadsheets, control-F for Covey.

1          THE COURT:  Oh, you just searched by name?

2          MR. LYNCH:  Yeah.

3          THE COURT:  So you searched by name, and what you

4    showed was a compilation of tests based on his name?

5          MR. LYNCH:  Based on his name --

6          THE COURT:  She's asked for that.

7          MR. LYNCH:  Okay.

8          THE COURT:  And maybe during the next break, you can

9    provide her with whatever that is.

10         MR. LYNCH:  Yeah.  We can --

11         THE COURT:  I've got to confess, once we're finished

12   with Murphy, it certainly would help, having these bench

13   conferences, if you could give -- if you're going to have

14   additional witness like him, to give the prosecutors the name

15   so they can at least -- we don't waste jury time having them

16   trying to figure out on the fly, okay, we have this patient,

17   this number of tests, et cetera.  That certainly would help.

18         MR. GLASSMAN:  I think we'll get to the next break

19   after Murphy and maybe we can address this at the break?

20         THE COURT:  Okay.  That's fine.

21         MR. LYNCH:  How can we know that?

22         MS. GERDES:  So what I'm requesting is a copy of the

23   screenshot that was displayed and then the sourcing from the

24   government exhibits that shows that.

25         MR. LYNCH:  Yeah.

1          THE COURT:  Okay.

2          MS. GERDES:  Thank you very much.  I appreciate it.

3          THE COURT:  You're welcome.

4       (Sidebar concluded.)

5          THE COURT:  We'll have Dr. Murphy back on the stand

6    for continued cross-examination.  He should be just outside, I

7    would think.

8       We'll pick up where we left off.  You may proceed,

9    Mr. Lynch.

10          MR. LYNCH:  Thank you, Your Honor.

11       JAMES MURPHY, M.D., DEFENSE WITNESS, previously sworn

12                CROSS-EXAMINATION (continued)

13    BY MR. LYNCH:

14    Q.  So just before the break, just to orient you, Dr. Murphy,

15    we talked about Gary Bitter.  Remember that?

16       All right.  We're going to move on to a different

17    patient.  If you'd go to page 13 of your report.  You also

18    reviewed Michelle Taylor, MT, a patient; is that right?

19    A.  Yes.

20    Q.  All right.  You also say in your report that MT was a

21    long-time patient of Dr. Siefert.  Do you see that in the

22    second line of your section on Michelle Taylor?

23    A.  Yes.

24    Q.  To your knowledge, how long was she a patient of

25    Dr. Siefert?

1    A.   I'd have to see her record to answer that.

2    Q.   Do you know how many -- do you know -- there's no

3    basis -- there's nothing sort of describing why she's a

4    long-term patient in your report; is that right?

5    A.   I don't give the time frame.

6    Q.   You don't give the time frame.  And you don't know here

7    today, you know, how long -- how long Michelle Taylor -- like

8    what period of time she was a patient of Dr. Siefert's either?

9    A.   I haven't committed it to memory.

10   Q.   Okay.  Let's go ahead and put this up.  This is

11   Government Exhibit 1, page 8, Dr. Murphy.

12        MR. LYNCH:  We can publish to the jury.

13   Q.   So, Dr. Murphy, I'll represent to you that this is --

14   these are mainly the prescriptions written to Ms. Taylor by

15   Dr. Siefert.  You'll see there are three prescriptions written

16   by another provider.  Okay?  Let's just count through the

17   dates that prescriptions were issued by Dr. Siefert.

18        So I see one, two, three, four, five, six, seven, eight,

19   nine, ten, eleven.  Did I count that right in terms of dates

20   that a prescription was issued?

21   A.   I think so.

22   Q.   Okay.  And that's a period of time -- this is from June

23   of 2016 to February of 2017; is that correct, sir?

24   A.   Yes.

25   Q.   And that's a seven-month period of time?  Approximately?

1    A.    Seven or eight, maybe.

2    Q.    Okay.  I did notice that this, like, "long-term patient"

3    language comes up a lot in your report.  Do you ever sort of

4    have a previous report and then kind of copy and paste it into

5    a new report?  Is that something you do?

6    A.    Not very often.

7    Q.    Not very often?

8    A.    Some of the parts, I might do that.  But every report I

9    give is an original report.

10   Q.    But there are parts that are copied and pasted?  Fair

11   enough?

12   A.    I don't know.  I mean, I look at everything I bring over,

13   and I adapt it and change it.  So I really don't think

14   there's much of it that's copied and pasted.

15   Q.    All right.  Let's just do one more of these.  Go to

16   page 14 of your report, Michael Casebolt, MC.

17        Do you see there you also call Mr. Casebolt a long-time

18   patient of Dr. Siefert in that second line?

19   A.    Yes.

20   Q.    Any idea how long Dr. Siefert was seeing Mr. Casebolt?

21   A.    I haven't committed it to memory.

22   Q.    Nothing about that in your report, though?

23   A.    I don't give the dates in my report.

24   Q.    Right.  Any idea of how -- what the duration is?

25   A.    I mean, it wasn't years, but I don't know the amount of

1  time.

2  Q.   Okay.  Let's go ahead and pull up Michael Casebolt.  This

3  is Government Exhibit 1 at page 10.

4       Have you seen that document before?

5  A.   It looks familiar to me.

6  Q.   Okay.  We don't need to count up the prescriptions.

7  We're talking a year from March 2016 to February 2017.  So

8  about 11 months for this long-time patient?

9  A.   Yes.

10  Q.   Okay.  And in your opinion, he's also a long-time

11  patient, right?

12  A.   Yes.

13  Q.   Let me move on to another -- I'm going to move away from

14  these patients.

15       I think you talked about -- and I'm just not sure I've

16  got this right.  I want to make sure I'm saying this right.

17  You talked about presumptive testing on direct examination.

18       Do you remember that?

19  A.   Yes.

20  Q.   And I think you talked about it, like, a presumptive test

21  is like a pee in a cup test.

22       Do you remember saying that?

23  A.   Yes.

24  Q.   Okay.  And when you're talking -- I want to make sure

25  I've got in my head what you've got in your head on this.  So

1   there are these -- I think you referred to it as it's like a

2   presumptive test, sort of like a pregnancy test too?

3   A.   They use the same technology as --

4   Q.   The same --

5   A.   -- familiar with a pregnancy test.

6   Q.   Are you talking about these little -- you see these,

7   like, cups, right?  And there's, like, labels all around the

8   outside of the cup.  And then, you know, one of the labels

9   will say, you know, opiates.  Another label will say marijuana

10  or THC.  Another label will say cocaine.  And they're all kind

11  of labels around a cup.  Is that the type of -- is that the

12  type of test you were thinking of?

13  A.   That's one type of presumptive test, but that would be

14  considered the same technology --

15  Q.   Okay.

16  A.   -- as the pregnancy test.

17  Q.   Is that the type of presumptive test that was being used

18  at Northern Kentucky Center for Pain Relief?

19  A.   I don't know the exact type.  But the presumptive tests

20  are called immunoassay.  That's the technology for these

21  presumptive tests.

22  Q.   But you don't know, sitting here today, whether or not

23  the presumptive test that was being used at Northern Kentucky

24  Center for Pain Relief was this pee in the cup thing or

25  something else?

1    A.   No, I don't know exactly how they did it.

2    Q.   How they did it.  Okay.  You did say that the frequency

3    of the testing was appropriate?  I think you said that on

4    direct; is that right?

5    A.   Yes.

6    Q.   Okay.  Would it make a difference whether or not it

7    was -- I mean -- sorry.

8         MR. LYNCH:  Actually, strike that question.

9    Could we just pull up Exhibit 601h.

10        THE COURT:  601h?

11        MR. LYNCH:  H, as in hotel.

12        THE COURT:  All right.

13   BY MR. LYNCH:

14   Q.   Did you -- do you know what that is?

15   A.   Are you talking about the --

16   Q.   The blue and white sort of machine there.

17   A.   That looks to me like a drug screen machine.

18   Q.   Do you know what -- have you ever -- did the defense ever

19   show you this picture before your testimony here today?

20   A.   I can't recall.  I don't know.

21   Q.   Do you know if that's a presumptive or definitive drug

22   testing machine?

23   A.   That's an immunoassay machine.  So if that gives a

24   number --

25   Q.   And all I want to know is --

MURPHY - Cross                                                    10-136

1            MR. LYNCH:  Move to strike, Your Honor.  I didn't

2    ask --

3            MS. GERDES:  Objection, Your Honor.

4            MR. LYNCH:  I asked if he --

5            THE COURT:  Hold on.  Fortunately, I have realtime up

6    here so I can spend five seconds.

7         Motion to strike denied.

8    BY MR. LYNCH:

9    Q.   All right.  Dr. Murphy, just to be clear for the record,

10   you did not see a picture of this machine prior to your

11   testimony here today?

12   A.   I don't know.

13   Q.   Okay.  To the best of your recollection, you didn't see a

14   picture --

15           MS. GERDES:  Objection.  Asked and answered.

16           THE COURT:  Sustained.

17   BY MR. LYNCH:

18   Q.   All right.  Let's move on to a different subject.  I want

19   to just go to another page of your report in the indictment.

20   I'm going to go to page -- sorry.  Hold on one second.

21        Yes, okay.  On page 31 of your report, if you can go

22   there, sir.  You have a copy of your report, right?

23   A.   Yes.

24   Q.   If you'd go to page 31 of your report.

25   A.   I have it.

1   Q.   All right.  Do you see the paragraph that sort of -- it

2   begins in the previous page, but continues into the -- on to

3   page 31.  The last sentence there, I'm just going to read it.

4      It says, "Many of Dr. Siefert's patients, including those

5   listed in the indictment, could be classified as high-risk

6   patients, which informs the acceptable frequency of urine drug

7   tests."

8      Do you see that?

9   A.   Yes.

10   Q.   In that sense, are you just -- do you remember how on

11   cross-examination -- or on direct examination, Ms. Gerdes

12   showed you sort of a table with a box of -- I believe it was

13   four or five patients?  Do you remember that?

14      The question, sir, is:  Are you referring here to just

15   the patients for whom you've offered an opinion here today,

16   that the prescribing to those patients was proper, or are you

17   referring to other patients?

18   A.   I'm referring to every record that I saw.  It seemed to

19   me that the prescribing -- I mean, the -- I mentioned the

20   prescribing was appropriate, proper, reasonable, and the drug

21   screening as well.

22   Q.   Okay.  So just -- I think this will clarify.  Can we just

23   go to page 4 of your report, and there's a section there that

24   says Materials Reviewed.

25      Do you see that section on page 4, Dr. Murphy?

1    A.   Yes.

2    Q.   All right.  It says -- the second sentence in that

3    section says -- the first sentence references GB, MT, TI, MC,

4    and BW.  And then the second sentence says, "I also reviewed

5    medical files on patients with the initials CM, CP, EH, MR,

6    MS, PP, RM, SS, and two patients with the initials JS and then

7    RM and TD."

8         Do you see that?

9    A.   Yes.

10   Q.   Are you saying that you reviewed those patient files as

11   well, and you think that the frequency of the urine drug

12   testing for those patients is also proper?

13   A.   I can say this -- that's not a yes or no answer.  I

14   cannot -- I reviewed the materials, and I can tell you that

15   the patients in the indictment, I really drilled down on those

16   in more detail.  But I did look at other records as well, and

17   I did not see any indication to me that the drug screening was

18   improper or that the prescribing was improper.

19   Q.   Okay.  So you see here -- I'm going to show you a page of

20   the indictment.  You've seen the indictment, right, sir?

21   A.   Yes.

22   Q.   So here's a page in the indictment, and you see here it

23   references Patient SS?

24   A.   Yes.

25   Q.   So you're saying, then -- and it's related to the urine

1   drug testing, right?

2   A.   Yes.

3   Q.   So you're saying that the urine drug testing for patient

4   SS was okay, in your opinion?  Is that right?  I'm honestly

5   just trying to figure out what your opinion is about the

6   frequency of the drug testing for a patient like SS.

7   A.   I didn't draw a firm conclusion about the drug testing

8   for patient SS.

9   Q.   You have no -- okay.  Do you know how frequently she

10  received drug tests?

11  A.   I don't recall how frequently she received drug tests.

12  Q.   Do you recall -- and it's not mentioned in your report,

13  right?

14  A.   Correct.

15  Q.   Do you know her -- do you know what substance she was

16  receiving?

17  A.   No.

18  Q.   That's also not mentioned in your report?

19  A.   Correct.

20  Q.   Do you know her MME level?

21  A.   No.

22  Q.   No?  Okay.  Do you know if she received presumptive and

23  definitive tests or just one or the other test?

24  A.   I can't recall the details of her record.

25  Q.   Do you know how many substances -- are you aware you can

1  test for a different number of substances on, for example, a

2  definitive drug test?

3  A.   Yes.

4  Q.   You could test for, you know, one substance, ten

5  substances, forty substances, right?

6  A.   Yes.

7  Q.   Do you have any idea how many substances Patient SS was

8  tested for?

9  A.   I can't recall how many.

10  Q.   Okay.  You actually don't even know -- do you know if she

11  got any definitive urine drug tests?

12  A.   I did not commit the details on her record to my memory.

13  Q.   And it's also -- not only did you not commit to it your

14  memory, it's also not in your report, right?

15  A.   It is not in my report.

16  Q.   Okay.  Do you know how many -- so I guess the other

17  thing, just same series of questions, again, for Patient SS.

18  I assume you don't know whether or not she had any unexpected

19  results in her urine drug testing?

20  A.   I haven't committed it to my memory.

21  Q.   Okay.  And it's also -- that information about unexpected

22  results is also not in your report?

23  A.   Correct.

24  Q.   Okay.  Let me move on to a different area.  Page 31 of

25  your report.  Let me know when you're there, Dr. Murphy.

1      So you see the -- we're just going down a paragraph here.

2    The first full paragraph on that page, I'm going to read a

3    portion of it.

4      Do you see where it says, "The accuracy of any drug test

5    is predicated on the use of valid testing procedures which

6    includes sample collection analysis and interpretation

7    results.  Inadequate provider or lab proficiency can result in

8    inaccurate test results."

9      Do you see that section of your report?

10   A.   Yes.

11   Q.   Okay.  So inadequate lab proficiency could create

12   inaccurate results on a presumptive or a definitive test,

13   right?

14   A.   Yes.

15   Q.   And so you would need to do -- are you aware you need to

16   kind of do normal upkeep on a presumptive or definitive drug

17   testing machine to make sure they continue to produce reliable

18   results?

19   A.   Yes.

20   Q.   Yeah, okay.  And that would include sort of regular,

21   like, maintenance on the machine as well, right?

22   A.   Yes.

23   Q.   Okay.  Do you remember ever seeing any drug tests in the

24   records for Patient SS or TD or all these other patients that

25   are referenced in your report that might call into question

1   the reliability of the testing that was being performed at

2   Northern Kentucky Center for Pain Relief?

3   A.   I don't recall anything like that.

4   Q.   Okay.  Did the defense ever tell you there might have

5   been problems with the personnel operating the -- for example,

6   the definitive urine drug testing machine at Northern Kentucky

7   Center for Pain Relief?

8   A.   I don't recall that happening.

9   Q.   The defense didn't tell you that; is that right?

10  A.   I don't recall that conversation.

11  Q.   Okay.  And if the urine drug testing at Northern Kentucky

12  Center for Pain Relief wasn't producing reliable results, that

13  could potentially affect your opinion as to whether or not it

14  was proper to proceed with that type of testing, right?

15  A.   Not necessarily.

16  Q.   Not necessarily?  So you think you can bill for -- you

17  can't bill, though, sir, for a definitive -- any urine drug

18  test that is a product of unreliable -- an unreliable machine;

19  is that correct?

20  A.   No, of course you can't.

21  Q.   You can't, no.

22  A.   Yes.

23  Q.   Fair enough.  And you, as a provider, wouldn't bill for a

24  urine drug test on a machine that, for example, one of your

25  nurse practitioners had told you was producing unreliable

1    results, right?

2    A.   It would depend on the circumstances.

3    Q.   If the nurse practitioner told you that, you would

4    certainly take that into account, correct?

5    A.   Yes.

6    Q.   Yes.  All right.  How about for urine drug testing?  Can

7    you run a -- let's say you collect urine in month one, and the

8    results of that urine are not reported out for four or five

9    months later.  You would agree with me that that's not a

10    urine -- do you know whether or not that actually happened in

11    this case?

12    A.   I don't recall.

13    Q.   You don't recall.

14        Did the defense tell you about any issues related to a

15    lag time between when urine samples were collected and when

16    they were being reported to providers?

17    A.   I don't recall that conversation.

18    Q.   You don't recall that conversation, and it's not in your

19    report, right?

20    A.   Correct.

21    Q.   Did the defense ever tell you about urine drug tests that

22    just -- that appeared to have been billed but just aren't in

23    the medical record?

24    A.   I don't recall that conversation.

25    Q.   Okay.  All right.  Let me ask you a couple questions

1    about the way you're doing urine drug testing at your clinic

2    in Indiana.

3         You use -- do you use an outside lab to run definitive

4    urine drug tests at your clinic?

5    A.   Yes.

6    Q.   Okay.  And you -- generally speaking, you might -- are

7    you running -- so, actually, let's talk about the presumptive

8    tests first.

9         For the presumptive tests, are you using the pee in a cup

10   option that we talked about earlier?

11   A.   The place where I send them for presumptive tests, to my

12   knowledge, it is a pee in the cup --

13   Q.   Okay.

14   A.   -- situation, using that technology.

15   Q.   So that's for the presumptive tests?

16   A.   Yes.

17   Q.   And then the definitive tests -- do you sometimes run

18   definitive tests as well?

19   A.   I send them out.

20   Q.   Send them out.  Yeah, you send them out.  I think with

21   your patients, isn't it true that you, I don't know, generally

22   send out only maybe one or two definitive tests per year?

23   A.   It just depends on the circumstances with the patient.

24   Q.   Okay.  Do you ever send out, I don't know, 10 or 11

25   definitive urine drug tests a year for a patient?

1    A.   I don't recall ever doing that myself.

2    Q.   Ever doing that yourself.

3         In fact, I think, generally speaking, you're at most

4    doing quarterly definitive urine drug testing on your

5    patients; is that fair?

6    A.   I think it depends.  I personally don't do them anymore

7    on a scheduled basis.

8    Q.   Okay.  But if you're doing it over the course of a year,

9    you're probably running, ballpark, two to three tests a year

10   on your patients?

11   A.   I would say it varies.

12   Q.   The other point, actually, Dr. Murphy, is when you're

13   running urine drug tests -- I think it says in your new

14   patient packet, you're going to randomly run urine drug tests,

15   right?  The patient won't necessarily know about it in

16   advance; is that right?

17   A.   That's my goal.

18   Q.   Right.  To randomly administer the drug tests, right?

19   A.   Well, in a sense, it's -- "random" is a word that -- some

20   of them are unexpected and random to the patient, but not

21   necessarily to me.

22   Q.   Okay.

23   A.   So the best way to describe it is random, but I would

24   like to do a drug screen that is unexpected by the patient.

25   Q.   Okay.  So you have a number of Medicare beneficiaries at

1   your practice; is that right?

2   A.   Yes.

3   Q.   And over the course of the years, you know, maybe around,

4   what, like around 100, 150 of your patients have been Medicare

5   beneficiaries, say, from 2017 through 2020?

6   A.   I'm sorry?

7   Q.   So for the period of time from 2017 to, say, 2020, you

8   have, you know, around like 100 Medicare beneficiaries at your

9   practice; is that fair?

10  A.   I have more than that.

11  Q.   You have more than that.  Okay.

12  A.   Yes.

13  Q.   All right.  Let me just cut to the chase and get to what

14  I'm driving at.

15       So, Dr. Murphy, what I'm going to show you, and only you,

16  is a record of what we understand to be your Medicare

17  beneficiaries year in, year out, from 2017 to 2020.  Okay?

18  A.   So this is data on my practice?

19  Q.   This is data on your practice.

20  A.   Okay.

21  Q.   Only your Medicare -- I want to be clear on this.

22  Medicaid is a different ball game.  You're in Indiana.  I

23  didn't want to go there.  So just so you're clear on this,

24  sir, no tricks or anything like that here.  This is only

25  Medicare beneficiaries.  So those are generally older people

1    that are disabled people.  Fair?

2              MS. GERDES:  May we briefly approach, Your Honor?

3              THE COURT:  Sure.  I had a question as well.  I was

4    going to have you all approach.

5         (Sidebar conference.)

6              THE COURT:  Just so I can make sure what I'm getting

7    at -- hold on.  You asked to approach.  We're here at the

8    bench outside the hearing of the jury.  This information was

9    provided by whom?

10             MR. LYNCH:  We got certified data from CoventBridge,

11   which is the Medicare -- it's the same --

12             THE COURT:  From Indiana?

13             MR. LYNCH:  Yes, from Indiana.

14             THE COURT:  So this is information that -- of course,

15   on cross, you can ask information that you have -- if you have

16   a legitimate basis to have the information, you can ask him.

17             MR. LYNCH:  Right.

18             THE COURT:  This information shows, I guess, the

19   number of patients who received the various number of tests

20   per year?

21             MR. LYNCH:  Yes, that's correct.

22             THE COURT:  Okay.  That's --

23             MS. GERDES:  I just want to understand what that

24   legitimate basis for the information is.  Because I don't

25   think requesting -- I don't think requesting information and

1   using a subpoena to obtain information for cross is a

2   legitimate basis for a subpoena at all.  And that's what I

3   believe --

4           THE COURT:  How they received it is how they received

5   it.

6           MS. GERDES:  I don't -- Your Honor --

7           MR. LYNCH:  We can receive --

8           THE COURT:  This would have been --

9           MS. GERDES:  If they requested this via subpoena,

10  they need to have a reasonable -- I'll let Mr. Glassman chime

11  in.

12          MR. GLASSMAN:  I think if it was information -- is it

13  by a grand jury subpoena?

14          MR. LYNCH:  We did not do it via grand jury subpoena.

15  We did --

16          THE COURT:  It couldn't have been, right?

17      (Indiscernible crosstalk.)

18          THE COURT:  One at a time.  I'm sorry.

19          MR. LYNCH:  Your Honor, we did an admin subpoena for

20  this information and we plan on disclosing it -- you know,

21  this is impeaching information.  We plan on disclosing it.  We

22  can disclose it contemporaneously here as the defense --

23          THE COURT:  Well, it's very rare for the prosecutors

24  to have anything in their back pocket that the other lawyers

25  don't know about because they cross so rarely.

1        So how he obtained this -- are you saying that this

2    information is inaccurate somehow?

3            MS. GERDES:  No.  I'm saying that I wanted to know

4    what kind of subpoena was used to obtain the information.  And

5    I'm not necessarily so sure that there's a legitimate basis

6    for an administrative -- surely, not for a grand jury

7    subpoena.

8            THE COURT:  Well, I understand.

9            MS. GERDES:  For an administrative --

10           THE COURT:  What's your remedy?  He can ask him

11   everything about this without the jury seeing this.  Agreed?

12           MS. GERDES:  He can ask the number of tests, yes.

13   But as far as these records show X, I don't think that that's

14   proper.  And I'm going to do some research into whether --

15           THE COURT:  Sure.

16           MS. GERDES:  -- an administrative subpoena is

17   appropriate --

18           THE COURT:  What would your remedy be?

19           MS. GERDES:  Striking this portion of the

20   cross-examination.

21           THE COURT:  At any rate, do you think it's legitimate

22   for --

23           MS. GERDES:  Your Honor, I'm not trying to be

24   contentious here.

25           THE COURT:  I know.

1          MS. GERDES:  You're getting frustrated with me.

2          THE COURT:  My head's hurting.  I had --

3      (Indiscernible crosstalk.)

4          MS. GERDES:  I didn't know.  I'm sorry.

5          THE COURT:  It's all good.  It's not bothering me.

6  It hasn't impacted my legal acumen at all.

7      At any rate, I wanted to just -- for instance, he

8  certainly can ask him about his practices in Indiana, clearly,

9  whether or not he would do something.  He's obviously been put

10  up to be an expert on -- not only on issues relating to

11  prescribing, but he also opined on these urine drug tests to

12  some extent.

13          MS. GERDES:  Fair enough.

14          THE COURT:  So whether or not he screened for 1 to 7,

15  1 to 15, 1 to 20, 1 to 22 when he did definitive, that also is

16  something that could be asked -- I don't know what the answer

17  would be, but that's certainly part of what could be asked

18  here.

19      I'm going to allow you to ask questions about his

20  definitive tests.  If you want to get into specifics, you do

21  so at your own peril.  If you want to ask for the majority,

22  majority is 50 percent plus one.

23          MR. LYNCH:  Right.

24          THE COURT:  I think it's a fair -- I mean, even

25  without this, you could ask him what his recollection is.

1          MR. LYNCH:  Yeah.  Well, I think he's already kind of

2     testified to that.  This is just -- you know, what I would

3     like to ask him is, you know, in 2017, of his Medicare

4     beneficiaries, 74 percent only got one definitive test a year.

5          THE COURT:  Look, how -- I presume for purposes of

6     this next statement that how you obtained the information --

7     the information you obtained from an official government

8     source, whether it be Indiana -- I guess Wellcare is the

9     equivalent --

10          MR. LYNCH:  It's from CoventBridge, which is the -- I

11     think, Medicare, the MAC -- I think I've got the acronym

12     right.  It's the place that we got all -- it's the place that

13     we got certified data for the Medicare patients in this case.

14          THE COURT:  That's fine.  But as far as -- I'm not --

15     if you just ask the questions without getting into the

16     specifics, I think you avoid the potential pitfall that

17     Ms. Gerdes has mentioned here at the bench.

18       I'm not saying if you get into it, that's necessarily

19     going to mean that it's stricken.  Because I'm thinking up

20     here out loud, which I do all the time because that's what I

21     have to do here at the bench, obtaining the information for

22     cross-examination, that's what witnesses -- that's what

23     lawyers do.  To the extent they can do it legitimately within

24     the --

25          MR. LYNCH:  And --

1          THE COURT:  Hold on.  Within the legal, I guess,

2     realm.  So I'm going to let him ask the questions, and then

3     we'll go from there.

4          MS. GERDES:  And I would just ask for a copy of the

5     administrative --

6          MR. LYNCH:  Yeah.  I know --

7          MS. GERDES:  -- whatever subpoena.  Because I agree,

8     a trial subpoena to the Court, and that's handled very

9     differently.  So I would like to see a copy of whatever --

10         THE COURT:  Well, he wouldn't even -- well, I guess

11    you could subpoena someone from -- well, that would be

12    potentially 608(b), impeachment on collateral matters.

13    Getting into mini trials, calling someone from this

14    Coventry [*sic*], we're not going to go that route.

15         MR. LYNCH:  All right.

16         THE COURT:  All right.  Thank you.

17         MS. GERDES:  I hope you're feeling okay.

18         THE COURT:  I'm good.  Thank you.

19       (Sidebar concluded.)

20         THE COURT:  I'm sorry, ladies and gentlemen.  We'll

21    get back to regularly scheduled programming momentarily.

22         MR. LYNCH:  Okay.

23    BY MR. LYNCH:

24    Q.   Dr. Murphy, I'm guessing you had a chance to at least

25    briefly look at this document in that break?

1     All right.  So fair to say that, for example, in 2017,

2  Dr. Murphy, according to the data that we've obtained, 114 of

3  your beneficiaries received just one definitive urine drug

4  test.  Do you see that on that second line of the table?

5  A.   I see the number 114.

6  Q.   Yes.  And that's -- and then 34 received two definitive

7  drug tests.  Do you see that?

8  A.   I see on this table that you've provided me --

9  Q.   Yes --

10  A.   -- which I've never seen before --

11  Q.   Fair enough.

12  A.   -- I see the number 34.

13  Q.   Okay.  And then three definitive drug tests, that's five

14  patients.  Do you see that?

15  A.   I see the number 5.

16  Q.   All right.  And then four definitive drug tests, that's

17  one patient.  Do you see that?

18  A.   I see the number 1.

19  Q.   All right.  For your Medicare patients for that year

20  2017, do you have any reason to dispute that, I don't know,

21  about 75 percent of those patients received just one

22  definitive urine drug test from your practice?

23  A.   Not knowing if this is accurate or not --

24  Q.   Fair enough.

25  A.   -- I would say that's probably a fair assessment.

1    Q.   Fair.  So three-quarters received one.  And then two

2    tests, it's another 34.  That brings it up to, what, about 95

3    percent of your patients, Dr. Murphy, have received at most

4    two definitive drug tests?

5    A.   Well, I'm not sure what those numbers mean.  But if you

6    are asking me if 95 percent of the Medicare patients received

7    at least two or up to --

8    Q.   At most two.

9    A.   At most two?

10   Q.   Does that sound about right?

11   A.   Yes.

12   Q.   Yeah.  And here again, for 2017, you had zero patients

13   who received more than four definitive drug tests?  Does that

14   sound about right?

15   A.   I can't recall, but I wouldn't dispute that number.

16   Q.   You wouldn't dispute that, okay.

17        And that's consistent with, you know, doing one to two

18   definitive drug tests a year on most of your patients, at

19   least in 2017, right?

20   A.   I think of the Medicare patients perhaps.

21   Q.   Sure.

22   A.   So of this population, that's probably close to accurate,

23   I would say.

24   Q.   Correct, yeah.  Older people, probably generally lower

25   risk.  Fair?  If you don't feel comfortable generalizing, sir,

1  I can withdraw that question.

2  A.   Without knowing more specifics, I'd prefer not to --

3  Q.   Sure.

4  A.   -- go on the record with an answer to that.  I can say --

5  I'd just say I don't know.

6  Q.   Do you know, sir, if any of those patients that you sort

7  of had opined on with the urine drug testing from that list in

8  your report, if any of them are Medicare beneficiaries?

9  A.   Again, I can't recall --

10  Q.   You can't recall.

11  A.   -- the specifics of those patients.

12  Q.   And you don't know if they received, you know, two tests

13  a year or if they received, for example, I don't know, like 12

14  tests a year, right?

15  A.   I don't recall.

16  Q.   Okay.  And that information isn't in your report either,

17  right?

18  A.   Correct.

19  Q.   Okay.  One other question on the drug tests.  When you

20  send samples out to sort of the outside lab, you're using kind

21  of the big ones like LabCorp and Quest Diagnostics, generally?

22  A.   I do use those two.

23  Q.   Sure.

24  A.   And there's another one I use as well.

25  Q.   Okay.  And you're generally -- you're -- you know, you

1  have to send those out.  There's a certain -- you know, it

2  could be a couple days.  But you're generally interpreting

3  those tests, you know, within the month after you've sent them

4  out; is that fair?  Maybe it's a shorter time frame.

5  A.  Generally, that is -- that is the case, yes.

6  Q.  Okay.  You're not -- you're certainly not interpreting

7  those urine drug tests five or six months after you've

8  collected the urine?  You wouldn't do that?

9  A.  On occasion, that has happened.

10 Q.  On occasion.  But that's a rare event, right?

11 A.  We like to make that a rare event, but that does happen.

12 Q.  All right.  And just to be clear, we sort of went through

13 2017.  In 2018, you had 64 Medicare beneficiaries getting one

14 test and -- you know, around 64 getting one test, 84 getting

15 two tests.  So about, what, 60 percent of your patients were

16 getting, at most, two tests?  Does that sound about right?

17 A.  I'm not sure how you came to that number.

18 Q.  Well, 34 plus 43.  76 --

19         THE COURT:  A percentage, okay.

20 Q.  Excuse me.  76 percent.

21 A.  So you're -- again, you're saying that -- asking me if

22 about 75 percent of my Medicare patients in 2018 received one

23 or two?

24 Q.  Yeah.  At most two.

25 A.  That's probably about accurate.

1   Q.   Yeah.  And then 2019, again, you know, you got 33 percent

2   plus 49 percent.  If you want to call that -- 82 percent

3   received, at most, two urine drug tests, definitive urine drug

4   tests?

5   A.   I would not dispute that.  It sounds about right to me.

6   Q.   All right.  And then in 2020, it looks like 82 plus 14.

7   I mean, we're talking 90 -- what is that?  I'm not good at

8   math -- 96 percent.  96 percent of your patients were

9   receiving, at most, two definitive urine drug tests; is that

10  right?

11  A.   Again, we're talking about just this group of --

12  Q.   Just this group of Medicare patients --

13  A.   -- Medicare patients?

14  Q.   Yeah, yeah, that's correct.

15  A.   Again, I don't know where you got the data exactly,

16  but --

17       (Indiscernible crosstalk.)

18  A.   -- tell you that that sounds like a --

19  Q.   Sounds about right.

20  A.   -- correct number to me.

21  Q.   Based on what your -- and I'm not holding you to these

22  numbers.

23       Fair enough.  But that's about the percentage?

24  A.   That seems right to me.

25  Q.   Seems about right to you.

1     A.   Yes.

2     Q.   Okay.  And in each of those years -- actually, just one

3     other thing.  In every year -- excuse me.  In 2017, in 2019,

4     and 2020 -- excuse me.  In 2017, 2018, and 2020, you had no

5     patients receive more than four definitive drug tests in a

6     year.  Does that sound about right?

7     A.   Of the Medicare --

8     Q.   Of the Medicare -- excuse me, yes, of the Medicare

9     patients.

10    A.   -- patients?

11    Q.   Yes.

12    A.   Again, I don't know the accuracy of that, but that

13    wouldn't surprise me if --

14    Q.   That wouldn't surprise you?

15    A.   -- that was correct.

16    Q.   Yeah, okay.  And it does seem like you did -- in 2018,

17    you had one guy who got nine definitive tests, it seems.

18    A.   I don't know.  I saw that.

19    Q.   Yeah.

20    A.   And I'm asking myself, I wonder who that was?  I mean, I

21    don't recall.

22    Q.   It kind of stands out to you, right?  It's like the one

23    guy who had nine tests in a year?

24    A.   Yeah, I don't know -- I don't know.  That's interesting.

25    That looks like kind of an outlier.  So I don't know who that

1    would be.

2    Q.   Outlier at your clinic would be nine definitive tests in

3    a year.  Okay.

4    A.   That would be unusual at my clinic.

5    Q.   That would be unusual at your clinic.  Fair enough.

6         All right.  I want to just, I think -- I just want to go

7    over one other area here.  You reviewed, Dr. Murphy, Judy

8    Stewart's prescribing, whether or not the -- excuse me.  Let

9    me start again.  Long day.

10        You reviewed whether or not Ms. Stewart's prescriptions

11   were proper or improper, the ones that were issued by

12   Dr. Siefert.  Do you remember talking about that on direct?

13   A.   Yes.

14   Q.   You remember how Ms. Gerdes also brought up a number of

15   urine drug tests for Ms. Stewart that went to outside labs.

16        Do you remember that?

17   A.   I don't recall exactly that conversation.

18   Q.   Okay.  Well, do you remember she sort of showed you --

19   she gave you like a stack of, I don't know, five or six

20   definitive urine drug tests and she asked you to sort of

21   identify them.

22        Do you remember that?

23   A.   Yes.

24   Q.   Yes, okay.  Fair enough.  We're on the same page.

25        And do you remember the companies for those were

1   Bluewater and something like Medical Toxicology or something

2   like that, those two company names?

3   A.   Well, I know there was more than one, and Bluewater was

4   one of them.

5   Q.   I'd like to show you one that she didn't show you.

6       Okay.  Here's another urine drug test for Ms. Stewart.

7   Take a look at that briefly.  This is on page 211 of

8   Exhibit 120.  That's been admitted, Government Exhibit 120.

9            THE COURT:  211?

10           MR. LYNCH:  211 of Exhibit 120.

11  BY MR. LYNCH:

12  Q.   Can you see that, Dr. Murphy?

13  A.   Yes.

14  Q.   Okay.  So this is a -- fair to say this is -- sorry.  Let

15  me show you the second page.  Do you need more time to read

16  the first page?

17  A.   I'm good.  Thank you.

18  Q.   You're good.  All right.

19      I think that's just a little bit more information on the

20  second page.  I'm just going to ask you just a couple

21  questions about the first page there, Dr. Murphy.  You

22  recognize this as a definitive urine drug test, right?

23  A.   Yes.

24  Q.   This is a different lab company.  It's called Southwest

25  Labs.  Do you see that?  It's not LabCorp.

1   A.   Yes.

2   Q.   Yeah.  Not Bluewater.  It's this one called Southwest.

3   Did the defense ever tell you anything about Southwest Labs,

4   Dr. Murphy?

5   A.   I don't recall a conversation about Southwest Labs.

6   Q.   Okay.  Have you ever had any dealings with Southwest

7   Labs?

8   A.   Personally?

9   Q.   Yes.

10  A.   No, not that I'm aware of.

11  Q.   Okay.  Let me ask you -- and you think that the -- I

12  think you said that the frequency of the urine drug testing

13  for Ms. Stewart was generally proper, to your view of the

14  medical record, right?

15  A.   My recollection is that it was.

16  Q.   The frequency.  Okay.

17       Let me ask you a hypothetical about that.  Let's say that

18  you had used Southwest Labs and a representative from that lab

19  said to you, Dr. Murphy, I'd like to give you some money if

20  you agree to send me all your drug testing orders for people

21  like Ms. Stewart.

22       Would you take that deal?

23  A.   Say that again.

24  Q.   Let's say that a representative from Southwest Labs said

25  to you, Dr. Murphy, I'd like to give you some money if you

1   agree to send me all your drug testing orders for people like

2   Ms. Stewart.

3        Would you take that deal?

4   A.   If that's the language, the exact that was used with me,

5   I would -- it doesn't sound like something that I would want

6   to do.

7   Q.   Have you ever taken a -- and I'm not trying to -- do not

8   take this question the wrong way.

9        Have you ever taken a payment from an outside lab in

10  exchange for referring that lab business?

11  A.   Not that I'm aware of.

12  Q.   You wouldn't do that either, would you?

13  A.   I would do what I could to avoid that.

14  Q.   Yeah.  That would be paying -- that would be taking a

15  kickback, wouldn't it?

16  A.   I'm not sure what I would call that.  That would not be

17  something that I would want to do.

18  Q.   That would not be something you -- you could use the

19  word -- would you use the word "kickback"?  You know what a

20  kickback is, sir, right?

21  A.   Just what I've, you know, learned on TV and over the

22  years.  But I would not want to accept money from a lab to

23  send them patients.

24  Q.   Right, right.  And, in fact, I mean, you're Medicare

25  enrolled, right?  You sign certifications saying you're not

1   going to do that.  You're not going to take money from an

2   outside lab in exchange for referring them tests, right?

3   That's something you sign off on as an enrolled provider for

4   Medicare, right?

5   A.   I did when I was an enrolled provider.  I'm not an

6   enrolled provider now.

7   Q.   Okay.  But that's something that you -- that you did and

8   you -- again, I think we're on the same page here.  That's not

9   something you would have done?

10  A.   I don't remember the actual language of signing it.

11  Q.   Okay.

12  A.   But I can tell you that that's not something that I

13  would --

14  Q.   Okay.

15  A.   That I would accept, that I would want to do.

16  Q.   And it doesn't really make it any less of a kickback,

17  right, if you call it not money but a distribution from the

18  lab company, right?  You wouldn't take -- you wouldn't take

19  that money if it was just cold, hard cash or if it was called

20  a distribution of money, would you?

21  A.   Now, that's something that I'm --

22  Q.   If you're uncomfortable talking about it --

23       (Indiscernible crosstalk.)

24  A.   -- what that means.

25  Q.   Fair enough.  All right.  Let me just ask you this.  How

1    much has the defense told you about Dr. Ehn?  What do you know

2    about him?

3    A.   Well, I know that he's a chiropractor.

4    Q.   Okay.

5    A.   And that he was the owner of the practice.

6    Q.   All right.  Let me put up an exhibit.  It's Government's

7    Exhibit 4, page 7.

8            THE COURT:  Is this in evidence?

9            MR. LYNCH:  This is in evidence, Your Honor.  This

10   was admitted through an earlier witness.

11   BY MR. LYNCH:

12   Q.   Dr. Murphy, I think you said earlier in this

13   cross-examination that the defense had provided you Government

14   Exhibit 1, which has some information on the prescribing.

15           MS. GERDES:  Objection.  If we can clarify the

16   defense as to who we're talking about here.

17           MR. LYNCH:  Dr. Siefert.

18   BY MR. LYNCH:

19   Q.   Dr. Siefert provided you a copy of Government Exhibit 1

20   that includes sort of those summaries of the prescribing by

21   Dr. Siefert?

22   A.   I don't remember what Exhibit 1 was.  I'm sorry.

23   Q.   They didn't provide you with this document, though,

24   right?

25           MS. GERDES:  Objection.  If we can be specific when

1    we're talking about the defense, which attorneys we're talking

2    about.

3    Q.   Did Dr. Siefert's --

4         MS. GERDES:   Thank you.

5    Q.   -- attorneys provide you the document that is currently

6    displayed before you that is part of Government Exhibit 4?

7    A.   I don't recall seeing this document.

8    Q.   All right.  Do you see on the left side of that document

9    a little bubble that says Southwest Labs?

10   A.   Yes.

11   Q.   And then do you see an arrow going from Southwest Labs to

12   the guy over there, Timothy Ehn?

13   A.   There is an arrow pointing toward Timothy Ehn.

14   Q.   And you see that number, about half a million dollars?

15   A.   There is a number on that arrow of $446,417.

16   Q.   Do you know anything about whether or not Dr. Ehn made

17   about half a million dollars from Southwest Labs?

18   A.   I don't know anything about Dr. Ehn's relationship with

19   Southwest Labs.

20   Q.   Okay.  And fair to say that you opined on the

21   appropriateness of those urine drug tests, including those

22   tests to outside labs, without any information like the

23   information contained in Exhibit 4?

24   A.   Yes.

25        MR. LYNCH:   No further questions, Your Honor.

1          THE COURT:  Mr. Glassman, since he touched on some

2    information relating to your client, if you'd like to ask some

3    questions.

4          MR. GLASSMAN:  No questions of this witness, Your

5    Honor.

6          THE COURT:  Ms. Gerdes, redirect.

7          MR. LYNCH:  Just briefly.

8                        REDIRECT EXAMINATION

9    BY MS. GERDES:

10   Q.   Dr. Murphy, tell us about how your -- well, remind us,

11   how many patients do you have at your practice at any given

12   time?

13   A.   I think right now, we have somewhere between 400 and 430.

14   Q.   And how many patients are you typically seeing per month?

15   A.   We evaluate about 125 per month.

16   Q.   And based on your review of cases, this is not the first

17   case that you have reviewed related to urine drug testing; is

18   that fair to say?

19   A.   Yes.

20   Q.   And have you observed any kind of differences between how

21   practices handle that from, say, large clinics that see lots

22   of patients versus smaller individual practices?

23   A.   Yes.

24   Q.   And what observations have you made?

25   A.   It's all over the board.  Some practices give very few

1    drug screens.  Other practices will get them on every visit

2    when someone comes in and even in between visits.  It just

3    varies from practice to practice, depending upon how they want

4    to conduct their course of business.

5    Q.   Fair enough.  You were asked questions by Mr. Lynch about

6    testimony that you gave in a prior trial.  This is the

7    Suetholz trial.  You testified on September 12th of 2022.  And

8    this related to testimony you gave about medical records.  And

9    I just want to -- did he only read a portion of your testimony

10   on that?

11   A.   Yes.

12   Q.   Okay.  We can just give the full context.  This is

13   page 115.

14       Is the full context, you were asked:  "When you first

15   start seeing a patient in your practice, you also require the

16   patient to generally bring their medical records with them,

17   correct?"

18       And what did you say?

19   A.   "Not necessarily.  It's nice if they do, but I don't

20   require that."

21   Q.   And then you were asked:  "But you typically do get

22   medical records for a new patient from a prior provider?"

23       And what did you say?

24   A.   "We ask for medical records, typically.  If we get them,

25   great.  If we don't get them, I still treat the patient."

1   Q.   Mr. Lynch showed you an article that you wrote back in,

2   it looks like, approximately 2005 regarding the COMPLIANCE

3   documentation aid.

4        And he read the phrase, "In this day of, 'if it wasn't

5   written down, it wasn't done,' cognizance of the COMPLIANCE

6   mnemonic should help busy physicians apply and record the

7   recommendations set forth by both of these important clinical

8   guidelines."

9        What, if any, punctuation did you have around "if it

10  wasn't written down, it wasn't done"?

11  A.   I have quotation marks around those, indicating that's

12  not my quote.   That's quoting what I've heard before.

13  Q.   Fair enough.   But in the context of medical care, just

14  because something wasn't written down doesn't mean it didn't

15  happen, correct?

16  A.   Correct.

17  Q.   This affidavit that you gave in connection with

18  Commonwealth of Kentucky and Purdue Pharma, do you talk about

19  your qualifications as a physician at the first page?

20  A.   Yes.

21  Q.   And that you were a past president and, at the time,

22  current board chair of the Greater Louisville Medical Society?

23  A.   Yes.

24  Q.   And you're also, or you were at the time, an assistant

25  clinical professor at the University of Louisville School of

1    Medicine?

2    A.    Yes.

3    Q.    And then you address that you have prescribed OxyContin

4    to patients in the past?

5    A.    Yes.

6    Q.    And you talk about how some patients have benefitted from

7    that?

8    A.    Yes.

9    Q.    And some of those patients who were previously disabled

10   because of pain were able to return to work and lead

11   productive lives?

12   A.    Yes.

13   Q.    And in some of those cases, that medication was able to

14   relieve their pain when other medications had failed to

15   provide that same level of relief?

16   A.    Yes.

17   Q.    And then ultimately, what you're saying is, "I have never

18   overprescribed OxyContin based on information I have received

19   from Purdue Pharma or its sales representatives"?

20   A.    Yes.

21   Q.    And this is dated May 30th of 2014?

22   A.    Yes.

23         MS. GERDES:   I don't have any further questions.

24   Thank you very much, Dr. Murphy.

25         THE COURT:   Anything further?

1    MS. GERDES:  I have no objection to the affidavit
2  going into evidence.
3    MR. LYNCH:  We're not admitting it, Your Honor.
4                    RECROSS-EXAMINATION
5  BY MR. LYNCH:
6  Q.    Just a couple questions, Dr. Murphy.
7    Ms. Gerdes talked about how OxyContin, that drug, might
8  have helped some of your patients.  You put that in your
9  affidavit, right?
10 A.    Yes.
11 Q.    OxyContin, prescribed by Purdue Pharma, devastated the
12 lives of countless people in Eastern Kentucky; isn't that
13 true?
14    MS. GERDES:  Objection, Your Honor.
15    THE COURT:  Sustained.
16    MR. LYNCH:  No further questions.
17    THE COURT:  May this witness be finished?
18    MR. LYNCH:  Yes.
19    MR. GLASSMAN:  Request to approach before the witness
20 is released.
21    THE COURT:  Very well.
22    (Sidebar conference.)
23    THE COURT:  All right.  Mr. Glassman?
24    MR. GLASSMAN:  Thank you, Your Honor.  So there was a
25 significant line of questions on cross-examination with

1    respect to Southwest Labs, and one lab test was shown for Judy

2    Stewart from 2015.

3         The Court allowed evidence of Southwest Labs pretrial as

4    404(b) evidence.

5              THE COURT:  Correct.

6              MR. GLASSMAN:  That is outside the charged conspiracy

7    which begins in January of 2017.  As we sit here right now, I

8    think the jury could be quite confused as to whether that

9    evidence was part of the conspiracy or something else.  So I

10   would ask for a limiting admonition that evidence with respect

11   to Southwest Labs is not part of the crimes charged and is --

12   may be considered only for whatever purpose they're trying to

13   use it for, which I assume is intent.

14             THE COURT:  I thought I already gave the limiting

15   instruction.

16        Frankly, even if it's before the charged conspiracy, if

17   it goes to show his intent and knowledge -- perhaps the reason

18   why he knew it was so lucrative to send these tests out, he

19   was receiving a lot of money -- I mean, it is admissible under

20   404(b) to show knowledge and intent as it relates to him.

21        Do you want me to give that again?

22             MR. GLASSMAN:  I would just -- well, yeah, I think

23   that would be helpful.

24             THE COURT:  Very well.  I can do that.

25             MR. LYNCH:  Your Honor, I just do not remember right

10-172

1    in this moment.  We had two theories of admissibility on the

2    Southwest Labs stuff, both that it was intrinsic and it was

3    404(b).  Your recollection is that the only basis for

4    admissibility was the 404(b) theory?

5             MR. GLASSMAN:  That is my recollection, yes.

6             THE COURT:  Well, the jury instruction that's

7    prepared to be given to you at the close of today, at least

8    the draft set, includes the information relating to the labs

9    as 404(b).

10            MR. LYNCH:  Fair enough.  I just didn't remember,

11   Your Honor.

12            MS. GERDES:  So can we release the witness as

13   finished, then?

14            THE COURT:  We will.

15       (Sidebar concluded.)

16            THE COURT:  You're free to go.  Be careful going to

17   Nashville.  Say hello to Judge Campbell for me.

18            THE WITNESS:  I will.  Thank you.

19       (Witness excused.)

20            THE COURT:  Ladies and gentlemen, before we hear from

21   the next witness, I told you earlier -- and throughout the

22   trial, I've been giving you some, when appropriate,

23   admonitions relating to the admissibility of certain evidence

24   for a limited purpose, and I'm going to be giving you a final

25   set of instructions which includes some of those things later.

1       But for purposes of right now, you've heard testimony

2   that Defendant Ehn was perhaps involved in other acts other

3   than those charged in the superseding indictment, including

4   arrangements to perhaps receive payments in exchange for

5   sending orders to laboratory testing companies such as

6   Southwest Labs.

7       If you find Defendant Ehn did those acts, you can

8   consider the evidence only as it relates to the government's

9   claim on Mr. Ehn -- or Dr. Ehn's motive, intent, and

10  knowledge.  You must not consider it for any other purpose.

11      Remember that he is only on trial here -- "he" being

12  Defendant Ehn -- for conspiracy to distribute a controlled

13  substance, conspiracy to commit healthcare fraud, and

14  healthcare fraud.  Not for the other acts.

15      Do not return a guilty verdict unless the government

16  proves those crimes in the superseding indictment against him

17  beyond a reasonable doubt.

18      So that is one of those limiting instructions where you

19  can consider that evidence for a limited purpose; that is, to

20  show his motive, intent, and knowledge.

21      All right.  Next witness.  Or before I ask you,

22  Mr. Glassman --

23      Ms. Gerdes, any other witnesses on behalf of your client

24  at this time?

25          MS. GERDES:  We're still discussing certain things

1    related to that with the government so I would ask that

2    Mr. Glassman call their next witness.

3          THE COURT:  That's fine.  Mr. Glassman, next witness?

4          MR. GLASSMAN:  Yes.  Timothy Ehn calls Dale Dexter.

5              DALE DEXTER, DEFENSE WITNESS, SWORN

6          THE COURT:  Good afternoon, sir.

7          THE WITNESS:  Hello.

8          THE COURT:  Try to keep your voice up, and speak

9    clearly into that microphone.

10          THE WITNESS:  I will.  Thanks.

11                      DIRECT EXAMINATION

12    BY MR. GLASSMAN:

13    Q.   All right.  Good afternoon.  Please introduce yourself

14    and spell your name for the court reporter.

15    A.   I am Dale Dexter.  D-a-l-e D-e-x-t-e-r.

16    Q.   Mr. Dexter, can you tell the jury about your professional

17    background?

18    A.   Sure.  Went to college, got a biology and chemistry

19    degree.  Worked at a laboratory in Kansas City for about five

20    or six years doing some clinical pharmaceutical research.  The

21    key to that job was the laboratory tool that we used,

22    instrumentation called LC-MS.  That's what made it really

23    valuable.  I was laid off in 2013, along with a gentleman in

24    my group who was the lead of the group, kind of a mentor to

25    me.

1      Took a job in a completely different industry, moved to

2      Indianapolis, and was there a year and a half or two.  Stayed

3      in touch with the same gentleman that was laid off.  He drug

4      me back into the lab industry as a consultant for small

5      clinical labs, toxicology labs.  And bounced around a little

6      bit, got a lot of experience in the industry, and then started

7      my own company in the fall of '17 and have been doing this

8      since then.

9      So it's a small clinical laboratory consulting company.

10     We have small labs, small physician office labs, like this

11     one; and we've worked with big, huge hospitals, St. E,

12     UC Health, Kaiser.

13     But started the company as specifically LC-MS toxicology

14     and, due to some very fortunate circumstances, have expanded

15     to other lab stuff.  But the core of the business has always

16     been this toxicology work.

17     Q.   Mr. Dexter, before we get into your own company, I want

18     to take you back in time so that we're going chronological.

19     Do you remember the first time that you had any interaction

20     with Northern Kentucky Center for Pain Relief?

21     A.   Yeah.  It would have been 2016 or '17 when I was working

22     at Quasar.

23     Q.   Tell the jury about that, please.

24     A.   Quasar was my employer in Colorado Springs, and that's

25     where I got the bulk of the experience in this space.  I don't

1   recall the date; but, again, probably 2016-ish, that I was

2   serving as a full-time employee for them.

3        So my role, once they had engaged with this lab through

4   McKesson -- there was sort of a three-way partnership with

5   Quasar, McKesson, and the instrument vendor, SCIEX.  Once

6   they'd engaged and signed a contract and had the deal in

7   place, they would send me out to the lab, and my job and role

8   was to validate the equipment, provide them with an SOP,

9   provide them with a summary of the work that I did, and train

10  the staff, and then sort of walk away, other than we had some

11  level of support for, you know, weeks or months after that was

12  remote.

13  Q.   What do you mean "validate"?

14  A.   So when we validate equipment --

15            MR. LYNCH:  Objection, Your Honor.  Can we approach?

16            THE COURT:  I guess.  That's fine.  Sure.  Come on

17  up.

18       (Sidebar conference.)

19            THE COURT:  What's the objection?

20            MR. LYNCH:  This is about to be undisclosed expert

21  testimony.  They have a Rule 16 obligation.  If he's going to

22  talk about what constitutes validation of testing, that had to

23  be disclosed to us beforehand.  He can't offer any expert

24  testimony because he hasn't been disclosed.

25            THE COURT:  Is he testifying as an expert?

DEXTER - Direct                                                    10-177

1           MR. GLASSMAN:  No.  I'm just asking him what he did.

2           MR. LYNCH:  This is beyond lay opinion testimony.

3      He's about to offer an opinion about what constitutes

4      validation for purposes of a liquid chromatograph mass

5      spectrometer test.  That's not -- that's beyond the ken of --

6      that that require disclosure of an expert.

7           THE COURT:  Did you call someone to testify

8      regarding -- I can't remember who it was --

9           MR. GLASSMAN:  Your Honor, it was Ms. Corley.

10          MR. LYNCH:  And for Ms. Corley, we had an extensive,

11     like, five-page disclosure beforehand to show the basis for

12     her knowledge to be able to testify about that stuff.  We even

13     litigated that issue in motions in limine.  Mr. Glassman can't

14     choose not to disclose witnesses --

15          THE COURT:  Here's what we're going to do.  I'm going

16     to overrule the objection at this time.  If he gets into

17     anything that's a little bit more hairy and specific, I'll

18     start sustaining his objections.

19       And keep it to facts and then you won't run afoul of

20     Rule 16.

21          MR. GLASSMAN:  Absolutely, Your Honor.  For the

22     record, there was an objection raised by Dr. Siefert pretrial

23     to the extent of certain disclosures under Rule 16 for certain

24     witnesses.  The Court took the government's side and overruled

25     that and said that these were not expert witnesses, such as

DEXTER - Direct                                          10-178

1    Ms. Corley.  They could testify based upon what they knew.  He

2    elicited extensive testimony from Ms. Corley on direct about

3    her observations of how the lab was functioning or not

4    functioning.  This is a fact witness who can say what he did.

5              THE COURT:  He can do that.

6              MR. LYNCH:  My recollection of it -- okay.  Okay.

7              THE COURT:  There's just a little bit of recollection

8    in this case for all of us.

9         Go ahead and ask.  Your objection will be overruled at

10   this point.

11        (Sidebar concluded.)

12             THE COURT:  You may proceed.

13             MR. GLASSMAN:  Thank you, Your Honor.

14   BY MR. GLASSMAN:

15   Q.   Okay.  The question that was pending, I believe, was --

16   so when you said -- you had just said that you validated the

17   machine.  What is that?

18   A.   Sort of the protocol that we follow when we go on site to

19   a brand-new piece of laboratory equipment, it needs to pass a

20   certain number of tests so that you know it's reliable when

21   we're running lab samples through that.  And this would apply

22   certainly for any kind of lab equipment and something that

23   takes us about a week on site.  It's just a rigorous number of

24   tests that we run on it so that we know that every sample that

25   goes through that is -- the results are very reliable.

1    Q.   And this LC-MS that was installed at the Northern

2    Kentucky Center for Pain Relief, do you remember it?  Do you

3    remember installing this or when it was installed?

4    A.   Yeah.

5    Q.   Can you just tell the jury about this piece of equipment?

6    A.   It was very standard, meaning we had done it at a dozen

7    or dozen and a half other labs.  Nothing new, nothing

8    surprising.  Same model, same -- yeah.  Very normal, if you

9    will.  Nothing obscure about it or -- I mean ...

10   Q.   Yeah.  That's fine.  Thank you.

11        And then that was in -- if you testified that was in 2016

12   when you were working for Quasar, when was the next time that

13   you came into contact with the Northern Kentucky Center for

14   Pain Relief?

15   A.   It was after I had departed from Quasar and started my

16   own company, but I --

17   Q.   That's okay.

18   A.   2018-ish.

19   Q.   I am ready to attempt to refresh your recollection.

20        MR. GLASSMAN:   Showing a document to the witness

21   only.

22        THE COURT:   That's fine.

23   A.   Yep.  So spring of '18.

24   Q.   I take it your recollection is refreshed?

25   A.   Yeah.

1    Q.   So tell the jury what happened.

2    A.   They reached out -- they'd had some staff turnover.  They

3    reached out to have the new lab team member trained.  He had

4    experience on -- with that laboratory instrument, but a

5    different vendor.  And there's a significant difference in the

6    software and the way that the software is utilized, and it's a

7    steep learning curve.  So they reached out and asked if I

8    could come out for a day and train him.

9    Q.   And do you remember the names of the lab people who were

10   involved when you mentioned turnover?

11   A.   Yeah.  So the very first gal, Julie Brokamp, I think --

12   and she was the one that was -- that started when the lab

13   started when I was with Quasar.  I believe there was a

14   gentleman, A.J., between Julie and Kaleb.  Kaleb is the one

15   that I came out for one day to train.  I never met A.J.  But

16   Kaleb was the one that I came out to train for a day, whom I'd

17   kept in touch with after that.

18   Q.   When you came out to train, there was that staff

19   turnover, had there been a problem?

20   A.   No.  I mean, not that I was aware of, anyways.  I was

21   just there to show him how to effectively -- he was fluent in

22   all things lab, except that brand of LC-MS.

23   Q.   I meant with the previous guy.

24   A.   Oh, not to my knowledge.

25   Q.   When you came out to train Kaleb Porter, how was the

DEXTER - Direct                                          10-181

1   machine?

2   A.   It seemed fine.  I didn't see anything wrong with it.

3   You know, I took him through as much as I could in one day,

4   but nothing apparent out of the ordinary.

5   Q.   Was it functional?

6   A.   Yes.

7   Q.   So if it was functioning totally -- it was functioning

8   totally fine when you got there?

9   A.   Right.

10  Q.   Okay.  After you did that training, did you have any

11  further interaction with Northern Kentucky Center for Pain

12  Relief?

13  A.   After that, Kaleb had some very minor follow-up

14  questions, and he would stay in touch periodically for things

15  that were super inconsequential.  Hey, how do I order this

16  part number?  Things like that.  But nothing of any substance

17  for maybe a calendar year.

18  Q.   At some point, did you develop a contractual relationship

19  with Northern Kentucky Center for Pain Relief?

20  A.   Yeah.  When Kaleb left, I had engaged Dr. Ehn -- and I

21  don't remember who the practice manager was at the time --

22  about sort of a solution to this turnover issue, which is the

23  same solution that we've provided with other clients.  And

24  that was, when we started working with them, very -- being

25  very involved.

DEXTER - Direct                                                10-182

1              MR. GLASSMAN:  I'm going to show the witness only

2       what's been marked and previously produced as Defendant Ehn

3       Exhibit 8.

4              THE COURT:  Exhibit 8?

5              MR. GLASSMAN:  Yes.

6              THE COURT:  All right.

7       BY MR. GLASSMAN:

8       Q.   Do you recognize this document?

9       A.   Yep.

10      Q.   What is it?

11      A.   It's the contract between my team and Northern Kentucky.

12             MR. GLASSMAN:  At this time, move to admit

13      Defendant Ehn Exhibit 8.

14             THE COURT:  Any objection?

15             MR. LYNCH:  Can we just -- can I just briefly see it?

16             MR. GLASSMAN:  I'll give you a copy.

17             THE COURT:  This was previously provided in

18      discovery, I take it?

19             MR. GLASSMAN:  Yeah, in pretrial.

20             THE COURT:  Very well.

21             MR. LYNCH:  No objection, Your Honor.

22             THE COURT:  Let it be received without objection.

23             MR. GLASSMAN:  May we just publish it for the jury

24      now so we can --

25             THE COURT:  You may.

1    MR. GLASSMAN:  Thank you.  It might be easiest if I

2  could give a copy to the witness, Your Honor.

3    THE COURT:  Very well.

4    THE WITNESS:  My contracts have improved since then.

5  BY MR. GLASSMAN:

6  Q.  Can you just walk the jury through what were the services

7  that you were agreeing to perform?

8  A.  Sure.  So, basically, there was two parts to the lab.

9  There was the immunoassay for the screen component of the

10  toxicology and there was the confirmation, which was the

11  LC-MS.

12    So this contract was sort of in an effort to manage our

13  side of the lab where there was the staff turnover issues and

14  everything that went with that, except having literal hands on

15  deck to prep samples in the lab every day and consumables,

16  ongoing consumables.

17    So we provided remote support and assistance,

18  troubleshooting guidance.  We provided the -- on the second

19  line here, the cals and QCs, calibrators and QCs.

20  Q.  What is that?

21  A.  So those are a very nontrivial item to prepare.  A lab

22  like this will test for anywhere from 30 to 60 compounds in

23  the urine test, so to speak.  Morphine, codeine, heroin,

24  prescribed opiates, benzos, illicits.  Anything that you might

25  see anybody taking that, you know, maybe would be visiting a

DEXTER - Direct                                                10-184

1    pain practice.

2         So opiates, specifically; illicits, of course, too.  So

3    there's 30 to 50 drugs.  Each one of those needs to be ordered

4    as a reference material, and they come in a vial.  And for all

5    intents and purposes, they need to be pipetted, all of them

6    individually.  Some of the same volume, some of them

7    different.  It's a -- for somebody without a lot of lab

8    experience, it's a really tedious task.

9         And so we have many customers that order this from us for

10   accuracy reasons because they just don't want to do it, for

11   time reasons.  And if somebody messes it up, you don't find

12   out till the next day, and then you've wasted time and

13   materials.  So this was included in that, shipped overnight,

14   monthly, on ice.

15        And then, of course, the other complex component of this

16   role, where we were trying to replace him having to hire

17   somebody, was the data review.  Meaning somebody in the lab

18   would prepare the samples, put them on the instrument, and

19   then it would run overnight, and then in the morning somebody

20   from my team would log on and review the data.  Again, a very

21   nontrivial task that could take anywhere from one to three

22   hours.  And there's a lot of interpretation that goes --

23   involved -- is involved in the data review.

24        So those are the -- you know, and then some of the other

25   stuff.  Technical supervisory services, that's -- it's us

1  checking a box on paper in terms of compliance that we're, you

2  know, again, serving as the supervisor on that side of the

3  lab.

4      Yeah.  That kind of summarizes it all.

5  Q.  And what did it cost for this?

6  A.  Thirty-one-ninety-five a month.

7  Q.  And did Northern Kentucky Center for Pain Relief pay you?

8  A.  Always on time, yeah.

9  Q.  Just so the jury can see -- excuse me.

10      THE COURT:  Try and get that focused a little bit.

11  Sometimes you have to leave it on the machine for a couple

12  seconds.

13      There we go.

14  BY MR. GLASSMAN:

15  Q.  What was the date it was executed?

16  A.  It looks like September 21 of '19.

17  Q.  Do you remember who signed on that for Northern Kentucky

18  Center for Pain Relief?

19  A.  It looks like Dr. Ehn's signature.

20  Q.  And who signed it for DASH Lab Services?

21  A.  Myself.

22  Q.  And that's your company, DASH Lab Services?

23  A.  That's right.

24  Q.  While you were in this -- once you executed this contract

25  and you were in this role, did you field questions from people

1    at Northern Kentucky Center for Pain Relief?

2    A.   Occasionally, yeah.  Nothing on a regular basis.  There

3    would have been questions like, hey, can you double-check this

4    result, which is not uncommon at all.  You know, if

5    somebody's, again, using something illicit they shouldn't be

6    using, they want to make sure before they kicked them out of

7    the practice.

8         Simple questions like, hey, do we need to order more of

9    this supply?  Where should we order it from?  I mean, very

10   standard things.

11   Q.   Do you remember any time when people would be calling you

12   to ask about the results for specific patients?

13   A.   Yeah, yeah.  Not consistent, but yeah.  It was -- it was

14   common, you know.  I don't know.  Once or twice a week, maybe.

15   Maybe not that often.

16   Q.   And the jury's heard about the robot.  Do you know what

17   the robot is?

18   A.   Yep.  It was some --

19   Q.   Can you tell the jury what the robot is?

20   A.   Sure.  It was something that -- again, the goal was to

21   manage the lab remotely.  And as I mentioned, there was still

22   the need for somebody to be in there to prepare the samples.

23        So the urine samples come in in a cup in through the door

24   of the lab, just like you'd imagine a urine cup.  And on the

25   other side of the lab, there was lab personnel that would take

1    care of running that on the screening component of the lab.

2    And the screening component of the lab -- I'm not sure how

3    much the jury's been briefed, but the screening component of

4    the lab is -- it's a much, much less complex portion of doing

5    the urine toxicology testing.  It's only testing for drug

6    classes.

7         And then once it's done on there, we have to also run it

8    on the confirmation component, which is the LC-MS.  But

9    there's a sort of recipe we have to take the sample through to

10   prepare it.  And it's not complex.  It's quite literally a

11   recipe of just following instructions, but it is

12   time-consuming.  It maybe takes an hour and a half.  You have

13   to uncap each sample, you've got to pipette -- you've got to

14   do some things.

15        And the goal -- we haven't got there yet with managing

16   labs.  I can't do that remotely, unfortunately.  But the goal

17   is to also not have to have anybody there do it, Dr. Ehn or

18   anybody else in the lab.  And so I suggested that he get a

19   robot, a liquid handler.  And this robot was a very small

20   footprint, maybe two feet by two feet by two feet.  It was

21   very inexpensive for comparisons in the industry for the same

22   type of instrument.

23        And so what this would do would eliminate, you know, the

24   possibility for any human errors.  It was very much so going

25   to speed up the time that it took to prepare the samples and

1    just kind of streamline things quite a bit to make life easier

2    on the lab.

3        Yeah.  That was pretty much the gist of it.  We've

4    installed these at seven or eight of our labs.

5    Q.  Does the robot ever break?

6    A.  Yeah.  I mean, yeah.  It's a machine.  It's not perfect.

7    Q.  What do you do if it breaks?

8    A.  So -- well, there's several things.  This one, like many

9    of them, has sort of a built-in system to it where it will

10   stop.  So it won't even finish the whole -- or execute the

11   whole protocol.  So you're left with something that you either

12   have to restart it, redo it, you know, what have you.  It

13   won't give you an end product, so ...

14       And you always have -- keep in mind, we always have the

15   option of somebody doing it manually.  The goal is just not to

16   have to do it.  But if it breaks, we either fix it, reboot it,

17   or call the vendor for support.

18           MR. GLASSMAN:  Your Honor, may I check with my

19   colleague for a moment?

20           THE COURT:  Sure.

21           MR. GLASSMAN:  Thank you.

22       A few more questions.

23           THE COURT:  All right.

24   BY MR. GLASSMAN:

25   Q.  So if you -- you had talked early in your testimony about

1    when you validated the LC-MS.  I don't know if you explained

2    in that process about once you validate it, can you just

3    willy-nilly change which drugs you're testing for?

4    A.   No.  No.  And that's a -- it's a very -- no.  Validating

5    it -- when inspectors come in to inspect the lab every two

6    years or ballpark there, they ask for a lot of very specific

7    information.  They look at personnel logs.  They look at

8    all -- and validation is something that they look at very

9    critically.

10         And part of that too is when you register the lab with

11   CMS, you have to say, Hey, we're testing for these drugs.  So

12   there's a lot that goes into it.  You definitely can't just go

13   in one day and say we're going to change our list of drugs.

14   It's a process that would need to be signed off on.  It would

15   require executing a whole 'nother validation.

16   Q.   Can you also explain for the jury, the LC-MS, how it

17   interfaces with, like, the electronic medical -- like the

18   medical software?

19   A.   Sure.  So there's a lab software called an LIS, lab

20   information system.  And -- let me back up.

21         So we have the screen and confirm component of the lab.

22   Two different lab equipment -- pieces of equipment.  They both

23   communicate with what's the LIS, the lab information system,

24   and then that software communicates with the EMR.

25         And there's -- and so -- and we don't do anything with

DEXTER - Direct                                                    10-190

1    EMR.  The LIS, you know -- some labs, we just have LIS; some

2    labs, we don't.  But long story short, you run a test on both

3    the screen and the confirm component of the -- in the lab.

4    Those results transfer -- they communicate over to the LIS.

5    And then from there, you know, reports will go to providers,

6    clinicians, physicians, whoever's relevant to see that result.

7         And then, of course, the practice will -- it will get

8    shipped from the LIS to the EMR for, you know, billing

9    purposes or patient records, if you will.

10   Q.   Do these systems ever get out of sync?

11   A.   Yeah.  I mean, it's not uncommon for them to -- I mean,

12   it's never anything that's not fixable, but it's software, you

13   know.  Yeah.  Especially up front when they're first installed

14   or if they're not, you know, connected properly or things like

15   that.

16   Q.   I think you said this in the beginning, but just before I

17   sit down, you do this kind of work with other organizations

18   besides Northern Kentucky Center for Pain Relief?

19   A.   Yep.

20   Q.   Such as?

21   A.   Many small physician office labs, pain practices.  We

22   work with larger reference labs.  Right when COVID started, we

23   were doing a project with St. E.  We're getting ready to start

24   a project with UC.  MetroHealth in Cleveland.  Big and small.

25        We get our business from -- and this is partly how I

1    started the company.  The gentleman that was laid off from my

2    first job out of college, he had a great relationship with

3    SCIEX, the vendor of the LC-MS.  And I happened to run into a

4    few sales reps on the road years ago, and they found out that

5    he was the brains behind the operation and I was the sales.

6    And I wasn't too offended but -- you know, I had the brains

7    too.

8        So I started the company.  And they asked -- SCIEX asked

9    if we were willing to be, you know, at the top of their

10   consulting list about four years ago.  And, you know, of

11   course I said yes.  So we're very fortunate that our

12   business -- we get referrals from them.  So customers all over

13   the country, all sizes; identical to Northern Kentucky Center

14   for Pain Relief, bigger, smaller.  You name it.

15   Q.   Just to make sure it's all clear, what is SCIEX again?

16   A.   So SCIEX is the vendor, the manufacturer of the LC-MS.

17   And --

18   Q.   Keep going.

19   A.   And it's not just for toxicology or these labs.  The

20   LC-MS has an equipment -- and this is just a sidebar.  It's

21   used in the food industry, agriculture.  Pharmaceuticals use

22   it.  It's used for a lot of different things, not just

23   toxicology.  So it's a big business.

24   Q.   I want to show you one more exhibit.

25           THE COURT:  What exhibit number are we giving this,

DEXTER - Direct                                                    10-192

1    Mr. Glassman?

2              MR. GLASSMAN:  This would be Defendant Ehn's

3    Exhibit 9.

4              THE COURT:  All right.

5              MR. GLASSMAN:  And I would like to just hand a copy

6    to the witness, let him thumb through it.

7              THE COURT:  That's fine.

8              MR. GLASSMAN:  Thank you.

9              THE COURT:  Any objection to 9?

10             MR. LYNCH:  No objection, Your Honor.

11             THE COURT:  Very well.  Let it be received without

12   objection.

13        If you want to show it to the jury, you can.

14   BY MR. GLASSMAN:

15   Q.   Okay.  Do you recognize these documents?

16   A.   Yep.

17   Q.   What are they?

18   A.   Invoices from QuickBooks.

19   Q.   Okay.

20             MR. GLASSMAN:  And since it's already been admitted,

21   I have no further questions.

22             THE COURT:  All right.  We're going to go ahead and

23   take our midafternoon break before we pick up the

24   cross-examination of this witness.  During the recess,

25   continue to heed all the prior admonitions of the Court.

1          We'll be in recess for ten minutes.

2          (The jury exited the courtroom at 3:10 p.m.)

3              THE COURT:  Anything we need to take up before our

4      break?

5              MR. GLASSMAN:  I'd just like to retrieve 9 from the

6      witness.

7              THE COURT:  That's fine.

8              MR. GLASSMAN:  Thank you.

9              MR. LYNCH:  No, Your Honor.

10             MS. GERDES:  Nothing from Dr. Siefert.

11             THE COURT:  Very well.  We'll be in recess for ten

12     minutes.

13         (Recess from 3:11 p.m. until 3:24 p.m.)

14             THE COURT:  If we could have the witness come up.

15         While we're waiting for the witness and the jurors,

16     anything we need to take up before we resume?

17             MR. LYNCH:  Nothing from the United States, Your

18     Honor.

19             MS. GERDES:  And nothing from Dr. Siefert, Your

20     Honor.

21             MR. GLASSMAN:  No, Your Honor.

22             THE COURT:  Bring them in, please.

23         (The jury entered the courtroom at 3:27 p.m.)

24             THE COURT:  You may cross-examine, Mr. Lynch.

25             MR. LYNCH:  Yes, Your Honor.

1                       CROSS-EXAMINATION

2    BY MR. LYNCH:

3    Q.   Good afternoon, Mr. Dexter.  We've never met before,

4    right?

5    A.   Right.

6    Q.   You just have to answer audibly, sir.

7    A.   Yes, that's right.

8    Q.   But we've never met before?

9    A.   Correct.

10   Q.   You -- I think you testified on direct, you do not work

11   at Northern Kentucky Center for Pain Relief?

12   A.   That's correct.

13   Q.   You've never worked at Northern Kentucky Center for Pain

14   Relief?

15   A.   That's right.

16   Q.   And you were not on site at the Northern Kentucky Center

17   for Pain Relief lab day in, day out?

18   A.   That's correct.

19           MR. LYNCH:  No further questions, Your Honor.

20           MS. GERDES:  Briefly.

21                       CROSS-EXAMINATION

22   BY MS. GERDES:

23   Q.   Hi, Mr. Dexter.  My name is Lindsay Gerdes, and I

24   represent Dr. Siefert.  I'm just going to show you what's in

25   evidence as Government Exhibit 240.

1           MR. LYNCH:  Your Honor, may we approach on this

2    exhibit?

3           MS. GERDES:  This is the government's exhibit that's

4    in evidence.

5           MR. LYNCH:  But I don't believe he -- may we

6    approach?

7           THE COURT:  Sure.

8        (Sidebar conference.)

9           MR. LYNCH:  Your Honor, my understanding is this

10   exhibit is from a time period when Mr. Dexter wasn't providing

11   any services to the -- to Northern Kentucky Center for Pain

12   Relief.  If I'm mistaken about that, I apologize, but ...

13          THE COURT:  I'm looking at 2/8/18.

14          MR. GLASSMAN:  I think he testified that he did the

15   initial validation and then they did follow-up, and then he

16   came in to help train in the lab prior to the time that he

17   signed the contract, which was in 2019.  I think that was the

18   testimony.

19          MR. LYNCH:  I don't think he --

20          MS. GERDES:  He's also on cross-examination by me.

21          THE COURT:  Yes.

22          MR. LYNCH:  But it's speculation as to what this --

23          THE COURT:  Do you have an objection?

24          MR. LYNCH:  Yeah.  My objection is it's speculative.

25   He can't talk about a document that he --

1    THE COURT:  Well, if he knows, he can answer.

2    Overruled.

3         (Sidebar concluded.)

4    BY MS. GERDES:

5    Q.   Mr. Dexter, if you can just take a look at Government

6    Exhibit 240.  This is page 824.

7         Does this appear to be the result, if you know, of a

8    presumptive or a definitive test?

9    A.   So the presumptive tests, that's the equivalent of what I

10   was talking about earlier with the screen.  Anything that says

11   Indiko Plus on there on the far right column -- or next to far

12   right, under Instrument.  So everything that we dealt with was

13   the confirmation.  That's -- where it says SCIEX 4500, that's

14   our guy.

15   Q.   And what do these results mean, if you know?

16   A.   Yes.  So let's start with the cut-off column, right?  The

17   cut-off column, anything in this space, meaning clinical lab,

18   clinical tox, there's a number that's a cut-off.  So any

19   patient that's higher than 50 -- if it's 50.1 to 50 trillion,

20   it's positive.  49.99999 or less is negative.  That's the

21   cut-off.

22        And when it says -- and then the units, units is

23   whatever, but the result says greater than 500.  And right

24   below that, it says 60.06.  We have to -- I don't know if it's

25   relevant.  We have to report out greater than 500 because we

1   only validate up to 500.  Long story short, it could be 501 or

2   it could be 5 million.  But that's what those numbers mean.

3       The "normal" for specific gravity and creatinine, that

4   just means that the urine wasn't tainted or wasn't fake urine

5   or it wasn't Mountain Dew or something like that.  And then

6   the -- under where it says opiates EIA, kind of on the bottom

7   left, and oxycodone EIA and just says "positive," that's

8   because that instrument -- the screen, the Indiko -- only

9   reports results as positive or negative.  Even though it has a

10  cut-off, it doesn't report a number.  It's a qualitative test.

11  It only says positive or negative.

12      And then the "ceased," I can't answer that question.  I

13  don't know why it says ceased.  It should either say positive

14  and have a number under the interpretation column, or it

15  should say negative and then have nothing in the

16  interpretation column.

17  Q.  So what was the result of this test for the oxycodone and

18  the oxymorphone?

19  A.  Positive.

20          MS. GERDES:  Thank you.

21          MR. GLASSMAN:  Actually, I do have a redirect

22  question, Your Honor.

23          THE COURT:  Are you finished?

24          MS. GERDES:  I am.  I appreciate it.

25          MR. GLASSMAN:  I'm sorry.  I thought she was sitting

1    down.  I wasn't sure.  Sorry.

2            THE COURT:  You may redirect.

3                     REDIRECT EXAMINATION

4    BY MR. GLASSMAN:

5    Q.   Mr. Dexter, Mr. Lynch was asking you about how you've

6    never met him before, right?

7    A.   That's right.

8    Q.   Okay.  When did the DEA reach out to you?

9    A.   Well, I had a call just this past Friday.  Before

10   that ...

11   Q.   Do you know what time on Friday?

12   A.   Afternoon, I think.  I was traveling.  I had a Zoom call,

13   a Teams call, another Zoom call.  I was traveling from where I

14   live in Pittsburgh to Oklahoma City for the weekend.

15   Q.   That's fine.  This past Friday afternoon, DEA reached out

16   to you?

17   A.   Yeah.  I'd also had somebody reach out three years ago --

18   or whenever the initial thing happened.  It was maybe weeks

19   after.  It was pretty close after.  But it was a really short

20   and cryptic call and then never a follow-up.

21           MR. GLASSMAN:  No further questions.

22           THE COURT:  Anything else?

23           MR. LYNCH:  No, Your Honor.

24           THE COURT:  May this witness be finally excused?

25           MS. GERDES:  From Dr. Siefert's perspective, yes.

1   Thank you, Your Honor.

2            MR. GLASSMAN:  Yes, Your Honor.

3            THE COURT:  Thank you, sir.

4         (Witness excused.)

5            THE COURT:  Safe trip.

6            THE WITNESS:  Thank you.

7            THE COURT:  Next witness.

8            MR. GLASSMAN:  Timothy Ehn calls Vicky Sebastian.

9              VICKI SEBASTIAN, DEFENSE WITNESS, SWORN

10           THE COURT:  Good afternoon, ma'am.

11           THE WITNESS:  Good afternoon.

12           THE COURT:  Try to keep your voice up.

13           THE WITNESS:  Okay.

14           THE COURT:  You may proceed.

15           MR. GLASSMAN:  Thank you, Your Honor.

16                      DIRECT EXAMINATION

17  BY MR. GLASSMAN:

18  Q.   Ms. Sebastian, can you state your name and spell it for

19  the court reporter?

20  A.   Vicki Sebastian.  V-i-c-k-i S-e-b-a-s-t-i-a-n.

21  Q.   Can you give the jury -- can you tell the jury about your

22  professional background?

23  A.   I've been a nurse for approximately 40 years.  Last 20 to

24  25 has been spent in management.  I have been assistant

25  director of nursing at such facilities as Madonna Manor,

1   Baptist Convalescent, Garrard Convalescent.  I've been

2   director at Elmcroft, and I was the director at Baptist

3   Towers.

4        And then I went to the floor as a nurse in 2019 and went

5   to work at Northern Kentucky in 2020.  And I currently am a

6   home health nurse.

7   Q.   You mentioned going to work at Northern Kentucky.  What's

8   the full name?

9   A.   Northern Kentucky Center for Pain Relief.

10  Q.   What was your job?

11  A.   I was the office administrator.

12  Q.   Do you remember the names of some of the people who had

13  held that position before you?

14  A.   I was only aware of one, and that was a Karla Cox.

15  Q.   Let's talk a little bit about if you could describe for

16  the jury -- when you were the practice administrator for

17  Northern Kentucky Center for Pain Relief, just tell them about

18  the practice.

19  A.   Essentially, it was a pain clinic where we did

20  medications, but we also did procedures.  And we had a chiro

21  department, where they would go to the chiro department for

22  adjustments and everything.  We tried everything

23  alternatively, with the chiro and then with the procedures,

24  before we did give the medications.

25       Anyone that was under medications was seen on the medical

SEBASTIAN - Direct                                          10-201

1    side by our physicians.  Now, with -- we do refer to Dr. Ehn

2    as Dr. Ehn, but he's a chiro.  He's not a medical doctor.  So

3    with that being said, it was separated totally.  There was one

4    side that was medical, and then the other side that was chiro,

5    it was a chiropractor -- or physician is what it is.  He is a

6    chiropractor.

7         So it was kind of divided.  One side was chiropractic,

8    and then the other side was medical.

9    Q.   What days of the week was it open?

10   A.   Monday through Thursday.

11   Q.   Not open Friday?

12   A.   Not -- well, it never was open Friday while I was there.

13   Q.   And I'm only going to ask you questions about when you

14   were there.

15   A.   Yes.

16   Q.   What about -- how did patients come to Northern Kentucky?

17   Were they walk-ins?

18   A.   No.  Most of our patients came from referrals from such

19   as orthopedic facilities such as Ortho Cincy, Beacon, general

20   practitioners if they had ortho issues with back pain, hip,

21   knee, joints.  Most were outside referrals.

22   Q.   And did you have a new patient coordinator?

23   A.   Yes, we did.

24   Q.   Who was that?

25   A.   Debbie Haynes.

1    Q.   What was her job?

2    A.   She actually would screen anybody that we got a referral

3    on, and she would decide whether they were actually a good fit

4    for us.  And if she had any questions, she would refer it over

5    to the actual medical doctor, and they would decide whether

6    they were a safe person for us to actually admit to our

7    facility.

8    Q.   Did you guys use any tools to mitigate risk for patients

9    who were being given prescriptions?  In other words, you know,

10   things like pill counts or --

11   A.   Yes, sir.  What we did most of the time was anybody that

12   was on medications was required to have a drug screen upon

13   every appointment.  Now, it was up to the medical doctor if a

14   panel was pulled.  And when I say that, I mean if the

15   physician was in the room and there was a red flag that flew

16   off, and he decided that maybe he needed to do an in-depth

17   panel because there was something that just seemed off that

18   day or anything, he would do the full panel.

19        But everybody that came in on our medical side would

20   receive a urine screen for any type of illicit drugs.

21   Q.   Before I ask you about other risk mitigation tools, what

22   about if somebody came in just for a chiro appointment?

23   A.   No, sir, we did not do drug screens.

24   Q.   Okay.  Thank you.  Can you tell the jury about if there

25   were any other risk mitigation tools you used, such as --

1   A.   We --

2   Q.   -- pill count or -- go ahead.

3   A.   We did -- many -- a lot of time -- when you came in every

4   three months, we had -- we had software.  We changed

5   softwares, but the software actually did a rotating mental

6   assessment to make sure that you were mentally stable to take

7   the medication and that you had no suicidal thoughts, et

8   cetera.

9        But we also -- with that being said, everybody that came

10  in was -- we did -- let's just say you came in and then we

11  decided to pull a random pill count.  And when I say a random

12  pill count, one of us would call you and say, Mr. Smith, would

13  you please come in.  We need to do a pill count.

14       We would actually figure up how many pills should be in

15  your bottle at that point in time.  We would bring you in and

16  do a pill count and see if it was accurate to what we had.  If

17  it was, you remained a patient at our facility.  If it was

18  not, you were discharged.

19       And that also goes with a urine.  If you came up with

20  illicit medications -- illegal drugs or other prescribed drugs

21  that were not prescribed by our physician that were

22  narcotics -- you were discharged.

23  Q.   We'll get back to that in a minute.  What about treatment

24  agreements, narcotics agreements?

25  A.   We had a signed agreement for everybody that came through

1     that knew what was required of you to maintain your ability to

2     see our physicians.

3     Q.    Let me ask you about billing.  Who was in charge of

4     billing on the chiro side?

5     A.    Brittany Madden.

6     Q.    And who was in charge of billing on the medical side?

7     A.    Christy Smith.

8           MR. GLASSMAN:  Madam Clerk, I believe we're on

9     Exhibit Ehn 46; is that right?

10          THE COURT:  46?

11          MR. GLASSMAN:  Yeah.

12          THE COURT:  All right.

13          MR. GLASSMAN:  I'd like to show the witness only

14    what's been marked for identification as Defendant Ehn

15    Exhibit 46.  And we'll let it get its bearings.

16    BY MR. GLASSMAN:

17    Q.    Do you see that?

18    A.    Yes.

19    Q.    Can you identify what that is?

20    A.    Corrected -- it says "updated urine drug test standard

21    requirement effective."  That is an update that we received

22    for meeting criteria to do the drug screening.

23    Q.    Who is it from and who is it to?

24    A.    It says that is from Passport, and it was to -- from

25    Brittany Wildt, which was her prior name, to Dr. Ehn.  But it

1    was from Passport to Brittany, and it's a correction of an

2    update urine test effective 1/1/2020.

3    Q.   As an e-mail?

4    A.   Yes.  As an e-mail, yes, sir.

5         MR. GLASSMAN:  Move to admit Defendant Ehn

6    Exhibit 46.

7         THE COURT:  Any objection to 46?

8         MR. LYNCH:  No objection, Your Honor.

9         THE COURT:  Let it be received without objection.

10   And I presume that any exhibit offered by a defendant,

11   the other defendant doesn't object?  I haven't asked that.

12   Both sides --

13        MS. GERDES:  We don't, Your Honor.

14        THE COURT:  That's what I figured.

15   BY MR. GLASSMAN:

16   Q.   Would you just go ahead and tell the jury what the e-mail

17   says down there?

18   A.   It says, "To ensure our provider receives the appropriate

19   reimbursement and avoid denied claims, Passport Health Plan

20   has established guidelines to align that the Kentucky

21   Department for Medicaid Services, DMS, for the appropriate use

22   of urine drug screening.  Passport has updated its claim

23   payment system to apply these guidelines effective 1/1/2020.

24   Passport will allow 35 presumptive and 16 definitive urine

25   drug screens for the initial treatment.  Limits do not apply

1    to UDTs" -- which is the urine drug testing -- "done in the

2    emergency department or while the beneficiary is in an

3    inpatient facility."

4         Then at the bottom, it states maximum was 35 code,

5    maximum is 16 with the different urine drug tests with the

6    G-zero, and then the other codes that you were supposed to

7    bill under.

8    Q.   And there's a last line on there.

9    A.   "Any combination of codes in each column is allowed up to

10   the maximum benefit numbers."

11   Q.   Thank you.

12   A.   Yes, sir.

13        MR. GLASSMAN:  I'm now going to mark for

14   identification Defendant Ehn Exhibit 47.

15        THE COURT:  Very well.

16        MR. GLASSMAN:  So I'd like to show the -- actually, I

17   think the easiest way to do this is let me show this to the

18   witness and let her read through it.

19        THE COURT:  That's fine.

20   A.   This is actually a service agreement for our lab that we

21   had -- we conducted our urine testing.

22   Q.   If you could just take a minute and flip through it all

23   the way.

24   A.   Yes.  It was signed by Karla.  It does have descriptions

25   of services that we actually had.

1    Q.   My first question before we get to any of that stuff is,

2    is this the sort of contract that you would keep at Northern

3    Kentucky in the ordinary course of business?

4    A.   Yes, sir.  You have to.  In order for us to receive our

5    CLIA or our COLA certifications and to stay in good standards

6    to operate as a lab, we have to keep these in a maintenance

7    file.

8            MR. GLASSMAN:  Move to admit Defendant Ehn

9    Exhibit 47.

10           THE COURT:  Any objection to 47?

11           MR. LYNCH:  No objection, Your Honor.

12           THE COURT:  Let it be received without objection.

13   BY MR. GLASSMAN:

14   Q.   Because, unfortunately, I ran out of copies, I'm going to

15   just put this down on the ELMO.

16   A.   Okay.

17   Q.   Let's look at the first page first.  And what did you say

18   this was?

19   A.   Service agreement for our lab.

20   Q.   Between who?

21   A.   It would have been between -- at this time, it says

22   entered by McKesson and the Northern Kentucky Center for Pain

23   Relief.

24   Q.   All right.  And what does it say about the pricing?

25   A.   "In consideration for the services, customer shall pay to

1      Medsol the amount identified on Exhibit A."

2      Q.   Okay.  And then what were those services?

3      A.   It says, "Medsol shall perform the services,

4      collectively, services identified on Exhibit A attached hereto

5      and incorporated herein by the reference."

6      Q.   And then is that Exhibit A?

7      A.   Yes, it is.

8      Q.   Okay.  So can you just go ahead and read what are the

9      description of services.

10     A.   "Our license and compliances is consulting through

11     electronic means, which is fax -- phone, fax, or e-mail.

12          "The CLIA, which is the CMS-116 application.  State

13     applications as applicable.  Enrollment in proficiency testing

14     as applicable.  Evaluation of laboratory director

15     qualifications.  Evaluations of laboratory personnel.

16     Assistance with prescreening of personnel prior to interview

17     for hire.

18          "Completion of all general laboratory policy and

19     procedures.  Completion -- I think it says completion, it's

20     kind of blurry -- of complete quality assessment plan.  And

21     then completion of general lab safety policies with SDS.  All

22     logs for reagent inventory, temperature, QC, procedures.

23          "Guidance through the validation of the LC-MS system.

24     Data reduction and evaluation of validation reports.  General

25     guidance for proper CPT coding.  Preparation for initial CLIA

SEBASTIAN - Direct                                               10-209

1     and state survey and inspection process."

2     Q.   Thank you.  And what was the price for that?

3     A.   LC-MS setup fee was 25,000.

4     Q.   We were talking about the lab a little bit.  I think you

5     mentioned CLIA already.

6     A.   Yes, sir.

7     Q.   Can you explain to the jury about CLIA and COLA?

8     A.   We had to maintain certifications in order to run the

9     drug screens and the panels.  And when I say that, we had a

10    certain amount of criteria that fell under the CLIA and then

11    the COLA.  Any time you operate a lab, for you to be

12    recognized as an outstanding lab, you usually maintain the

13    COLA.  CLIA comes along in most of your labs, which just

14    states that you can run laboratory testing to receive results.

15         But the thing that really, really stands over and above

16    is the fact that we have to go through survey.  And we have

17    three individuals that would come into our actual office and

18    run -- they would do random tests to make sure that we were

19    doing such as maintaining our records, keeping up to date with

20    our education.  And we had to make sure that everything was

21    documented and all the files were up to date, and that's how

22    we actually qualified.

23         But then we would have the actual general inspection come

24    in to go through our books, and then that's when we would have

25    Natty, Lindsay come in.  And they were our actual laboratory

1    people that would go through an actual inspection and see if

2    we met criteria.

3    Q.   I'm not sure that the jury's heard about Natty and

4    Lindsay before.  Can you say who they are?

5    A.   They were -- actually I'm not sure Lindsay's last name.

6    And Natty was actually another -- I think she was called

7    Netta, or something like that.  We had two people that Dr. Ehn

8    had actually hired to come in and oversee the lab to make sure

9    that it was running up to par.

10        When I say that, that we went over and above to maintain

11   our records, we kept all of our maintenance IDs, and that

12   there was tests being ran so that there was accuracy in our

13   results that we did have.  And they would come in usually

14   every three months to every six months.

15             MR. GLASSMAN:  I'd like to approach and hand the

16   witness what's been marked and previously produced as a

17   series, Defendant Ehn Exhibit 4 and 5.  Each one is a series.

18   I'd like to let the witness thumb through it real quick.

19             THE COURT:  Very well.  Mr. Lynch, you have copies of

20   this?

21             MR. LYNCH:  Yes, we do.  Yes, Your Honor.

22             THE COURT:  Thank you.

23             MR. LYNCH:  We're going to have Ms. Kootman actually

24   handle this witness.

25             THE COURT:  Ms. Kootman, I'm sorry.  I've been

1    defaulting to you in the absence of instruction otherwise.  So

2    we'll get with Ms. Kootman, then.  Thank you.

3    A.   All right.  This entire packet, it is the Center for

4    Medicare and Medicaid Services for the CLIA waiver.  This is

5    all the files.  We had to keep this in vision.  So it was

6    usually in a picture frame on the wall behind the desk in the

7    lab so that everybody that came in knew that we were CLIA and

8    COLA certified.

9    Q.   Let me grab that back from you.

10   A.   Okay.

11        MR. GLASSMAN:  So for the record, what the witness

12   was just referring to was Ehn Exhibit 4a through 4d and then

13   Ehn 5a through 5e.

14        And I apologize I didn't say this before.  I actually

15   want to draw the witness's attention to what's marked as

16   Defendant Ehn Exhibit 6a.

17        THE COURT:  So we have 4a through d, 5a through e,

18   and 6.

19   BY MR. GLASSMAN:

20   Q.   Is that another document that you would keep in the

21   ordinary course of business?

22   A.   Yes.  That was where we actually did the proficient

23   testing services for certification.  It's where we would do

24   updated testing on our personnel also, the lab personnel, to

25   make sure that she was up to date on how to run the tests and

SEBASTIAN - Direct                                          10-212

1    qualified to do so.

2              MR. GLASSMAN:  And there is a series of 6a, 6b, 6c,

3    and 6d just so the witness can see.

4    Q.   That takes us up to what year?

5    A.   2022.

6              MR. GLASSMAN:  At this time, move to admit Defendant

7    Ehn's Exhibit -- the series 4, 5, and 6.

8              THE COURT:  Any objection?

9              MS. KOOTMAN:  No objection.

10             MS. GERDES:  The only question I --

11             THE COURT:  Let it be received without objection.

12             MR. GLASSMAN:  I'm sorry.  4 goes through 4e.  That

13   was my bad.

14             THE COURT:  4a through e?

15             MR. GLASSMAN:  Yes.

16             THE COURT:  I guess it's five years for each of those

17   others.  Very well.  Let them be received without objection.

18             MR. GLASSMAN:  I'd like to show the witness, while

19   we're talking about the lab, Government's Exhibit 240.1033,

20   which has previously been admitted.

21             THE COURT:  Exhibit 240, page 1033?

22             MR. GLASSMAN:  Yes, Your Honor.

23             THE COURT:  All right.

24   BY MR. GLASSMAN:

25   Q.   Did you take a look at that, Ms. Sebastian?

1    A.   Yes, sir.  This is a urine confirmation panel.

2    Q.   Do you remember -- does this remind you at all of a time

3    when this report was printed out several months after the

4    specimen was taken?

5    A.   Yes, sir.

6    Q.   Okay.  Can you explain to the jury what was going on

7    there?

8    A.   We -- once I got in and got able to start running reports

9    and everything on our software, we came to the conclusion that

10   the software that we had was no longer functional.

11   Q.   What was that software?

12   A.   That was actually Athena.  It had not been maintained

13   appropriately.  When I say that, it's not pointing fingers to

14   anybody.  It's just that people were not DC'd out of it --

15   they were not discharged out of the system.

16        So as we went through and I finally found out, there was

17   over 68,000 open claims of urines, doctor visits, and

18   everything that we ended up having to write off and was not

19   collected because there was no way that we could close it

20   five, six years down the road.

21        So we decided -- and the physician that was there and

22   everybody decided to go with Prognosis.  That was within the

23   time frame that we were switching from Athena to Prognosis.

24   And the actual software -- and I'm not in IT so I hope I tell

25   you -- the software was not reading with our new software that

1    we had.  So the time overlapped and a lot of -- it wasn't that

2    we didn't have access to it.

3        We could call Dale, who was our laboratory technician,

4    supervisor, overall general person and get the results right

5    then and there.  He probably doesn't even realize when the

6    printouts were because of the fact that --

7                MS. KOOTMAN:  Objection.  Speculation.

8                THE COURT:  Sustained.

9    A.   We probably aren't sure when the printouts were --

10   occurred because when we actually finally got the software to

11   inter-react and work with the new computer system, then we did

12   start generating the reports.

13       So the delay on the report date was because it was

14   delayed with the reading of each software that was

15   inter-reacting together.

16   Q.   I just want to make sure I understood.  The test was ran?

17   A.   It was ran, yes.  And we had access to the results by

18   calling Dale by telephone.  But the thing of it is, when it

19   printed out was not until we actually got the inter-reaction

20   between the software that was new and the actual computer.

21   Q.   And when you're talking about the software, is that an

22   EMR?

23   A.   That is an EMR.

24   Q.   What is EMR?

25   A.   Electronic medical records.

SEBASTIAN - Direct                                          10-215

1    Q.   And I think -- you did just mention it.  I just want to

2    make sure that for the jury, we're highlighting -- what were

3    you talking about with the 68,000?

4    A.   I would have to run a report.  We discharged people who

5    had dirty urines or they did not pass their pill count.  So I

6    would have to submit a report to OIG, which is the Office of

7    the Attorney General, every three months.

8         What I would do is run a report, and it never came up

9    accurate.  And so I finally got ahold of somebody at Athena,

10   and they talked me through going into the software and

11   looking.

12        When I finally got to where I got access to it, there was

13   68,000 open files that had never been closed so -- and we had

14   an astronomical amount of money at the top of our -- when you

15   go in and -- I don't know if anybody has -- when you go into

16   an EMR in the billing part of it, you can look at the top, and

17   it will tell you how much outstanding money is there that you

18   have not billed for, the claims that you have in your system

19   that you have not submitted.  So we -- it was there when I

20   actually came into the facility to work.

21        When we finally got to the bottom of it, it was the fact

22   that the actual charts had not been closed by the physician.

23   There had been documents that were not put in there and

24   closed.

25        The way the system should work is every night at midnight

1     with the Prognosis that we had, it would close down, it would

2     submit everything that was closed.  So everything at that

3     point was sent over to billing through our actual software.

4     But it was unable to do that.  Because it had so many open

5     claims, none of our reports were accurate.  So that's when we

6     switched to Prognosis because we didn't have the ability to

7     run reports and stay accurate.

8     Q.   I just want to be clear that you said there were these

9     68,000 open claims.  Had those been billed?

10              MS. KOOTMAN:  Objection.  Leading.

11              THE COURT:  Sustained.

12    A.   They had not.

13    Q.   Well, okay.  Let me ask a better --

14              THE COURT:  When I sustain an objection, you don't

15    have to answer.

16              THE WITNESS:  Okay.

17    BY MR. GLASSMAN:

18    Q.   Yeah.  You don't have to answer.  Let me ask you a better

19    question.

20    A.   Okay.

21    Q.   Was this software switch an issue with respect to whether

22    you could actually get the money for the services you'd

23    provided?

24    A.   No, sir.  Any insurance will not usually reimburse you

25    after 18 months, and most of those claims were five and six

1    years old.

2    Q.   Thank you.  On the subject of billing, did it ever come

3    to your attention whether Northern Kentucky Center for Pain

4    Relief was underbilling for anything?

5    A.   We had -- Dr. Ehn had hired a gentleman, Tim, to come in

6    as a consultant to reeducate our physicians.  And only because

7    of -- we were trying to -- we were changing software and

8    trying to stay within the legalities and updating their

9    knowledge on documentation.

10        Most of our physicians would not charge --

11             MS. KOOTMAN:  Objection.  Speculation.

12             MR. GLASSMAN:  That's not speculation.

13             THE COURT:  Well, it's --

14             MR. GLASSMAN:  She's stating what she knows.

15             THE COURT:  I'm going to overrule the objection.

16   It's that fine line.  We're trying not to lead, but we're

17   trying not to narrate.

18             MR. GLASSMAN:  Exactly.

19             THE COURT:  But an objection is raised, I have to

20   rule on it.

21        I'm going to overrule this one.  Go ahead.

22   A.   Most of our physicians would not charge for a level 4.

23   And when I say that, if you go over a history and you're also

24   treating them for the condition that they came in to see you

25   today, let's say it's knee pain, you should be able to charge

SEBASTIAN - Direct                                          10-218

1   at --

2              MS. KOOTMAN:  Objection.  Relevance.

3              THE COURT:  I'll sustain that objection.

4              MR. GLASSMAN:  Hm.  Okay.  Let me move on.

5              THE COURT:  Hm.

6   BY MR. GLASSMAN:

7   Q.   In preparation for your testimony today, did I ask you to

8   review Karla Cox's assessment of risk for two patients?

9   A.   Yes, you did.

10  Q.   Scott Samuel and Martha Sigmon?

11  A.   Yes, sir.

12  Q.   And what was that assessment?

13  A.   They were for categories of high, medium, or low for

14  being tested for drugs.

15  Q.   And for these two patients, what was the final

16  assessment?

17  A.   They both ranked in the high area.

18  Q.   Can you tell the jury from your perspective as the

19  practice --

20             MS. KOOTMAN:  Objection, Your Honor.  This is

21  opinion.

22             THE COURT:  Let's go ahead and approach.

23        (Sidebar conference.)

24             THE COURT:  Let the record reflect we're at the

25  bench.  I do recall there being -- and I think it was during

SEBASTIAN - Direct                                                  10-219

1    Mr. Lynch's examination showing these two patients where there

2    was a handwritten "low," and he focused on it exclusively

3    during cross-examination.  So is this in response to that,

4    Mr. Glassman?

5              MR. GLASSMAN:  Yes, Your Honor.

6              THE COURT:  How is it opinion, then?

7              MS. KOOTMAN:  Well, she's giving her opinion on the

8    risk assessment, and she's not qualified to provide an

9    opinion --

10             THE COURT:  Speak up.  I can't hear you.

11             MS. KOOTMAN:  Sorry.  She's giving her opinion on the

12   risk assessment.  She's not qualified to provide an --

13             THE COURT:  Response?

14             MR. GLASSMAN:  That's not what I asked.

15             THE COURT:  What did you ask?

16             MR. GLASSMAN:  I asked her if she looked at Karla

17   Cox's assessment in the audit of where these patients were

18   risk assessed.  And she said yes, and they were ranked high.

19             MS. KOOTMAN:  But that's --

20             THE COURT:  Hold on.  Let me look at it, see what was

21   said.

22        She was asked to review Karla Cox's assessment of these

23   two patients, not her own individual assessment.

24             MS. KOOTMAN:  Correct.

25             THE COURT:  She's just reporting what Karla Cox said.

1    She's not giving her opinion.  Overruled.

2            MR. GLASSMAN:  While we're at the bench, I want to

3    retake up the question about the underbilling.

4            THE COURT:  Let's do that.

5            MR. GLASSMAN:  I think it's super relevant, Judge,

6    because she was going to testify that there are -- that they

7    were underbilling certain services in order to make sure that

8    they were staying on the right side of scrutiny, et cetera.

9        And I think it's highly relevant because the whole theory

10   of the government here is that they were billing for the sake

11   of overbilling.  And so this goes to show, no, they weren't.

12           THE COURT:  Response?

13           MS. KOOTMAN:  So, first of all, she's talking about a

14   defined period of time after November of -- July of 2020.  She

15   also is not speaking about what is charged here, which is

16   overbilling for urine drug testing.  She's talking about a

17   variety of outside procedures that are not relevant.

18           THE COURT:  Here's how I'm going to handle that.  I

19   don't need to hear from you because I'm going to agree with

20   him unless you want --

21           MS. GERDES:  Nothing more to say.

22           THE COURT:  Okay.  I'm going to -- having revisited

23   that, I'm going to allow that testimony.  But I'm going to

24   allow you to explore that on cross-examination and perhaps

25   give you a little more leeway regarding that.

1          MS. KOOTMAN:  Thank you, Your Honor.

2       (Sidebar concluded.)

3          MR. GLASSMAN:  I do believe we already do have the

4    answer that they were classified as high.

5          THE COURT:  Yes.  That was her answer.

6          MR. GLASSMAN:  Thank you.

7    BY MR. GLASSMAN:

8    Q.   I want to go back to the question about underbilling.

9    A.   Okay.

10   Q.   What did you observe about underbilling?

11   A.   The physicians that I had that was working with me at the

12   time said that they would not bill over a level 2 because then

13   it throws up a red flag for OIG and everybody to start

14   questioning why they were billing for a level 4.  And they

15   said they weren't going to do that because of that.

16       So they would always bill for a level 2, which was a

17   routine visit.  It did not go into great detail.  And most of

18   the time, they got the level 4 because of the time frame that

19   the physician would spend with them.  But we would -- they

20   would only bill for the level 2.

21   Q.   In general, how would you characterize the risk level of

22   the patient population that you served?

23   A.   I would say every one of them was a risk level of a high.

24   And most of our physicians -- when I first went into the

25   office and I was hired, there was a doctor that had been there

1   probably six months or less.  He stated to me that he would

2   do --

3            MS. KOOTMAN:  Objection.  Hearsay.

4            THE COURT:  Sustained.

5            MR. GLASSMAN:  Yeah.  We'll go into something

6   different.

7   BY MR. GLASSMAN:

8   Q.   I would like to show you a few pictures and get you to

9   identify them.

10  A.   Okay.

11           THE COURT:  To the witness only?

12           MR. GLASSMAN:  Let me check with the government and

13  see if they'll just agree.

14           THE COURT:  That's fine.

15           MS. KOOTMAN:  No objection to these, but I just want

16  to clarify for the record the time when these were taken.  I

17  believe these were taken prior by you, not part of the search

18  warrant?

19           MR. GLASSMAN:  Yes, correct.

20           MS. KOOTMAN:  Okay.  And that time frame would be?

21           MR. GLASSMAN:  2021.

22           MS. KOOTMAN:  Okay.  Thank you.

23           THE COURT:  That's fine.  You can show them.  What

24  exhibit number are we looking at here now?

25           MR. GLASSMAN:  We are going to be looking at Ehn

SEBASTIAN - Direct                                    10-223

1    Exhibit 2a through Ehn 2n.

2              THE COURT:  A through N?

3              MR. GLASSMAN:  Yes.

4              THE COURT:  Admitted without objection, Ms. Kootman?

5              MS. KOOTMAN:  No objection.

6              THE COURT:  All right.

7    BY MR. GLASSMAN:

8    Q.   So now we can show everybody at the same time.  What is

9    Exhibit Ehn 2a?

10   A.   That is the actual entrance to the Northern Kentucky Pain

11   Relief Center.

12   Q.   What about Ehn 2b?

13   A.   That is the actual building where we worked at the

14   Northern Kentucky Pain Relief Center.

15   Q.   What about Ehn 2c?

16   A.   That is the reception area.

17   Q.   What is Ehn 2d?

18   A.   That would be the billing office.

19   Q.   Whose office was that?

20   A.   Christy Smith.

21   Q.   What about Ehn 2e?

22   A.   That is exact -- Dr. Ehn's examining room and his actual

23   treatment room for the chiro department.

24   Q.   And what is Ehn 2f?

25   A.   That is the treatment area for the chiro department.

SEBASTIAN - Direct                                         10-224

1    Q.   Ehn 2g?

2    A.   That is actually one of his beds that he uses for the

3    adjustment and everything for chiro.

4    Q.   Ehn 2h?

5    A.   The x-ray machine used by Dr. Ehn for x-rays prior to

6    treatment.

7    Q.   And so those ones that we just discussed, were those on

8    the medical side or the chiro side?  All of the chiro things

9    that we just looked at.

10   A.   That was on the chiro side.

11   Q.   It's not a trick question.

12   A.   No.  That was on the chiro side.

13   Q.   What about Ehn 2i?

14   A.   That is actually the C-arm that was used for guiding

15   needles for procedures done in our medical side.

16   Q.   What about 2j?

17   A.   That is an extended view of the actual procedure room.

18   Q.   2k?

19   A.   That is the C-arm and the procedure bed where they did

20   the procedures on the medical side.

21   Q.   2l?

22   A.   That is the C-arm, the procedure bed, and all the

23   equipment for the procedure room on medical side.

24   Q.   2m?

25   A.   That is the lab.  And the blue is the actual computer

1  part that ran the panels.

2  Q.  And 2n?

3  A.  That would be the front signage for the physicians and

4  everybody that is actually at the Northern Kentucky Center for

5  Pain Relief.  That is all the businesses.

6  Q.  Oh, I'm sorry.  What was --

7  A.  That's all right.

8  Q.  All the -- I cut you off.

9  A.  That was all the businesses.  We had the hearing, we had

10  the dentist, and then we had Christ Hospital that was

11  downstairs.  But also we were upstairs.

12          MR. GLASSMAN:  May I have a moment to confer with

13  co-counsel?

14          THE COURT:  You may.

15          MR. GLASSMAN:  Thank you.

16          THE COURT:  You went back and you came back with a

17  bunch of files.

18          MR. GLASSMAN:  Mr. Burton does that.

19  BY MR. GLASSMAN:

20  Q.  I'd like to just hand you a couple of files.

21  A.  Okay.

22          MR. GLASSMAN:  If I may?

23          THE COURT:  Very well.

24          MS. KOOTMAN:  Your Honor, can we see these files?

25          MR. GLASSMAN:  I'm not going to move to admit these.

1    I'm just going to ask the witness a question.

2            THE COURT:  All right.  Very well.

3            MS. KOOTMAN:  Have these documents been disclosed to

4    us?

5            MR. GLASSMAN:  I'm not planning to seek to admit

6    these.  I'm just going to ask her to look at them.  So, no, I

7    haven't given you those ahead of time.

8            THE COURT:  Can you approach.

9        (Sidebar conference.)

10           THE COURT:  First of all, what are we showing the

11   witness?

12           MR. GLASSMAN:  They're just some patient files that

13   are discharges.

14           THE COURT:  Patient files that are discharges?

15           MR. GLASSMAN:  Yep.

16           THE COURT:  Are these during the relevant time

17   period?

18           MR. GLASSMAN:  Some yes, some no.

19           THE COURT:  The purpose for asking is that they are

20   what?

21           MR. GLASSMAN:  They were just discharging patients,

22   and it's going to lead to the next question.

23           MS. KOOTMAN:  So with regard to the opioid

24   distribution conspiracy, she did not begin at the clinic until

25   July of 2020.  That is well beyond the time period for the

1    charged conspiracy for the Title 21 charges.

2          THE COURT:  The other healthcare conspiracy lasts

3    past that, correct?

4          MR. GLASSMAN:  Yes.

5          THE COURT:  Okay.

6          MS. KOOTMAN:  But he is asking about specifically

7    with regard to discharging patients.

8          THE COURT:  They wouldn't get drug tested then, and

9    they wouldn't have been the source of the drug test funds

10   during the time frame that she was there.  Why wouldn't that

11   be relevant?

12         MS. KOOTMAN:  So as to the period of July 2020 until

13   February 2021, that would be relevant.  She also can't speak

14   to time periods that she doesn't have knowledge of.

15         THE COURT:  Something you can certainly ask her about

16   on cross.

17         MS. KOOTMAN:  And if they're providing her with

18   materials that we haven't -- that haven't been provided to --

19         THE COURT:  I'll give you a chance to look at them.

20         MS. KOOTMAN:  Thank you.

21         THE COURT:  Overruled.

22      (Sidebar concluded.)

23         THE COURT:  You may proceed.

24   BY MR. GLASSMAN:

25   Q.  While we were talking up there, have you had a chance to

1    look through those?

2    A.   No, I did not.

3    Q.   Oh, all right.  Well, please go ahead.

4    A.   Okay.

5    Q.   Now, I don't want you to say any patient names or

6    information, but can you just say what those appear to be to

7    you?

8    A.   Each of the actual files are of individuals that have

9    been discharged from our actual facility due to dirty urines,

10   positive urines, or deceptive medications in their urines.

11   And the final was for also a dirty urine.

12   Q.   Okay.  I'd like to show you -- and you can just leave

13   those there.  I'd like to show you what's been previously

14   admitted as Government Exhibit 600.

15         THE COURT:  600?

16         MR. GLASSMAN:  Yes.

17         THE COURT:  All right.

18   BY MR. GLASSMAN:

19   Q.   Do you recognize that?

20   A.   Yes, I do.  That's actually the layout of the building.

21   Q.   Where is the waiting room?  There are letters.  Can you

22   identify them by the letters?

23   A.   That would be the A area that had the double swinging

24   doors.

25   Q.   Where was your office?

SEBASTIAN - Direct                                                    10-229

1    A.   Mine was back behind -- there is the reception area.  I
2    believe it falls under -- right at QQ.  Is that the letters
3    that's right there?
4    Q.   What about GG?  Do you see GG on there?
5    A.   I do.  That's actually -- that actually was our
6    conference room.
7    Q.   Okay.
8    A.   Yes.
9    Q.   What about D?
10   A.   That was the lab.
11   Q.   Where was the chiro part?
12   A.   The whole -- keep coming over.  The whole area, yes, sir.
13   Q.   Oh, good job with the yellow.  Very good.
14        What about FF?
15   A.   That would have been our medical records, where we kept
16   our active and inactive patients that had been discharged.
17   Q.   I'm going to --
18        MS. KOOTMAN:  Objection.
19        THE COURT:  Well, let's approach.  I don't know what
20   we're showing here.
21        (Sidebar conference.)
22        THE COURT:  What are we looking at?
23        MS. KOOTMAN:  I mean, this is the first time -- this
24   is a photograph of a bunch of files.  He's continuing to bring
25   in documents that have -- this is Rule 16 violations.  These

*SEBASTIAN - Direct*                                                    10-230

1    are documents that the defendant has in their possession that

2    they're trying to use in their case-in-chief, and they have

3    not been previously provided to us.

4              THE COURT:  Is that correct, you haven't provided

5    them?

6              MR. GLASSMAN:  That specific one, no.

7              THE COURT:  Why not?

8              MR. GLASSMAN:  Because when the FBI went in, they did

9    take that picture.  They just didn't use it.  They have that

10   photo.  It was in -- they have a photo of the same room in the

11   production.

12             MS. KOOTMAN:  The same room.  We don't have this

13   photo.  We don't know when this photo was taken.

14             MR. GLASSMAN:  Photographed during the search

15   warrant.

16             THE COURT:  Can I see it?  Where's the Bates stamp at

17   the bottom?

18             MS. GERDES:  The photos, I don't think you can print

19   out -- at least when I would try to print them out, you

20   couldn't print them with Bates stamps on them.  They were very

21   hard to deal with.

22             THE COURT:  It just seems --

23             MS. KOOTMAN:  It's just -- and it's the same with the

24   rest of the documents that he's --

25             THE COURT:  Pardon?

1          MS. KOOTMAN:  You know, this document, I don't know

2     where he's going with it.

3          THE COURT:  I don't either.

4          MS. KOOTMAN:  And the same thing with the rest of the

5     documents.  If we haven't been provided with them ahead of

6     time --

7          THE COURT:  Well, he provided it during the search

8     warrant -- they were provided.  Do you disagree with the

9     representation that he's making?  Do you believe that it

10    wasn't?  As an officer of the Court, he's saying that was

11    given to him.

12         MR. GLASSMAN:  Judge, I want to be clear.  This

13    specific photo was not.  They have -- they did take photos of

14    this room --

15         THE COURT:  Oh, this was not taken?

16         MR. GLASSMAN:  Not that exact photo, no.

17         THE COURT:  Okay.  I'm going to sustain the

18    objection.  You can use one that's -- it's the same general

19    thing.

20       (Sidebar concluded.)

21         MR. GLASSMAN:  Just a moment, Your Honor.  We're

22    going to switch to the computer.

23         THE COURT:  Very well.

24         MR. GLASSMAN:  We're showing the witness only right

25    now.

1          THE COURT:  All right.

2    BY MR. GLASSMAN:

3    Q.   Can you look at that?

4    A.   Yes, sir.  That is our actual medical records room.

5    Q.   Okay.

6          MR. GLASSMAN:  Let's call that Ehn Exhibit 48.

7          THE COURT:  Any objection to 48?

8          MS. KOOTMAN:  No objection, Your Honor.

9          THE COURT:  All right.  Let it be received without

10   objection.  We'll have to get a copy of it at some point from

11   the computer.

12         MR. GLASSMAN:  Yes, Your Honor.

13         THE COURT:  We'll do that later.

14         MR. GLASSMAN:  Can you bring up the next one,

15   Mr. Burton?

16   BY MR. GLASSMAN:

17   Q.   Do you recognize that?

18   A.   Yes.  That is actually the right -- the left-hand side of

19   our medical records room, where we have discharged patients on

20   the back side and active on the front.

21         MR. GLASSMAN:  Let's call that Ehn Exhibit 49.  Move

22   to admit.

23         THE COURT:  Any objection to 49?

24         MS. KOOTMAN:  No objection, Your Honor.

25         THE COURT:  Let it be received without objection.

| | |
|---|---|
| 1 | And, again, we'll get copies for the jurors. |
| 2 | BY MR. GLASSMAN: |
| 3 | Q.   And one more, please. |
| 4 | A.   That also is our medical records where we had the active |
| 5 | patients.  And the front side is active, the back side is |
| 6 | discharged. |
| 7 |       MR. GLASSMAN:  Move to admit Ehn 50. |
| 8 |       THE COURT:  Without objection? |
| 9 |       MS. KOOTMAN:  No objection. |
| 10 |       MR. GLASSMAN:  Can the jury see that, please? |
| 11 |       THE COURT:  They can. |
| 12 | BY MR. GLASSMAN: |
| 13 | Q.   How many discharged patients are in -- files are in FF, |
| 14 | ballpark? |
| 15 | A.   Probably -- I would guesstimate probably three to five |
| 16 | hundred in that room. |
| 17 |       MR. GLASSMAN:  No further questions. |
| 18 |       THE COURT:  Cross, Ms. Kootman. |
| 19 |                 CROSS-EXAMINATION |
| 20 | BY MS. KOOTMAN: |
| 21 | Q.   Good afternoon, Ms. Sebastian. |
| 22 | A.   Hi, there.  How are you? |
| 23 | Q.   Just to clarify, you began working at the Northern |
| 24 | Kentucky Center for Pain Relief on July 29th of 2020? |
| 25 | A.   That is correct. |

SEBASTIAN - Cross (by Ms. Kootman)                    10-234

1    Q.   And is that about one, two weeks before the search
2    warrant was executed on the clinic?
3    A.   Yes, ma'am.  About two weeks.
4    Q.   And so the entire -- almost the entire time you were
5    working there, the clinic was under investigation that you
6    were aware of?
7    A.   Yes.
8    Q.   And during the time that you were there, patients were
9    discharged if they tested positive for illicit drugs or --
10   A.   Yes, ma'am.
11   Q.   Or for medications --
12   A.   Other than prescribed.
13   Q.   -- that weren't prescribed?
14   A.   Yes.
15   Q.   And for the UDT testing, the definitive testing, is it
16   true that if a patient was older and receiving a lower dose of
17   narcotics, it was not necessary to run the urine through both
18   machines every time?
19   A.   That would be entirely up to the doctor.
20   Q.   Okay.  And you do not treat patients yourself?
21   A.   No, ma'am.
22   Q.   So you were not reviewing urine lab test results to treat
23   patients?
24   A.   Not on a routine basis, no.
25   Q.   And is this the first time you'd worked in a -- around a

1   lab?

2   A.   Yes, ma'am.

3   Q.   And you, yourself, did not have any lab expertise at all?

4   A.   No.

5   Q.   And when you were working there -- actually, strike that.

6           MS. KOOTMAN:  No further questions.

7           THE COURT:  Okay.  Ms. Gerdes, any questions?

8           MS. GERDES:  Briefly.

9       Mr. Burton, if you could pull up Ehn Exhibit 50.

10                      CROSS-EXAMINATION

11  BY MS. GERDES:

12  Q.   Ms. Sebastian, if you could just take a look at what's in

13  evidence now as Ehn Exhibit 50, does that photograph show us

14  really how tall those shelves are?  Does it show the top of

15  the shelf?

16  A.   No, it does not.

17  Q.   Okay.  And are you able to really appreciate how deep

18  those shelves are by that photograph either?

19  A.   No.

20          MS. GERDES:  I was just previously given another

21  photograph of that room, and I'm going to show it to the

22  witness only on the screen.

23      Showing the witness only what I will mark as

24  Defendant Siefert's Exhibit --

25          COURTROOM DEPUTY:  11 is where we left off.  This is

1    12.

2              MS. KOOTMAN:  Objection, Your Honor.

3              THE COURT:  Well, let me ask, is that the same room?

4              THE WITNESS:  That is the same room, Your Honor.

5              THE COURT:  All right.  Overruled.

6              MS. GERDES:  And we're on 11?

7              COURTROOM DEPUTY:  12.

8              MS. GERDES:  12.  Okay.  Defendant Siefert 12.

9    BY MS. GERDES:

10   Q.  And does this photograph fairly and accurately depict the

11   discharged files?

12   A.  Yes, ma'am --

13             MS. GERDES:  Move to admit, Your Honor.

14             THE COURT:  It's admitted over United States'

15   objection.

16   A.  -- it does.

17             MS. GERDES:  Thank you.

18             THE COURT:  Mr. Glassman, anything further, sir?

19             MR. GLASSMAN:  Nothing further, Your Honor.

20             THE COURT:  Thank you, ma'am.  You may step down.

21        May this witness be finally excused?

22             MS. KOOTMAN:  Yes, Your Honor.

23             MS. GERDES:  By Dr. Siefert, thank you, Your Honor.

24             MR. GLASSMAN:  Yes, Your Honor.

25             THE COURT:  Very well.

1    (Witness excused.)

2         THE COURT:  Next witness.

3         MR. GLASSMAN:  No further witnesses, Your Honor.

4         THE COURT:  Will the attorneys approach, please.

5    (Sidebar conference.)

6         THE COURT:  I know there was a discussion about

7    potentially calling an FBI agent regarding impeachment on

8    prior inconsistent statements, but I wasn't sure if that was

9    something you were still going to follow up with.

10         MS. GERDES:  We reached a stipulation on that one

11   witness.

12         MR. LYNCH:  On the FBI agent.

13         MS. GERDES:  We still intend on calling Investigator

14   Harrington, whatever his title is, for the other impeachment.

15         THE COURT:  Is he here now?

16         MR. LYNCH:  Yes.

17         MS. GERDES:  I think we need to take up with the

18   Court what we believe to be the scope of impeaching a witness

19   by prior inconsistent statement.  There's a fundamental

20   disagreement between the government and the defense as to what

21   they can get in with this witness.

22         THE COURT:  Once we take that up, do you think we'll

23   finish with this witness today?

24         MS. GERDES:  Harrington?  Oh, yeah.

25         THE COURT:  We'll take a brief recess with the jury

1    and stay in session.

2         MS. GERDES:  Sure.  If we could have Mr. Harrington

3    step out while we have this discussion.

4         THE COURT:  I don't know who he is.

5         MR. GLASSMAN:  With the beard.

6         THE COURT:  The ominous looking character.

7         MR. LYNCH:  For the record, Ms. Carson is going to

8    handle this.

9         THE COURT:  Okay.  Great.  We haven't heard from her

10   in a while.  Very well.

11        (Sidebar concluded.)

12        THE COURT:  Ladies and gentlemen, I have a brief

13   legal question to take up with the attorneys.  I still think

14   we'll be able to wrap up today fairly quickly once I get

15   through the legal hurdle.  That's my problem, not yours.

16        We'll be in recess for ten minutes.  Continue to heed all

17   the prior admonitions of the Court.

18        (The jury exited the courtroom at 4:33 p.m.)

19        THE COURT:  Jury's out.  Who wants to be heard on

20   this first?  I'm looking at Rule 613.  Just as a starting

21   point, if you have another rule you'd like to point me to, I'm

22   willing to listen.

23        MS. GERDES:  Your Honor, that's it.  That really is

24   what we would direct the Court's attention to.

25        THE COURT:  Has the witness stepped out?

1          MS. GERDES:  It looks like it.

2          THE COURT:  Go ahead.

3          MS. GERDES:  We have laid the proper foundation to

4     elicit, through this witness, multiple inconsistencies from

5     witnesses.  And the way that that is done is:  On this date,

6     did you speak to this person, and isn't it true that this

7     person said X to you?

8          The government does not get to then say, well, didn't the

9     person say A, B, C, D, E, and F.  They cannot impeach with

10    prior consistent statements.  I shouldn't say impeach.  They

11    cannot bolster the credibility of their witnesses by bringing

12    out any prior consistent statements.

13         The only thing that can be done at this point in time is

14    the defense is allowed to impeach with the prior inconsistent

15    statement because we drew the witness's attention to these

16    statements.  We gave them an opportunity to explain or deny

17    them, and the foundation is there.

18         THE COURT:  Response?

19         MS. CARSON:  Respectfully, Your Honor, I know you're

20    looking at 613 right now.

21         THE COURT:  Should I look at a different rule?

22         MS. CARSON:  Yes.  I'd like to direct your attention

23    to Rule 801(d)(1)(B)(ii), which deals with consistent prior

24    statements.  Because what we have here is the fact that the

25    prior statements were, actually, consistent with what they

1    said at trial.

2         So under Rule 801(d)(1)(B)(ii), as amended in December of

3    2014, a statement that meets the following conditions is not

4    hearsay.  One, declarant testifies, subject to cross-exam,

5    about a prior statement.  And the statement, (B), is

6    consistent with the declarant's testimony and is offered (ii)

7    to rehabilitate the declarant's credibility as a witness when

8    attacked on other grounds.

9         So this basically allows a witness's prior consistent

10   statements to be admitted for their truth when necessary to

11   rebut attacks on the witness's credibility.

12             THE COURT:  Response to 801(d)(2) -- (d)(1)(B)(ii),

13   Ms. Gerdes.

14             MS. GERDES:  I believe that's when there's a claim of

15   recent fabrication.

16             THE COURT:  Right.  We're not dealing with that.

17             MS. CARSON:  That's the first (i).  The second was

18   amended in December of 2014.

19             MS. GERDES:  Let me pull this up, and I'll address

20   it.  I am familiar with this rule having been changed, but

21   just give me a minute.

22             MS. CARSON:  Just to clarify, Your Honor, it is

23   established that the statement can be introduced through a

24   witness other than the declarant.  And that's --

25             THE COURT:  It's not hearsay.  That's why --

1          MS. CARSON:  Exactly.

2          MS. GERDES:  Your Honor, so I'm looking at this.  I

3     do know that the rule change -- the statement has to be

4     consistent with the declarant's testimony.

5          THE COURT:  The statement she wants to point out

6     needs to be consistent with declarant's testimony.

7          MS. GERDES:  Right.  And we are impeaching with the

8     prior inconsistent statements.  We are not bringing out dates

9     in which consistent information was given.

10          MS. CARSON:  No dates on which consistent information

11     was given?

12          MS. GERDES:  Correct.

13          THE COURT:  Well, here's what I'm going to allow.

14     I'm certainly going to allow the agent to be called to

15     establish that on such and such a date, this person was

16     interviewed, and did they say X, whatever it was.

17          Over the defendant's objection, I'm going to allow them

18     to bring in any consistent statement that is made pursuant to

19     Rule 801(d)(1)(B)(ii).  So that's the ruling of the Court.

20          Go ahead and bring the jury in.

21          MS. GERDES:  So, for example, Ms. Francis, who is the

22     Kroger pharmacist, she was interviewed on two prior occasions.

23          THE COURT:  Okay.

24          MS. GERDES:  On neither of those occasions did she

25     say that pharmacists refused to fill prescriptions.  I'm not

1   quite sure what possibly the government could use when the
2   absence of those statements is what's documented in the
3   report.

4          THE COURT:  Well, unless there's something that's
5   consistent with what she said, they can't ask about it.  You
6   can't just bring in everything that she says.  If it's
7   consistent with what she said while she's testifying, you can
8   point it out.  If it's something else that might help clarify
9   what she said, you can't point it out.

10      Is that fair?

11          MS. CARSON:  Understood, Your Honor.

12          THE COURT:  I'm not going to rule in a vacuum.  I
13   need to see what the testimony is.

14      Go ahead and bring the jury in, please.

15      After the jury goes home for the evening today, I plan on
16   going through my Fifth Amendment spiel with both defendants,
17   something I do in every criminal case.

18          MR. LYNCH:  Your Honor, maybe I'll retrieve the
19   witness?

20          THE COURT:  That would be great.  Thank you.

21          MS. GERDES:  Your Honor, my plan is to read the
22   stipulation first for the record.

23          MR. BURTON:  Judge, can I retrieve the patient files
24   from the witness box?

25          THE COURT:  You may.  Thank you, sir.

1          (The jury entered the courtroom at 4:42 p.m.)

2               THE COURT:  I understand you have a stipulation you'd

3     like to read?

4               MS. GERDES:  We do, Your Honor.  The government and

5     Defendant Siefert stipulate to the following.

6               THE COURT:  Approach the podium so we can hear you.

7               MS. GERDES:  Sure.  On July 29 of 2020, when Debbie

8     Williams was asked by law enforcement agents about the cocaine

9     in Mr. Casebolt's toxicology report at the time of his death,

10    Ms. Williams said he used it when he was younger, but that he

11    did not show any signs of current use.

12         And at this time, I have some additional certified

13    exhibits I'm going to put in.

14              THE COURT:  What exhibits are we looking at?

15              MS. GERDES:  I'm marking them, Your Honor.

16         Defendant's Exhibit 13 are copies of certified checks.

17         Defendant's Exhibit 14 is a certified business record

18    from Indiana University Health, from IU Health Ball Memorial

19    Hospital.  It gives a date of 3/24/2014 to 6/26/2014.

20              THE COURT:  Are these just records to establish what?

21              MS. GERDES:  I didn't want to testify.  These are

22    employment related records.

23              THE COURT:  Employment related, thank you.

24         Any objection to these, if they have certified -- they've

25    been self-authenticated under 902(11) and 902(13)?

1          MR. LYNCH:  Your Honor, I think I'm seeing some of

2     these records for the first time.  I don't understand the

3     relevance of a 2008 tax return, for example.

4          THE COURT:  Response.

5          MS. GERDES:  It will become very relevant in my

6     summation, Your Honor.  There have been allegations here about

7     money.

8          THE COURT:  That's fine.  As long as it's

9     otherwise -- are you objecting to 14 or 15 or both, Mr. Lynch?

10         MR. LYNCH:  No objection to 13.  Relevance as to 15

11    and relevance as to employment in 2014.

12         THE COURT:  So without objection, 13 will be

13    received.

14         MS. GERDES:  Thank you.

15         THE COURT:  14, over objection, will be received.

16      15, you're only objecting to part of this, correct?  Is

17    that right?  Because it does reference records from later in

18    time than the time you referenced beginning in 2008.

19         MR. LYNCH:  Sure.  Yes, Your Honor.

20         THE COURT:  The partial objection to 15, based on the

21    dates, will be overruled as well.  13, 14, and 15, Siefert

22    exhibits, will be admitted over partial objection.

23         MS. GERDES:  Thank you, Your Honor.

24         THE COURT:  Very well.

25      You may call your next witness.

10-245

1          MS. GERDES:  Your Honor at this time, Defendant
2    Siefert rests.
3          THE COURT:  You're not calling the witness you
4    mentioned?
5          MS. GERDES:  Your Honor, the defense has no burden in
6    this case, and I --
7          THE COURT:  I understand.  We had discussed something
8    at the bench.  You're not planning on addressing that.
9          MS. GERDES:  With these exhibits, Defendant Siefert
10   rests.  I appreciate that.
11         THE COURT:  Fair enough.  I was surprised.
12      Rebuttal?
13         MR. LYNCH:  We have no rebuttal case, Your Honor.
14   Government again rests.
15         THE COURT:  All right.  Well, ladies and gentlemen,
16   all the evidence is in, but what that doesn't mean is you can
17   start talking about the case.  That will happen tomorrow,
18   likely.  I have a matter at 8:00, just like I had last week.
19   I had a hearing at 8:00, unrelated case.  I'm going to do that
20   tomorrow morning.
21      I think what I'll do, I'm probably going to need to
22   discuss the jury instructions with the attorneys.  I'm giving
23   them a draft set after we finish for the day.  I probably need
24   to have a hearing with them in the morning regarding that.
25         So I think from a timing standpoint, rather than have you

1    here at 8:30 or 8:45, probably be here 9:30.  We'll start at

2    9:30.  It may end up being a little later than that.  Who

3    knows, it may not.

4         If we can start at 9:30 with you, my thought process

5    would be I'll give you the jury instructions that tend to be

6    lengthy.  Take about 45 to 50 minutes to get through them all.

7         Then the attorneys will present their closing arguments

8    to summarize the evidence for you that you've heard.  That

9    will take probably the balance of the rest of the morning and

10   into the afternoon so I'm hoping that probably by midafternoon

11   tomorrow, you'll have the case to begin deliberating.

12        Don't do anything beforehand.  That time will come

13   tomorrow.  So we will have you back here at 9:30 in the

14   morning.  Hope you have a good evening.

15        (The jury exited the courtroom at 4:48 p.m.)

16             MS. GERDES:  May I hand the clerk the exhibits?

17             THE COURT:  Sure.

18             MS. GERDES:  This is 12 through 15.

19             THE COURT:  I thought it was 13 through 15.

20             MS. GERDES:  Number 12 is the picture.

21             THE COURT:  Before we take up scheduling, I want to

22   make sure I have a discussion with each of the defendants.  I

23   know you both have retained counsel to represent you.

24        I'll start first with Dr. Siefert because you're the

25   first one on the right.  Have you spoken with your attorneys

1    about your rights to testify, sir?

2              MS. GERDES:  Did you hear?

3              DEFENDANT SIEFERT:  Yes, I did hear you.

4              THE COURT:  Well, you need to answer yes or no.  We

5    don't have the jury here.  I do this with every single

6    defendant in every single case.

7              DEFENDANT SIEFERT:  We have not spoken about it in

8    detail, but we've touched on it.

9              MS. GERDES:  Judge, I'll represent to the Court, over

10   the pendency of this case, we've had numerous discussions

11   about the advantages and disadvantages of Dr. Siefert

12   testifying.  We've had some recent conversations about it even

13   since the trial started.

14        If the Court wants me to touch base with Dr. Siefert on

15   that, because I know our focus has been on the crosses of

16   these witnesses and preparing other things, so everyone is

17   comfortable with the record, I can do that.

18             THE COURT:  You can if you want.  I just usually

19   confirm that they've spoken with their counsel and discussed

20   the pitfalls and potential benefits and risks of testifying,

21   and I just want to make sure that he's, in fact, done that.

22        If you want to do that, that's fine.

23        (Off-the-record.)

24             MS. GERDES:  We're ready, Your Honor.

25             THE COURT:  So, Dr. Siefert, your attorney made a

1      representation that throughout the pendency of the case, you

2      have had kind of discussions about that.  You've been focused

3      on cross-examination, of course, which is not surprising here.

4           But the issue I'm asking you about is if you've had

5      enough time to discuss with your attorney your rights to

6      testify and perhaps not testify.  That's what I'm asking you

7      about.

8           DEFENDANT SIEFERT:  Yes, Your Honor.

9           THE COURT:  And you understand that by not

10     testifying, I will tell the jury -- in fact, we have a draft

11     jury instruction that says that they're not to consider your

12     silence in any way in determining your guilt because you don't

13     have to prove anything.

14          Understand that?

15          DEFENDANT SIEFERT:  Yes, I do.

16          THE COURT:  After having the discussion with your

17     attorney, even today and perhaps before, you all have

18     collectively decided that you're not going to testify; is that

19     right?

20          DEFENDANT SIEFERT:  Yes, sir.

21          THE COURT:  Okay.  Same question for you, Dr. Ehn.

22     Have you had enough time to talk to your attorneys about your

23     rights to testify and not testify?

24          DEFENDANT EHN:  Yes, Your Honor.

25          THE COURT:  And have you gone over with them the

1   benefits and risks involved with testifying?

2          DEFENDANT EHN:  Yes, I have.

3          THE COURT:  And then, also, the benefits and risks

4   with not testifying?

5          DEFENDANT EHN:  Yes, I have.

6          THE COURT:  Mr. Glassman, I take it you have

7   spoken -- you or Mr. Burton -- about that with him previously?

8          MR. GLASSMAN:  Yes, Your Honor.

9          THE COURT:  Okay.  After discussing your Fifth

10   Amendment rights, Dr. Ehn, is it your intention not to testify

11   here?

12          DEFENDANT EHN:  Yes, Your Honor.

13          THE COURT:  Fair enough.  We'll just make sure the

14   record and the minutes can reflect that we went over their

15   Fifth Amendment rights with them.

16      Okay.  The very last stipulation kind of -- my law clerk

17   was IM'ing me about adding the instruction on stipulations.

18   That had not been something we did.  We'll add that to a draft

19   set.  We have a set for you that says draft on it.  It is a

20   draft.

21      I know you all have submitted some proposals, jury

22   instructions.  You submitted a supplemental one this morning

23   that was filed.  I'm not going to prejudge the filing.  I

24   just -- it's a Ninth Circuit case that really doesn't involve

25   jury instructions.  It's just kind of a statement.  I'm not

1    sure if it's the type of thing that I'm likely going to give,

2    but I'll certainly give you a chance to be heard on that

3    tomorrow.

4        I thought we'd have a Rule 30 conference at 8:30, and

5    then we can kind of put on the record any objections you have

6    to the draft set.  I did kind of telegraph this to you last

7    week, Mr. Lynch.  I presume you'll be giving the closings.

8    Maybe not.

9        MR. LYNCH:  I'll be giving one of them, Your Honor,

10   and Ms. Kootman will give the other.

11       THE COURT:  Which one are you going to be giving?

12       MR. LYNCH:  Rebuttal.

13       THE COURT:  That's fine.  As far as the jury

14   instructions go, I mentioned we have *Ruan* on remand, we have

15   *Kahn* on remand, which have opined on the actual propriety of

16   the jury instructions given prior to.  And the instructions

17   that you're going to be getting are different on the 841

18   counts than they were with Suetholz, and I think they are

19   different in a significant way as far as explanatory, what

20   subjective intent is.

21       The magic buzz words that the jury has heard ad nauseam

22   are still in there, but that is not going to be sufficient in

23   and of itself.  So take a look at them.  You can put

24   objections on the record tomorrow.

25       Do you all plan on submitting supplemental instructions,

1          other than the one that was submitted by Mr. Glassman?

2                    MS. GERDES:  I don't believe so, Your Honor.  There's

3          one that we've just been consulting with Mr. Glassman on.  If

4          we are going to propose it, we'll propose it in the morning.

5          It would be very easy.

6                    THE COURT:  It would be helpful to have something --

7                    MS. GERDES:  This evening?

8                    THE COURT:  Frankly, I'll probably have access to

9          my -- I'm not going to be up at 2:00 a.m. like you guys are,

10         preparing your summations, but I need to be ready to rule on

11         those countless objections that we have during closings, which

12         generally are overruled on the basis of not in evidence.  The

13         jury, of course, can consider what the evidence is.  I would

14         just call on the attorneys, reasonable inferences based upon

15         the evidence are one thing.  Misrepresentations of the

16         evidence are yet another.  Given the volume of the evidence,

17         I'm probably going to err on the side of it's probably in

18         there because I don't have specific recollection of everything

19         that every witness said.

20             So having said that, if you all feel like you need to

21         object on behalf of your respective clients, you can object

22         'til the cows come home.  If it's that basis, I'm going to

23         struggle with that because it's been two-plus weeks.

24                    MS. GERDES:  Understood, Your Honor.

25             I have a couple of things I want to clarify to give some

1    bounds for the summation.

2        So with respect to Dr. Siefert's letter to the KBML, I

3    believe that's 301, the Court adopted the government's

4    redactions and rejected Defendant Siefert's.  I want to make

5    sure that means the government is not going to be commenting

6    on the absence of anything related to urine drug testing in

7    that record.

8        THE COURT:  Whatever in that letter that the jury can

9    see, they can comment on.  Whatever is redacted, they can't

10   comment on.

11       MS. GERDES:  That's my exact point.  The jury, if

12   they can't see the redactions, that would not be a fair

13   comment based on what is in evidence.  The jury would not be

14   able to make any assessment whatsoever about that because that

15   would be commenting on a letter when they can't see what else

16   is in it.

17       MR. LYNCH:  Your Honor, there's nothing in the

18   redacted portion of the letter that mentions urine drug

19   testing.

20       THE COURT:  Well, but what do you plan on doing with

21   that?  It was redacted for a reason.  Frankly, the whole

22   reason -- the Judge Sargus case that I relied on, the one

23   about the FAA, and I was recalling this over the weekend, I

24   allowed it -- the portions that I allowed were so that the

25   jury would know it was in response to something.  It wasn't in

1    response to a criminal investigation.

2         I mean, it was a KBML investigation, and a lot of that

3    redacted portion is -- I continue to find, and the record

4    speaks for itself here, but the point that she's raising is a

5    valid one.

6         It's kind of like commenting on something not in

7    evidence.  301, whatever the jury can see, whatever that is in

8    301, both sides can comment on it or not comment on it.  So do

9    you plan on commenting on something that's in the black

10   portions?

11             MR. LYNCH:  No, no, not at all.

12             THE COURT:  Then we shouldn't have a problem.

13             MR. LYNCH:  We are not planning on commenting on

14   anything in the black portions.

15             MS. GERDES:  So that means he will not say to the

16   jury there's no information about urine drug testing in this

17   letter.

18             MR. LYNCH:  But that's not in the black portions.

19             MS. GERDES:  But the jury doesn't independently know

20   that.

21             THE COURT:  What portion is it in?

22             MR. LYNCH:  There's no mention of drug testing at all

23   I think -- I'm guessing in the entirety of the KBML file and

24   certainly not --

25             THE COURT:  Why don't you stipulate to something in

 1    there.

 2              MR. LYNCH:  I'm happy to stipulate.

 3              MS. GERDES:  That would be Mr. Lynch testifying.

 4    That would be Mr. Lynch offering evidence about what either is

 5    or is not in the redacted portion.  That's totally

 6    impermissible.

 7              THE COURT:  Fair.  Why is that permissible for you to

 8    comment on?

 9              MR. LYNCH:  I am not --

10              THE COURT:  Or Ms. Kootman.  I'm focusing on

11    Mr. Lynch because he's standing.

12              MR. LYNCH:  Okay.  I'm not -- sorry.  In the redacted

13    portions of the KBML letter, there is no mention of urine drug

14    testing.

15              THE COURT:  Okay.  Well, are you allowed to say

16    there's nothing in this letter about urine drug testing?

17              MR. LYNCH:  I think that a fair thing to say is

18    Dr. Siefert did not report any problems with urine drug

19    testing to the KBML.  And that's a true statement.  If there

20    were something in the redacted portion of the letter where

21    Dr. Siefert was alerting, you know, the KBML to the urine drug

22    testing scheme as alleged here, that would be a different

23    situation.

24         But that's not in -- that's just not in the letter.  I

25    just -- a fact, an undisputed fact in this case is he did not

1    raise the way urine drug testing was being conducted at --

2         THE COURT:  Again, I kept most of that out because it

3    was self-serving hearsay.

4         MR. LYNCH:  Right.

5         THE COURT:  And it still is, in my view.  But

6    commenting on something that's not in something, how is that

7    ever proper?

8         MR. LYNCH:  The absence of -- it's inconsistent with

9    what he was saying to other witness, right?  For example,

10   Jeanette Corley testified that Dr. Siefert, at the time or

11   close to the time that he was leaving Northern Kentucky Center

12   for Pain Relief, he said to her, you know, the way -- I'm not

13   going to be able to quote chapter and verse, but the way urine

14   drug testing is being conducted is improper.  Says that to

15   her, makes the statement to her, not a regulator.

16        The fact that he is willing to make that statement to her

17   and doesn't make that statement to somebody else, to a

18   regulator who is actually -- you know, would have authority to

19   look into that, that's permissible.  I mean --

20        THE COURT:  I'm not going to allow you to do that.

21        MR. LYNCH:  All right.

22        THE COURT:  It helps from a planning standpoint.

23        Now, you've won one on this.  We're not going to go into

24   the 10 or 12 different things, unless you have a list of

25   things.

1        MS. GERDES:  I have just another thing that I'm

2   trying to -- because I don't want there to be lots of

3   objections.  I think summations go much better --

4        THE COURT:  I agree.

5        MS. GERDES:  -- when everyone understands the scope

6   of proper summations.

7        THE COURT:  I always hated when people would object

8   when I was closing, but I would wait until the judge ruled.

9      Go ahead.

10        MS. GERDES:  So there's evidence before the jury

11   related to four deceased patients, and there is not a shred of

12   evidence that the clinic was aware that those four patients

13   died.

14        THE COURT:  And the jury instruction reflects that to

15   the extent that they didn't know about it, they are not to

16   consider that evidence.

17        MS. GERDES:  So what arguments -- we all know.  We

18   all sat through this whole trial.  There is no evidence at all

19   in this case that the clinic was aware of four of the deaths.

20   So I am just trying to understand what proper argument the

21   prosecution could possibly make related to that evidence.

22      I don't think any of us necessarily want this case coming

23   back.  So there were two cases just on Friday reversed by a

24   judge that the ARPO prosecutors have done, and part of the

25   basis for the reversal was improper comments --

1           THE COURT:  At the Court of Appeals?

2           MS. GERDES:  It was by Judge Watson in the Southern

3   District of Ohio.  Improper comments on summation.  I cannot

4   conceive of a proper comment related to the deaths of those

5   four patients --

6           THE COURT:  Which four?

7           MS. GERDES:  It would be Barbara Works, James Stima,

8   Judy Stewart, and Gary Bitter.

9           THE COURT:  So we have Taylor and Casebolt, there is

10  some evidence in the record to establish there was some

11  knowledge of that?

12          MS. GERDES:  Taylor and Ilg, I'll concede that.  In

13  Casebolt --

14          THE COURT:  At least have that little notation.

15          MS. GERDES:  Exactly.  So I won't make an argument on

16  that.  Let them do what they think is proper as to that.  You

17  have my objection as to the death evidence in general.  As to

18  the other four, there's not a shred of evidence before the

19  jury.

20          MR. LYNCH:  Response, Your Honor?

21          THE COURT:  Go ahead.  You've got me doing it now.  I

22  feel like Atticus Finch.

23          MR. LYNCH:  I've actually been criticized for too

24  many --

25          THE COURT:  You don't have to be criticized.  My wife

1     says, why are you using your hands so much?  And I tell her.

2        Go ahead.

3           MR. LYNCH:  The paper record establishes knowledge,

4     like notice of those -- of the three deaths that Ms. Gerdes is

5     talking about.

6           THE COURT:  What about the other four?

7           MR. LYNCH:  The other four, here's what we have.

8           THE COURT:  There's a lot of evidence --

9           MR. LYNCH:  There's a --

10        (Indiscernible crosstalk.)

11           THE COURT:  -- deaths.

12           MR. LYNCH:  Mark Jackson, Karla Cox, Mary Compton,

13    they all -- at least those three.  I might be missing somebody

14    else.  They all said we were aware of patient deaths.

15           THE COURT:  Plural.  But they -- just saying "deaths"

16    and then throwing a bunch of stuff at the jury, are you hoping

17    that they'll say, well, there's been four deaths.  He may not

18    have known about it, but that's really bad.  We're going to

19    convict them because four people died.  That would be

20    improper.

21           MR. LYNCH:  No, no.

22           THE COURT:  I'm allowing it for a limited purpose.

23    The jury instructions that you're getting set forth that

24    limited purpose.

25           MR. LYNCH:  Right.  And it's grounded -- you know,

1    the proposals that we've made are grounded in Judge Bell, a

2    distinguished jurist on the Tenth Circuit talked about a way

3    to prove an 841 conspiracy in a --

4            THE COURT:  If they know about it.  They have to know

5    about it, don't they?

6            MR. LYNCH:  Yeah, but we should be allowed -- at the

7    very least, Your Honor, we should be allowed to talk about the

8    testimony of these three witnesses was they were aware of the

9    deaths, and they didn't do anything.

10           THE COURT:  Aware of the deaths, specifically aware

11   of these deaths -- look, I'm in Day 10 of a three-week trial.

12   We set aside 14 days.  I'm trying to make sure we can keep the

13   train on the tracks, to use a word from a former colleague of

14   mine who has now passed on.

15       Ms. Gerdes raises a legitimate issue with commenting on

16   things that might perhaps lead a reviewing court to reverse.

17   I don't think anybody wants that.  You have evidence that they

18   knew, at least, of two of the deaths.  "They" being the

19   clinic.

20           MR. LYNCH:  Three.

21           THE COURT:  Whether it was at the PR meeting where it

22   was discussed, CYA, this type of thing, as you've

23   characterized it.  Or perhaps the seminal -- sentinel event

24   that was discussed by Dr. Thomas, as I recall.

25       I think the patient death issue, the Court's pretrial

1    ruling, the Court's ruling during the trial, the fact that I

2    gave a limiting instruction, I'm giving another instruction, I

3    think it's important that the parties point to specific

4    evidence regarding specific deaths because otherwise -- what

5    we don't want is the jury to make their decision based upon

6    something other than that -- to decide the case based on

7    something that would be impermissible.

8        If they talked about Stima back there, you know what?  I

9    couldn't remember if it was Stima or somebody else.  He was a

10   patient death, but the jury instruction says right here, it

11   says -- this may not be the exact final instruction.  I'm

12   using the draft one.  It says, if the defendant did not know

13   about certain evidence of deaths, then such evidence is not

14   relevant to that defendant's knowledge, and I instruct you to

15   disregard such evidence if that were to be the case.

16       Now, I'm giving that because I want them to understand

17   that if they didn't know about it, they're to disregard that.

18   I'm telling them that in this instruction.  So I think you're

19   probably safer if you focus on those deaths to which they have

20   knowledge.

21       MR. LYNCH:  Sure.  Okay, Your Honor.  You know what?

22   We will agree to that.

23       THE COURT:  I think that avoids them having to focus

24   on this last line of this instruction.

25       MR. LYNCH:  Okay.  So then I think just to clarify,

1   right, we will still talk about -- there's a difference,

2   right --

3           THE COURT:  You can mention patient deaths, clearly,

4   but then specifically boom, boom, boom.

5           MR. LYNCH:  Right.  For example, there's three 841

6   counts for Gary Bitter.  I think, as I understand the Court's

7   ruling, we won't mention the death of Gary Bitter in the

8   summation, but we will obviously talk about, you know, he

9   shouldn't have gotten these controlled substance prescriptions

10  because of A, B, C.

11          THE COURT:  Sure.  That's certainly permissible.

12  Absolutely.  Otherwise, you -- and frankly, look, that's fine.

13      What else?  Anything else?

14          MS. GERDES:  No.  Just for purposes of the record,

15  Your Honor, given that we all concede that there's no evidence

16  related to knowledge with respect to four of the patient

17  deaths, we would move to strike all of that testimony.

18      In the event that the Court is not going to grant that, I

19  believe that we need to, for purposes of the record, move for

20  a mistrial because I don't think there's any instruction that

21  the Court could give this jury that would cure the prejudice

22  of having the number of uncharged patient deaths and the

23  amount of testimony that was devoted to that and the family

24  members of all those people.  I don't think that there's

25  anything the Court can say that unrings that bell.

1              THE COURT:  Response?

2              MR. LYNCH:  First of all, there's been extensive

3    testimony, two experts on this talking about whether or not

4    there's a connection between the deaths.  I mean, this has

5    been a heavily litigated issue.  There's evidence on both

6    sides here about the connection between a specific

7    prescription and an overdose death.

8         There's also evidence -- we have a situation, right,

9    where a number of witnesses over a long period of time knew

10   about, talked about how they knew about deaths.

11        We also have something that's very important here we're

12   not talking about, which is evidence of incentive to conceal,

13   right?  There's the letter from the KBML that says I knew of

14   no patient overdose deaths.

15        If you're willing to say that, make that false statement

16   in a record, well, then, we also, you know, have to, you know,

17   consider the fact that, like, you're not going to create a

18   paper record of that, Your Honor.  I mean, this is not -- this

19   is an issue that, you know, we litigated pretrial that, you

20   know, we had a basis in law to bring it.  I just disagree.

21             THE COURT:  The oral motion for a mistrial on the

22   basis that the jury's heard evidence regarding patient deaths

23   to which the defendants didn't have any knowledge, I'm going

24   to deny that.  The motion to strike that testimony is also

25   going to be denied.

1      The response to the information contained in Government

2   Exhibit 301, with respect to what Dr. Siefert may or actually

3   penned in his letter to the KBML investigator, Mr. Marshall,

4   that evidence is -- there certainly was a reason why that

5   evidence was elicited.  So your two oral motions, one for a

6   mistrial and one to strike, are going to be denied.

7      Anything else as far as kind of setting up maybe buoys

8   for cross-examination [*sic*]?  If you feel like you need to

9   object, object.

10      I prefer, and I think you all would prefer not to have

11   objections.  I agree with Ms. Gerdes.  Having made hundreds of

12   closing arguments in my life before I put on this black robe,

13   I didn't like to be interrupted either.

14      Mr. Glassman.

15      MR. GLASSMAN:  For the record, no further argument.

16   Defendant Ehn joins Defendant Siefert's two objections.

17      THE COURT:  Very well.

18      MR. LYNCH:  The only other thing to bring up, I know

19   we had a slight difficulty with demonstratives earlier in the

20   week.  Is the defense planning on using slides for closing?

21      MS. GERDES:  Yes.

22      THE COURT:  Are you planning on using slides?

23      MR. LYNCH:  We are planning on using slides.

24      THE COURT:  As long as it's fair commentary or

25   inference based upon evidence, you can use demonstrative.

1      Now, the demonstrative slides you're using in a

2  PowerPoint or whatever you're planning on using are not going

3  back to the jury unless they -- well, they're not going back

4  to the jury.  If you are using exhibits that are referenced in

5  the demonstratives, they will go back to the jury.

6          MR. LYNCH:  Okay.  I just --

7          THE COURT:  I don't think it's necessary to exchange

8  that prior to closings.  If there's something that's not in

9  evidence, you run the risk of putting something before the

10  jury, objection sustained, and then you will have egg on your

11  face.  I don't think anybody here is going to run that risk.

12          MR. LYNCH:  What we'd done in the Suetholz trial with

13  Mr. Wicker, and I thought this was the custom, was shortly

14  before the closing, just show a copy of the slide.  I mean, I

15  think that Mr. Wicker adopted that.

16          THE COURT:  That's Mr. Wicker.

17          MR. LYNCH:  All right.

18          THE COURT:  I'm not going to require these lawyers to

19  do what Mr. Wicker did.

20          MR. LYNCH:  Fair enough.  Thank you.

21          THE COURT:  If you want to give them yours and they

22  don't want to give you theirs, that's up to you.

23          MR. LYNCH:  Fair enough, Your Honor.

24          THE COURT:  Timing-wise, 8:30 for the charge

25  conference, and then you can make whatever objections you

1    have.  I'll rule on those objections, if you have any, and

2    then we'll proceed right into closings, maybe after a brief

3    recess.  No earlier than 9:30.

4         Timing-wise, my general rule is ten minutes a day for

5    closings.  That's, of course, a guideline.  It's not a rule.

6    Use some of the language we've heard during the trial.

7         I mentioned two hours, but then when I said that, that's

8    12 days at ten minutes a day.  I was thinking more 90 minutes

9    for a case like this.

10             MS. GERDES:  Judge, I would appreciate if you just

11    gave us the two hours.  I believe mine will be less time, but

12    just for sanity's sake tonight.  I know we had ten solid days

13    of testimony, but there are a lot exhibits that went into

14    evidence so I don't think that really accurately reflects the

15    bulk of information that's before the jury.  So I would ask

16    for two hours.

17             THE COURT:  Mr. Glassman.

18             MR. GLASSMAN:  I think that if you have an upper

19    limit of two hours, we'll do our very best to come in under

20    that.

21             THE COURT:  If I'm a betting man, I bet the under?

22             MR. GLASSMAN:  Yeah, bet the under.  I don't think

23    we'll have an opportunity, necessarily, to moot it and give

24    you a very clear number.

25             THE COURT:  I understand.  We'll get the case to the

1  jury close of business tomorrow, then.  I'll leave it to them

2  whether they want to stay and deliberate.

3      We'll go from there.  Anything else before we break?

4          MR. LYNCH:  Your Honor, we had two hours.  How do --

5          THE COURT:  90/30.

6          MR. LYNCH:  90/30, okay.

7          THE COURT:  30 minutes is the most fun you'll have as

8  a lawyer.  I used to always enjoy rebuttal closing.  The

9  former prosecutors are shaking their head.  That was fun.

10     We'll see you back here at 8:30.  If you have a

11 supplemental instruction -- I use that singular because of

12 what you all said -- I'd appreciate you filing it just as soon

13 as you can, any supplemental instructions by you that you

14 anticipate.

15         MR. LYNCH:  I'd like to digest the one filed this

16 morning, but we don't anticipate any supplemental

17 instructions.

18         THE COURT:  Okay, great.  See you back here at 8:30

19 in the morning.

20     One thing my court reporter just mentioned, usually we

21 try to go straight through all the closings without a break.

22 Timing-wise, I think what we're going to need to do is take

23 the United States' opening closing -- that we'll get to at

24 maybe 10:30.  Probably take the initial opening of

25 Ms. Kootman, break for lunch, and then come back.  I don't

10-267

1    want to make the jury sit all day without having lunch.

2              MS. GERDES:  Sounds good.

3              THE COURT:  Wanted to let you know for scheduling.

4         We'll be in recess.

5         (Proceedings concluded at 5:17 p.m.)

6                        - - -

7                   C E R T I F I C A T E

8              I, LISA REED WIESMAN RDR-CRR, certify that the
     foregoing is a correct transcript from the record of
9    proceedings in the above-entitled case.

10

11   _/s/ Lisa Reed Wiesman_              ___June 8, 2023___
     LISA REED WIESMAN, RDR-CRR          Date of Certification
12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

10-268

INDEX

**DEFENDANT SIEFERT WITNESSES**

JAMES MURPHY, M.D.
Direct Examination.............................. Page 5
Cross-Examination............................... Page 60
Cross-Examination (Continued)................... Page 130
Redirect Examination............................ Page 166
Recross-Examination............................. Page 170

- - -

**DEFENDANT EHN WITNESSES**

COLIN COVEY
Direct Examination.............................. Page 112
Cross-Examination............................... Page 116

DALE DEXTER
Direct Examination.............................. Page 174
Cross-Examination............................... Page 194
Cross-Examination............................... Page 194
Redirect Examination............................ Page 198

VICKI SEBASTIAN
Direct Examination.............................. Page 199
Cross-Examination by Ms. Kootman................ Page 233
Cross-Examination by Ms. Gerdes................. Page 235

- - -

**DEFENDANT SIEFERT EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 7d | Various discharge letters | 3/10/23 | 4 |
| 12 | Photo | 236 | 236 |
| 13 | Copies of certified checks | 243 | 244 |
| 14 | Certified records from Indiana University Health | 243 | 244 |
| 15 | Various tax documents for Dr. Siefert | 244 | 244 |

- - -

1

**INDEX** (continued)

**DEFENDANT EHN EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---------|-------------|-----------|----------|
| 8 | DASH Lab contract | 182 | 182 |
| 9 | DASH Lab invoices | 192 | 192 |
| 46 | 1/1/20 e-mail from Passport to Wildt | 204 | 205 |
| 47 | NKYCPR Services Agreement | 206 | 207 |
| 5a-5e | COLA certificates | 211 | 212 |
| 6a-6d | API certificates | 212 | 212 |
| 4a-4e | CLIA certificates | 212 | 212 |
| 2a-2n | Photos | 223 | 223 |
| 48 | Photo | 232 | 232 |
| 49 | Photo | 232 | 233 |
| 50 | Photo | 233 | 233 |

- - -